IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

POWEROASIS, INC. and, )
POWEROASIS NETWORKS, LLC )
)
Plaintiff, )    04-12023 RWZ
)
v. )    Civil Action No. _____
)
WAYPORT, INC. )
)
Defendants. )

MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION

CONTENTS

I.   STATEMENT OF FACTS ............................................. 2

     A.  PowerOasis, Inc. and PowerOasis Networks, Inc............. 2
     B.  Wayport's Massachusetts Activities ....................... 3
     C.  Wayport's Airport Internet Access Service ................ 3
     D.  Wayport's Equipment And Service Providing
         Internet Access .......................................... 4
     E.  Competition and Irreparable Harm ......................... 7

II.  APPLICABLE LAW .................................................. 9

     A.  Requirements for Preliminary Injunctive Relief ........... 9
     B.  Legal Requirements for Infringement Liability ............ 11
         1.  Components of a Patent ............................... 11
         2.  Patent Infringement Analysis ......................... 13
             a.  Claim Construction ............................... 13
             b.  Comparison of Construed Claims to
                 the Accused Device or Method ..................... 16
                 (1)  Literal Infringement ........................ 16
                 (2)  Doctrine of Equivalents ..................... 16

III. ARGUMENT ........................................................ 17

|   |    |                                                                                   |    |
|---|----|-----------------------------------------------------------------------------------|----|
|   | A. | Plaintiffs Have Proven a Reasonable Likelihood of Success ....................... | 17 |
|   |    | 1.  Claim Construction ...............................                            | 17 |
|   |    |     a.  The Preamble .............................                               | 19 |
|   |    |     b.  Limitations [a] – [f] ........................                            | 22 |
|   |    | 2.  Comparison of Claim 1 to Wayport's Wired and Wireless Internet Access Service | 28 |
|   | B. | Plaintiffs are Suffering Irreparable Harm Because Of Wayport's Infringing Conduct | 31 |
|   | C. | The Balance of the Harm Tips in Favor of Plaintiffs .......                       | 32 |
|   | D. | The Public Interest Favors a Preliminary Injunction .......                       | 33 |
| IV. | CONCLUSION................................................................                              | 34 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| POWEROASIS, INC. and <br> POWEROASIS NETWORKS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> WAYPORT, INC. <br><br> Defendant. | Civil Action No. _____ |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The Plaintiffs, PowerOasis, Inc., and PowerOasis Networks, LLC, seek an order, in the form submitted with this motion, preliminarily enjoining the defendant, Wayport, Inc., from continuing to provide wireless and wired Internet access in airports, hotel rooms and lobbies, and other public places, because Wayport's Internet access service infringes U.S. Patent No. 6,466,658 B2, issued October 15, 2002 (the " '658 patent"), and U.S. Patent No. 6,721,400 B2, issued April 13, 2004 (the " '400 Patent"), of which PowerOasis Networks, LLC, is the assignee and PowerOasis, Inc., is the exclusive licensee. A preliminary injunction should be granted by this Court, because (1) Plaintiffs have a reasonable likelihood of success on the merits; (2) Plaintiffs are sustaining and will sustain irreparable harm absent an injunction; (3) the balance of hardships tips in favor of Plaintiffs; and (4) the public interest favors an injunction.

The evidentiary basis supporting the present motion is set forth in the Affidavits of Thomas M. Duff, Jr., William S. Joransen, Charles C. Schelberg, and Sibley P. Reppert that are submitted with this Memorandum.

## I. STATEMENT OF FACTS

### A. PowerOasis, Inc. and PowerOasis Networks, LLC

1. PowerOasis, Inc., is a privately held company incorporated in the state of New Hampshire with its principal place of business in Nashua, New Hampshire that was formed in 1997. Power Oasis Networks, LLC, is a New Hampshire limited liability company with its principal offices in Nashua, New Hampshire. (Duff Aff. ¶1)

2. PowerOasis provides wired and wireless Internet and other telecommunications channel access to members of the public in airports and other public places. (Duff Aff. ¶2)

3. PowerOasis presently provides Internet access in twenty-one airports located in sixteen different states and in eight public buildings in other public facilities located in five states. (Duff Aff. ¶3)

4. PowerOasis' service is covered by four United States patents of which PowerOasis Networks, LLC, is the assignee and PowerOasis, Inc., is the exclusive licensee: U.S. Patent Nos. 5,812,643; 6,314,169 B1; 6,466,658 B2; and 6,721,400 B2. A copy of U.S. Patent No. 6,466,658 B2 (the " '658 patent") is attached to the Duff Affidavit as Exhibit 1, and a copy of U.S. Patent No. 6,721,400 B2 (the " '400 patent") is attached to the Duff Affidavit as Exhibit 2. The '658 and '400 patents are for the vending of telecommunications channel access to customers, such as wired or wireless Internet

access by customers using laptop computers in airports and other public places. (Duff Aff. ¶4)

### B. Wayport's Massachusetts Activities

5.  Wayport, Inc. ("Wayport") is a company that identifies its headquarters as being in Austin, Texas and that provides high-speed wireless and wired Internet access in hotels and airports. (Duff Aff. ¶5 and Exhibit 3; www.wayport.com).

6.  According to its website, Wayport provides high-speed Internet access to customers in at least twenty-one hotels in Massachusetts. (Duff Aff. ¶7 and Exhibit 4)

7.  On May 24, 2004, Wayport provided wireless Internet access to a customer in the lobby of the Wyndham Boston Hotel located at 89 Broad Street, Boston, Massachusetts on a daily "pay as you go" basis for a fee of $6.95. (Duff Aff. ¶s 12-22 and Exhibits 9-19)

8.  On June 3, 2004, Wayport provided wired Internet access to a customer in a hotel room of the Wyndham Hotel in Andover, Massachusetts, on a daily "pay as you go" basis for a fee of $9.95. (Duff Aff. ¶s 23-30 and Exhibits 20-27)

### C. Wayport's Airport Internet Access Service

9.  Wayport provides both wired and wireless Internet access to customers in airports. (Joransen Aff. ¶s 3-21 and Exhibits 1-17)

10. According to its Website, Wayport provides wireless Internet access in at least seven airports in the United States and also provides "Wayport Internet Business Centers" in at least six airports in the Unites States. (Duff Aff. ¶s 5, 7 and Exhibits 3, 4)

3

11. On June 26, 2004, Wayport provided wired Internet access to a customer on a daily "pay as you go" basis at a "Laptop Lane" booth in Cincinnati/Northern Kentucky International Airport. (Joransen Aff. ¶s 4-12 and Exhibits 1-8)

12. On June 26, 2004, Wayport provided wireless Internet access to a customer on a "pay as you go" basis at Dallas - Ft. Worth International Airport. (Joransen Aff. ¶s 13-21 and Exhibits 9-15)

### D. Wayport's Equipment And Service Providing Internet Access

13. Every element of Claim 1 of the '658 patent, and every element of Claim 1 of the '400 patent, is found in Wayport's wired and wireless equipment and service.

14. With reference to Claim 1 of the '658 patent and Claim 1 of the '400 patent[1], the Wayport wired and wireless equipment and service provides Internet access on a "pay as you go" basis, and constitutes a "vending machine for vending telecommunications channel access to a customer" as set forth in the preamble to Claim 1 of the '658 patent and Claim 1 of the '400 patent. This is shown, for example, by the Internet access that Wayport provided to Mr. Duff and Mr. Joransen in the Wyndham Boston Hotel lobby in Boston, Massachusetts, in the Wyndham Hotel in Andover, Massachusetts, in the Cincinnati/Northern Kentucky International Airport, and in the Dallas – Ft. Worth International Airport. (Duff Aff. ¶s 12-30, 33 and Exhibits 9-27; Joransen Aff. ¶s 4-21 and Exhibits 1-15)

15. The Wayport equipment and service includes "a payment mechanism for receiving payment from the customer," as stated in the first element of Claim 1 of the

---

[1] For the convenience of the Court, a table showing the elements of Claim 1 of the '658 patent and Claim 1 of the '400 patent is set forth on page 18 below. While this Memorandum addresses Wayport's infringement of independent Claim 1 of these patents, additional dependent claims are also infringed by the same activities.

4

'658 patent, and "a payment mechanism for obtaining information from the customer to initiate a vending transaction," as stated in the first element of Claim 1 of the '400 patent. This is shown, for example, by the Web pages displayed on the customer's laptop computer that request and permit the customer to input credit card information, combined with the equipment for transmitting that information to and through the credit card processing system by means of which the customer's credit card purchase of Internet access is approved. (Duff Aff. ¶s 12-19, 23-28, 34-35 and Exhibits 9-14, 21, 24-27; Joransen Aff. ¶s 4-12, 14-18 and Exhibits 6-8, 10-14)

16. The Wayport equipment and service includes "a customer interface for indicating the status of said vending machine," as stated in the second element of Claim 1 of the '658 and '400 patents. This is shown, for example, by the various screens of information from the Wayport equipment that are displayed on the customer's laptop computer (shown in Exhibits 9-18, 21-26 to the Duff Affidavit, and Exhibits 6-8, and 10-15 to the Joransen Affidavit), including, for example, the screens shown in Exhibits 18 and 26 (Duff Aff.) and Exhibits 8 and 14 (Joransen Aff.) informing the customer: "You are now connected to the Internet." (Duff Aff. ¶36)

17. The Wayport equipment and service includes "an electronic circuit for determining when the vending transaction is completed" as stated in the third element of Claim 1 of the '658 and '400 patents. This is shown, for example, in (a) the electronic circuit for Wayport's "pay as you go" service that terminated Mr. Duff's wireless Internet access at the Wyndham Boston Hotel, ending at 12:00 AM on May 26, 2004 (Duff Aff., Exhibit 11); (b) the electronic circuit for Wayport's "pay as you go" service that terminated Mr. Duff's wired Internet access at the Wyndham Hotel in Andover,

Massachusetts, at 2:59 PM on June 4, 2004 (Duff Aff., Exhibits 24, 25); (c) the electronic circuit for Wayport's "pay as you go" service that terminated Mr. Joransen's wired Internet access at the Cincinnati/Northern Kentucky International Airport at 3:00 AM on June 27, 2004 (Joransen Aff., Exhibit 7); and (d) the electronic circuit for Wayport's "pay as you go" service that terminated Mr. Joransen's wireless Internet access at Dallas – Ft. Worth International Airport at 12:00 AM on June 27, 2004. (Joransen Aff., Exhibit 12; Duff Aff. ¶37)

18.   The Wayport equipment and service includes "a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction," as stated in the fourth element of Claim 1 of the '658 and '400 patents. This is shown, for example, in the wireless access point/router or wired router networked to an authorization/billing server to enable access to an external telecommunications channel for access to the Internet with a routable IP address at the beginning of a vending transaction and disabling access at the end of the vending transaction. (Duff Aff. ¶s 31-32, 38 and Exhibits 5, 7-8, 20, 25-27; Joransen Aff. ¶s 4-20 and Exhibits 7, 8, 10, 15)

19.   The Wayport equipment and service includes "a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling a connection to an external telecommunications device of the customer," as stated in the fifth element of Claim 1 of the '658 and '400 patents. This is shown, for example, in the wired or wireless connection between the customer's laptop computer

and the Wayport equipment that provides a telecommunications channel access circuit for access to the Internet. (Duff Aff. ¶s 13-14, 23-25, 39 and Exhibits 7, 8; Joransen Aff. ¶s 5, 8, 14 and Exhibit 5)

20. The Wayport equipment and service includes "a control unit having a storage device for storing payment information received from the customer and for controlling said electronic circuit and said telecommunications channel access circuit," as stated in the sixth element of Claim 1 of the '658 patent, and a " control unit having a device for receiving payment information from the customer and for controlling said electronic circuit and said telecommunications channel access circuit," as stated in the sixth limitation of Claim 1 of the '400 patent. This is shown, for example, in the authentication server that receives a customer's payment information and authorizes access to the Internet through a Wayport wireless access point or wired access router. (Duff Aff. ¶s 40-41)

### E.  Competition and Irreparable Harm

21. PowerOasis and Wayport compete directly in airports and elsewhere for customers who wish to obtain wired or wireless Internet access using their laptop computers. (Duff Aff. ¶6; Joransen Aff. ¶s 3, 22-28)

22. Wayport competes directly with PowerOasis for the business of providing wired Internet access in Dallas – Ft. Worth International Airport. (Joransen Aff. ¶22)

23. PowerOasis began installing its wired Internet access vending units at Dallas – Ft. Worth Airport in December, 1999, and installed 31 wired Internet access vending units there. (Joransen Aff. ¶23)

7

24. Wayport announced its wireless Internet access offering by press release dated July 20, 2000. (Joransen Aff. ¶24, Exhibit 16)

25. The number of PowerOasis wired Internet access terminals at Dallas – Ft. Worth International Airport has dropped from 30 to 11 vending units within the past 12 months. (Joransen Aff. ¶25)

26. In March, 2002, PowerOasis was in discussions to provide Internet telecommunications access at Cincinnati/Northern Kentucky International Airport, and began devising service architecture. (Joransen Aff. ¶26)

27. Wayport announced its acquisition and opening of Laptop Lane business centers in Cincinnati/Northern Kentucky International Airport on February 13, 2002. (Joransen Aff. ¶27, Exhibit 17)

28. Subsequently, PowerOasis was informed that the Cincinnati/Northern Kentucky International Airport was not going to use PowerOasis. (Joransen Aff. ¶28)

29. PowerOasis and PowerOasis Networks, LLC have suffered, and continue to suffer, irreparable harm because of conduct by Wayport that infringes at least Claim 1 of the '658 and Claim 1 of the '400 patent. In particular, Wayport has deprived PowerOasis of the ability to sell and expand its services in airports and in other locations, including hotels, to an extent that cannot be calculated, but that has severely hampered PowerOasis in its effort to expand its business. (Duff Aff. ¶42; Joransen Aff. ¶29)

30. Unless a preliminary injunction is granted, Wayport will continue to infringe the '658 and '400 patents and will continue to cause irreparable harm to Plaintiffs. (Duff Aff. ¶43)

## II. APPLICABLE LAW

### A. Requirements for Preliminary Injunctive Relief

In patent cases such as this, the law of United States Court of Appeals for the Federal Circuit governs motions for preliminary injunctive relief. *Texas Instruments, Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1328 (Fed. Cir. 2000).

As patentee, PowerOasis is entitled to a preliminary injunction if it shows the following four factors.

  (1) a reasonable likelihood of success on the merits;

  (2) irreparable harm absent in an injunction;

  (3) the balance of hardships tips in its favor; and

  (4) that the public interest favors an injunction.

*Tate Access Floors v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1364-5 (Fed. Cir. 2002) (affirming grant of preliminary injunction). The grant of a preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer. *H.H. Robertson co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987).

In showing a likelihood of success on the merits, the patentee is entitled to a presumption that the patent in suit is valid. This presumption acts as a procedural device which places the burden of going forward with evidence and the ultimate burden of persuasion of invalidity at trial on the alleged infringer. Unless the alleged infringer undertakes to challenge validity with evidence, the patentee need do nothing to establish its rights under the patent. *New England Braiding Co., v. A.W. Chesterton Co.*, 970 F.2d. 878, 882 (Fed. Cir. 1992). Because an issued patent is presumed to be valid, 35 U.S.C.

§282, the evidentiary burden to show facts supporting a conclusion of invalidity is clear and convincing evidence. *Oakley, Inc. v. Sunglass Hut International*, 316 F.3d 1331, 1335 (Fed. Cir. 2003) (affirming grant of preliminary injunctive relief).

If the patentee clearly establishes that it has a reasonable likelihood of success on the merits on the issue of infringement, it is entitled as well to a rebuttable presumption of irreparable harm. *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996). The presumption of irreparable harm acts as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer. Id. At 974. Factors contributing to an analysis of irreparable harm include loss of revenue and good will. *Bio-Technology General Corp. v. Genentech*, 80 F.3d 1553, 1556 (Fed. Cir. 1996). The nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is the right to exclude. *H.H. Robertson Co., Inc., supra*, 820 F.2d at 390. Merely asserting that it would have sufficient funds to answer for the patentee's future losses does not sustain the accused infringer's burden to rebut the presumption of irreparable harm:

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one seller by legal fiat. Requiring purchasers to pay higher prices after years of lower prices to infringers is not a reliable business option.

*Polymer Technologies, supra*, 103 F.3d at 975-976. Mere "potential loss of market share" has been found to indicate irreparable harm. *Canon Computer Sys. V. Nu-Kote Int'l*, 134 F.3d 1085, 1090 (Fed. Cir. 1998).

In balancing the hardships, the magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of the likelihood of success, against the injury to the accused infringer. *H.H. Robertson Co., Inc.*, supra, 820 F.2d at 390. It is not a prerequisite to the awarding of a preliminary injunction that the district court expressly find that the balance of hardships tips in favor of the moving party. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed. Cir. 1988).

Upholding the exclusive rights of a patentee is in the public interest. See *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63, 142 L.Ed. 2d 261, 119 S. Ct. 304 (1998) ("The patent system represents a carefully crafted bargain that encourages both the creation and public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time."); *Eli Lilly & Co. v. Premo Pharm. Labs, Inc.*, 630 F.2d 120, 138 (3rd Cir. 1980) ("Congress has determined that it is better for the nation in the long run to afford the inventors of novel, useful and nonobvious products short-term monopolies on such products than it is to permit free competition in such goods."). The focus of the court's public interest analysis should be whether there is some critical public interest – such as public health – that would be injured by the grant of preliminary relief. *Hybritech*, supra, 849 F.2d at 1458.

### B. <u>Legal Requirements for Infringement Liability</u>

#### 1. <u>Components of a Patent</u>

A United States patent includes several parts. It commences with an "abstract," followed by drawings and written text called the "specification," which concludes with numbered claims. The specification typically includes a description of the field of the

invention and of the prior art, a summary of the invention, a brief discussion of the drawings, and a detailed description of the invention. 35 U.S.C. § 112, ¶1.

The claims of a patent define what is patented, and thus the patent holder's right to exclude others. 35 U.S.C. §112, ¶2; *SRI International v. Matsushita Elec. Corp.*, 775 Fed. 2d 1107, 1121 (Fed. Cir. 1985)(en banc).

Claims typically commence with a "preamble," which generally introduces the invention being claimed, followed by a transition such as "comprising" to introduce the elements or limitations of the claim. The limitations are normally set forth in separate paragraphs identified by letter, and often include sub-paragraphs.

The preamble does not usually constitute a limitation of the claim, but it can constitute a limitation when it must be referred to in order to gain a full understanding of the invention being claimed. *Catalina Marketing Int'l, Inc. v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002). If the preamble merely states the intended use or purpose of the invention, it does not limit the scope of the claim. *C.R. Bard, Inc. v. M3 Sys.,Inc.*, 157 F.3d 1340 (Fed. Cir. 1998). A phrase in the preamble providing a descriptive name to the set of limitations in the body of the claim that completely set forth the invention does not constitute a claim limitation. *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000); *Intirtool, Ltd v. Texar Corp*; 2004 U.S. App. LEXIS 9055 (Fed. Cir. 2004) (District court erred by interpreting preamble of claim stating, "hand-held pliers for simultaneously punching and connecting overlapping sheet metal such as at the corners of overlapping ceiling tile grids," as a limitation of the invention). However, when the preamble serves to "give life, meaning and validity" to

the claim and to define the invention, it constitutes a limitation of the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 2000).

### 2. Patent Infringement Analysis

A patent infringement analysis involves two steps: (a) construction of the patent claim at issue, followed by (b) a comparison of the claim thus construed to the accused device. *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). The former is a question of law for the court, while the latter is a question of fact for the jury (or for the court in a jury-waived trial). *Markman v. Westview Instruments*, 517 U.S. 370, 384-391 (1996); *Catalina Marketing Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002).

#### a.  Claim Construction[2]

No reference to the accused device should be made during the claim construction step. *Young Dental Mfg. Co. v. Q3 Special Products, Inc.*, 112 F.3d 1137 (Fed. Cir. 1997). It is only after the claims have been construed without reference to the accused device that those claims, so construed, are applied to the accused device to determine infringement. *SRI International*, 775 F.2d at 1118.

The Federal Circuit recently explained the claim construction process, as follows

> We begin our claim construction analysis with the words of the claim. See *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996. In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves.

---

[2] The U.S. Court of Appeals for the Federal Circuit released an en banc order on July 21, 2004 that has potentially important consequences for claim construction. In *Phillips v. AWH Corp.*, 2004 U.S. App. LEXIS 15065 (Fed. Cir. 2004), the Federal Circuit vacated a prior judgment reported at 363 F.3d 1207 and granted a petition for rehearing en banc "to resolve issues concerning the construction of patent claims. raised by the now-vacated panel majority and dissenting opinions." The Court invited amicus briefs on seven questions pertaining to claim construction that it posed, to be filed by September 21, 2004.

*Nystrom v. Trex Co., Inc.*, __ F.3d. ___, 2004 U.S. App. LEXIS 13407, at 11-12 (Fed. Cir. June 28, 2004).

There is a "heavy presumption" that the terms used in claims mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. *Resonate Inc. v. Alteon Websystems, Inc.* 338 F.3d 1360, 1364 (Fed. Cir. 2003).

> We first look to the claim language itself, to define the scope of the patented invention. "As a starting point, we give the claims their ordinary and accustomed meaning as understood by one of ordinary skill in the art." *Dow Chem. Co. v. Sumimoto Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001). We look to the written description "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics*, 90 F.3d at 1582.

*Liquid Dynamics Corp. v. Vaughn Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004).

The ordinary meaning of the words of the claim may be determined by reviewing a variety of sources, including the claims themselves; dictionaries and treatises; and the written description, drawings, and prosecution history. *Nystrom*, 2004 U.S. App. LEXIS 13407, at 12. Claim terms may be construed to encompass all dictionary definitions not inconsistent with the intrinsic record. *Id.* at 14.

After identifying the ordinary meaning of a disputed claim term, the court should turn to the patent's written description and drawings to determine whether that meaning is inconsistent with the patentee's use of the term. *Id.*; *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). The "heavy presumption" in favor of ordinary meaning can be overcome when the patentee acted as his own lexicographer and clearly set forth a definition of the disputed term in either the specification or the file history,

14

distinguished that term from the prior art, expressly disclaimed subject matter, or described a particular embodiment as important to the invention. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002).

While the claims must be read in view of the specification of which they are a part, it is improper to read a limitation from the specification into the claims. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004). It is likewise improper to limit the claim based on a preferred embodiment of the invention. *Inverness Medical v. Warner Lambert Co.*, 309 F.3d 1373, 1379 (Fed. Cir. 2002). "This court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. [citing cases]. Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." <u>Liebel- Flarsheim</u>, 358 F.3d at 906, quoting *Teleflex, Inc. v. Ficosa N.Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Examples of such manifest exclusion or restriction are a situation where the specification makes clear that the invention does not include a particular feature or that a particular feature is inferior. In addition, claim language may be construed narrowly when the specification, claim or prosecution history make it clear that the invention was limited to a particular structure. *Id.* at 906 – 908

Where the plain language of the claim is clear and uncontradicted by anything in the written description or figures, it would be improper to rely upon the written description, the figures, or the prosecution history to add limitations to the claim. Under such circumstances, relying on the written description and prosecution history to reject

15

the ordinary and customary meanings of the words themselves is impermissible. *Liquid Dynamics*, 355 F.3d at 1368. "The danger of improperly importing a limitation is even greater when the purported limitation is based upon a term not appearing in the claim. "If we once begin to include elements not mentioned in the claim in order to limit such claim..., we should never know where to stop." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003), quoting Johnson *Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985. 990 (Fed. Cir. 1999).

### b. Comparison of Construed Claims to the Accused Device or Method

#### (1) Literal Infringement

For literal infringement of a patent claim, each and every limitation of the claim must be met in the accused device, composition or method. When any limitation recited in the claim is not met, literal infringement is avoided. *See, e.g., Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985).

#### (2) Doctrine of Equivalents

Infringement under the doctrine of equivalents is determined on a claim element by claim element analysis, a requirement known as the "all-elements rule." A finding of infringement under the doctrine of equivalents requires proof that the accused device, composition or method contains elements identical or equivalent to each claimed element of the patented invention. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29; 117 S. Ct. 1040; 137 L. Ed. 2d 146 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."). The accused method or device must contain every claim element