but not necessarily in a corresponding component. *Corning Class Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251 (Fed. Cir. 1989).

A finding of infringement under the doctrine of equivalents requires proof of only insubstantial differences between the claimed and accused products or processes. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 62 F.3d 1512, 1521-22 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997). Infringement may be found if the accused subject matter performs substantially the same function in substantially the same way to achieve substantially the same result. *Wright Medical Technology Inc. v. Osteonics, Corp.*, 122 F.3d 1440 (Fed. Cir. 1997); *Warner-Jenkinson*, 520 U.S. at 38.

## III. ARGUMENT

This Court should enter a preliminary injunction in the form of the Order submitted with this motion, because Plaintiffs have satisfied each of the requirements for preliminary injunctive relief.

### A. Plaintiffs Have Proven A Reasonable Likelihood of Success

In the Complaint, Plaintiffs allege that Wayport infringes Claim 1 of the '658 and '400 patents. The first task for the Court in evaluating the likelihood that Plaintiffs will succeed on the merits at trial is to construe each of the limitations of that claim. In this case, the limitations of Claim 1 of each patent are clear on their face, and the task of claim construction is straightforward.

#### 1. Claim Construction

Claim 1 of the '658 and '400 patents provides as follows[3]:

---

[3] Letters in parentheses have been inserted for ease of reference to specific limitations.

| '658 Patent | '400 Patent |
|---|---|
| A vending machine for vending telecommunications channel access to a customer, said vending machine comprising: | A vending machine for vending telecommunications channel access to a customer, said vending machine comprising: |
| [a] a payment mechanism for receiving payment from the customer; | [a] a payment mechanism for obtaining information from the customer to initiate a vending transaction; |
| [b] a customer interface for indicating the status of said vending machine; | [b] a customer interface for indicating the status of said vending machine; |
| [c] an electronic circuit for determining when the vending transaction is completed; | [c] an electronic circuit for determining when the vending transaction is completed; |
| [d] a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction; | [d] a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction; |
| [e] a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and | [e] a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and |
| [f] a control unit having a storage device for storing payment information received from the customer and for controlling said electronic circuit and said telecommunications channel access circuit. | [f] a control unit having a device for receiving payment information from the customer and for controlling said electronic circuit and said telecommunications channel access circuit. |

### a. **The Preamble**

The preamble of Claim 1 of each patent states a name and purpose for the invention ("a vending machine for vending telecommunications channel access to a customer"). Under applicable Federal Circuit law, a preamble that merely gives a name to the invention or that merely states the purpose of the invention is not itself a limitation of the claim when the claim body describes a structurally complete invention such that the deletion of the preamble phrase does not affect the structure or steps of the claimed invention. *Catalina Marketing International, Inc. v. Cool Savings.com,* supra, 289 F.3d 801, 809; (Fed. Cir. 2002); *IMS Technology, Inc. v. Haas Automation, Inc.,* supra, 206 F.3d 1422, 1434 (Fed Cir. 2000).

The preamble states that the "vending machine for vending telecommunications channel access to a customer" "comprises" limitations [a] through [f]. Under Federal Circuit law, "comprising" means "including, but not limited to." *Moleculon Research Corp v. CBS, Inc.,* 793 F.2d 1261 (Fed. Cir. 1986)." Limitations [a] through [f] define a complete invention for vending telecommunications channel access to a customer. The phrase in the preamble, "vending machine for vending[4] telecommunications channel access to a customer" is merely a convenient name for the combination of components and functions stated in limitations [a] through [f].

In *Intirtool, Ltd v. Texar Corp.,* supra, 2004 U.S. App. LEXIS 9055 (Fed. Cir., May 10, 2004), the Federal Circuit held that the preamble in a patent claim ("[a] hand-held punch pliers for simultaneously punching and connecting overlapping sheet metal

---

[4] The specification does not provide a special meaning for the term "vending," which has its ordinary dictionary meaning of "selling." Merriam-Websters Collegiate Dictionary (10th Ed. 1993, "v.t.: to dispose of something by sale: sell").

19

such as at the corners of overlapping ceiling tile grids, comprising:") was not a limitation, because "the claimed tool was described in claim 1 in complete and exacting detail," and "the preamble does not recite any additional structure or steps underscored as important by the specification." Id. at 10-11. The same reasoning applies to the preamble of the '658 and '400 patents. Deleting the term "vending machine" and substituting another term such as "apparatus" would have no effect on the scope of the invention as described in the following limitations of Claim 1. Therefore, PowerOasis submits that the words, "vending machine for vending telecommunications channel access to a customer," as stated in the preamble of Claim 1, do not constitute a limitation of Claim 1.[5]

Even if one were to treat the preamble as a limitation of Claim 1, the patented invention would still be the same, i.e., the invention would consist of the combination of the components and functions stated in limitations [a] through [f] of each patent. It is apparent from the wording of the preamble itself that the term "vending machine" is not being used in the traditional sense as "a coin-operated machine for selling merchandise." *Merriam-Websters Collegiate Dictionary (10th Ed. 1993)*. The preamble states the purpose of the "vending machine" to be "vending telecommunications access to a customer," rather than vending merchandise.

Since the dictionary definition is clearly inapplicable, one must turn to the language of the patent to see how the term "vending machine" is used by the patentee. The language in Claim 1 of the '658 and '400 patents, and throughout the specification, is

---

[5] While the term "said vending machine" does appear at the end of limitation (b), that wording is merely a reference back to the name for the invention stated in the preamble, rather than an additional structural component or limitation of the claim.

clear that what is being vended is "access to . . . a telecommunications channel or channels . . . for a fee." ('658 patent, col. 2, lines 39-41; '400 patent, col. 2, lines 43-45). Thus, the patented invention does not sell "merchandise" in the traditional sense. Moreover, the invention does not require the use of coins or currency. The specification states that "the customer provides payment in electronic form (e.g. credit card, debit card, smart card, or other forms of electronic or magnetic currency devices) or, optionally, currency." ('658 patent, col. 2, lines 47-50; '400 patent, col. 2, lines 51-54) Payment also can be made through software present on the user's laptop computer, or even after the transaction following identification and authentication of the user. ('658 patent, col. 2, lines 50-57; '400 patent, col. 2, lines 54-61). This is reflected in the language of Claim 1 of the '400 patent, which refers to "a payment mechanism for *obtaining information from the customer* to initiate a vending transaction."

The patents make it clear that the invention is not limited to an ordinary stand-alone type of vending machine. The "Summary of the Invention" provides a functional description of what the invention provides:

> This invention provides access to one or more utilities after the customer provides payment in electronic form . . . The customer selects which utilities or services they require, typically by just connecting to the appropriate connector (also know[sic] as outlet, receptacle, or plug) either through physical means or through wireless connections such as infrared. The transaction then begins when some form of payment or user identification is received.

('658 patent, col. 2, lines 46 – 65; '400 patent, col. 2, lines 50-67).

The functional components of the invention can be remote from each other and networked together:

>Almost any combination of functional components of the vending machine could be removed to a location remote from the machine. This could be accomplished, for example, by networking a cluster of machines to a server either on site or at a remote location.

('658 patent, col. 4, lines 30-34; see also, col. 11, lines 19-29; '400 patent, col. 4, lines 33-38; see also, col. 11, lines 22-32)

When it describes a preferred embodiment for a "telecommunications vending machine," the specification refers, not to a single, stand-alone device, but to a block diagram (Fig. 4), including blocks representing the various components and functions that have to be accomplished to provide telecommunications channel access for a fee to a customer using a laptop computer. ('658 patent, col. 10, lines 43-50; '400 patent, col. 10, lines 45-54). There is no requirement that the equipment providing those functions be combined into one single device, or even that there be a device of any sort that the customer sees. Thus, even if the preamble is construed as a limitation of Claim 1, it is clear that the limitation consists merely of the combination of components and functions recited in the following limitations [a] through [f].

    **b.**    **Limitations [a] – [f]**

Following the rules for claim construction discussed above, the first steps are to read the words of each limitation of the claim and to determine their meaning from the viewpoint of one of ordinary skill in the art. *Dow Chemical Co. v. Sumimoto Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001). In this situation, the relevant art is telecommunications engineering. The following table sets forth the ordinary meaning of the words used in the limitations of Claim 1[6] of both patents, as described in the Affidavit

---

[6] For the reasons discussed above, the preamble is not set forth in this table as a limitation of Claim 1of either patent.

of Charles C. Schelberg, a senior software engineer who has more than 40 years of experience in telecommunications, embedded systems, real time controls, and robotics, and a co-inventor of the '658 and '400 patents.

| Claim Limitation No. | '658 Patent | '400 Patent | Meaning |
|---|---|---|---|
| 1.a. | *a payment mechanism for receiving payment from the customer;* | *a payment mechanism for obtaining information from the customer to initiate a vending transaction;* | "Payment" means paying money in some form.<br><br>"Mechanism" means machinery or process for achieving a result.<br><br>"Vending transaction" is a transaction by which something is provided to the customer in exchange for payment.<br><br>The remaining words have their ordinary meanings. |
| 1.b. | *a customer interface for indicating the status of said vending machine;* | *a customer interface for indicating the status of said vending machine;* | An interface is the place where two different systems meet and interact with each other. An example is a GUI (graphic user interface, the display on a computer screen). "Said vending machine" refers to "a vending machine for vending telecommunications access to a customer" as stated in the preamble. |

23

| | | | |
|---|---|---|---|
| 1.c. | *an electronic circuit for determining when the vending transaction is completed;* | *an electronic circuit for determining when the vending transaction is completed;* | An "electronic circuit" is any circuit that conducts electricity. "Vending transaction" has the same meaning as in claim 1.a.<br><br>"Completed" has its ordinary meaning, i.e. finished, brought to an end. |
| 1.d. | *a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction;* | *a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction;* | A "telecommunications channel" is a pathway or route on which a telecommunications signal travels.<br><br>An "access circuit" is a circuit providing access.<br><br>"Adapted to be connected" means having a physical configuration enabling connection to be made.<br><br>"External telecommunications channel" means an outside channel such as a T1 line, telephone line, or other channel on which a telecommunications signal is carried.<br><br>"for enabling access to the at least one external telecommunications channel" means for the purpose of activating the telecommunications channel so telecommunications can take place.<br><br>"disabling access" means deactivating the telecommunications channel. |

| | | | |
|---|---|---|---|
| 1.e. | *a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and* | *a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and* | A "telecommunications channel access connector" is a physical device providing a connection such as a plug or a wireless connection.<br><br>An "external telecommunications device of the customer" is a device of the user used for telecommunicating, such as a telephone or a computer. |
| 1.f. | *a control unit having a storage device for storing payment information received from the customer and for controlling said electronic circuit and said telecommunications channel access circuit.* | *a control unit having a device for receiving payment information from the customer and for controlling said electronic circuit and said telecommunications channel access circuit.* | A "control unit" is an electronic device that controls a system.<br><br>"Storage device" is computer memory.<br><br>"Payment information" is information relating to payment.<br><br>"Controlling said electronic circuit" means electronically controlling the "telecommunications channel access circuit." |

The next step in the claim construction process required by the Federal Circuit is "to look to the written description to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Liquid Dynamics*, 355 F.3d at 1367. A careful review of the specification reveals that none of the terms in the limitations[7] of Claim 1 of the '658 and the '400 patents is used in a manner inconsistent with its ordinary meaning.

---

[7] As discussed above, the preamble "a vending machine for vending telecommunications access to a customer, said vending machine comprising:" is not a limitation of Claim 1 of either patent. However, if

25

- "Payment" as described in the specification can be "in currency, coin or electronic form. The electronic forms include, but are not limited to, credit cards, debit cards, smart cards, pre-paid cards." (Col. 10, lines 55-58)[8]

- The term "vending transaction" is used in the patents to mean "to provide access to electrical power, a telecommunications channel or channels and/or other utilities or services for a fee." (Col. 2, lines 43-49) Claim 1 refers specifically to "vending telecommunications channel access."

- The term "interface" is discussed in the specification as follows: "This microprocessor also communicates with the customer via a user interface to provide details on the progress of the transaction. The user interface is not particularly limited and need not even include a visual display on the vending machine." (Col. 3, lines 5-9) "The user interface may be a visual display or some other type of progress indicator . . . ." (Col. 6, line 17) "Alternatively, the user interface can be present inside or uploaded to the user's laptop or other device thereby obviating the need for an interface within the vending machine unit." (Col. 6, lines 20-23)

- "Telecommunications channel access" is described in the specification as including "access to high speed data channels that are emerging for computer use as well as the typical telephone networks and cellular lines," and includes

---

the preamble is deemed to be a limitation, the term "vending machine" as used in the patents is broader than the dictionary definition "a coin-operated machine for selling merchandise." See pg. 18-22 supra.

[8] Column and line references are to the specification of the '400 patent. Identical language is found in the specification of the '658 patent, although the column and line references are different.

26

"ISDN, T1, T3, cable . . . broadband and other channels" for Internet access. (Col. 3, lines 42-60)

- The specification uses "connector" in its ordinary sense: "The customer selects which utilities or services they require, typically by just connecting to the appropriate connector (also know[n] as outlet, receptacle, or plug) either through physical means or through wireless connections such as infrared." (Col. 2, lines 61-65).

- The "central control unit" is "microprocessor based" and "controls the state" of a "switchable circuit" that "switches the telecommunications channel on and off at the telecommunications channel access connector." (Col. 5, line 57 – col. 6, line 2).

In sum, the specification uses the words of the claims in accordance with their ordinary meanings from the viewpoint of one of ordinary skill in the art. The patentee did not act as its own lexicographer (except as to the wording of the preamble).

The next inquiry in the process of claim construction is to review the file history to see if a restrictive definition of any of the terms of the claims was employed to distinguish that term from the prior art or whether any subject matter was expressly disclaimed. *CCS Fitness, Inc.*, 288 F.3d 1359, 1366-67. The file histories of the '658 and '400 patents, and the two patents of which they are continuations-in-part,[9] are attached to the Affidavit of Sibley P. Reppert submitted with this motion. A review of those file histories reveals that no amendments were made to the claims at issue during prosecution of the patents, and no arguments were asserted to avoid any prior art, so

---

[9] U.S. Patents Nos. 5,812,643 and 6,314,169.

27

nothing in the prosecution history would change the construction of the terms in the claims.

Since the language of the claims in issue is clear and uncontradicted by anything in the written description or figures, no reliance should be placed on the written description, the figures or the prosecution history to add limitations to the claims. *Liquid Dynamics*, 355 F.3d at 1368. In particular, the claims should not be limited based on any of the preferred embodiments described in the specification. *Inverness Medical*, 309 F.3d at 1379. The patentee did not employ "words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim*, 358 F.3d at 906. The specification does not expressly disclaim subject matter or describe a particular embodiment as important to the invention. See, *CCS Fitness, Inc.*, 288 F.3d at 1366, 1367. The invention is not limited to a particular structure. To the contrary, many preferred embodiments are described, and others are contemplated:

> It is also to be understood that although the present invention has been described with regard to preferred embodiments thereof, various other embodiments and variants may occur to those skilled in the art, which are within the scope and spirit of the invention, and such other embodiments and variants are intended to be covered by the following claims.

(Col. 15, lines 61-67).

### 2. Comparison of Claim 1 to Wayport's Wired and Wireless Internet Access Service

Once the words used in each limitation of the two patent claims in issue have been construed, the claims as construed must be compared to the accused device. On the basis of the facts set forth in the Duff and Joransen Affidavits, Wayport literally infringes each of the limitations of Claim 1 of each of the patents in suit.

The following table sets forth the evidence of Wayport's infringing conduct, with reference to each limitation of Claim 1:

| Limitation | '658 Patent | '400 Patent | Evidence of Infringement by Wayport[10] |
|---|---|---|---|
| Preamble[11] | *A vending machine for vending telecommunications channel access to a customer, said vending machine comprising:* | *A vending machine for vending telecommunications channel access to a customer, said vending machine comprising:* | SF 14. Wayport uses networked equipment to sell Internet (i.e., telecommunications channel) access to customers that includes and performs the components and functions set forth in limitations (a) through (f) of Claim 1 of each patent. The vending of telecommunications access is evidenced by Exhibits 11-27 of the Duff Affidavit and Exhibits 1-16 of the Joransen Affidavit. Wayport holds itself out as a vendor of telecommunications access on its Website (Duff Affidavit, Exhibits 2-5) and in signs at airports (Joransen Affidavit, Exhibits 1, 3, 4, 9). |
| 1.a. | *a payment mechanism for receiving payment from the customer;* | *a payment mechanism for obtaining information from the customer to initiate a vending transaction;* | SF 15. Wayport provides a mechanism by which the customer makes payment by credit card or authorizes a charge to his hotel room to initiate a vending transaction. The payment mechanism receives the customer's credit card information or permission to charge the hotel room and provides for the receipt of payment from the customer. Access is initiated after customer information is obtained. |

---

[10] Factual references stated in the Statement of Facts are identified by the prefix "SF."
[11] As discussed above, the preamble is not a limitation of Claim 1. However, even if it is a limitation it is found in Wayport's offering.

| | | | |
|---|---|---|---|
| 1.b. | *a customer interface for indicating the status of said vending machine;* | *a customer interface for indicating the status of said vending machine;* | SF 16. The customer is informed by means of an interface consisting of various screens on his laptop computer of the status of his connection, such as a page advising him when he is connected. |
| 1.c. | *an electronic circuit for determining when the vending transaction is completed;* | *an electronic circuit for determining when the vending transaction is completed;* | SF 17. Under the Wayport "pay as you go" service, Wayport employs a circuit for determining when access is to be terminated at the end of the period for which the customer has paid for Internet access. |
| 1.d. | *a telecommuni-cations channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction;* | *a telecommuni-cations channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction;* | SF 18. Wayport uses a wired or wireless connection to a control unit that is in turn connected to an external telecommunications channel (e.g., the Internet) to enable access on a "pay as you go" basis at the beginning of the pay period and disable it at the end of the pay period. It uses a wireless access point/router or wired router networked to an authorization/billing server to enable the customer to access the Internet at the beginning of the vending transaction. The customer is disconnected at the end of the pay period chosen. |
| 1.e. | *a telecommuni-cations channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and* | *a telecommuni-cations channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the user; and* | SF 19. Wayport uses both wired and wireless connections to the user's computer. In a wired connection, the customer's laptop is physically connected to Wayport's equipment via a cable and an RJ-45 connector. In a wireless connection, the customer's laptop is connected via radio waves and a wireless access point or router. |

| 1.f. | *a control unit having a storage device for storing payment information received from the customer and for controlling said electronic circuit and said telecommuni-cations channel access circuit.* | *a control unit having a device for receiving payment information received from the customer and for controlling said electronic circuit and said telecommuni-cations channel access circuit.* | SF 20. Wayport provides this function using an authentication server that receives payment information and authorizes access through a wireless access point or wired access router. |
|---|---|---|---|

In addition to infringing Claim 1 of the '658 patent and Claim 1 of the '400 patent literally, Wayport also infringes each claim under the Doctrine of Equivalents. It cannot be disputed that Wayport's wired and wireless equipment and service perform substantially the same functions as stated in each of the claim limitations in substantially the same way to achieve substantially the same result.

### B. Plaintiffs Are Suffering Irreparable Harm Because Of Wayport's Infringing Conduct

In light of Plaintiffs' clear showing of a reasonable likelihood of success on the merits, irreparable harm is presumed. See, *e.g. Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983).

Even without reference to a presumption, the evidence establishes that PowerOasis has, in fact, suffered irreparable harm and that it continues to do so by reason of Wayport's infringing conduct as set forth in Statements of Fact 20-29 and the supporting affidavits and exhibits. Wayport and PowerOasis are direct competitors for the provision of wired and wireless Internet access in airports and elsewhere. Wayport is depriving Plaintiffs of revenue and the opportunity for expansion in the provision of wired and wireless telecommunications channel access, and thus infringes the '658 and

'400 patents. If Wayport is permitted to continue its infringing conduct until this case is tried, it will in all likelihood be impossible to restore Plaintiffs' rightful position by an award of damages. The "Wi-Fi" market for wireless Internet access is changing rapidly in ways that cannot be calculated, and Plaintiffs will be harmed irreparably if they are prevented from exercising their right to exclude others from operating in that realm.

In this case, Wayport cannot establish the typical facts asserted to rebut a presumption of irreparable harm, such as evidence that the non-movant has or will soon cease the allegedly infringing activities, that the movant is engaged in a pattern of granting licenses under the patent, or that the movant unduly delayed in bringing suit. *Polymer Technologies, Inc.*, *supra*, 103 F.3d at 975. None of those circumstances applies here. The patents in suit are recently issued, and there is every indication that Wayport intends to expand its infringing business rather than to cease doing business in the infringing area.

### C.  The Balance of the Harm Tips in Favor of PowerOasis

The sole business of PowerOasis is providing wired and wireless telecommunications access. (Duff Aff. ¶2) If Wayport is not preliminarily enjoined, PowerOasis will lose the ability to operate without competition in that important arena for the duration of the '658 and '400 patents. Much larger players, like Wayport, will move in to occupy the field and to squeeze out the real innovator, PowerOasis. PowerOasis will thus be deprived of the opportunity to experience explosive growth in an area of great promise, and may well be forced out of business.

The only consequence to Wayport of the relief here sought is that it will be required to abide by a lawfully issued United States patent. Wayport is free to provide

other types of services that do not infringe, to design around the '658 and '400 patents, or to reach an accommodation with Pliantiffs if it wishes to continue activities that presently infringe.

While an injunction would prohibit Wayport from providing its service on a "pay as you go" basis, it would still be able to provide its service if paid by the merchant, or using a Wayport membership, as described in the web page attached to the Duff Affidavit as Exhibits 5 and 6.

In light of the strong showing by Plaintiffs of a likelihood of success, this factor tips decisively in their favor.

### D.     The Public Interest Favors A Preliminary Injunction

Wireless Internet access in airports and hotels is undoubtedly a convenience for the public, but it is not a critical matter of public health of the sort that has in other cases been held to justify the abrogation of the normal rights of patent holders to an exclusive monopoly for a limited period of time.   See, *Hybritech, supra*, 849 F.2d at 1458. In the absence of such an overriding public health consideration, the prevailing public interest is the interest of the public that the laws of the land -- including the patent law -- be fairly enforced.

## IV.   **CONCLUSION**

All four requirements for preliminary injunctive relief have been met by Plaintiffs. This Court should grant preliminary injunctive relief as requested in the present motion.

                                      Respectfully submitted,

                                      POWEROASIS, INC. and
                                      POWEROASIS NETWORKS, LLC
                                      By its attorneys,

                                      */s/ Sibley P. Reppert*
                                      Sibley P. Reppert, B.B.O. No. 416900

                                      */s/ William A. Scofield, Jr.*
                                      William A. Scofield, Jr., B.B.O. No. 448940

                                      LAHIVE & COCKFIELD, LLP
                                      28 State Street
                                      Boston, Massachusetts 02109 - 1784
                                      (617) 227-7400 (telephone)
                                      (617) 742-4214 (fax)