**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| POWEROASIS, INC. and<br>POWEROASIS NETWORKS, LLC, | ) ) ) ) ) | |
| Plaintiffs-<br>Counterclaim Defendants, | ) ) ) | Civil Action No.:  04-12023-RWZ |
| v. | ) ) ) | Hon. Rya W. Zobel<br>**FILED UNDER SEAL** |
| WAYPORT, INC., | ) ) ) | |
| Defendant-<br>Counterclaim Plaintiff. | ) ) ) | |

**WAYPORT, INC.'S BRIEF IN OPPOSITION TO POWEROASIS' MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES

<u>Cases</u>

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
    346 F.3d 1075 (Fed. Cir. 2003) ............................................................................12

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) ................................................................6, 7, 8, 25

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
    234 F.3d 14 (Fed. Cir. 2000) ...............................................................................14

*Biodex Corp. v. Loredan Biomedical, Inc.*,
    946 F.2d 850 (Fed. Cir. 1991) ..............................................................................17

*Cable & Wireless Internet Servs., Inc. v. Akamai Techs., Inc.*,
    *Civ. No.* 02-11430, 2003 WL 1916691 (D. Mass. Apr. 22, 2003) .............................6

*CF Inflight, LTD v. Cablecam Sys., LTD*,
    No. 03-CV-5374, 2004 WL 234372 (E.D. Pa. Jan. 30, 2004).................................31

*Cole v. Kimberly-Clark Corp.*,
    102 F.3d 524 (Fed. Cir. 1996) ................................................................................9

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
    868 F.2d 1251 (Fed. Cir. 1989) ..............................................................................9

*Eaton Corp. v. Rockwell Int'l Corp.*,
    323 F.3d 1332 (Fed. Cir. 2003) ............................................................................10

*Eli Lilly & Co. v. Am. Cyanamid Co.*,
    82 F.3d 1568 (Fed. Cir. 1996) .........................................................................27, 28

*eSpeed, Inc. v. BrokerTec USA, L.L.C.*,
    69 U.S.P.Q.2d 1466 (D. Del. 2004) .......................................................................31

*Genentech, Inc. v. Chiron Corp.*,
    112 F.3d 495 (Fed. Cir. 1997) ..............................................................................13

*Goldenberg v. Cytogen, Inc.*,
    373 F.3d 1158 (Fed. Cir. 2004) ............................................................................10

*Helefix Ltd. v. Blok-Lok, Ltd.*,
    208 F.3d 1339 (Fed. Cir. 2000) ..............................................................................8

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
    49 F.3d 1551 (Fed. Cir. 1995) .........................................................................27, 29

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
  906 F.2d 679 (Fed. Cir. 1990) ...............................................................................6, 30

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
  995 F.2d 1566 (Fed. Cir. 1993) ......................................................................................6

*Jonsson v. Stanley Works*,
  903 F.2d 812 (Fed. Cir. 1990) ......................................................................................12

*Kalipharma, Inc. v. Bristol-Myers Co.*,
  707 F. Supp. 741 (S.D.N.Y. 1989) ................................................................................31

*Kimberly-Clark Corp. v. Johnson & Johnson*,
  745 F.2d 1437 (Fed. Cir. 1984) ....................................................................................17

*Litton Sys., Inc. v. Whirlpool Corp.*,
  728 F.2d 1423 (Fed. Cir. 1984) ......................................................................................4

*New England Braiding Co. v. A.W. Chesterton Co.*,
  970 F.2d 878 (Fed. Cir. 1992) ......................................................................................20

*Nutrition 21 v. Thorne Research, Inc.*,
  930 F.2d 867 (Fed. Cir. 1991) ...............................................................................7, 8, 20

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999) ....................................................................................10

*Reebok Int'l Ltd. v. J. Baker, Inc.*,
  32 F.3d 1552 (Fed. Cir. 1994) ...............................................................................6, 27, 28

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ....................................................................................16

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ....................................................................................11

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*,
  308 F.3d 1193 (Fed. Cir. 2002) ....................................................................................11

*Waldemar Link, GmbH v. Osteonics Corp.*,
  32 F.3d 556 (Fed. Cir. 1994) ..........................................................................................4

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
  29 U.S.P.Q.2d 1481 (C.D. Cal. 1993) ...........................................................................31

Federal Statutes

35 U.S.C. § 102(b) ..............................................................................................21, 26

35 U.S.C. § 102(e) ....................................................................................................26

Other Authorities

Federal Rule of Civil Procedure 65(c) ......................................................................32

Manual of Patent Examining Procedure § 1302.14 (8th rev. ed. May 2004) ..............................12

# TABLE OF CONTENTS

I.     Introduction......................................................................................................................1

II.    Statement of Facts...........................................................................................................1

    A.    Wayport ................................................................................................................1

    B.    PowerOasis .........................................................................................................3

    C.    The Patents-In-Suit ............................................................................................4

III.    Argument .........................................................................................................................6

    A.    Preliminary Injunction Standard for Patent Infringement Suits .......................6

    B.    PowerOasis' Proffered Evidence Falls Far Short Of Demonstrating A Likelihood Of Success On The Merits ..............................................................7

        1.    PowerOasis Has Not (And Cannot) Demonstrate A Likelihood That Its Patents Are Infringed .....................................................................8

        2.    The Proper Construction Of Relevant Claim Terms ...........................9

            a.    To Grant PowerOasis' Injunction Motion, The Court Must Accept PowerOasis' Proffered  Construction On Nineteen Different Claim Terms ............................................................................9

            b.    Claims Must Be Read As A Whole To Gain Context .........................14

        3.    PowerOasis Fails To Compare The Construed Claims To The Accused Device And Instead Provides Nothing More Than Conclusory Statements Without Any Competent Evidentiary Support .................................................14

        4.    PowerOasis' Alleged Factual Support Is Both Completely Inadequate and Erroneous………………………………………………………........17

        5.    The PowerOasis Patents Are Invalid ...............................................20

            a.    U.S. Patent No. 4,517,412 to Newkirk et al. ......................................21

            b.    The Newkirk Patent Anticipates The Asserted Claims .......................22

            c.    Still Other Prior Art References Raise Serious Questions As To The Validity Of The Asserted Claims Of The PowerOasis Patents ………………………………………………………………..25

C.    PowerOasis Has Not Satisfied The Remaining Three Elements That Would Justify The Grant Of A Preliminary Injunction ................................................................ 26

    1.    PowerOasis Has Not Demonstrated Irreparable Harm ................................. 27

        a.    PowerOasis Is Not Entitled To A Presumption of Irreparable Harm .. 27

        b.    PowerOasis' Alleged "Harm" Is Purely Speculative ........................... 27

        c.    PowerOasis Has Admitted That Any Alleged Harm It Has Suffered Is Not "Irreparable" ......................................................................... 28

        d.    PowerOasis' Delay In Bringing This Suit Is A Clear Indication That There Is No Irreparable Harm. ...................................................... 29

    2.    The Balance Of Hardships Tips In Wayport's Favor ..................................... 30

    3.    A Preliminary Injunction Would Harm The Public Interest ........................... 30

IV.    Conclusion .......................................................................................................... 32

## I.    <u>INTRODUCTION</u>

Based on a demonstrably incorrect claim construction of two patents that are highly likely to be found invalid and unenforceable, PowerOasis, Inc. and PowerOasis Networks, LLC (collectively "PowerOasis") have asked the Court to take the extraordinary step of granting a preliminary injunction against the defendant, Wayport, Inc. ("Wayport").  Ignoring well-established precedent strongly discouraging the issuance of pretrial injunctions in patent infringement litigations, PowerOasis has brought this motion in an apparent attempt to accomplish in the courtroom what it cannot in the marketplace.

Without independent support for its arguments, PowerOasis instead bases its motion exclusively on affidavits from heavily biased affiants who have a significant financial stake in the outcome of this litigation.  Even if the Court considers the merits of PowerOasis' supporting affidavits, they are quickly revealed to be lacking in any credible evidence that would support the extraordinary relief sought by PowerOasis.

PowerOasis makes its request for preliminary relief despite the fact that its witnesses have admitted that any damages it may have suffered are most assuredly not "irreparable."  Moreover, PowerOasis has further admitted that its motion would cause great inconvenience to the traveling public, thereby acknowledging that the public interest favors denial of its motion.

PowerOasis' motion for a preliminary injunction should be denied.

## II.    STATEMENT OF FACTS

### A.    <u>Wayport</u>

Wayport is a Delaware corporation with its headquarters in Austin, Texas.  (Declaration of James D. Keeler ("Keeler Decl."), ¶ 2).  Wayport was founded in 1996 and has since become a leading Internet Service Provider ("ISP"), providing high-speed Internet access ("HSIA") to mobile customers in hotels, airports, and other public places.  (Keeler Decl., ¶ 3).  Over the past

eight years, Wayport has grown to a company of more than 300 employees and is an ISP that provides HSIA at more than 4,000 locations, including nearly 800 hotels, 12 airports, and over a thousand McDonald's restaurants, UPS stores and other retail establishments nationwide.  (*Id.*, ¶ 4).

Wayport's ISP systems enable travelers, using their own laptop computers, to log onto the Internet, to check e-mail, and to access company networks at speeds up to fifty times faster than traditional "dial-up" services.  (*Id.*, ¶ 5).  Wayport provides both "wired" Internet access (*i.e.*, where the user plugs an access cable into a socket) and "wireless" Internet access (*i.e.*, where the user gains access through localized radio waves).  (*Id.*, ¶ 6).  Wayport customers can access the Internet from hotel guest rooms, meeting facilities and common areas, airports, McDonald's restaurants, and other retail establishments.  (*Id.*).  Wayport also operates several Laptop Lane® business centers in airports, which generally feature private offices with HSIA and other business services such as printing, copying, and faxing.  (*Id.*, ¶ 7).

To obtain wired access to the Internet through the Wayport ISP systems, a customer simply plugs a laptop computer's "Ethernet" cable into a Wayport-labeled port.  (*Id.*, ¶ 9).  To obtain wireless access, a customer turns on a notebook computer that has a "Wi-Fi"[1] network card.  (*Id.*, ¶ 10).  A customer with a laptop computer that has a standard Internet browser (*e.g.*, Internet Explorer or Netscape) will, upon opening the browser, be greeted with the Wayport "Welcome Page," allowing the customer to select a connection option or, in some cases, to freely browse a limited number of sites.  (*Id.*).  Typically, a new customer will opt to pay a set fee for unlimited HSIA at a particular location or set of locations during a predetermined period of time

---

[1]    "Wi-Fi" is short for "wireless fidelity" and is a term used generically when referring to any type of wireless network that conforms to a certain established standard.  (Ex. 1, *Webopedia Computer Dictionary*).  (Unless otherwise noted, all exhibits cited herein are attached to the Declaration of Amr O. Aly, Esq., dated November 4, 2004 and filed herewith.)

(typically until midnight, or until hotel check out time, or until a set number of hours have

expired).  (*Id.*, ¶ 11).  Alternatively, a customer may opt to use a prepaid connection card, to log

on with a monthly or annual membership, or to use a coupon or a roaming connection.  (*Id.*).

> **B.**    **PowerOasis**

PowerOasis is a New Hampshire corporation with its principal place of business in

Nashua, New Hampshire.  (PowerOasis Br. at 2).                                          (Ex. 3,

Deposition Transcript of Thomas M. Duff, Jr. ("Duff Tr.") 25:4-5, 26:3-5)

(Ex. 2, Deposition Transcript of William S. Joransen ("Joransen Tr.") 19:10-12).

(*See* Ex. 3, Duff Tr. 21:15-

17).  PowerOasis installs and maintains "vending machines" that provide electrical power and

data ports for laptop computers and other electronic equipment.  (*See* Ex. 4, PowerOasis Website

-- FAQs).  Today, PowerOasis allegedly operates power and data vending machines in a total of

twenty-one airports and eight public buildings.  (Declaration of Thomas M. Duff, Jr. ("Duff

Decl."), ¶ 3).

PowerOasis' vending machines typically supply electrical power and telephone data

ports.  (*See* Ex. 4, PowerOasis Website, at 1).  A PowerOasis customer initiates use of a

PowerOasis vending machine by swiping a credit card through a reader to activate the power and

data line connectors.  (*See id.* at 2).  To use the power line, a customer plugs an electronic device,

such as a laptop computer or a cellular phone, into the power outlet.  (*See id.*).  To use the data

line, a customer connects the modem from a laptop computer and dials into the phone number of

the network or Internet service provider to which the customer wishes to connect.  (*See id.* at 3-

4).

C.    **The Patents-In-Suit**

In this litigation, PowerOasis asserts two U.S. patents against Wayport -- U.S. Patent

Nos. 6,466,658 (the "'658 patent") and 6,721,400 (the "'400 patent") (collectively referred to as

the "PowerOasis patents"). The '658 and '400 patents are both directed to "power and

telecommunications access vending machines." Both patents stem from the same patent

application filed on February 6, 1997, which subsequently issued as U.S. Patent No. 5,812,643 (a

patent PowerOasis does not assert in this litigation). The '400 patent is expressly labeled by

PowerOasis as a "continuation"[2] of the '658 patent. However, this patent is not a continuation at

all, but instead is a "continuation-in-part," because new information was added to the '400 patent

application, even though this new matter was never brought to the attention of the patent

examiner.[3]

The PowerOasis patents describe a specialized "vending machine" for vending electrical

power and/or telecommunications access to a customer.[4] (Declaration of Edmond S. Cooley

("Cooley Decl."), ¶ 19). Instead of selling candy or toys, however, these vending machines sell

electrical power and/or access to a telecommunications channel. The claimed invention is

essentially a specialized payphone for computers. Just like a payphone transaction begins when

money is inserted and ends when the user hangs up, the telecommunications transaction provided

by the claimed vending machine begins when payment is received and ends when the user

---

[2]    A continuation is a subsequent patent application that is filed while the original patent application (sometimes referred to as the "parent") is still pending. By definition, because it benefits from the parent application's filing date, a "continuation" cannot contain anything that was not in the parent application. *See Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1438 (Fed. Cir. 1984). In contrast, a continuation-in-part ("CIP") application is an application that contains some new matter that was not in the parent application. *Id*. at 1436-37. A claim in a CIP application can rely on the filing date of the parent application only to the extent that the claim is supported by the disclosure in the parent application. *Waldemar Link, GmbH v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994).

[3]    This addition of new matter to a patent application even though was identified by the applicant as a "continuation" may be grounds for an inequitable conduct charge against PowerOasis.

[4]    The purported invention is repeatedly described as being embodied in a "vending machine." In fact, the phrase "vending machine" is used in each patent over 80 times.

disconnects from the machine.  (*Id.*).

Figure 2 in the '658 patent illustrates one embodiment of the alleged invention:



FIG. 2

Figure 2 shows a front view of a vending machine operating panel for vending power and telecommunications channel access.  (Ex. 5, '658 patent, col. 5, ll. 13-14).  The customer sees an operating panel (101) with a user interface (110).  The operating panel (101) includes a payment processing unit (114) in the form of a credit card swipe reader; a power connector (108) in the form of a standard electrical socket and a telecommunications channel access connector (122) in the form of a standard telephone line connector.  (*Id.* at ll. 56-63).

To operate the vending machine, a customer swipes her credit card through the payment mechanism (114) and plugs her equipment into the appropriate connectors (108) and/or (122).  The customer interface light (110) indicates the status of the transaction.  After the customer completes the transaction, she pulls the power plug from the power connector (108) and/or

disconnects the cable from the socket (122) and the vending machine detects the disconnection and ends the transaction.  (*Id.* at col. 8, l. 64 - col.9, l. 19).

## III.  ARGUMENT

### A.  Preliminary Injunction Standard for Patent Infringement Suits

As the Court is well aware, any party seeking a preliminary injunction carries the burden of demonstrating four factors:  (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant would suffer if an injunction were not granted; (3) the balance of hardships tipping in its favor; and (4) that the injunction would not harm the public interest. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001). In patent infringement cases in particular, courts have routinely refused to grant the extraordinary relief of an injunction before trial. *See, e.g., Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552 (Fed. Cir. 1994) (motion for preliminary injunction denied); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) ("[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."); *Ill. Tool Works, Inc. v. Grip-Pak, Inc.,* 906 F.2d 679, 683 (Fed. Cir. 1990) (same, noting that "[a] preliminary injunction is a drastic remedy"); *Cable & Wireless Internet Servs., Inc. v. Akamai Techs., Inc.*, Civ. No. 02-11430, 2003 WL 1916691 (D. Mass. Apr. 22, 2003) (Zobel, J.) (denying motion for preliminary injunction).

PowerOasis has fallen far short of meeting its burden on each of the four factors.  <u>First</u>, PowerOasis has not demonstrated a likelihood of success on the merits.  PowerOasis can only assert infringement at all by relying on a strained claim construction that requires this Court to ignore key elements of the asserted claims.  Under any reasonable claim construction, Wayport clearly does not infringe the PowerOasis patents.  Even if the Court were to adopt PowerOasis' proffered construction, however, both of the '658 and '400 patents would thereby be rendered invalid due to the existence of extensive prior art.  Second, by the admission of its own

- 6 -

witnesses, PowerOasis will not suffer irreparable harm in the event that Wayport is permitted to continue providing its service. <u>Third</u>, Wayport will be harmed by an injunction more than PowerOasis will be harmed by the absence of one. <u>Finally</u> -- and again by the admission of PowerOasis itself -- a preliminary injunction would harm the public interest by depriving members of the business community convenient Internet access while traveling, a business necessity in today's marketplace.

**B.    PowerOasis' Proffered Evidence Falls Far Short Of Demonstrating A Likelihood Of Success On The Merits**

PowerOasis' Motion for a Preliminary Injunction must fail because PowerOasis cannot show that, "in light of the presumptions and burdens that will inhere at trial on the merits, (1) [it] will likely prove that [Wayport] infringes [PowerOasis'] patent[s] and (2) [its] infringement claim will likely withstand [Wayport's] challenges to the validity and enforceability of [PowerOasis'] patent[s]." *Amazon.com*, 239 F.3d at 1350; *see also Nutrition 21 v. Thorne Research, Inc.,* 930 F.2d 867, 869 (Fed. Cir. 1991) (patentee carries the burden of showing a likelihood of success with respect to both validity and infringement in a preliminary injunction motion). A preliminary injunction shall not issue where the non-moving party "raises a substantial question concerning *either* infringement or validity." *Amazon.com*, 239 F.3d at 1350-51 (emphasis added) (citing *Genentech Inc. v. Novo Nordisk, A/S,* 108 F.3d 1361, 1364 (Fed. Cir. 1997)). Here, Wayport raises a substantial question regarding *both* infringement and validity.

Moreover, to defeat a motion for a preliminary injunction "one need not make out a case of actual invalidity. *Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.* The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Id.* at 1359 (emphasis added); *see also Helefix Ltd. v. Blok-Lok, Ltd.,* 208 F.3d 1339, 1352 (Fed. Cir. 2000)

(upholding a district court's denial of a preliminary injunction on evidence that fell short of demonstrating invalidity but was nonetheless sufficient); *Nutrition 21*, 930 F.2d at 869 ("The presumption of validity of a patent is a procedural device . . . .  However, at the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement." (emphasis in original)).

1.    **PowerOasis Has Not (And Cannot) Demonstrate A Likelihood That Its Patents Are Infringed**

As is demonstrated by the analysis of a genuinely qualified, independent expert, none of the accused Wayport systems infringe the asserted claims of either the '658 patent or the '400 patent.  (*See generally* Cooley Decl.)[5]  As a consequence, PowerOasis cannot, and will not, prevail on the merits of its claim.  Therefore, it is certainly not entitled to its requested preliminary injunction.

Patent infringement analysis is a two-step process:  first, the Court must construe the claims, and second, the properly construed claims must be compared to the accused device. *Amazon.com*, 239 F.3d at 1351.  In its strained effort to obtain a preliminary injunction, PowerOasis commits fundamental errors in its legal and factual analysis with regard to both steps of this prescribed analysis.  As is detailed below, PowerOasis' infringement assertion is not only "vulnerable," it is fatally flawed.

Infringement of a claim limitation can be either literal or under the doctrine of equivalents.  An accused device infringes a patent claim literally only if it satisfies each and

---

[5]    Professor Cooley is and has been an assistant professor of electrical and computer engineering at Dartmouth College for more than 13 years and has experience in telecommunications, computer hardware and design programming.  He received a Bachelor of Science degree in Electrical Engineering and Computer Science from the University of Vermont in 1980, a Master of Engineering and a Doctor of Engineering, both from the Thayer School of Engineering, Dartmouth College, in 1982, and 1988, respectively.  He has no previous connection with Wayport and bases his opinions solely on demonstrable facts.  Dr. Cooley is being compensated for his work at his usual rate of $250.00 per hour plus expenses.

every element claimed precisely as stated in the asserted claim. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996) ("Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly"). An accused device infringes a claim limitation equivalently if it performs substantially the same function in substantially the same way to obtain the substantially same result. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1258 (Fed. Cir. 1989).

> ### 2.    The Proper Construction Of Relevant Claim Terms
>
> #### a.    To Grant PowerOasis' Injunction Motion, The Court Must Accept PowerOasis' Proffered Construction On Nineteen Different Claim Terms

According to PowerOasis, there are nineteen different limitations from its asserted patent claims that need construction. (*See* Chart attached to Affidavit of Charles Schelberg). Even in the abstract, the odds that PowerOasis will succeed in receiving a favorable construction on all nineteen claim limitations is small. Given the facts of this particular case, the likelihood of such success is virtually nonexistent, in light of the fact that several of PowerOasis' proposed constructions are completely divorced from the ordinary meaning of those terms, and lack any other support. The following examples are illustrative.

As noted in passing in PowerOasis' opening brief, each of the claims it asserts against Wayport recites a "vending machine" having certain elements. For instance, the term "vending machine" appears in the preamble and body of claims 1 of the '658 and '400 patents. PowerOasis asks the Court simply to ignore this claim language, asserting that it is not a claim limitation at all. (PowerOasis Br. at 19-20). PowerOasis makes this extraordinary request despite the fact that it uses the phrase "vending machine" over 80 times in each of its patents to describe and distinguish the purported invention.

- 9 -

In addition to being factually incorrect, PowerOasis' argument is legally misguided. Preamble terms are considered limitations under the facts presented by this case. The Federal Circuit has held that language in the preamble of a claim limits the claimed invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Here, the fundamental concept of "vending machine" permeates the entire specification and the claims of both patents such that, if it were simply ignored (as PowerOasis advocates), then the core concept of the claimed invention would be removed.

As a simple grammatical matter, in claims 1 of the '658 and '400 patents, the preamble is required to provide a proper antecedent basis for the term "*vending machine*" as it appears later in the claims. That is, the body of each asserted claim refers to "*said* vending machine." If PowerOasis' logic is followed, and the preamble is ignored, then the term "said vending machine" would not have any antecedent basis at all. In such circumstance, the Federal Circuit has held that the preamble clearly is a limitation. *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 n.2 (Fed. Cir. 2004) ("[A]lthough 'intracellular marker substance' appears in the preamble of claim 1, it provides an antecedent basis for 'said marker substance' appearing in the body of the claim, thus 'indicating a reliance on both the preamble and claim body to define the claimed invention." (citation omitted)); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When the body of the claim refers to '*said* vehicle master clutch (8),' and '*said* drive train,' it is referring back to the particular clutch and the particular drive train *previously described in the preamble.*" (emphases added)).

Recognizing the weakness of its request that the Court simply ignore the critical language of the preamble, PowerOasis proposes an alternative argument. (PowerOasis Br. at 20). But in

making this alternative argument, PowerOasis attempts to distance itself from the plain meaning of "vending machine."  The Federal Circuit has mandated, however, that a proper claim construction must begin with the "plain meaning" of the disputed term, and has stated that the best evidence of such plain meaning is a dictionary.  *See Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002).  Not surprisingly, PowerOasis' alternative argument ends with the same result as that reached with the first; it too renders the phrase "vending machine" effectively meaningless.  According to PowerOasis, the patent itself defines the term "vending machine" to be a "combination of components and functions" and the components need not be combined into one single device.  (PowerOasis Br. at 22).  But, as the patent examiner expressly recognized, the plain meaning of "vending machine" clearly requires a "physical combination" of elements.  (Ex. 7, File History of U.S. Patent Appl. Serial No. 08/796,562, Paper No. 4; *see also* Ex. 10, Excerpt from *Webster's Third New International Dictionary* (1981) ("vending machine: a slot machine for vending merchandise mechanically")).

To avoid the plain meaning of a term, the patentee must unequivocally demonstrate an intent to be his own lexicographer and assign a special meaning to the term.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention 'with reasonable clarity, deliberateness, and precision.'"  (citation omitted)).  PowerOasis cannot identify any such clear intent in the patents' specifications.

Indeed, PowerOasis' argument is factually and legally flawed.  First, contrary to the position PowerOasis asks the Court to accept, the patent examiner clearly understood that a "vending machine" is *not* merely a functional "combination of components and elements"; instead, the patent examiner determined that a vending machine is a "*physical combination of*

- 11 -

*elements*," and premised the allowance of a parent application of the patents-in-suit on precisely

such an understanding.  (*See* Ex. 7, File History of U.S. Pat. Appl. Serial No. 08/796,562, Paper

No. 4, at 3 ("The following is an Examiner's Statement of Reason for Allowance: none of the art

of record suggest nor teach the system and method of vending telecommunications channel

access and power to a customer having *the physical combination* of elements and steps as set

forth in independent claims 1, 23 and 24."  (emphasis added))).  Perhaps not surprisingly, an

examiner's reasoning for allowing the patent claims to issue is important in any future

construction of the claims, because the examiner's reasoning was the basis upon which the

patentee was granted the patent in the first place.  *See ACCO Brands, Inc. v. Micro Sec. Devices,*

*Inc.,* 346 F.3d 1075, 1078-79 (Fed. Cir. 2003); *see also* Manual of Patent Examining Procedure

§ 1302.14 (8th rev. ed. May 2004).

        Moreover, in this case, the patent examiner who allowed the parent application is the

*same* patent examiner who allowed the '658 and '400 patents.  PowerOasis has not cited -- and

cannot cite -- any basis for suggesting that the Examiner did not have the same understanding of

the term "vending machine" when he allowed each of these related patents.  *See Jonsson v.*

*Stanley Works,* 903 F.2d 812, 818 (Fed. Cir. 1990) (considering the prosecution history of a

patent related to the patent-in-suit when construing a term common to both patents).

        As another example of PowerOasis' flawed claim construction, the asserted claims recite

the following:

        1.  A vending machine [] comprising:
                "a payment mechanism for receiving payment from the customer"
        and "a customer interface for indicating the status *of said vending*
        *machine*."

        Putting aside for the moment the issues of how "payment mechanism" and "customer

interface" should be construed, these two limitations are most assuredly *part of* the claimed

"vending machine."  The transition word "comprising" following "vending machine" is a term of art indicating that the product is made up of the limitations recited in the body of the claim.  *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997).  Here, that means that "vending machine" is made up of the limitations in the claim.  However, under PowerOasis' distorted reading, both of these limitations need not be part of the same vending machine, or for that matter part of *any* vending machine whatsoever.  (PowerOasis Br. at 21).  According to PowerOasis, the payment mechanism and customer interface of "*said vending machine*" may be part of a customer's laptop computer, *i.e.*, the user of the vending machine.  (PowerOasis Br. at 22).

The asserted claims recite a "telecommunications channel access connector." PowerOasis argues that "connector" means a physical device such as a plug.  (PowerOasis Br. at 27).  Wayport does not dispute that construction.  After reciting this proposed construction, however, PowerOasis contradicts itself and suggests that the connector can be "a wireless connection."  (PowerOasis Br. at 27).  A wireless "connection" has no physical component and PowerOasis' expansive reading of "connector" thereby effectively reads the limitation "telecommunications channel access connector" out of the claim.

The asserted claims recite: "a control unit. . . for *controlling said electronic circuit* and said telecommunications channel access circuit."  PowerOasis proposes, inexplicably, that "controlling said electronic circuit" means "electronically controlling the telecommunications channel access circuit."  (PowerOasis Br. at 25).  There is no explanation or support for how PowerOasis reaches this construction.  The claims, on their face, recite a control unit that controls two separate circuits -- an electronic circuit and a telecommunications channel access

circuit. PowerOasis' definition, inexplicably, has one circuit (the electronic circuit) controlling the other circuit (the telecommunications channel access circuit).

### b.    Claims Must Be Read As A Whole To Gain Context

Perhaps the most disturbing aspect of PowerOasis' proposed construction is its failure to consider the asserted claims as a whole. *See Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) (stating that claims "must be viewed as a whole"). PowerOasis instead dissects the claims piece-by-piece in an apparent attempt to obscure their obvious meaning. In its plain meaning, a "vending machine" is a physical thing. (*See* Ex. 10, *Webster's Third New International Dictionary* ("vending machine: a slot machine for vending merchandise mechanically")). People buy candy and other items from such machines. The patent itself refers to other vending machines, such as one that sells services like charging electric vehicles (*see, e.g.*, Ex. 8, '400 patent, col. 2, ll. 16-17). Thus, the claimed vending machine is like a payphone in that it is a physical device that sells telecommunications channel access. Any other construction does violence to the plain meaning of the claim language, and should be rejected by the Court.

### 3.    PowerOasis Fails To Compare The Construed Claims To The Accused Device And Instead Provides Nothing More Than Conclusory Statements Without Any Competent Evidentiary Support

Not only does PowerOasis build its motion on a demonstrably incorrect claim construction, it fails to properly compare the construed claims to the accused device. Instead, PowerOasis' infringement "analysis" is nothing more than one conclusory statement after another, based not on evidence but on "information and belief." For virtually every element of the claims, PowerOasis' proposed infringement analysis fails to refer to an identifiable, actual component of a Wayport ISP system. PowerOasis instead relies on vague references to elements that its affiants simply assert exist based "on information and belief." Nowhere does PowerOasis

- 14 -

provide evidentiary support for the "information" and nowhere does it provide a basis to support its "beliefs."

Examination of the actual Wayport ISP systems, however, reveals that they are nothing like the alleged invention of the '658 and '400 patents:

First, the Wayport ISP systems do not make or use a "vending machine."   (Cooley Decl., ¶ 24).  Instead, as is illustrated below in a schematic of the components that make up the Wayport ISP systems, Wayport's ISP systems involve multiple components -- such as access points ("AP"), network management devices ("NMD"), and remote billing servers at Wayport's headquarters -- distributed over very wide areas.  (*Id.*).

None of the various and widely distributed components in the Wayport systems are claimed in the asserted patents.  (*Id.*, ¶¶ 24-27).

Second, Wayport does not make or use anything "for vending telecommunications channel access to a customer."  (*Id.*, ¶ 26).  Instead Wayport sells subscriptions to Internet

service in a channel-portable manner.  (*Id.*).  The subscriptions are for prescribed time periods (*e.g.,* a day).  Users are not charged based on the actual amount of use and a user may access the Internet in a channel-portable way.  For example, in some facilities once a user subscribes she may access the Internet via a wired connection in a hotel room and later access the Internet via a wireless connection in the hotel lobby.  (*Id.*).  Each of these channels is different yet the subscription applies to both.  (*Id.*).

Third, the Wayport systems do not include a "vending machine payment mechanism." (*Id.*, ¶ 28).  Instead, with Wayport's ISP systems, all customer payment information is encrypted at the user's computer and sent (encrypted) to a central server for processing.  (*Id.*).  PowerOasis expressly disclaimed such centralized processing systems from the patent's scope during prosecution of the patents when it specifically criticized computer-usable payphones that accepted credit cards, but which required central offices to process the transaction.  (*See* Ex. 8, '400 patent, col. 2, ll. 25-40).  By explicitly distinguishing the prior art on that basis, the patentees made clear that the claimed invention does *not* include a central processing system. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1342-43, 1344 (Fed. Cir. 2001).

Fourth, the Wayport ISP systems do not "initiate a vending transaction" or determine when a "vending transaction is completed" in connection with the recited "payment mechanism" and the "electronic circuit."  (Cooley Decl., ¶ 29).  Instead, Wayport is subscription-based, not transaction-based.  That is, users of Wayport systems can disconnect and reconnect multiple times during their subscription period without having to start a new session, contrary to the plain requirements of PowerOasis' patent claims.

- 16 -

Fifth, the Wayport ISP wireless systems do not include a "telecommunications channel access connector." (*Id.*, ¶ 30). Instead, Wayport's systems include 802.11 (wireless) access points, which include antennas, not "connectors." (*Id.*).

### 4. PowerOasis' Alleged Factual Support Is Both Completely Inadequate and Erroneous

The only proffered evidentiary support for PowerOasis' proposed claim construction is the affidavit of Charles S. Schelberg. As a threshold matter, the Court should be aware that Mr. Schelberg is far from the disinterested, neutral "expert" he holds himself out to be. Although the fact is nowhere mentioned in Mr. Schelberg's affidavit -- nor anywhere in Power Oasis' 34-page brief -- Mr. Schelberg owns approximately 33% of PowerOasis' outstanding stock. (Ex. 6, Deposition Transcript of Charles S. Schelberg ("Schelberg Tr.") 48:12-49:3). The declaration of an individual with a heavily vested financial interest in the outcome of the litigation hardly constitutes compelling evidence of infringement or validity. *See Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 860 (Fed. Cir. 1991) (observing that corporate executives and expert witnesses in patent cases may be biased by financial interests).

(Ex. 6, Schelberg Tr. 10:23-11:12)

(*Id.* at 14:1-3, 14:23-15:1, 11:19-12:21). Furthermore, Mr. Schelberg is a named inventor on the PowerOasis patents and, therefore, as a matter of law cannot be considered a person of "ordinary" skill in the art. *See Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir. 1984) ("What controls the patentability of the fruits of the inventor's labors are the statutory conditions of novelty, utility, and unobviousness 'to a person having ordinary skill in the art to which said

subject matter pertains' as stated in § 103.  It should be clear that that hypothetical person is not the inventor . . . .").

Mr. Schelberg's affidavit should be given little or no weight for several reasons.  First, Mr. Schelberg purports to give his affidavit "*as one of ordinary skill in the art of telecommunications engineering.*"  (Affidavit of Charles C. Schelberg, *emphasis added*).  As demonstrated above, Mr. Schelberg is clearly *not* one of ordinary skill in the relevant art.

(Ex. 6, Schelberg Tr. 37:10-14, 52:2-4).

(*Id.* at 52:6-14).

The affidavits of Thomas M. Duff, Jr. and William S. Joransen, the only two other declarations submitted to the Court in support of PowerOasis' motion, are similarly flawed.

(Ex. 2, Joransen Tr. 16:20-17:6; Ex. 3, Duff Tr. 12:18-21).

(Ex. 2, Joransen Tr. 16:22-17:2; Ex. 3, Duff Tr. 16:17-24).

(Ex. 2, Joransen Tr. 19:6-9; Ex. 3, Duff Tr. 17:1-4).

Mr. Joransen failed to provide *any* factual support for the positions asserted in his affidavit.  For instance, when discussing the supposed harm that has been caused to PowerOasis by Wayport, Mr. Joransen alleges that PowerOasis was not awarded a contract in Cincinnati/Northern Kentucky International Airport.  (Affidavit of William S. Joransen, ¶¶ 26-28).

(Ex.

2, Joransen Tr. 27:14-28:21).  That is not evidence.  It is baseless conjecture.


(*Id.* at 37:14-17).


(*Id.* at 37:20-38:22).

PowerOasis' final affidavit (from Mr. Duff) is also demonstrably inadequate.


(Ex. 3, Duff Tr. 52:4-13).


(*id.* at 27:15-28:10) despite the fact that he swore to the contrary in his affidavit

"under the pains and penalty of perjury."  (*See* Affidavit of Thomas M. Duff, Jr.).


(Ex. 3, Duff. Tr. 27:1-

28:19, 29:19-22, 46:21-47:7).  Tellingly, Mr. Duff's affidavit provides no explanation of his

alleged qualifications for making such determinations.  PowerOasis simply asks the Court to rely

on Mr. Duff's unsupported guesses.

For at least all of these reasons, even if the Court were to accept PowerOasis' strained claim construction, PowerOasis would still have failed to carry its burden of establishing a likelihood of success on its claim of infringement by Wayport.[6]

### 5.     The PowerOasis Patents Are Invalid

Even if the Court were to accept PowerOasis' claim construction, and even if it were to conclude that Wayport's products likely infringe those claims, PowerOasis' motion for a preliminary injunction must still be denied because PowerOasis has failed to carry its burden of establishing that the patents-in-suit are likely valid.  Rather than addressing the issue, PowerOasis instead simply relies upon the statutory presumption of validity.  (*See* PowerOasis Br. at 9-10).[7]  The Federal Circuit flatly rejected such an attempt to justify a preliminary injunction in *Nutrition 21 v. Thorne Research, Inc.,* 930 F.2d 867 (Fed. Cir. 1991).  There the Court specifically held that "at the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement."  *Id.* at 869.  PowerOasis has failed to carry its burden.

Indeed, as demonstrated below, there are serious and legitimate questions regarding the validity of the asserted claims.  Even in the limited amount of time that Wayport has had available to it since PowerOasis' complaint and preliminary injunction motion were served upon it without warning, Wayport has uncovered a number of prior art references that cast strong

---

[6]     In addition to failing to establish literal infringement, PowerOasis has failed to present any evidence that would justify a finding of infringement under the doctrine of equivalents.

[7]     PowerOasis cites *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878 (Fed. Cir. 1992), for the proposition that a patentee seeking a preliminary injunction may rely on nothing more than the statutory presumption of validity to establish its rights under the asserted patents if the alleged infringer does not challenge validity.  (PowerOasis Br. at 9).  However, *New England Braiding* makes clear that the statutory presumption of validity "does not relieve a patentee who moves for a preliminary injunction from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity."  970 F.2d at 882.  Because Wayport has raised substantial questions regarding the validity of the two patents-in-suit, PowerOasis bears the burden of showing at this stage that Wayport's invalidity defenses lack substantial merit.  *See id.* at 883.  It cannot meet this burden.

doubts on the validity of the asserted claims.  Significantly, *none* of these prior art references were submitted by PowerOasis to the patent examiner.  Thus, the patent examiner did not have the opportunity to consider them before allowing the patents-in-suit.

**a.     U.S. Patent No. 4,517,412 to Newkirk et al.**

A prime example of the prior art uncovered by Wayport is U.S. Patent No. 4,517,412 to Newkirk et al. (the "Newkirk patent").  (*See* Cooley Decl. Ex. 2). This patent, entitled "Card-Actuated Telecommunication Network," issued on May 14, 1985.  It qualifies as prior art to the PowerOasis patents under 35 U.S.C. § 102(b) because it issued more than one year before the earliest possible filing date of the patents-in-suit, which is February 6, 1997.[8]

The Newkirk patent discloses a system and method that enables callers to purchase billable telecommunication services using public payphones by means of machine-readable credit cards.  (Cooley Decl., ¶ 35).  The patent describes various types of telecommunications services, including voice, facsimile images, *computer data* and any other form of intelligence conveyable over existing telephone lines.  (*See* Cooley Decl., ¶ 35 and Ex. 2, Newkirk patent, col. 1, ll. 18-24).

The Newkirk patent explains that in 1983 "[t]here [was] growing interest in using telephone lines intended for voice transmission to also transmit computer data, thereby merging computer and communications technology."  (Cooley Decl. ¶ 36 and Ex. 2, Newkirk patent, col. 10, ll. 29-32).  The arrangement described in the Newkirk patent of a payphone in combination with a portable computer "makes it possible in a public access credit-card activated network . . . to also transmit computer data, the card holder who uses this network for data transmission being

---

[8]     Given that the prior art relied on herein easily qualifies as prior art even under PowerOasis' earliest filing date of February 6, 1997, Wayport does not take issue with this effective filing date for purposes of this opposition. Wayport, however, reserves the right to contest this issue in any trial on the merits in this action.

- 21 -

billed therefor by the company issuing the credit card."  (Cooley Decl. Ex. 2, Newkirk patent, col. 10, ll. 59-64).

That the Newkirk patent is relevant to the asserted claims is beyond question, given that the PowerOasis patents expressly admit that a payphone is a claimed "vending machine" or at least can include such a machine:

> [I]t is possible that the vending machine 100 is incorporated within the mechanical structure of a telephone or payphone.  In this embodiment, the payment processing unit 114 may be used to pay for the vending of power, telecommunications channel access and phone calls.  The vending machine can use the telephone line connected to the telephone as the telecommunications channel. (Ex. 5, '658 patent, col. 12, ll. 59-66; Ex. 7, '400 patent, col. 12, l. 62 - col. 13, l. 2).

### b.    The Newkirk Patent Anticipates The Asserted Claims

Figure 4 from the Newkirk patent, which is reproduced below, demonstrates that that patent discloses all of the elements of the asserted claims from the PowerOasis patents.  (*See* Cooley Decl., ¶ 36).[9]



---

[9]    Claim 1 of the '658 patent and claim 1 of the '400 patent are virtually identical so they will be discussed simultaneously.  Any relevant differences between the claims will be noted.

### "A Vending Machine For Vending Telecommunications Channel Access To A Customer, Said Vending Machine Comprising"

The Newkirk patent meets the preamble language of the asserted claims because the disclosed arrangement in Figure 4 acts as the claimed "vending machine" to vend telecommunications channel access to a customer.  (Cooley Decl., ¶ 38).  As expressly disclosed, the Newkirk patent states that the "arrangement shown in FIG. 4 makes it possible in a public access credit-card activated network of the type shown in FIG. 2 to also transmit computer data, the card holder who uses this network for data transmission being billed therefor by the company issuing the credit card." (Cooley Decl., ¶ 38 and Ex. 2, Newkirk patent, col. 10, ll. 59-64).

### "A Payment Mechanism For Receiving Payment From The Customer" ('658 Patent) And "A Payment Mechanism For Obtaining Information From The Customer To Initiate A Vending Transaction" ('400 Patent)

The card reader (12) shown in Figure 4 of the Newkirk patent clearly meets these limitations.  (Cooley Decl., ¶ 39).  As explained in the Newkirk patent, a user inserts his credit card into the card reader (12) to link his portable computer to a computer thereby commencing the vending transaction.  (*See* Cooley Decl., ¶ 39 and Ex. 2, Newkirk patent, col. 11, ll. 10-15; *see also* col. 3,  ll. 43-54 and col. 6, l. 68 - col. 7, l. 3)

### "A Customer Interface For Indicating The Status Of Said Vending Machine"

The Newkirk patent discloses several alternative embodiments for a "customer interface" to indicate the status of the vending machine.  (Cooley Decl., ¶ 40).  In particular, customer interfaces disclosed in the Newkirk patent are: (1) a Liquid Crystal Display ("LCD") or other form of display to provide messages to the customer (*see* Cooley Decl. Ex. 2, Newkirk patent, col. 7, ll. 13-15); (2) a voice chip that interacts with the caller during the card verification process

- 23 -

(*id.*, col. 7, ll. 4-12); and (3) a dial tone provided to the caller once the caller's credit card

information is verified (*see id.*, col. 11, ll. 19-21; *see also* Cooley Decl., ¶ 40).

### "An Electronic Circuit For Determining When The Vending Transaction Is Completed"

The local processor (11) in Figure 4 is the electronic circuit of the Newkirk patent that

determines when the vending transaction is completed.  (Cooley Decl., ¶ 41.)   The Newkirk

patent states that "the local processor acts to time the duration of the data transmission and to

create the necessary billing record in the manner previously described in connection with

telephone calls."  (Cooley Decl., ¶ 41 and Ex. 2, Newkirk patent, col. 11, ll. 34-37).

### "A Telecommunications Channel Access Circuit Adapted To Be Connected To At Least One External Telecommunications Channel For Enabling Access To The At Least One External Telecommunications Channel At The Beginning Of A Vending Transaction And Disabling Access At The End Of The Vending Transaction"

The switch (25) shown in Figure 4 of the Newkirk patent meets this claim limitation.

(Cooley Decl., ¶ 42).  As explained by Newkirk, "[s]hunted across telephone set 10 is a standard

telephone jack 24.  A single pole double-throw mode switch 25 is provided to connect local

processor 11 either to telephone set 10  for operation of the network in the telephone mode or to

jack 24 for operation in the computer mode.  Jack 24 is adapted to receive a standard modular

plug 26 coupled by an extension cable 27 to a portable computer or data transmission device 28."

(Cooley Decl., Ex. 2, Newkirk patent, col. 10, l. 68 - col. 11, l. 8; *see also* Cooley Decl. ¶ 42).

### "A Telecommunications Channel Access Connector Connected To Said Telecommunications Channel Access Circuit For Enabling Connection To An External Telecommunications Device Of The Customer"

The jack (24) in Figure 4 of the Newkirk patents meets the claim limitation requiring a

"telecommunications channel access connector."  (*See* Cooley Decl., Ex. 2, Newkirk patent, col.

- 24 -

11, ll. 5-8 ("Jack 24 is adapted to receive a standard modular plug 26 coupled by an extension

cable 27 to a portable computer or data transmission device 28."); Cooley Decl., ¶ 43).

> **"A Control Unit Having A Storage Device For Storing Payment Information Received From The Customer And For Controlling Said Electronic Circuit And Said Telecommunications Channel Access Circuit" ('658 Patent) And "A Control Unit Having A Device For Receiving Payment Information From The Customer And For Controlling Said Electronic Circuit And Said Telecommunications Channel Access Circuit" ('400 Patent)**

The Newkirk patent meets these claim limitations as well.  (Cooley Decl., ¶ 44).   In

particular, the Newkirk patent discloses that "[i]n order to provide billing information, a billing

processor 22 at control central MCC has access to the log created by the verification processor

18.  In addition to the credit card number, this processor places information in the log from the

local processors which provide data as to the duration of each call, the destination of the call, and

where the call is made." (Cooley Decl., ¶ 44 and Ex. 2, Newkirk patent, col. 8, ll. 10-14).

Based on the foregoing analysis, the Newkirk patent is applicable prior art that fully

anticipates the asserted claims.  (Cooley Decl., ¶ 37).  At the very least, the Newkirk patent --

which was not considered by the patent examiner who allowed the PowerOasis patents -- raises a

"substantial question as to invalidity."  *Amazon.com*, 239 F.3d at 1359.  As a result, PowerOasis

simply cannot meet its burden of showing a likelihood of success that the asserted claims are

valid.

> **c.    Still Other Prior Art References Raise Serious Questions As To The Validity Of The Asserted Claims Of The PowerOasis Patents**

There are several other prior art references that, like the Newkirk patent, raise serious

questions as to the validity of the PowerOasis asserted patent claims.  None were before the

patent examiner who considered PowerOasis' patent applications.  Two such prior art references

are described briefly below:

- As early as 1991, AT&T made its Public Phone 2000 available to the public. (Cooley Decl., ¶ 45). This qualifies as prior art under 35 U.S.C. § 102(b) because it was available to the public more than one year prior to the earliest filing date of the PowerOasis patents. The Public Phone 2000 was described as a public phone that could function as a portable office for travelers on the road. (*Id.*). The Public Phone 2000 was equipped with a dataport that allowed users to plug their laptops into the telephone to access electronic mail or dial-up home or office databases. (*Id.*). The phone provided a nine-inch color monitor customer interface to display graphics and text instructions to users in English and other select foreign languages. (*Id.*).

- U.S. Patent No. 5,602,905 to Mettke (the "Mettke patent"), entitled "Online Communication Terminal/Apparatus," was filed on January 23, 1995 and issued February 11, 1997. (*See* Cooley Decl. Ex. 6) As a result, the Mettke patent qualifies as prior art under 35 U.S.C. § 102(e). It disclosed a "pay-as-you-use" communication terminal (*e.g.*, a "vending machine") capable of interfacing with all major commercial Internet Service Providers to provide telecommunication services. (Cooley Decl., ¶ 48). The terminal includes a monitor to provide a customer interface. (*Id.*). Payment for services was to be made by credit card, using a "magnetic swipe" system included as part of the terminal system. (*Id.*).

C.     **PowerOasis Has Not Satisfied The Remaining Three Elements That Would Justify The Grant Of A Preliminary Injunction**

Even if PowerOasis could establish a likelihood of success on the merits -- and it cannot -- its motion for a preliminary injunction should be denied because it has not, and cannot, satisfy the remaining three prerequisites for the grant of such an injunction.

1.     **PowerOasis Has Not Demonstrated Irreparable Harm**

a.     **PowerOasis Is Not Entitled To A Presumption Of Irreparable Harm**

The presumption of irreparable harm arises *only* when the patentee has made a "clear" showing of validity and infringement. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995); *see also Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996) ("strong" showing required). Having failed to demonstrate either infringement or validity "clearly," PowerOasis may not rely on the presumption. Moreover, even when it exists, "the presumption does not necessarily or automatically override the evidence of record. It is rebuttable." *Reebok*, 32 F.3d at 1556.

b.     **PowerOasis' Alleged "Harm" Is Purely Speculative**

PowerOasis alleges that it has suffered irreparable harm and that it continues to do so by reason of Wayport's infringing conduct. (PowerOasis Br. at 31). As the basis for this assertion, PowerOasis repeatedly asserts that PowerOasis and Wayport are "direct competitors." The actual facts, however, simply do not support this assertion.

As to the alleged irreparable harm suffered by PowerOasis, both Messrs. Joransen and Duff admitted that there is simply no basis for their statements that the loss of PowerOasis business opportunities at Cincinnati/Northern Kentucky International Airport and DFW were caused by actions of Wayport.

(Ex. 2, Joransen Tr. 27:6-28:4). Similarly, there is no evidence that Wayport's actions caused any of PowerOasis' loss of business at DFW.

- 27 -

(*Id.* at 37:1-38:22).[10]

Mr. Duff testified that PowerOasis recently lost contracts at five airports because the airports decided not to renew PowerOasis' contracts when they expired. (Ex. 3, Duff Tr. 61:6-11). Wayport could not possibly be the cause of PowerOasis' demise at at least four of those five airports, because Wayport does not conduct business at these four sites. (Keeler Decl. ¶ 8).

As to PowerOasis' allegations that the two companies are "direct competitors,"

(Ex. 3, Duff Tr. 55:10-14).

### c.    PowerOasis Has Admitted That Any Alleged Harm It Has Suffered Is Not "Irreparable"

To the extent PowerOasis has suffered any harm at all as a result of Wayport's activities, it is not "irreparable." Despite the unsupported assertions of irreparable harm made in PowerOasis' brief, testimony provided by PowerOasis' directors clearly demonstrates the contrary.

First, PowerOasis admits that any alleged damages are quantifiable

(Ex. 2, Joransen Tr. 46:9-47:4). The Federal Circuit has held that where alleged damages can be quantified, there is by definition no "irreparable" harm. *See Eli Lilly*, 82 F.3d at 1578 (district court did not err in finding absence of irreparable harm where money damages would be adequate remedy and calculating lost profits would be a "relatively simple task"); *see also Reebok*, 32 F.3d at 1554-55, 1558 (district court did not err in finding absence of irreparable

---

[10]    Wayport did not gain any business at DFW, as PowerOasis insinuates. On the contrary, Wayport, like PowerOasis, has lost business at DFW. (Keeler Decl. ¶ 8).

harm where the actual damages sustained by the plaintiff could be calculated with "exact certainty").

Second, PowerOasis unequivocally admits that it is willing to grant Wayport a license:

(Ex. 3, Duff Tr. 64:6-8).

Evidence that the patentee is willing to grant a license to the alleged infringer weighs heavily against the granting of a preliminary injunction. *High Tech Med.*, 49 F.3d at 1557 ("[T]he evidence shows that HTMI offered a license to New Image, so it is clear that HTMI is willing to forgo its patent rights for compensation. That evidence suggests that any injury suffered by HTMI would be compensable in damages assessed as part of the final judgment in the case.").

> **d.    PowerOasis' Delay In Bringing This Suit Is A Clear Indication That There Is No Irreparable Harm.**

PowerOasis alleges that it was harmed by Wayport's alleged patent infringement as early as July 2000, when Wayport announced its wireless Internet service at DFW. (PowerOasis Br. at 8, ¶ 24). PowerOasis therefore could have brought suit as early as October 2002, when the '658 patent issued. Accordingly, PowerOasis' two-year delay in bringing this suit weighs heavily against a grant of its preliminary injunction motion. *See High Tech Med.*, 49 F.3d at 1557 (finding that the patentee's 17-month delay militated against the issuance of a preliminary injunction by demonstrating that there was "no apparent urgency to the request for injunctive relief").

### 2.    The Balance Of Hardships Tips In Wayport's Favor

Whereas PowerOasis has offered only vague predictions of competitive pressure absent a preliminary injunction, Wayport would suffer real and definitive hardships if the Court were to grant the requested preliminary injunction.

Wayport has spent approximately eight years and more than $100 million building the company and developing the Wayport ISP systems; approximately 120 Wayport employees have job responsibilities primarily associated with the sales and marketing of Wayport's ISP systems. (Keeler Decl., ¶ 12).  A preliminary injunction at this point would halt Wayport's installation, sales, and research and development plans and threaten the jobs of Wayport employees. (*Id.*, ¶ 13).  Specifically, Wayport would potentially have to lay off a substantial number of employees involved in provisioning, sales, research and development, and support.  (*Id.*).  *See Ill. Tool,* 906 F.2d at 683 ("The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating.").

In sum, PowerOasis cannot possibly argue that Wayport will be in the same position when this case is resolved at trial if its preliminary injunction motion is granted.  Such an argument would ignore the fact that Wayport's current business relationships and internal processes would all be disrupted (possibly irreparably) by an injunction.  These very real and significant harms stand in sharp contrast to PowerOasis' unsubstantiated speculation.

### 3.    A Preliminary Injunction Would Harm The Public Interest

A preliminary injunction would adversely affect the public interest by inconveniencing the thousands of business travelers who rely on Wayport's ISP services while away from their offices.  Internet access while traveling outside of the office is now a virtual prerequisite of business travel.  (Keeler Decl., ¶ 14).  Hotels that offer Wayport services would also stand to suffer from a preliminary injunction in this case, as many of their customers consider the

availability of Internet access an important factor in choosing where to stay during business travel. (*Id.*). PowerOasis itself in fact recognizes the public interest in the availability of Internet access at hotels and airports (PowerOasis Br. at 33) and has even acknowledged that the traveling public would be "inconvenienced" if Wayport were enjoined. (Ex. 9, *Boston Globe* article dated September 23, 2004).

Although PowerOasis suggests that only a "public health" concern could justify the denial of a preliminary injunction (PowerOasis Br. at 33), courts have also declined to grant preliminary injunctive relief in patent cases when an injunction would adversely affect the public interest in technology that provides social or economic benefit. *See*, *e.g.*, *CF Inflight, LTD v. Cablecam Sys., LTD*, No. 03-CV-5374, 2004 WL 234372, at *9 (E.D. Pa. Jan. 30, 2004) (public interest in aerial footage of the Superbowl); *eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 69 U.S.P.Q.2d 1466 (D. Del. 2004) (public interest in maintaining a competitive market for trading government securities).

Moreover, as shown above, there is a strong likelihood that the PowerOasis patents are invalid. The public interest in maintaining the integrity of the patent system would not be served by enforcing invalid patents through the grant of preliminary injunctive relief. *See Kalipharma, Inc. v. Bristol-Myers Co.*, 707 F. Supp. 741, 756-57 (S.D.N.Y. 1989) (addressing the public interest factor and stating that "a court should be cautious to use its equity powers when a challenger has so clearly challenged the patent's validity"); *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 29 U.S.P.Q.2d 1481, 1503 (C.D. Cal. 1993) ("While the Court's enforcement of patent

rights is generally in the public interest, 'a preliminary injunction improvidently granted may impart undeserved value to an unworthy patent.'" (citation omitted)).[11]

## IV.    CONCLUSION

For the reasons cited above, Wayport respectfully requests that the Court deny PowerOasis' Motion for Preliminary Injunction.

Respectfully submitted,

**WAYPORT, INC.**

By its attorneys,

/s/ David B. Bassett
_____
William F. Lee (BBO #291960)
David B. Bassett (BBO #551148)
Dominic E. Massa (BBO #564694)
Amr O. Aly (pro hac vice)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000

Dated: November 4, 2004

## CERTIFICATE OF SERVICE

I, Benjamin M. Stern, hereby certify that on November 4, 2004, I caused a copy of this foregoing document to be delivered to counsel of record by hand.

/s/ Benjamin M. Stern
_____
Benjamin M. Stern

---

[11]    If PowerOasis' motion for preliminary injunction is granted, the Court must require PowerOasis to post a sufficient bond to cover the costs and damages that Wayport may incur in the event this litigation is ultimately resolved in Wayport's favor.  *See* Fed. R. Civ. P. 65(c).  PowerOasis has simply ignored this issue, and it is doubtful that PowerOasis could support the necessary bond, because it is a company of only four employees (Ex. 2, Joransen Tr. 19:10-12), operating out of the president's basement (Ex. 3, Duff Tr. 21:15-17), and cannot even pay an $8,000 bill (*see* Ex. 2, Joransen Tr. 18:1-21).