**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| POWEROASIS, INC. and POWEROASIS NETWORKS, LLC, <br><br> Plaintiffs - Counterclaim Defendants, <br><br> v. <br><br> WAYPORT, INC., <br><br> Defendant - Counterclaim Plaintiff. | Civil Action No.: 04-12023-RWZ <br><br> Hon. Rya W. Zobel <br><br> **REDACTED** |

## DECLARATION OF DR. EDMOND S. COOLEY

I, Dr. Edmond S. Cooley, make oath and state as follows:

**I.  Introduction**

1. I have been retained as a technical expert in this case by counsel for defendant Wayport, Inc. ("Wayport").

2. I understand that plaintiff PowerOasis, Inc. and PowerOasis Networks, Inc. (collectively "PowerOasis") has filed a motion with the Court seeking a Preliminary Injunction against Wayport (the "PowerOasis's PI Motion") for its alleged infringement of claim 1 of United States Patent No. 6,466,658 (the "'658 patent") and claim 1 of United States Patent No. 6,721,400 (the "'400 patent") (collectively the "PowerOasis patents").

3. I have been asked for my opinion with respect to validity of and alleged infringement of the PowerOasis patents.

**II.  Qualifications**

4. I have been an Assistant Professor at Dartmouth College in the Department of

Engineering specializing in Electrical and Computer Engineering for more than 13 years. I have been teaching classes at Dartmouth College for over 16 years.

5.  I hold a BSEE (with a concentration in Computer Science) from the University of Vermont, Burlington and Masters of Engineering and Doctor of Engineering degrees from Dartmouth College. My degrees were awarded in 1980, 1982, and 1988 respectively. My doctoral work was in the area of computer-aided design automation of digital signal processing systems (hardware and software). My Curriculum Vitae, including a list of my publications within the last 20 years, is attached as Exhibit 1. It includes a summary of my employment and teaching history.

6.  My present research areas include communications theory and systems, wireless networking, and multimedia-based materials for engineering instruction.

7.  The courses I teach to undergraduate and graduate level Dartmouth College students include Introduction to VLSI Systems, VLSI Systems Design (Optimization), Hardware Description Languages, and Communications Theory and Systems. Other courses I have taught include Digital Signal Processing, Computer Architecture, Microprocessor-Based Systems Design, and Programming in Prolog. Previously, I taught as a lab instructor at the University of Vermont, Burlington, as a teaching assistant at Dartmouth, and as an instructor at the Raytheon Institute, the latter while I was working for Raytheon Company. I advise undergraduate and graduate students, and oversee design projects and undergraduate and graduate theses (BEng, MS, PhD). In 1999, I was awarded the Outstanding Service Award for Faculty by Thayer School of Engineering, Dartmouth College.

8.  In addition to my teaching and research activities, I am the Director of Information Technology (IT) for Thayer School of Engineering School, at Dartmouth College.

In this role, I oversee all aspects of IT at the school, including needs assessment, identification of appropriate systems, evaluation, procurement and contract negotiation, configuration and deployment, etc. My role involves hardware, software, training and support, maintenance, and networking equipment throughout the school. Further, I oversee a team of full-time and part-time computing professionals.

9. I am active in the IEEE and have received an IEEE Computer Society Outstanding Contribution Award. In 2003, I was elected to the IEEE Computer Society's Golden Core. I am also a member of other professional societies, including the AAAI, ACM, and ASEE.

10. I am a named inventor on two United States patents and have one other patent application pending. My issued patents are United States Patent No. 6,163,862, entitled "On-Chip Test Circuit For Evaluating An On-Chip Signal Using An External Test Signal", and United States Patent No. 6,252,417, entitled "Fault Identification By Voltage Potential Signature".

11. I am being compensated for my work in this matter at my usual rate of $250 per hour, plus expenses. I have received no additional compensation for my work on this action.

12. I provided expert testimony in a deposition three times in the past four years.

13. For the purposes of this declaration, my opinions are based on my review of the PowerOasis patents, the asserted claims, the file histories of the PowerOasis patents, certain prior art, papers submitted by PowerOasis in support of PowerOasis's PI Motion, my discussions with Dr. James Keeler, Wayport's Vice President of Engineering Development, and my professional and academic experience in the field to which the PowerOasis patents pertain. Because of the Court schedule I did not have as much time as I would like (and perhaps need) to complete

searching for documents that predate the PowerOasis patents to my full satisfaction. I intend to do further searching and would not be surprised to uncover more material of interest. Included in my review were the following materials:

- United States Patent No. 4,517,412;
- United States Patent No. 5,602,905;
- United States Patent No. 5,745,884;
- United States Patent No. 5,812, 642 and file history;
- United States Patent No. 6,314,169 and file history;
- United States Patent No. 6,466,658 and file history;
- United States Patent No. 6,721,400 and file history;
- Press release for the AT&T Public Phone 2000;
- Documents at Bates Nos. WP000047-000135, WP000147-000163, WP000177-000205, WP000267-000295, WP000298-000311, WP000326-000358, WP000396-000430, WP000444-000504, and WP001050-001089; and
- Web pages of PowerOasis and Wayport.

**III.   Legal Principles**

14.   I have been informed and understand that a patent claim is anticipated if each element of that claim is present either explicitly or inherently in a single prior art reference.

15.   I have been informed and understand that a patent claim is infringed by an accused product when that product includes elements that are identical or equivalent to each element of the claim. I have further been informed and understand that an element of an accused product is equivalent to a claim element when the difference between the claim element and the accused product is insubstantial.

IV.    **The Technology**

A.    **Person of Ordinary Skill in the Art**

16.    For the purposes of this declaration, I have assumed that a person of ordinary skill in the art relevant to the PowerOasis patents would be a person with a basic understanding of engineering principles and techniques associated with telecommunications systems and access. Such a person would likely have a four year college degree in engineering (such as electrical engineering or computer science), as well as perhaps one or two years of experience working in the telecommunications industry. A technician without a college degree but with sufficient industrial experience (perhaps four or five years) working with telecommunications access issues would likely have ordinary skill in the art.

17.    To the extent that I propose definitions of claim terms, I make them from the perspective of one of ordinary skill in the relevant art.

B.    **The PowerOasis Patents**

18.    The PowerOasis patents are both directed to "power and telecommunications access vending machines."

19.    The PowerOasis patents describe a specialized "vending machine" for vending electrical power and/or telecommunications access to a customer. The system described in the PowerOasis patents is essentially a specialized pay phone for computers. Just like a payphone begins a transaction when money is inserted and ends when the user hangs up, the telecommunications transaction provided by the vending machine described in the PowerOasis patents begins when it receives payment and ends when a user disconnects from the vending machine.

20.    Figure 2 in the '658 patent illustrates one embodiment of the vending machine described in the PowerOasis patents:



FIG. 2

21.  Figure 2 is a front view of a vending machine operating panel for vending power and telecommunications channel access. ('658 patent, col. 5, ll. 14-18). The customer sees an operating panel (101) with a user interface (110). The operating panel (101) includes a payment processing unit (114) in the form of a credit card swipe reader; a power connector (108) in the form of a standard duplex, 115 VAC connector; and a telecommunications channel access connector (122) in the form of a standard telephone line connector.

22.  To operate the vending machine, a customer swipes her credit card through the payment mechanism (114) and plugs her equipment into the appropriate connectors (108) and/or (122). The customer interface light (110) indicates the status of the transaction. Once the customer completes the transaction, she pulls the power plug (108) and/or disconnects the cable from the socket (122) and the vending machine detects the disconnection and ends the transaction. ('658 patent, col. 9, ll. 1-22).

## V.  Wayport's Non-infringement of The PowerOasis Patents

23.  Based on the materials I reviewed, it is my opinion that Wayport's products do not infringe the inventions described in the PowerOasis patents.

24.  Wayport does not make or use a "vending machine". Wayport's Internet Service Provider ("ISP") systems involve multiple components – such as access points, network management devices, and remote billing servers – distributed over a very wide area. Computers communicate with one of the access points, for example, via radio waves (RF). A network of switches interconnect various such computers with a network management device ("NMD"). The NMD uses firewall rule sets to determine whether a computer user is properly subscribed to the ISP and, if so, allows access to the Internet. (Depending on the configuration, some form of Internet access may be provided without a subscription). Billing is generally handled by a centralized server.

25.  A schematic view of Wayport's systems is:

Wayport's ISP systems are entirely different from the "vending machine" described in the PowerOasis patents.

26. Wayport does not make or use anything for "vending telecommunications channel access to a customer". Instead, Wayport sells subscriptions to Internet service in a channel-portable manner. The subscriptions are for prescribed time periods (*e.g.*, a day). Users are not charged based on the actual amount of use and a user may access the Internet in a channel-portable way. For example, in some facilities once a user subscribes, she may access the Internet via a wired connection in a hotel room and later access the Internet via a wireless connection in the hotel lobby. Each of these channels is different yet the subscription applies to both.

27. As another example, in some situations a completely different ISP infrastructure may be involved. Such is the case when a user accesses the Internet at one airport terminal (*e.g.*, Dallas-Fort Worth ("DFW") Terminal A) and later accesses the Internet at a different terminal at the same airport (*e.g.*, DFW Terminal B).

28. Wayport's ISP systems do not use or have a "vending machine payment mechanism". Instead, with Wayport's ISP systems, all customer payment information is entered at the user's computer and sent (encrypted) to a central server for processing.

29. Wayport's ISP systems do not use or have a "payment mechanism" to "initiate a vending transaction" or an "electronic circuit" to determine when a "vending transaction is completed". Wayport is subscription-based, not transaction-based. Users pay for a subscription that is the same price regardless of how much the user actually uses the Internet (or even if the Internet is not used at all). This is just like what ISPs do for home Internet access (although the subscription is generally shorter with Wayport).

30. Wayport's wireless system does not use or have a "telecommunications channel

access connector" Instead, Wayport's systems include 802.11 access points, which include antennas, not connectors.

31.    The basic components of the Wayport system existed before 1997. The Wayport system is substantially different from the invention described in the PowerOasis patents. The Wayport system provides Internet access which is substantially different than mere telecommunication channel access. Channel access in and of itself does not provide Internet access. The Wayport system provides Internet service in a substantially different way than invention described in the PowerOasis patents provides telecommunication channel access. The Wayport system is subscription based which is substantially different than the transaction-based approach in the PowerOasis patents. In addition, Wayport provides its service via a complicated system that is widely distributed to provide Internet access in a channel-portable way. The invention described in the PowerOasis patents is a small, standalone vending machine to which a user must connect with a plug to connect to a telecommunications channel.  There is no channel portability and all connections are fixed. The Wayport systems provide Internet services in a channel portable way and is substantially different than mere telecommunication channel access in a fixed, rigid manner.

32.    I understand that the Court is supposed to determine the meaning of the claim language. Depending on how the Court interprets the claim language, I reserve the right to modify my opinions.

## VI.    The Invalidity Of The PowerOasis Patents

33.    Based upon my review of the PowerOasis patents as well as a number of patents and telecommunications equipment that predate the PowerOasis patents, it is my opinion that claim 1 of the '658 patent and claim 1 of the '400 patent are invalid. I reserve the right to conduct a broader search for additional materials that predate the PowerOasis patents.

### A.     The Newkirk Patent

34.     One such patent is United States Patent No. 4,517,412 to Newkirk et al. (the "Newkirk patent"), which is entitled "Card-Actuated Telecommunication Network" (attached as Exhibit 2). I have been informed and understand that the Newkirk patent is prior art to the PowerOasis patents. I have also been informed and understand that the United States Patent and Trademark Office did not consider the Newkirk patent when it examined and issued the PowerOasis patents.

35.     The Newkirk patent discloses a system and method that enables callers to purchase billable communication services using public payphones by means of machine-readable credit cards. The patent describes various types of communications services, including voice, facsimile images, computer data and "any other form of intelligence conveyable over existing telephone lines." (*See* Newkirk patent, col. 1, ll. 21-24).

36.     The Newkirk patent explains that in 1983 "[t]here [was] growing interest in using telephone lines intended for voice transmission to also transmit computer data, thereby merging computer and communications technology." (*See* Newkirk patent, col. 10, ll. 29-32). The arrangement shown in Fig. 4 of the Newkirk patent of a payphone in combination with a portable computer "makes it possible in a public access credit-card activated network . . . to also transmit computer data, the card holder who uses this network for data transmission being billed therefor by the company issuing the credit card." (*See* Newkirk patent, col. 10, ll. 59-64).

37.     It is my opinion that the Newkirk patent fully anticipates claim 1 of the '658 patent and claim 1 of the '400 patent as shown in the claim charts provided in Exhibits 3 & 4 to this declaration. Below I explain how the Newkirk patent discloses each element of the asserted claims.

38. **"A Vending Machine For Vending Telecommunications Channel Access To A Customer, Said Vending Machine Comprising"**

The Newkirk patent meets the preamble language of the claims as illustrated by the disclosed arrangement in Fig. 4. The figure acts as a "vending machine" to vend telecommunications channel access to a customer. As expressly disclosed, the Newkirk patent states that the "arrangement shown in FIG. 4 makes it possible in a public access credit-card activated network of the type shown in FIG. 2 to also transmit computer data, the card holder who uses this network for data transmission being billed therefor by the company issuing the credit card." (Newkirk patent, col. 10, ll. 59-64).

39. **"A Payment Mechanism For Receiving Payment From The Customer" ('658 patent) And "A Payment Mechanism For Obtaining Information From The Customer To Initiate A Vending Transaction" ('400 patent)**

The card reader 12 shown in Fig. 4 of the Newkirk patent clearly meets these limitations. As explained in the Newkirk patent, "a user inserts his credit card into card reader 12" to link his portable computer to a computer thereby commencing the vending transaction. (*See* Newkirk patent, col. 11, ll. 10-15; *see also id.* col. 3, ll. 43-54 and col. 6, l. 68 - col. 7, l. 3).

40. **"A Customer Interface For Indicating The Status Of Said Vending Machine"**

The Newkirk patent discloses several alternative embodiments for a customer interface to indicate the status of the vending machine. In particular, customer interfaces disclosed in the Newkirk patent are: (1) a Liquid Crystal Display ("LCD") or other form of display to provide messages to the customer (*see* Newkirk patent, col. 7, ll. 13-15); (2) a voice chip that interacts with the caller during the card verification process (*see* Newkirk patent, col. 7, ll. 4-12) and (3) providing a dial tone to the caller once the caller's credit card information is verified (*see* Newkirk patent, col. 11, ll. 19-21).

41. **"An Electronic Circuit For Determining When The Vending Transaction Is Completed"**

The local processor 11 in Fig. 4 is the electronic circuit of the Newkirk patent that determines when the vending transaction is completed. The Newkirk patent states that "the local processor acts to time the duration of the data transmission and to create the necessary billing record in the manner previously described in connection with telephone calls." (Newkirk patent, col. 11, ll. 34-37).

42. **"A Telecommunications Channel Access Circuit Adapted To Be Connected To At Least One External Telecommunications Channel For Enabling Access To The At Least One External Telecommunications Channel At The Beginning Of A Vending Transaction And Disabling Access At The End Of The Vending Transaction"**

The switch 25 shown in Fig. 4 of the Newkirk patent meets this claim limitation. As explained, "[s]hunted across telephone set 10 is a standard telephone jack 24. A single pole double-throw mode switch 25 is provided to connect local processor 11 either to telephone set 10 for operation of the network in the telephone mode or to jack 24 for operation in the computer mode. Jack 24 is adapted to receive a standard modular plug 26 coupled by an extension cable 27 to a portable computer or data transmission device 28." (Newkirk patent, col. 10, l. 68 - col. 11, l. 8).

43. **"A Telecommunications Channel Access Connector Connected To Said Telecommunications Channel Access Circuit For Enabling Connection To An External Telecommunications Device Of The Customer"**

The jack 24 in Figure 4 is the claimed "telecommunications channel access connector." (Newkirk patent, col. 11, ll. 5-8 ("Jack 24 is adapted to receive a standard modular plug 26 coupled by an extension cable 27 to a portable computer or data transmission device 28.")).

44. **"A Control Unit Having A Storage Device For Storing Payment Information Received From The Customer And For Controlling Said Electronic Circuit And Said Telecommunications Channel Access Circuit" ('658 Patent) And "A Control Unit Having A Device For Receiving Payment Information From The Customer And For Controlling Said Electronic Circuit And Said Telecommunications Channel Access Circuit" ('400 Patent)**

The Newkirk patent meets these claim limitations as well. In particular, the Newkirk patent discloses that "[i]n order to provide billing information, a billing processor 22 at control central MCC [Master and Management Control Center] has access to the log created by the verification processor 18. In addition to the credit card number, this processor places information in the log from the local processors which provide data as to the duration of each call, the destination of the call, and where the call is made." (Newkirk patent, col. 8, ll. 10-14).

**B.     The AT&T Public Phone 2000**

45.     In a press release dated October 2, 1991 (attached as Exhibit 5), AT&T announced its Public Phone 2000 and described it as a public phone that could function as a portable office for travelers on the road. The Public Phone 2000 was equipped with a dataport that allowed users to plug their laptops into the telephone to access electronic mail or dial-up home or office databases. The phone provided a nine-inch color monitor customer interface to display graphics and text instructions to users in English and other select foreign languages.

46.     I have been informed and understand that the October 1991 AT&T press release describing the Public Phone 2000 is prior art to the PowerOasis patents. I have also been informed and understand that the United States Patent and Trademark Office did not consider the AT&T press release describing the Public Phone 2000 when it examined the PowerOasis patent applications that issued as the '658 and the '400 patents.

**C.     The Mettke Patent**

47.     United States Patent No. 5,602,905 to Mettke ("the Mettke patent") (attached as

Exhibit 6) is another example of a reference that predates the PowerOasis patents that casts serious doubt on the validity of the asserted claims. The Mettke patent, entitled "Online Communication Terminal/Apparatus" was filed on January 23, 1995 and issued on February 11, 1997. I have been informed and understand that the Mettke patent is prior art to the PowerOasis patents. I have also been informed and understand that the United States Patent and Trademark Office did not consider the Mettke patent when it examined the PowerOasis patent applications that issued as the '658 and the '400 patents..

48. The Mettke patent discloses a "pay-as-you-use" communication terminal (*e.g.*, a "vending machine") capable of interfacing with all major commercial ISPs to provide telecommunication services. (*See, e.g.,* Mettke patent, Abstract). The terminal includes a monitor to provide a customer interface. (*See, e.g.,* Mettke patent, col. 2, l. 54). Payment for services were to be made by credit card, using a "magnetic swipe" system included as part of the terminal system. (*See, e.g.,* Mettke patent, col. 2., ll. 16-17 and 55056).

49. I understand that the Court is supposed to determine the meaning of the claim language. Depending on how the Court interprets the claim language, I reserve the right to modify my opinions.

## VII. Supplementation of Opinions

50. I understand that discovery has not yet begun in this case and that the Court has not yet construed the claims of the PowerOasis patents. I therefore reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or information that may be brought to my attention. I also reserve the right to adjust or supplement my analysis in light of any critique of my report or alternative opinions advanced by or on behalf of PowerOasis.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this 04 day of November, 2004 in Hanover, New Hampshire.

_____
Dr. Edmond S. Cooley