## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| POWEROASIS, INC. and POWEROASIS NETWORKS, LLC, ) ) ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 04-12023 RWZ |
| ) | |
| WAYPORT, INC. ) | |
| ) | |
| Defendant. ) | |

## POWEROASIS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

PowerOasis Inc. and PowerOasis Networks, LLC (collectively "PowerOasis") file this

reply to the Opposition by Wayport to PowerOasis' motion for a preliminary injunction.

In a nutshell, Wayport's central argument for non-infringement is that the PowerOasis

patents only cover a "specialized 'vending machine'" like a candy machine, and not a system for

vending telecommunications access with distributed components. (Wayport Opp. at 4)  This

argument ignores the broad scope of the claim language, as well as the specific disclosure of

distributed components in the specification, and focuses instead on just one particular

PowerOasis embodiment.  This is a clear error of law.  The claims, properly construed, cover a

wide variety of embodiments, including specifically the wired and wireless implementations by

Wayport. [1]

---

[1] Wayport argues that PowerOasis relies on statements made "on information and belief" in its discussion of the Wayport system, but omits to explain that PowerOasis has since taken the deposition of Wayport by James Keeler, and that Keeler's deposition fully corroborates PowerOasis' previous understanding of the Wayport system. Relevant portions of the Keeler deposition transcript and deposition exhibits, highlighted for the benefit of the Court, are attached to the Declaration of Sibley P. Reppert filed herewith.  The designations in the right margin of the Keeler Deposition pages attached to the Declaration as Exhibit A correspond to the applicable claim elements of the patents in suit as set forth in the chart contained at page 18 of the Memorandum in support of plaintiffs' motion for preliminary injunction.  A copy of that chart is also attached to the Reppert Declaration as Exhibit B.  Exhibits C and D to the Declaration are Wayport documents describing its system that were marked as Keeler Exhibits 3 and 4.

Wayport also argues that the PowerOasis claims are invalid in light of prior art describing pay telephones with data ports. The art cited by Wayport is no more material than prior art that was specifically cited and discussed in the PowerOasis specification, and previously considered by the Examiner. Wayport ignores the fact that, as stated in the PowerOasis patents, "[t]hese payphones cannot and do not provide fiber, cable or other types of high speed communications channel access." ('400 Patent, col. 2, ln. 35-37, Duff Ex. 2) In fact, PowerOasis specifically claims several types of "high bandwidth" embodiments, including particularly the type of high speed wired and wireless installations employed by Wayport. ('400 Patent, Claims 18-22, 28, 29, 31, 35, 36, Duff Ex. 2)[2]

While Wayport contends that the claim construction offered by PowerOasis is flawed because it was authored by Chuck Schelberg, one of the PowerOasis co-inventors, Wayport never identifies any real disputes or offers any alternative claim construction. That is not surprising, since other than Schelberg's figurative use of the term "vending machine," which the Examiner understood correctly to mean a "system and method of vending telecommunications channel access . . . to a customer" (*see* Examiner's Statement of Reasons for Allowance, Aly Exhibit 7), all of Schelberg's claim constructions are based on the ordinary meaning of the claim terms.

---

[2] To rebut Wayport's invalidity attack, PowerOasis need only show that at least one claim is both infringed and valid. Independent Claim 1 of each patent in suit is infringed as explained in the motion papers, and Wayport also infringes, at a minimum, dependent Claims 18 (Wayport provides high bandwidth service, as shown by Duff Ex. 3), 20 (Wayport provides high bandwidth wired Ethernet connections, as shown by Joransen Ex. 5), 31 (Wayport provides a direct Internet connection as an Internet Service Provider, Keeler Dep. Ex. 3 at 4), and 35 (Wayport's wireless service provides a "telecommunications channel access connector [that] comprises a transceiver to connect wirelessly to an external telecommunications device of the customer," as shown by Duff Ex. 3 and Keeler Dep., Ex. 3, Figs. 2 and 3). Each of these dependent claims is clearly valid over the prior telephone art cited by Wayport.

Applying the claim terms to Wayport's own description of how its system operates, it is clear that each element is present, and Wayport infringes multiple claims of the PowerOasis patents.

1.    **The PowerOasis Patents Are Not Limited To Candy-Type Vending Machines**

Contrary to Wayport's argument that the "fundamental" or "core concept" of the PowerOasis invention is a candy-type vending machine, the PowerOasis patents clearly explain that the required elements do not all need to be in a unitary box. The specification states that "this invention is not limited to a fixed location." ('400 Patent, col. 4, ln. 25) The "payment mechanism" can operate through software on the user's laptop. ('400 Patent, col. 2, ln. 55-56) The "customer interface" can also be present inside or uploaded to the user's laptop. ('400 Patent, col. 6, ln. 20-23) The "control unit" can be located remotely from the access connectors used by customers. ('400 Patent, col. 4, ln. 23-38; col. 11, ln. 28-30) The specification goes on to state explicitly,

> "Similarly, almost any combination of functional components of the vending machine could be moved to a location remote from the machine. This could be accomplished, for example, by networking a cluster of machines to a server either on site or at a remote location."

('400 Patent, col. 4, ln. 33-38; col. 11, ln. 28-30)

Wayport's discussion of the facts is misleading, and cites only to Figure 2 of the patents, which shows the operating panel of *one embodiment* of the invention. (See '400 Patent, claims 41 and 42, in which the "vending machine is disposed within a booth," or "disposed on a kiosk.") This is clearly not the only embodiment disclosed in the PowerOasis patents. Wayport never even mentions any other embodiments, particularly those that utilize high bandwidth wireless or infrared connections. ('400 Patent, col. 2, ln. 61-65; col. 4, ln. 4-7 and 23-25; col. 6, ln. 27-29; and Claims 18, 21, 29, 35, 36)

Even if PowerOasis only disclosed a single embodiment (which they did not), the Court

of Appeals for the Federal Circuit has made clear that it is an error of law to construe a claim

solely by reference to a single embodiment described in the specification. *Home Diagnostics,*

*Inc. v. LifeScan, Inc.,* 831 F.3d 1352 (Fed. Cir. 2004). (Claim element requiring "detection of a

suitably stable endpoint" is not limited to "predetermined timing method" of determining end of

the measurement period, even though patent only disclosed this method as the preferred

embodiment.) "[T]he applicant's choice to describe only a single embodiment does not mean

that the patent clearly and unambiguously disavowed other embodiments." *Id.* at 1358. "The

patent's preferred embodiment is just that – one way of using the invention." *Id.* "A patentee

may claim an invention broadly and expect enforcement of the full scope of that language absent

a clear disavowal or contrary definition in the specification." *Id.*

Wayport also misleads the Court by twice misstating the Examiner's reasons for

allowance as requiring a "physical combination" of elements, as if to infer that the Examiner

construed "vending machine" to be like a candy machine. (Wayport Opp. at 11)  In fact, the full

quote from the Examiner's statement is:

> "The following is an Examiner's Statement of Reasons for Allowance: none of the art of
> record suggest nor teach the system and method of vending telecommunications channel
> access and power to a customer having the *physical combination of elements and steps* as
> set forth in independent claims 1, 23, and 24." (emphasis added)

(Aly Exhibit 7)  Of course, the components in the PowerOasis (and Wayport!) system are

connected physically (*e.g.,* electronically).  However, the Examiner's reference to a "physical

combination of *elements and steps*" is not a requirement that all elements be combined in a single

box, as suggested by Wayport.  Any such reading would fly in the face of the clear teaching of

the specification as well as the claims, as discussed above.

- 4 -

## 2.   The Payment Mechanism Can Include "Remote" Components

The PowerOasis patents clearly describe the "payment mechanism"[3] in broad terms,

including the use of the customer's laptop as part of the payment mechanism.  ('400 Patent, col.

2, ln. 50-61; col. 6, ln. 58–col. 7, ln. 3)

In addition, the use of a "remote billing server" for centralized processing and

authentication such as used by Wayport was specifically contemplated in the PowerOasis patents,

and was both *disclosed* and *claimed*:

> "It is possible to . . . require the central control unit 106 to contact a central computer and
> obtain payment approval before allowing a transaction to begin.  It is noted that in some
> instances, no bank authorization is required. In this case, upon successful connection to
> the vending machine, the vending machine calls a billing computer for payment
> authorization.  The billing computer would approve or disapprove the transaction based
> on information stored in the billing computer."

('400 Patent, col. 7, ln. 42-54)

> "In another version, the central control unit 106 must contact a central computer for
> approval before allowing a transaction to begin."

('400 Patent, col. 11, ln. 22-26)

> "A vending machine as claimed in claim 1, wherein said control unit is located remote
> from said vending machine."

('400 Patent, Claim 38)

This is no different from the Wayport system in which "customer payment information is

encrypted at the user's computer and sent (encrypted) to a central server for processing."

(Wayport Opp. at 16)  James Keeler, Wayport's Rule 30(b)(6) witness, admitted that Wayport

has the claimed payment mechanism.[4]  (Keeler Dep, p. 12, ln. 16– p. 13, ln. 24; p. 15, ln. 7-11,

p. 54, l. 12–p. 55, l. 6; p. 57, l. 20–p. 59, l. 9; Dep. Ex. 3, Figs. 2 and 3)

---

[3] Claim element 1[a] in PowerOasis' claim chart (PowerOasis Memorandum at 29).

Clearly, Wayport understands that all functions of the "vending machine," such as the

"payment mechanism," do not need to be performed in a single candy machine-like box.

### 3.    The Customer Interface Can Include A Laptop Computer

Wayport accuses PowerOasis of a "distorted reading" of the claim element for a

"customer interface for indicating the status of said vending machine"[5] that includes the

information displayed on a customer's computer screen. (Wayport Opp. at 12-13)  Of course, the

displayed information (the "Wayport 'Welcome Page'") comes from Wayport.  (Wayport Opp. at

2; Keeler Decl. ¶10)

The PowerOasis specification clearly states:

> "[t]he user interface is not particularly limited and need not even include a visual display
> on the vending machine."

('400 Patent, col. 3, ln. 7-9)  Moreover, the specification specifically discloses the use of an

interface that displays information on the customer's computer:

> "Alternatively, the user interface can be present inside or uploaded to the user's laptop or
> other device thereby obviating the need for an interface within the vending machine unit."

('400 Patent, col. 6, ln. 20-23)

Wayport's 30(b)(6) witness admitted that it has the customer interface of claim element

1[b].  (Keeler Dep., p. 21, ln. 7–p. 23, ln. 13; p. 83, l. 4–p. 84, l. 7; Dep. Ex. 4 at 5)

### 4.    The Telecommunication Channel Access Connector Includes A Wireless Connection

Wayport argues, remarkably, that its wireless installations do not include a

"telecommunication channel access connector," (element 1[e]) which it contends can only mean

a "plug." (Wayport Opp. at 13)  Of course, Wayport has both *wired* and *wireless* installations,

not just wireless.  (Wayport Opp. at 2; Keeler Decl., ¶6)

---

[5]Identified as Claim 1[b] in the PowerOasis claim chart located at page 29 of its Memorandum.

Moreover, no genuine argument can be made that the wireless connections of Wayport do not include a telecommunications channel access connector. PowerOasis explicitly described in the specification "connecting to the appropriate connector (also know [sic] as outlet, receptacle, or plug) *either through physical means or through wireless connections* such as infrared." ('400 Patent, col. 2, ln. 61-65) (emphasis added) *See also*, '400 Patent, col. 4, ln. 1-7 ("connecting through infrared or other *wireless* connection"); col. 4, ln. 23-25 ( "Using an internal power source and *wireless* telecommunications channels, this invention is not limited to a fixed location."); col. 6, ln. 27-29 ("*wireless* connector").

In addition, claim 35 is specifically directed at wireless connections:

"A vending machine as claimed in claim 1, *wherein said telecommunications channel access connector comprises a transceiver to connect wirelessly* to an external telecommunications device of the customer."

('400 Patent, col. 18, ln. 7-10) (emphasis added) This claim is clearly met by the wireless connections described in the Joransen and Duff Declarations, the essential facts of which are confirmed by the description of the operation of the Wayport system in the Wayport Opposition memorandum, as well as the Keeler and Cooley Declarations and the Keeler Deposition. (*See, e.g.,* Keeler Dep., p. 28, ln. 7-23; p. 48, l. 7-p. 49, l. 17)

## 5.  The Control Unit Is Clearly Present In The Wayport System

Wayport correctly points out that the "control unit" in the PowerOasis claims (element 1[f]) controls both the "electronic circuit" for determining when the vending transaction is completed, and the "telecommunications channel access circuit" for enabling and disabling external telecommunications channel access.[6] (Wayport Opp. at 13-14) Otherwise, Wayport raises no quarrel with the construction of this element. The facts, as described by Wayport in the Cooley

---

[6] The Affidavit of Charles C. Schelberg correctly states the construction of element 1[f]: "'Controlling said electronic circuit and said telecommunications circuit' means electronically controlling the circuit."

Declaration, and confirmed in the Keeler deposition, show that the Network Management Device ("NMD"), in with conjunction with instructions from the remote billing server, meets this element through the use of "firewall rule sets" to enable and disable access to the Internet for properly authorized users. (Cooley Decl., ¶24; Keeler Dep., p. 18, ln. 20-p. 21, ln. 3; p. 23, ln. 14-p. 25, ln. 19; p. 32, ln. 10-p. 33, ln. 6; p. 51, l. 7-12; p. 57, l. 20-p.59, l. 9; Dep. Ex. 3, Figs. 2 and 3)

Mr. Cooley and Wayport quibble that Wayport does not "vend" telecommunications channel access. Instead, Mr. Cooley states that Wayport "sells subscriptions to Internet service . . . for prescribed time periods (*e.g.*, a day)." Mr. Cooley, who is purportedly "independent," neglects to mention that Wayport sells Internet access for periods as short as two hours, such as at all the new McDonald's installations. (Keeler Dep., p. 102, ln. 9–p. 103, ln. 2) The differences between PowerOasis' and Wayport's billing and business models are irrelevant. Wayport still uses a control unit (the NMD), in conjunction with the billing server, to keep track electronically of the access period selected and paid for by the customer, compared with the time on an internal electronic clock. The longer the access period selected by the customer, the more the customer pays. At the beginning of the transaction, the customer's selection and payment are verified, and the NMD opens the firewall to permit the customer to have widespread access to the Internet. When the electronic clock runs out of time, the vending transaction is completed and the NMD changes the firewall rules to disable Internet access. Thus, the NMD controls both the "electronic circuit," and the "telecommunications channel access circuit," as required by the claims. (Keeler Dep., p. 19, ln. 16–p. 21, ln. 3; p. 23 ln. 14–p. 25, ln. 19; p. 33, ln. 7–p. 34, ln. 16; p. 58, l. 17-p. 59, l. 9; Dep. Ex. 3, Figs 2 and 3)

**6.    The Telephone-With-Data-Port Prior Art Does Not Invalidate The Patents**

In its initial patent application, PowerOasis disclosed payphones, pay facsimiles and pay TV, including specifically payphones that have an RJ11 plug that can connect to an external device of a customer, including a computer. PowerOasis stated, "[t]hese payphones cannot and do not provide fiber, cable, or other types of communications channel access." ('400 Patent, col. 2, ln. 36-38)

The Newkirk patent and the other payphone-with-data port art cited by Wayport are no more relevant than the art already of record. Newkirk simply shows a public access network that works over existing telephone lines, which customers can access via a credit card that is verified by a central processor. There is no disclosure in Newkirk of high speed or high bandwidth connections, or fiber optic or wireless connections. Likewise, there is no disclosure in Newkirk, or any of the other pay telephone art, of a direct Internet connection via an Internet Service Provider. Accordingly, even if one accepts *arguendo* Wayport's argument that Newkirk anticipates claim 1 of the PowerOasis patents, there is no basis to suggest that it anticipates the dependent claims that include such limitations. ('658 and '400 Patents, claims 18-22, 28, 29, 31, 35, 36) These dependent claims stand as separate inventions that are independently valid.

Moreover, the argument that Newkirk is invalidating prior art under-cuts Wayport's own argument that a "vending machine" cannot include distributed components and functions. Newkirk is expressly directed at a system enabling the use of credit cards to pay for telecommunications access, where the caller's credit card information is verified by a central verification processor. Only if the card passes the appropriate tests at the central computer is the telephone set activated and the caller permitted to dial. This aspect of the Newkirk system is

- 9 -

similar to the Wayport system that uses a billing server to authenticate payment and instruct the NMD how long to permit the customer to have Internet access.

The Mettke patent cited by Wayport is likewise limited to existing telephone lines. It also requires a built-in terminal including a CPU and keyboard, and thus does not satisfy limitation 1(d) of each of the patents in suit regarding "an external telecommunications device of the user."

**7.    Wayport Is Causing Irreparable Harm to PowerOasis**

PowerOasis is entitled to a presumption of irreparable harm because it has made a "strong showing of infringement and validity, and [Wayport's] defenses lack[] substantial merit."[7] *BioTechnology General Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1555 (Fed. Cir. 1996).[8]  Time is of the essence in this market, and PowerOasis will never be able to meaningfully exercise its patent rights if huge competitors like Wayport are allowed free reign to infringe.

Wayport's cry of "undue delay" rings hollow, because the '400 patent issued only months ago, and PowerOasis did not obtain a full understanding of the Wayport system until recently.

**8.    Wayport Should Be Preliminarily Enjoined**

To deny an injunction would be to trample on the patent rights of PowerOasis and to support an egregious infringer merely because of its size and market power. Upholding patent rights is a higher public interest than permitting Wayport to continue to vend infringing wired and Wi-Fi access.

---

[7] The Court has discretion under F.R.Civ.P. 65(c) to dispense with the requirement that PowerOasis post a bond, and should do so in this case in light of the strong likelihood that PowerOasis will succeed on the merits.  See, *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972).

[8] Additional case law supporting PowerOasis is cited in its initial Memorandum at 10-11.

Respectfully submitted,

POWEROASIS, INC. and
POWEROASIS NETWORKS, LLC

By their attorneys,

Sibley P. Reppert, B.B.O. No. 416900
William A. Scofield, Jr., B.B.O. No. 448940
LAHIVE & COCKFIELD, LLP
28 State Street
Boston, Massachusetts 02109 - 1784
(617) 227-7400 (telephone)
(617) 742-4214 (fax)

## Certificate of Service

I, Sibley P. Reppert, hereby certify that on November 12, 2004, I caused a copy of the foregoing document and of the Declaration of Sibley P. Reppert to be delivered by hand to counsel of record.

Sibley P. Reppert

- 11 -