**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| POWEROASIS, INC. AND POWEROASIS NETWORKS, LLC, | ) ) ) | |
| Plaintiffs/ Counterclaim-Defendants, | ) ) ) | Civil Action No.:  04-12023-RWZ |
| v. | ) ) ) | Hon. Rya W. Zobel |
| WAYPORT, INC., | ) ) | |
| Defendant/ Counterclaim-Plaintiff. | ) ) ) | |

**WAYPORT'S REBUTTAL CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. CLAIM CONSTRUCTION PRINCIPLES .............................................................1

III. THE PATENTS-IN-SUIT.......................................................................................3

   A. Background Of The Claimed Invention ..............................................................4

   B. The Solutions Described In The PowerOasis Patents ..........................................4

   C. The Prosecution History Of the PowerOasis Patents ..........................................6

IV. THE DISPUTED CLAIM TERMS..........................................................................7

   A. Person Of Ordinary Skill In The Art ...................................................................7

   B. Independent Claim 1 ............................................................................................8

   C. Construction of Disputed Claim Terms ...............................................................8

     1. "Vending machine" ('658 and '400 patents) .................................................8

       a) Preamble As A Limitation.......................................................................9

         (1) "Vending Machine" Serves As An Antecedent Basis .....................9

         (2) The Preamble Is Necessary To Give Structure To The Claimed Inventions...10

       b) Plain Meaning Of The Term "Vending Machine"..................................12

         (1) The Claim Language ......................................................................12

         (2) The Specification...........................................................................13

         (3) Prosecution History ......................................................................17

         (4) Extrinsic Evidence ........................................................................18

       c) Conclusion.............................................................................................19

     2. "Payment mechanism" ('658 and '400 patents, Claim 1[a]).......................19

     3. "Customer interface for indicating the status of said vending machine" ('658 and '400 patents, Claim 1[b]) ...........................................................21

     4. "A telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction" ('658 and '400 patents, Claim 1[d])....22

     5. "A telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer ('658 and '400 patents, Claim 1[e]) .....24

     6. "Said customer interface comprises a mechanism that interfaces with software supplied by the customer" ('658 and '400 patents, Claim 15)..................25

     7. "A vending machine as claimed in claim 1, wherein said control unit is located remote from said vending machine" ('658 and '400 patents, Claim 38)..................25

V. CONCLUSION .....................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001) ............................................................................ 20

*Applied Materials, Inc. v. Advanced Semiconductor Materials of America, Inc.,*
98 F.3d 1563 (Fed. Cir. 1996) .............................................................................. 10

*Bell Atlantic Network Services v. Covad Communications Group, Inc.,*
262 F.3d 1258 (Fed. Cir. 2001) ............................................................................ 13

*Bell Communications Research, Inc v. Vitalink Communications Corp.,*
55 F.3d 615 (Fed. Cir. 1995) ............................................................................. 9, 10

*CCS Fitness, Inc. v. Brunswick Corp.,*
288 F.3d 1359 (Fed. Cir. 2002) ............................................................................ 13

*Chef America, Inc. v. Lamb-Weston, Inc.,*
358 F.3d 1371 (Fed. Cir. 2004) ........................................................................ 19, 26

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
388 F.3d 858 (Fed. Cir. 2004) ................................................................................ 3

*In Re Crish,*
393 F.3d 1253 (Fed. Cir. 2004) ............................................................................ 11

*In re Cruciferous Sprout Litigation,*
301 F.3d 1343 (Fed. Cir. 2002) ............................................................................ 10

*Eaton Corp. v. Rockwell International Corp.,*
323 F.3d 1332 (Fed. Cir. 2003) .............................................................................. 9

*Elekta Instrument S.A. v. O.U.R. Sci. International, Inc.,*
214 F.3d 1302 (Fed. Cir. 2000) ............................................................................ 13

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
909 F.2d 1464 (Fed. Cir. 1990) ............................................................................ 20

*Intell-A-Check Corp. v. Autoscribe Corp.,*
346 F. Supp. 2d 698 (D.N.J. 2004) ......................................................................... 9

*Intirtool, Ltd. v. Texar Corp.,*
369 F.3d 1289 (Fed. Cir. 2004) ........................................................................ 11, 12

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
383 F.3d 1295 (Fed. Cir. 2004) ............................................................................ 14

*Kumar* v. *Ovonic Battery Co.,*
351 F.3d 1364, 1368 (Fed. Cir. 2003) ................................................................... 12

## CASES

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995) ............................................................................. 3

*Merck & Co., Inc. v. Teva Pharms USA, Inc.,*
395 F.3d 1364 (Fed. Cir. 2005) ......................................................................... 19

*Phillips v. AWH Corporation,*
415 F.3d 1303 (Fed. Cir. July 12, 2005) .......................................................... *passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
182 F.3d 1298 (Fed. Cir. 1999) ......................................................................... 9

*Poly-America, L.P. v. GSE Lining Technology, Inc.,*
383 F.3d 1303 (Fed. Cir. 2004) ......................................................................... 10

*Renishaw PLC v. Marposs Societa per Azioni,*
158 F.3d 1243 (Fed. Cir. 1998) ......................................................................... 13, 17

*ResQNet.com, Inc. v. Lansa, Inc.,*
346 F.3d 1374 (Fed. Cir. 2003) ......................................................................... 13

*Rowe v. Dror,*
112 F.3d 473 (Fed. Cir. 1997) ........................................................................... 9

*Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,*
242 F.3d 1337 (Fed. Cir. 2001) ......................................................................... 16

*Seachange Intern., Inc. v. C-COR, Inc.,*
413 F.3d 1361 (Fed. Cir. 2005) ......................................................................... 10

*Spectrum Int'l, Inc. v. Sterilite Corp.,*
164 F.3d 1372 (Fed. Cir. 1998) ......................................................................... 11

*SuperGuide Corp. v. DirecTV Enterprises, Inc.,*
169 F. Supp. 2d 492 (W.D.N.C. 2001) .............................................................. 20

*Vitronics Corp. v. Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996) ........................................................................... 1, 2

## MISCELLANEOUS

3 Walker on Patents § 11:5 (3rd ed. 1985) ........................................................ 20

## I.    INTRODUCTION

As the Federal Circuit recently affirmed in an *en banc* opinion, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude'" and that the "words of a claim 'are generally given their ordinary and customary meaning' . . . to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corporation et. al,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In short, the plain meaning of a claim's words is the critical component of claim construction.

Despite *Phillips*, Plaintiffs and Counterclaim-Defendants PowerOasis, Inc. and PowerOasis Networks LLC (collectively, "PowerOasis") propose claim constructions in this litigation that *directly contradict* the plain meaning of critical claim terms. PowerOasis bases its proposed constructions on no more than a handful of disconnected quotations that have been wrenched out of context and selectively edited from the patent specifications and file histories. Despite PowerOasis' efforts to the contrary, the plain language of the asserted claims, supported by the specifications and file histories of the patents-in-suit, establish that the claimed invention includes a "vending machine" consisting of physically connected parts. Indeed, PowerOasis itself admits that this is the plain meaning of "vending machine." (PowerOasis' Memorandum on Claim Construction ("PO Br.") at 10). PowerOasis' improper attempts to expand the scope of the claims distort the intrinsic evidence in this case, and ignore the Federal Circuit's *Phillips* holding.

Thus, pursuant to the recently reiterated and long-settled principles of claim construction, this Court should reject the improperly overbroad claim constructions proffered by PowerOasis and adopt, instead, the narrower constructions comporting with the plain meaning of the intrinsic evidence proposed below by Defendant and Counterclaim-Plaintiff Wayport, Inc. ("Wayport").

## II.    CLAIM CONSTRUCTION PRINCIPLES

The Federal Circuit's recent *en banc* decision in *Phillips* clarified the law of claim construction, reaffirming that courts engaged in claim construction should focus on the

"intrinsic" evidence of record. *Phillips v. AWH Corporation et. al,* 415 F.3d 1303, 1312-17 (Fed. Cir. 2005). Intrinsic evidence includes a patent's claims, specification, and when in evidence, prosecution history. *Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1582 (Fed. Cir. 1996). Among the sources of intrinsic evidence, there is a hierarchy of relevance and weight – courts should first look to the plain language of the claims, then to the specification, and finally to the prosecution history. *Phillips*, 415 F.3d at 1312-17.

As *Phillips* reinforced, all claim construction starts with the plain meaning of the claims themselves: "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1312-13. With respect to the specification (the portions of the patent other than the claims), "[i]t is … entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317; *see also Vitronics*, 90 F.3d at 1583 (noting that the prosecution history "is of critical significance in determining the meaning of claims"). As to prosecution history, which "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent," *Phillips* held that a court should also consider the patent's prosecution history in connection with claim construction. 415 F.3d at 1317. However, the Federal Circuit cautioned against relying too heavily on prosecution history, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Beyond intrinsic evidence, *Phillips* also delineated the role of "extrinsic" evidence in claim construction. *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* The Federal Circuit limited the weight of extrinsic evidence's relevance, however, cautioning

that "while extrinsic evidence 'can shed useful light on the relevant art,' we have explained that it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id., quoting C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004). Moreover, *Phillips* criticized courts' reliance on dictionaries, especially general dictionaries, for claim construction purposes (415 F.3d at 1321), and explicitly warned against reliance on extrinsic evidence that is "conclusory or unsupported," "clearly at odds with the claim construction mandated by the claims themselves," or "suffers from bias." *Id., at* 1318. Finally, *Phillips* did nothing to upset settled law that disfavors considering named inventors' testimony during the claim construction process. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) (holding that such testimony is disfavored due to inherent bias).

## III. THE PATENTS-IN-SUIT

PowerOasis asserts U.S. Patent Nos. 6,466,658 and 6,721,400 ("the '658 patent" and "the '400 patent," respectively) (Exh. 1 and 2) against Wayport.[1] The patents-in-suit are both entitled "Power and Telecommunications Access Vending Machine," and share related prosecution histories. The '400 patent issued from a patent application that PowerOasis characterized as a "continuation" of the same patent application that issued as the '658 patent. ('400 patent, col. 1, ll. 6-8).

While PowerOasis initially alleged infringement of 14 claims from each patent, it later dropped several claims-- including claim 1 (the patents' sole independent claim).[2] Claims 15, 18, 31, 35, 38, 40 and 49 are the remaining asserted claims. (Exh. 3, July 26, 2005 Reppert Ltr. to Bassett).

---

[1] Exhibits referenced in this Brief are attached to the Declaration of Amr O. Aly, which is being filed contemporaneously herewith.

[2] On September 20, 2004, PowerOasis asked this Court to issue a preliminary injunction against Wayport based primarily on Wayport's alleged infringement of claim 1 of the '658 and '400 patents. Now, PowerOasis is not even asserting that Wayport infringes claim 1.

### A.    Background Of The Claimed Invention

The patents-in-suit "relate[] to the vending of electricity, telecommunications and/or other utilities." ('658 patent, col. 1, ll. 16-19; '400 patent, col. 1, ll. 20-22). According to the patents themselves, the alleged invention was intended to address the problems of travelers faced with limited battery life for battery-operated devices ('658 patent, col. 1, ll. 23-30; '400 patent, col. 1, ll. 26-33) as well as travelers in need of access to "telecommunications channels." ('658 patent, col. 1, ll. 35-42; '400 patent, col. 1, ll. 37-44).

In the '658 and '400 patent specifications, PowerOasis identified three prior art references, including U.S. Patent No. 5,544,784, issued to Francis P. Malaspina and entitled "Rechargeable Battery Vending Machine" ("the Malaspina patent") (Exh. 4). The '658 and '400 patent specifications suggest that these prior art references failed to adequately address certain travelers' problems related to telecommunications access. Specifically, the specifications asserted that: "[h]owever, these payphone installations do not provide AC power to operate an accessory or a computer and are limited to providing access to the telephone network line connected to the payphone. These payphones cannot and do not provide fiber, cable or other types of communications channel access. Further *these payphones that do accept credit cards as a means of payment still require the central office to process the transaction **before** the phone can be used*." ('658 patent, col. 2, ll. 22-36; '400 patent, col. 2, ll. 26-40) (emphasis added).

### B.    The Solutions Described In The PowerOasis Patents

The patents-in-suit describe a specialized "vending machine" for vending electrical power and/or telecommunications access to a customer. Instead of selling candy, soda or toys, however, these "vending machines" sell electrical power and/or access to a telecommunications channel. ('658 patent, col. 2, ll. 39-41; '400 patent, col. 2, ll. 42-44; Declaration of Dr. Edmond S. Cooley ("Cooley Decl.") at ¶ 15) (filed herewith). The disclosed invention is essentially a specialized payphone for computers. (Cooley Decl. at ¶ 15). Just as a call from a payphone begins when one inserts money and ends when one hangs up, the telecommunications transaction provided by the PowerOasis patents' vending machine begins when payment is received and

ends when the user disconnects from the machine. ('658 patent, col. 2, ll. 61-65; '400 patent, col. 2, l. 65 – col. 3, l. 2; Cooley Dec. at ¶ 15). The user is denied access to the telecommunications channel until payment is made. ('658 patent, col. 2, ll. 43-54; '400 patent, col. 2, ll. 50-54: "This invention provides access to one or more utilities *after* the customer provides payment in electronic form (e.g. credit card, debit card, smart card or other forms of electronic or magnetic currency devices) or optionally, currency") (emphasis added).

Figure 2 in the '658 and '400 patents illustrates one embodiment of the alleged invention:



FIG. 2

Figure 2 shows the front view of a vending machine operating panel for vending power and telecommunications channel access. ('658 patent, col. 5, ll. 13-14; '400 patent, col. 5, ll. 16-17; Cooley Decl. at ¶ 17). The customer sees an operating panel (101) with a "user interface" (110), which in this embodiment is a light. The operating panel (101) includes a payment processing unit (114) in the form of a credit card swipe reader; a power connector (108) in the form of a standard electrical socket, and a telecommunications channel access connector (122) in the form of a standard telephone line connector. ('658 patent, col. 5, ll. 56-63; '400 patent, col. 5, l. 61 – col. 6, l. 2). To operate the vending machine, a customer swipes her credit card through the payment mechanism (114) and plugs her equipment into the appropriate connectors (108) and/or (122). The customer interface light (110) indicates the status of the transaction. ('658 patent, col. 8, l. 64 – col. 9, l. 8; '400 patent, col. 9, 1-11). After the customer completes the

transaction, she removes the power plug from the power connector (108) and/or disconnects the cable from the socket (122). The vending machine then detects the disconnection and ends the transaction. ('658 patent, col. 9, ll. 15-20; '400 patent, col. 9, ll. 18-22; Cooley Decl. at ¶¶ 17-18).

Figure 5 below illustrates another embodiment of the alleged invention configured in a telephone booth style structure. ('658 patent, col. 5, ll. 20-22; '400 patent, col. 5, ll. 24-26).



FIG. 5

In this embodiment, the vending machine (501) is located on the sidewall (503) of a vending unit (502). Panel (501) contains electrical receptacles (508), video display unit (510), telecommunications access connectors (522), and card swipe (514). All other components of the described "vending machine" are hidden within the physical structure. ('658 patent, col. 11, ll. 51-61; '400 patent, col. 11, ll. 54-64; Cooley Decl. at ¶ 20).

### C.    The Prosecution History Of the PowerOasis Patents

The '658 and '400 patents stem from a series of "continuation" and "continuation-in-part" patent applications.[3] The first of these previous applications was filed on February 6, 1997, ultimately issued as U.S. Patent No. 5,812,643 ("the '643 patent") (Exh. 5), and is not asserted in this litigation.

---

[3]    A "continuation" application is a subsequent patent application that is filed while the original patent application (sometimes referred to as the "parent") is still pending. A continuation has the same disclosure as the patent application. In contrast, a continuation-in-part ("CIP") application is an application filed while the parent is still pending that contains some "new matter" different from that in the parent application.

The prosecution histories of the patents-in-suit go back to the parent '643 patent and span several patent applications.  Working backwards through the patent family chain, the relationship between the patents-in-suit and the related previous patent applications, as explained in the '400 patent (at col. 1, ll. 6-15), is as follows:

- The '400 patent is a "continuation" of the application that issued as the '658 patent;
- The '658 patent is a "continuation" of the application that issued as U.S. Patent No. 6,314,169 ("the '169 patent") on June 15, 2000;
- The '169 patent is a "continuation-in-part" of U.S. Patent Application Ser. No. 09/156,487 ("the '487 Application") (Exh. 6), which was abandoned; and
- The '487 Application is a "continuation" of the application that issued as the '643 patent.

## IV.    THE DISPUTED CLAIM TERMS

The parties have agreed on constructions for several terms that were previously in dispute.[4]  The seven disputed claim terms addressed below still require this Court's construction.

### A.    Person Of Ordinary Skill In The Art

It is a fundamental premise of claim construction law that claim terms are to be construed as they would have been understood by one of ordinary skill in the art at the time of the claimed invention.  *Phillips*, 415 F.3d at 1313.  PowerOasis' own brief repeatedly states that particular claim terms are to be construed based on what a person of skill in the art would have understood the disputed claim term to mean.  (*See, e.g.*, PO Br. at 4, 5).  Inexplicably, however, PowerOasis nowhere provides the Court with a proposal of who would be such a person of ordinary skill in the art.

The "relevant art" of the '658 and '400 patents is that of telecommunications systems and of access to such systems.  In the context of the patents-in-suit, a person of ordinary skill in the art would be a person with a basic understanding of the engineering principles and techniques associated with telecommunications systems and access to such systems.  (Cooley Decl. at ¶ 12).  He would likely have a four-year college degree in engineering (such as electrical engineering or computer science), as well as one or two more years of experience working in the

---

[4]    For the Court's convenience, Wayport has listed the proposed constructions of terms no longer in dispute. (See Appendix A, attached hereto).

telecommunications industry. (*Id.*). A technician without a college degree but with sufficient industrial experience (four or five years) working with telecommunications access issues also would have been considered one of ordinary skill in the art. (*Id.*).

### B.     Independent Claim 1

All of the asserted claims (15, 18, 31, 35, 38, 40 and 49) of the '658 and '400 patents are dependent of independent claim 1, recited below:[5]

1. A **vending machine** for vending telecommunications channel access to a customer, **said vending machine** comprising:

[1.a] a **payment mechanism** ['658 patent: for receiving payment] ['400 payment: for obtaining information] from the customer ['400 patent: to initiate a **vending transaction**];

[1.b] a **customer interface** for indicating the status of **said vending machine** ;

[1.c] an electronic circuit for determining when the vending transaction is completed;

[1.d] a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for **enabling access** to the at least one external telecommunications channel **at the beginning of a vending transaction and disabling access at the end of the vending transaction**;

[1.e] a **telecommunications channel access connector** connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and

[1.f] a control unit ['658 patent: having a storage device for storing payment information received] ['400 patent: having a device for receiving payment information] from the customer and for controlling said electronic circuit and said telecommunications channel access circuit.

### C.     Construction of Disputed Claim Terms

   **1.**     "**Vending machine**" ('658 and '400 patents: preamble, 1[b], 15, 18, 31, 35, 38, 40, 49)[6]

| TERM | WAYPORT'S CONSTRUCTION | POWEROASIS' CONSTRUCTION |
|---|---|---|
| "Vending machine" | *A mechanically, electrically, or electronically operated device or unit for dispensing goods or services to a single customer at a time when the customer provides sufficient payment.* | *"Vending machine for vending telecommunications channel access to a customer" means a system and method for vending telecommunications channel access to a customer.* |

---

[5]     Claim 1 of the '658 patent and claim 1 of the '400 patent are nearly identical. The difference between the claims is addressed in the bracketed language. Disputed terms are in bold: In addition, for the Court's convenience, Wayport has adopted PowerOasis' nomenclature (*e.g.*, 1[a], 1[b], etc.) to refer to the sub-parts of the body of claim 1.

[6]     The numbers referenced within the parentheses are the patents-in-suit claim numbers that include the disputed terms or phrases.

a)     Preamble As A Limitation

Prior to determining the plain meaning of the disputed term "vending machine," the Court must first resolve whether the preamble to claim 1 (which contains the term "vending machine") itself functions as a claim limitation.  Under the facts of this case, it clearly does.

The "preamble" is the portion of the claim that includes everything before the so-called "transitional phrase."[7]  It can function as a claim limitation when any one of the following three circumstances exists: 1) the preamble serves as an "antecedent basis"; 2) the preamble is necessary to give "structure" to the claimed invention; or 3) the preamble is relied upon during prosecution.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305-06 (Fed. Cir. 1999); *see also Rowe v. Dror*, 112 F.3d 473, 478-79 (Fed. Cir. 1997).  In this case, the preamble functions as a limitation both because it serves as an antecedent basis and because it is necessary to give structure to the claimed invention.

(1)     "Vending Machine" Serves As An Antecedent Basis

Where the body of the claim explicitly refers back to a preamble term by using, for example, the word "said," the preamble term is the antecedent basis for the term as found in the body of the claim.  The Federal Circuit has found that a preamble term that serves as an antecedent basis functions as a limitation.  *See, e.g., Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When the body of the claim refers to '*said* vehicle master clutch (8),' and '*said* drive train,' it is referring back to the particular clutch and the particular drive train *previously described in the preamble*" therefore limiting the claim) (emphasis added); *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 621 (Fed. Cir. 1995) (finding that claimed method's reference to 'said packet' expressly incorporated preamble language describing packets).  When a preamble serves as an "antecedent basis" for words or phrases in the body of the claim, the preamble limits the claim because the patentees used *both* the claim's preamble and body to define the invention.  *Id.* at 620 ("[W]hen the claim

---

[7]     Generally speaking, there are three parts to every claim: the preamble, the transitional phrase, and the body. The transitional phrase, *e.g.*, "comprising" or "consisting of," connects the preamble to the body of the claim.  *Intell-A-Check Corp. v. Autoscribe Corp.*, 346 F.Supp.2d 698, 704 (D.N.J. 2004).

drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects") (citations omitted).

Here, PowerOasis does not dispute, as it cannot, that the claim 1 preamble recitation of "vending machine" provides the antecedent basis for sub-paragraph 1[b] of claim 1's "said vending machine." Per Federal Circuit precedent, therefore, the preamble's "vending machine" language is a claim limitation in the PowerOasis patents.

(2)    The Preamble Is Necessary To Give Structure To The Claimed Inventions

A preamble is also a limitation when it "recites essential structure or steps or if it is necessary to give life, meaning, and vitality to the claim." *See Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1375-76 (Fed. Cir. 2005) (internal quotations omitted) (citations omitted); *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1309-10 (Fed. Cir. 2004) ("when reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation") (citations omitted).

To determine whether a preamble's language states the purpose and context of the invention so as to serve as a claim limitation, courts must examine the overall form of the claim and the invention, both as described in the specification and as illuminated by the prosecution history. *See Applied Materials, Inc. v. Advanced Semiconductor Materials of America, Inc*., 98 F.3d 1563, 1572-73 (Fed. Cir. 1996) (citations omitted); *see also In re Cruciferous Sprout Litig*., 301 F.3d 1343, 1347 (Fed. Cir. 2002) (stating that determining whether a preamble is a limitation requires a review of the entire patent "to gain an understanding of what the inventors actually invented and claimed"); *Bell Communications*, 55 F.3d at 621 (looking to patent specification to determine whether claimed invention includes preamble recitations). Moreover, whether the preamble recites a structure that is "important" to the invention is a key consideration as to its status as a limitation. *Poly-America*, 383 F.3d at 1310.

- 10 -

Here, the term "vending machine" not only appears "many times" in the patent specifications, as PowerOasis concedes (PO Br. at 9)-- it in fact appears *well over 80 times* in the patents-in-suit, including in each and every asserted claim, in the patents' titles and in the Summary of the Invention.

PowerOasis mistakenly relies on *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289 (Fed. Cir. 2004), to support its argument that "vending machine" should not be a limitation. (PO Br. at 8). In fact, *Intirtool* supports Wayport's position. First, *Intirtool* acknowledged that a preamble term could be a limitation. 369 F.3d at 1295. Second, in *Intirtool* no one challenged the plain meaning of "hand-held pliers," the claim term that was the counterpart to "vending machine." *Id.* (neither party contested that "hand-held pliers" meant hand-held pliers; instead the issue was whether the pliers performed the function of simultaneously punching and connecting sheets of metal).

Indeed, the fact that the preamble term "vending machine" is a limitation is supported by PowerOasis' own actions. In 2004, PowerOasis sought a patent featuring claims virtually identical to those of the '658 and '400 patents – except with the phrase "vending machine" omitted. Those claims were then *rejected* over the prior art by the *same* Examiner who examined the '658 and '400 patents. (Excerpts from Prosecution History of U.S. Patent Appl. Ser. No. 10/819,168, attached as Ex. 7). In essence, PowerOasis now asks this Court to do what the PTO refused to do – broaden the scope of the claims by replacing the term "vending machine" with a more open-ended term. (PO Br. at 8-9, suggesting that "vending machine" should be replaced with "system and apparatus").[8]

---

[8]    Furthermore, the preamble of claim 1 ends with the transitional phrase "comprising," which is an open-ended term indicating that the claim includes, but is not limited to, the limitations that follow. *In Re Crish*, 393 F.3d 1253, 1257 (Fed. Cir. 2004). It therefore follows that the preamble phrase "vending machine" is necessary to give some limitation to the otherwise unbounded "comprising" language. *Spectrum Intl, Inc. v. Sterilite Corp.*, 164, F.3d 1372 (Fed. Cir. 1998) ("'Comprising' is not a weasel word with which to abrogate claim limitations").

For all of these reasons, the term "vending machine" as used in the preamble of the PowerOasis patents clearly functions as a claim limitation that this Court must therefore construe.

           b)      <u>Plain Meaning Of The Term "Vending Machine"</u>

              (1)      <u>The Claim Language</u>

As mandated by *Phillips*, the first step in any proper claim construction is to determine the ordinary meaning of the disputed claim term.   415 F.3d at 1312-13.   In this case, PowerOasis has expressly admitted that the "commonly used sense" of "vending machine" is "a coin-operated machine for selling merchandise."  (PO Br. at 10).  Wayport proposes a more precise formulation of "vending machine's" ordinary meaning: "a mechanically, electrically, or electronically operated device or unit for dispensing goods or services to a single customer at a time when the customer provides sufficient payment."  (Cooley Decl. at ¶¶ 25, 33; *see also* Exh. 8, The American Heritage College Dictionary (Houghton Mifflin Company at 1496 (3rd ed. 1997)).  In any event, either Wayport's proposed formulation or PowerOasis' conceded understanding of the plain meaning would suffice for the purposes of this litigation.

The intrinsic record demonstrates both that one skilled in the art at the relevant time understood a "vending machine" to be a physical combination of components, and that one skilled in the art would have understood PowerOasis to have intended to adopt that commonly-understood meaning, rather than its litigation-inspired "system and method" interpretation, when it drafted the patent specifications.  Prior art cited in the patent is one type of intrinsic evidence. *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to

persons skilled in the art, but also that the patentee intended to adopt the meaning") (internal quotations omitted).[9]

### (2)     The Specification

In an effort to sidestep the plain meaning of the term "vending machine," PowerOasis argues that the patentees acted as their own lexicographers and assigned that term a specialized definition.  (PO Br. at 10).  Simply put, however, PowerOasis' supporting "evidence" cannot support this argument.

In construing patent claims there is a "heavy presumption" that a claim term carries its ordinary and customary meaning, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002), *i.e.*, its meaning "amongst artisans of ordinary skill in the relevant art at the time of the invention."  *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1378 (Fed. Cir. 2003). Accordingly, a high standard must be met to find that a patentee acted as his own lexicographer-- the patentee must clearly express that intent in the specification of the patent.  *Bell Atl. Network Servs. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).  The Federal Circuit has repeatedly emphasized that specially-defined words or terms must be sufficiently clear to put one skilled in the art on reasonable notice that the inventor intended to redefine the claim term.  *Bell Atl.*, 262 F.3d at 1268; *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning"); *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) ("The patentee's lexicography must, of course, appear with

---

[9]     The Malaspina patent, cited in the specification of the '658 and '400 patents, describes a "vending machine" as a unit made up of physically connected components:  "Therefore, there exists a need to provide a *vending machine* for rechargeable batteries whereby a spent battery pack may be exchanged for a recharged or new battery pack."  (Exh. 4, Malaspina, col. 2, ll. 6-8).  "These functions may be embodied by anything from large buttons with signs or pictures of the alternatives, as in a *canned beverage vending machines*, to a cathode ray tube (CRT) display or a touch screen display CRT."  (Exh. 4, Malaspina, col. 3, ll. 48-50).  "*The components of the system are enclosed in a housing*.  The housing may be relatively large, approximating the size of *common vending machines for canned beverages*."  (Exh. 4, Malaspina, col. 4, ll. 34-36).  Thus, the Malaspina patent cited to the Patent Office by the named inventors themselves repeatedly reinforces the ordinary meaning of the term "vending machine."

'reasonable clarity, deliberateness, and precision before it can affect the claim'") (citations omitted).

Here, PowerOasis does not – and cannot – point to *any* statement in the specification where the patentees clearly expressed an intent to use the term "vending machine" in any specialized manner. Moreover, PowerOasis cannot demonstrate that the term "vending machine" was used in a consistent fashion throughout the specification in such a way that a specialized definition arose by "implication." *Cf., Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (finding that applicant's use of terms in specification control their scope, because such terms have no accepted meaning in the art and were "very adequately described in the specification"). On the contrary, the specification consistently and repeatedly refers to "vending machine" as a stand-alone unit. Furthermore, consistent with the plain meaning of the term "vending machine," none of the patents' figures shows anything other than a self-contained structure.

PowerOasis relies first on two statements from the specification to supports its argument that "vending machine" should be construed as something made up of functional components. (PO Br. at 11). The first statement is a block quote from the Summary of the Invention section. Rather than "provid[ing] a functional description of what the invention provides," as PowerOasis asserts (PO Br. at 11), that statement merely describes *how* a customer gains access to one or more of the vending machine's utilities after payment is made. The second statement, that "almost any combination of functional components *of* the vending machine could be moved to a location *remote from* the machine," is at best unclear. (PO Br. at 11, *citing* '658 patent, col. 4, ll. 30-34; '400 patent, col. 4, ll. 33-38) (Cooley Decl. at ¶ 31). It makes no sense (grammatically or otherwise) that components "of" the machine could be moved to locations "remote from" the same machine. This fatally ambiguous statement is insufficiently clear to overcome the admitted

plain meaning of the claim term "vending machine," which is otherwise used repeatedly and pervasively throughout the patent specification.  (Cooley Decl. at ¶ 31).[10]

PowerOasis, however, argues that even if the specification fails to clearly state that a "vending machine" can be made up of functional components, the specification at least "makes it clear that the invention is not limited to a conventional unitary vending machine such as a 'Coke machine.'"  (PO Br. at 11).  In support of this contention, PowerOasis again relies upon two statements from the specification.  (PO Br. at 11-12).

The first statement, that "this invention is not limited to a fixed location" does not support PowerOasis' argument when read in the proper context.  Instead, the statement simply means that the unitary vending machine is *portable*:  "Another object of this invention is portability.  Using an internal power source and wireless telecommunications channels, this invention is not limited to a fixed location.  In this configuration, *the invention could be used at fairs, outdoor concerts and similar sites* where permanent installations are not cost effective."  ('658, col. 4, ll. 20-25; '400 patent, col. 4, ll. 23-28) (emphasis added).

The second statement that PowerOasis relies upon, that "[i]t is possible to … require the central control unit 106 to contact the central computer to obtain payment approval before allowing a transaction to begin" is equally misleading.  That statement relates only to whether the vending machine can operate autonomously without prior approval.  Despite PowerOasis' protestations, it does not support an argument that the vending machine is made up of dispersed functional components, as is evident when the statement is read in context:  "The central control unit 106 is autonomous and controls the operation of the vending machine 100 completely.  *It typically does not seek preapproval for the transaction to begin*.  It is possible to modify this and require the central control unit 106 to contact a central computer and obtain payment approval

---

[10]     Moreover, the fairest reading of this statement *in context* is that it refers to kiosk embodiments, such as the one disclosed in Fig. 10 that was added during prosecution: "These multiple vending machines may be arranged in the form of a kiosk to allow multiple customers access to the vending machine at the same time.  Similarly, almost any combination of functional components of the vending machine could be moved to a location remote from the machine.  This could be accomplished, for example, by networking a cluster of machines to a server either on site or at a remote location."  ('659 patent, col. 4, ll. 27-34; '400 patent, col. 4, ll. 30-37).

before allowing a transaction to begin." ('658 patent, col. 7, ll. 37-42; '400 patent, col. 7, ll. 42-47) (emphasis added).

Even if it were correct to construe portions of the patents' specifications as allowing for the vending machine *itself* to be distributed (and, as set forth above, Wayport maintains that such construction would be error), PowerOasis' proposed construction would *still* contradict Federal Circuit precedent by attempting to reclaim subject matter that PowerOasis specifically disclaimed in the patent specification. *See Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question"). In *Scimed*, a case involving balloon dilation catheters used in coronary angioplasty procedures, the Federal Circuit held that the claims at issue did not encompass catheters with coaxial lumens because the patentee had specifically criticized prior art catheters with dual lumens configuration. *Id.* at 1345. In this case, PowerOasis criticized the prior art payphones because they required processing of the credit cards by a "central office." For example, in the Background of the Invention section of the specification, the patentees state that "these [prior art] payphones that do accept credit cards as a means of payment still require the central office to process the transaction *before* the phone can be used." ('658 patent, col. 2, ll. 34-36; '400 patent, col. 2, ll. 39-39) (emphasis added). The distinction is reiterated in the Summary of the invention section, "[c]urrent payphones require central office support to enable a transaction (call). This invention allows the transaction regardless of the capabilities of the central office." ('658 patent, col. 3, ll. 63-65; '400 patent, col. 3, l. 63 – col. 4, l. 1). This case, then, is *Scimed* revisited. Under controlling Federal Circuit law, therefore, PowerOasis has disclaimed a machine that requires preapproval by the central office, and should not now be permitted to reclaim that disclaimed subject matter through the claim construction process.

(3)    Prosecution History

While *Phillips* cautioned that the file history is not as instructive as the claim language

and specification for claim construction purposes, 415 F.3d at 1317, the prosecution history in

the present case contains statements and arguments that are consistent with Wayport's proposed

construction of "vending machine"– *i.e.*, as a stand-alone machine.  For instance, the Examiner

of the parent application of the patents-in-suit stated in the Notice of Allowability that "[n]one of

the art of record suggest[s] nor teach[es] the system and method of *vending* telecommunications

channel access and power to a customer having the *physical combination* of elements and steps

as set forth in independent claim 1."  (Exh. 5, '643 File History, Notice of Allowability at 3)

(emphasis added).  Contrary to PowerOasis' arguments, by describing the claimed invention as

having a "physical combination of elements and steps," the Examiner clearly indicated his

understanding that the described invention was a unitary machine rather than a distributed

system made up of components located at remote locations.  The body of the claim neither states

that the related elements are a "physical combination" nor does it recite "system."  The only

plausible explanation for the Examiner's statement, therefore, is that he equated the term

"vending machine" with a "system" having a "physical combination" of elements.[11]

While PowerOasis relies upon this very same statement to support its proposed

construction for "vending machine"  (PO Br. at 6), that statement is in fact more consistent with

Wayport's proposed construction because it refers to the "physical combination" of elements and

steps.  (Cooley Decl. at ¶ 31).  In any event, the statement lacks the "clarity, deliberateness, and

precision" needed to override the plain meaning of the term "vending machine."  *See Renishaw*,

158 F.3d at 1249.

---

[11]    As explained above, *supra* at page 13, one of ordinary skill in the art also would have understood the term
"vending machine" to refer to a "physical combination" of elements.

(4)    Extrinsic Evidence

The *Phillips* case permits courts to consider extrinsic evidence when construing claims, but recognizes that such evidence has less weight than intrinsic evidence. *Phillips*, 415 F.3d at 1317.

Wayport has presented extrinsic evidence in support of its proposed construction in the form of a declaration from Professor Edmond S. Cooley of Dartmouth College. The Cooley Declaration is corroborated by contemporaneous publications that would have been relied upon or used by persons of skill in the art during the relevant time frame.

In contrast, PowerOasis relies on a named inventor's testimony as to his alleged "intent" regarding the term "vending machine." (PO Br. at 12). This as yet unidentified testimony is utterly irrelevant, and should be ignored by the Court in construing the claims of the '658 and '400 patents. As a threshold matter, Mr. Schelberg's alleged "anticipated testimony" is not properly before the Court at all – there is no sworn affidavit or deposition testimony from Mr. Schelberg on the topic. Thus, PowerOasis' contentions regarding Mr. Schelberg's intentions are no more than unsupported attorney argument. At most, they state what their extrinsic evidence *might* be. This is precisely the kind of extrinsic evidence that *Phillips* declared unreliable. *Phillips*, 415 F.3d at 1318 ("[t]he effect of [] bias can be exacerbated if [] the expert's opinion is offered in a form that is not subject to cross-examination").

In any event, even if Mr. Schelberg's "anticipated testimony" were properly before the Court, his testimony about what he allegedly intended the term "vending machine" to mean when he drafted his patent is legally irrelevant to claim construction. To the extent that Mr. Schelberg intended the term "vending machine" to mean something other than its commonly understood meaning, he had an obligation to put that meaning into the specification of the

- 18 -

patent.[12]  Otherwise, the patent could not serve its required public notice function.  *Merck & Co., Inc. v. Teva Pharms USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005).  In other words, unstated "intent" by the inventor is simply not relevant to a proper claim construction.  Indeed, the term "system," which PowerOasis now contends should replace "vending machine," is not used in the patents to describe the alleged invention.  PowerOasis had the power of the pen and decided to use the words "machine" and "vending machine" rather than "system."  It should not be allowed to reclaim through litigation what it chose to forego during prosecution.  *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("Even a nonsensical result does not require the court to redraft the claims of the [] patent.  Rather, where as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated").

c)    <u>Conclusion</u>

The Court should construe the claim term "vending machine" as a claim limitation with the plain meaning of "a mechanically, electrically, or electronically operated device or unit for dispensing goods or services to a single customer at a time when the customer provides sufficient payment."

2.    **"Payment mechanism"** ('658 and '400 patents, Claim 1[a])

| TERM | WAYPORT'S CONSTRUCTION | POWEROASIS' CONSTRUCTION |
|---|---|---|
| "Payment mechanism" | *An arrangement of connected parts for payment that is part of the vending machine.* | *"Payment" means paying money in some form;*<br>*"Mechanism": machinery or process for achieving a result.* |

The plain meaning of a "mechanism" is an arrangement of connected parts.  (Cooley Decl. at ¶¶ 35-38, *citing* The American Heritage College Dictionary definition).  This is

---

[12]    PowerOasis has also failed to demonstrate that the *Time* magazine article allegedly found in Mr. Schelberg's notebook is *any* evidence of what one skilled in the art would understand the term "vending machine" to mean at the time of the invention.  The *Time* magazine article does not use the term "vending machine" to describe a distributed system.  (PO Br. at 12).  Instead, the article merely discloses the use of cyber coins instead of cash for transactions made over the Internet.

- 19 -

consistent with the intrinsic evidence, where the term "mechanism" is used consistently to describe items made of connected parts:

- The '643 patent:
  - Col. 9, ll. 17-26: discloses a cover "mechanism"; and
  - Claim 19 claiming a cover "mechanism" ("vending machine [] wherein said phone booth type structure incorporates a mechanism to enclose the electronic device of the customer and lock them in the phone booth type structure").
- The '169 patent:
  - Claim 56 (steam "mechanism"); claim 57 (hydrocarbon supply "mechanism"); claim 59 (electricity supply "mechanism").

In contrast, PowerOasis' proposed construction, that a "payment mechanism" is a "process," is unsupported by intrinsic or extrinsic evidence. PowerOasis' citation to the specification ("[a]lternatively, no physical payment method is required, and payment is carried out through software that is present in the user's laptop or other device", PO Br. at 13) does not indicate that the payment mechanism is a "process." This statement actually refers to an alternate embodiment that is not covered by the claim—one where the software is on the customer's computer instead of in the claimed "vending machine" itself. Furthermore, since claim 1 is an apparatus rather than a method claim, PowerOasis' proposed construction of "payment mechanism" as a "process" is improper.[13]

Accordingly, Wayport contends that, consistent with its plain meaning and the intrinsic evidence, "payment mechanism" should be construed to mean an arrangement consisting of connected parts for payment that is part of the vending machine. (Cooley Decl. at ¶¶ 35-38).

---

[13]  "[A]pparatus claims cover what a device is, not what a device does." *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990). Thus, "[a]n apparatus claim includes the mechanical device or combination of mechanical powers and devices to perform a function and to produce an effect, *i.e.*, a machine or elements thereof." *SuperGuide Corp. v. DirecTV Enters, Inc.*, 169 F. Supp. 2d 492, 515 n.19 (W.D.N.C. 2001), *citing* 3 Walker on Patents § 11:5 (3rd ed. 1985). In contrast, a method claim is directed to what a device does. *See, e.g., Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1348 (Fed. Cir. 2001) (method claims directed to placing an order for an item).

3.    **"Customer interface** for indicating the status of said vending machine"
('658 and '400 patents, Claim 1[b])

| TERM | WAYPORT'S CONSTRUCTION | POWEROASIS' CONSTRUCTION |
|---|---|---|
| "Customer interface" | *A part of the vending machine for communicating information about the status of the vending machine to the customer.* | *"Interface": the place where two different systems meet and interact with each other. An example is a GUI (graphic user interface, the display on a computer screen).* |

Although claim 1 recites a "customer interface," that term appears nowhere in the specifications of the '658 and '400 patents. Instead, the specification uses the term "user interface," which the patentees apparently considered to be interchangeable with "customer interface." Wayport contends that a "customer interface" is an interface that enables information to be passed between a human user and the hardware or software components of a system. The intrinsic record supports this construction: the '658 patent, col. 3, ll. 1-3; col. 6, ll. 9-12; col. 8, ll. 10-12 ("the user interface 110 includes a push-button which allows the *customer* to terminate the transaction"); col. 8, ll. 55-57; and col. 9, ll. 2-23 (a customer interface in the form of lights exists as part of the vending machine); *see also* '400 patent, col. 3, ll. 1-3; col. 6., ll. 14-17; col. 8, ll. 14-16; col. 8, ll. 56-58; and col. 9, ll. 23-26.

PowerOasis' construction of "customer interface" as "the *place* where two different systems meet and interact with each other" (PO Br. at 14, emphasis added), does not jibe with the plain meaning of the claim term and the other intrinsic evidence. (Cooley Decl. at ¶ 43). As an initial matter, a "customer interface" is not a place, as PowerOasis suggests. In equipment like vending machines, a customer interface is typically hardware and software, not a location. (Cooley Decl. at ¶ 42). Furthermore, PowerOasis' construction, taken literally, treats a "customer" – a human being – as a "system." PowerOasis has not and cannot provide *any* support for this strained construction.

Accordingly, the Court should, consistent with the plain meaning and the intrinsic evidence, construe "a customer interface for indicating the status of said vending machine" to

mean a part of the vending machine for communicating information about the status of the vending machine to the customer. (Cooley Decl. at ¶¶ 39-45).

4.    "A telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for **enabling access** to the at least one external telecommunications channel **at the beginning of a vending transaction and disabling access at the end of the vending transaction**" ('658 and '400 patents, Claim 1[d])

| TERM | WAYPORT'S CONSTRUCTION | POWEROASIS' CONSTRUCTION |
|---|---|---|
| "enabling access … at the beginning of a vending transaction and disabling access at the end of the vending transaction" | *"Enabling" and "disabling" means "turning on and off" access to the external telecommunications channel so that communications through the vending machine to and from the telecommunications channel can or cannot take place; "vending transaction" means a single open-ended session delineated by a turning on and off of access to the telecommunications channel ("pay-as-you-go") and does not include multiple sessions ("prepaid subscription").* | *For the purpose of activating the telecommunications channel so telecommunications can take place, and deactivating the telecommunications channel; "vending transaction" is a transaction by which something is provided to the customer in exchange for payment.* |

Wayport contends that the Court should construe the phrase "enabling access at the beginning of the transaction and disabling access at the end of the vending transaction" as having its plain ordinary meaning to one skilled in the art. Simply stated, the phrase means "turning on and off the access to the external telecommunications channel." (Cooley Decl. at ¶¶ 47-49).

With respect to the term "vending transaction," Wayport proposes that it is a single open-ended session delineated by a turning on and off of access to the telecommunications channel ("pay-as-you-go") and does not include multiple sessions ("prepaid subscription"). This construction is consistent with the plain meaning of the claim's words, which specifically provides for "enabling access… at the beginning… and disabling access at the end[.]" ('658 and '400 patents, Claim 1[d]). PowerOasis' own proposed construction has no trace of the claim's concept of a defined beginning and end. (PO Brief at 13-14).

Moreover, further support for this construction appears in the specification and in the file history. As to enabling access at the beginning of a vending transaction, the specification states

that: "When the customer first approaches the vending machine 100, the READY light is on …

If the central control unit 106 receives valid card information it… *turns on* telecommunications

channel access …" ('658 patent, col. 8, l. 64 – col. 9, l. 4; '400 patent, col. 9, ll. 1-8; Cooley

Decl. at ¶ 48).

As to disabling access at the end of the vending transaction, PowerOasis overcame the

rejection of pending claims directed to the vending of power contained in the '169 patent

application (which is related to the '658 and '400 patents, *see supra*, at p. 7) by distinguishing

over prior art identified by the Examiner.  PowerOasis argued that, in the claimed invention,

"*[one] of the main features of this invention* is that the central control unit can detect that the

customer has disconnected … [O]nce a customer swipes their credit card, the unit dispenses

power until the customer *disconnects* from the unit and the transaction is *terminated*."[14]

PowerOasis summarized its argument as follows: "Specifically, [the prior art] do[es] not have a

control unit that can detect when the customer has disconnected from the power connector thus

ending the vending transaction."  (Exh. 6, '487 File History, December 1, 1999 Amendment at 4,

6).  PowerOasis has not, and cannot, cite any intrinsic evidence that contradicts its own previous

arguments.

During prosecution of the '169 patent application, PowerOasis distinguished its claimed

invention from prior art.   In particular, PowerOasis argued that the term "vending transaction,"

as recited in the claims, is a single open-ended transaction:

> One of the main features of this invention is that the central control
> unit can detect that the customer has disconnected from the power
> connector when the power has dropped to zero.  *This allows the
> vending transaction to be open-ended*.  In other words, once a
> customer swipes their credit card, the unit dispenses power until
> the customer disconnects from the unit and the transaction is
> completed.  (Exh. 6, December 1, 1999 Amendment at 4).

---

[14]     Interestingly, despite its arguments to this Court, PowerOasis did not distinguish over the prior art on the basis that its vending machine consists of functional components that can be located at remote locations.

PowerOasis distinguished the cited prior art as featuring prepaid rather than open-ended payment: "This apparatus [prior art], like those discussed above, is a prepaid machine so that when a fixed amount of value has been used, the unit stops dispensing power. This type of system [prior art] is not an open-ended transaction system as that set forth in the present invention." (Cooley Decl. at ¶ 49; Exh. 6, December 1, 1999 Amendment at 6). PowerOasis' attempts in this case to abandon its own previous distinctions are solely litigation inspired and without merit.

> **5.** "A **telecommunications channel access connector** connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer ('658 and '400 patents, Claim 1[e])

| TERM | WAYPORT'S CONSTRUCTION | POWEROASIS' CONSTRUCTION |
|---|---|---|
| "telecommunications channel access connector" | *A physical device providing a connection, such as an outlet, receptacle, or plug.* | *A device providing a connection such as a plug or a wireless connection.* |

The parties dispute whether the "telecommunications channel access connector" is a physical device (Wayport's contention) or whether it also includes the means of connection (PowerOasis' contention).

The specification clearly supports Wayport's proposed construction, (Cooley Decl. ¶ 50-54), in which the connector is identified as a physical device: "The customer selects which utilities or services they require, typically by just connecting to *the appropriate connector (also know [sic] as outlet, receptacle, or plug)* either through physical means or through wireless connections such as infrared. ('658 patent, col. 2, ll. 57-61; '400 patent, col. 2, ll. 61-65).

While PowerOasis relies upon the same sentence from the specification to support its proposed construction, it focuses on the latter half concerning the means of connection. PowerOasis' construction confuses the physical device used to make the connection with the *means*, either physical or through wireless connections, by which the connection is made. Wayport's construction correctly asserts that regardless of the *means* of connection, the connection must be made through a physical device, such as an outlet, receptacle or plug.

**6.** "Said customer interface comprises a **mechanism that interfaces with software supplied by the customer**" ('658 and '400 patents, Claim 15)

| TERM | WAYPORT'S CONSTRUCTION | POWEROASIS' CONSTRUCTION |
|---|---|---|
| "said customer interface comprises a mechanism that interfaces with software supplied by the customer" | *A mechanism (as construed above) that interacts with software made available to the vending machine by the customer.* | *A process or technique that involves interacting with software that is loaded on the customer's computer.* |

This dispute between the parties centers on whether the "customer interface," as claimed in claim 15, needs to be on the vending machine itself (Wayport's contention) or whether it can also be on the customer's computer (PowerOasis' contention).

PowerOasis argues that the specification makes it clear that the inventors contemplated a "user interface that [could] be present inside or uploaded to the user's laptop." (PO Br. at 18, *citing* '658 patent, col. 6, ll. 15-18; '400 patent, col. 6, ll. 20-23). However, the specification citation simply does not relate to the subject matter of claim 15. Rather, when read in context, the specification statement discloses an alternative embodiment in which there is *no* customer interface at all included in the vending machine.[15] In other words, the alternative embodiment does not disclose a *different location* for the customer interface (as PowerOasis alleges), but instead illustrates an embodiment with *no* customer interface. This statement thus provides no support for PowerOasis' proffered construction. (Cooley Decl. at ¶¶ 55-60).

**7.** "A vending machine as claimed in claim 1, wherein said control unit is **located remote from** said vending machine" ('658 and '400 patents, Claim 38)

| TERM | WAYPORT'S CONSTRUCTION | POWEROASIS' CONSTRUCTION |
|---|---|---|
| "Located remote from" | *"[L]ocated remote from said vending machine" means "having a different physical location than the vending machine."* | *"[L]ocated remote from" means having a different physical location from other components of the system.* |

Wayport contends that "located remote from said vending machine" plainly means, "[having] a different physical location" than the vending machine." (Cooley Decl. at ¶ 62). The parties thus dispute whether the vending machine itself is self-contained at one fixed location

---

[15]     '658 patent, col. 6, ll. 14-18; '400 patent, col. 6, ll. 19-23: "For example, the vending machine could instruct or inform the user via an audio speaker. Alternatively, the user interface can be present inside or uploaded to the user's laptop or other device thereby *obviating the need for an interface* within the vending machine."

(Wayport's contention) or whether the vending machine is composed of components that may have different physical locations (PowerOasis' contention).

Once again, the specification clearly supports Wayport's proposed construction. (Cooley Decl. at ¶¶ 61-65). Statements in the specification (including those erroneously relied upon by PowerOasis (PO Br. at 21)) consistently refer to the vending machine as *one unit*, with *other* components – presumably components not considered part of the claimed "vending machine" – existing outside of, or remote from, the claimed vending machine: "[N]o physical payment method need be *included in* the vending machine." (PO Br. at 13, *citing* '658, col. 3, ll. 19-20; '400 patent, col. 3, ll. 23-24); "[A]lmost any combination of functional components of the vending machine could be moved to a location *remote from* the vending machine." (PO Br. at 21, *citing* '658, col. 4, ll. 30; '400 patent, col. 4, ll. 33). It is at best unclear, and at worst incomprehensible, how, under PowerOasis' proposed construction, something that is a *part of* the vending machine can simultaneously exist *remote from* the machine.[16] (*See* Cooley Decl. at ¶ 64 for additional citations to the specifications). As with all of the contested claim terms, PowerOasis had the power of the pen and must now face the consequence of its draftsmanship. *Chef America*, 358 F.3d at 1374. The plain meaning of the language as it was *actually* included in the specification is consistent with Wayport's, not PowerOasis', proposed construction.

## V.    CONCLUSION

For all the foregoing reasons, the Court should reject the proposed claim constructions proffered by PowerOasis and should instead adopt the narrower, plain-meaning constructions proffered by Wayport.

---

[16]     To make grammatical sense under PowerOasis' proposed construction of a "vending machine" being a dispersed system, this statement would presumably need to be stated that "the vending machine consists of functional components that can exist at remote locations," or something similar.

Respectfully submitted,

Date:  January 25, 2006

/s/ Gregory F. Noonan
William F. Lee (BBO #291960)
David B. Bassett (BBO #551148)
Amr O. Aly (admitted *pro hac vice*)
Gregory F. Noonan (BBO #651035)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Phone: 617-526-6000
Fax:    617-526-5000

<u>Certificate of Service</u>

I hereby certify that on the 25th day of January, 2006, a copy of the within pleading was electronically served through ECF upon:

Sibley P. Reppert, Esquire
William A. Scofield, Jr., Esquire

/s/ Gregory F. Noonan_____
Gregory F. Noonan

**Appendix A**

**Claim Terms No Longer In Dispute**

| TERM | AGREED-UPON CONSTRUCTION |
|------|--------------------------|
| "electronic circuit" ('658 and '400 claim 1[c]) | *An interconnection of electrical elements and electronic devices.* |
| "when the vending transaction is complete" ('658 and '400 claim 1[c]) | *When the customer's connection to the vending machine has been terminated or the customer's payment has been exhausted.* |
| "telecommunications channel" ('658 and '400 claim 1[d]) | *The physical means of connecting one location or device to another for the purpose of transmitting and receiving data over a distance. Coaxial cables, fiber optics, microwave signals, telephone lines, and satellite communications all serve as telecommunications channels.* |
| "External telecommunications channel" ('658 and '400 claim 1[d]) | *An outside channel such as a T1 line, telephone line, or other channel on which a telecommunications signal is carried.* |
| "Adapted to be connected" ('658 and '400 claim 1[d]) | *Having a physical configuration enabling connection to be made.* |
| "Access circuit" ('658 and '400 claim 1[d] | *A circuit providing access.* |
| "External telecommunications device of the customer" ('658 and '400 claim 1[e] | *A device of the user used for telecommunicating, such as a telephone or computer.* |
| "Control unit" ('658 and '400 claim 1[f] | *An electronic device that controls a system.* |
| "Storage device" ('658 and '400 claim 1[f] | *Computer memory.* |
| "Payment information" ('658 and '400 claim 1[f] | *Information relating to payment.* |
| "Controlling said electronic circuit and said telecommunications channel access circuit" ('658 and '400 claim 1[f] | *Electronically controlling the circuit.* |

| TERM | AGREED-UPON CONSTRUCTION |
|---|---|
| "High bandwidth channel connector" ('658 and '400 claim 18) | *A connector that provides access to high speed data channels, such as found in ISDN, T1, T3, and cable.* |
| "Adapted to be connected to a direct Internet connection" ('658 and '400 claim 31) | *Able to connect directly to the Internet.* |
| "Internet Service Provider" ('658 and '400 claim 31) | *An entity that provides access to the Internet.* |
| "transceiver to connect wirelessly" ('658 and '400 patent, claim 35) | *A device that sends and receives signals to and from the customer's device without a direct wired connection.* |
| "mechanism that interfaces with software resident on equipment of the customer" ('658 and '400 patent, claim 49) | *A process or technique that involves interacting with software that is located on the customer's computer.* |