## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| POWEROASIS, INC. and<br>POWEROASIS NETWORKS, LLC, | ) ) ) | |
| Plaintiffs | ) ) | Civil Action No.: 04-12023 RWZ |
| v. | ) ) | Hon. Rya W. Zobel |
| WAYPORT, INC. | ) ) | |
| Defendant | ) ) ) ) | |

## DECLARATION OF DR. EDMOND S. COOLEY

I, Edmond S. Cooley, make oath and state as follows:

## I.    INTRODUCTION

1.    I have been retained as a technical expert in this case by counsel for defendant Wayport, Inc. ("Wayport").

2.    I understand that plaintiffs PowerOasis, Inc. and PowerOasis Networks, Inc. (collectively "PowerOasis") have filed suit against Wayport for its alleged infringement of claims 15, 18, 31, 35, 38, 40 and 49 of United States Patent No. 6,466,658 (the "'658 patent") and United States Patent No. 6,721,400 (the "'400 patent") (collectively the "PowerOasis patents").

3.    I have been asked for my opinion with respect to the meaning of certain claim terms included in the asserted claims of the PowerOasis patents as they would be

understood by one of ordinary skill in the pertinent art at the time of the claimed invention.

## II.    QUALIFICATIONS

4.    I have been an Assistant Professor at Dartmouth College in the Department of Engineering specializing in Electrical and Computer Engineering for more than 13 years.  I have been teaching classes at Dartmouth College for over 16 years.

5.    I hold a Bachelors of Science in Electrical Engineering (with a concentration in Computer Science) from the University of Vermont, Burlington, and Masters of Engineering and Doctor of Engineering degrees from Dartmouth College.  My degrees were awarded in 1980, 1982, and 1988 respectively.  My doctoral work was in the area of computer-aided design automation of digital signal processing systems (hardware and software).  My Curriculum Vitae, including a list of my publications within the last 20 years, is attached as Exh. 10.[1]  It includes a summary of my employment and teaching history.

6.    My present research areas include custom integrated circuit design and test, communications theory and systems, wireless networking, and multimedia-based content delivery for engineering instruction.

7.    The courses I teach to undergraduate and graduate level Dartmouth College students include Introduction to VLSI Systems, VLSI Systems Design (Optimization), Hardware Description Languages, Communications Theory and Systems,

and Engineering Design Methodology.  Other courses I have taught include Digital Signal

Processing, Computer Architecture, Microprocessor-Based Systems Design, and

Programming in Prolog.  Previously, I taught as a lab instructor at the University of

Vermont, Burlington, as a teaching assistant at Dartmouth College, and as an instructor at

the Raytheon Institute, the latter while I was working for Raytheon Company.  I am

academic advisor to undergraduate and graduate students, and oversee design projects and

undergraduate and graduate theses (A.B., B.Eng, M.E.M., MS, Ph.D.).  In 1999, I was

awarded the Outstanding Service Award for Faculty by Thayer School of Engineering,

Dartmouth College.

        8.      In addition to my teaching and research activities, I am the Director of

Information Technology (IT) for Thayer School of Engineering at Dartmouth College.  In

this role, I oversee all aspects of IT at the school, including needs assessment,

identification of appropriate systems, evaluation, procurement and contract negotiation,

configuration, and deployment, and am involved with hardware, software, training and

support, maintenance, and networking equipment throughout the school.  Further, I

oversee a team of full-time and part-time computing professionals.

        9.      I am active in the Institute of Electrical and Electronics Engineers, Inc.

("IEEE") and have received an IEEE Computer Society Outstanding Contribution Award.

In 2003, I was elected to the IEEE Computer Society's Golden Core.  I am also a member

of other professional societies, including the AAAI, ACM, and ASEE.

---

[1]      All exhibits cited in this declaration are attached to the Declaration of Amr O. Aly, filed herewith.

10.     I am a named inventor on two United States patents and have one other patent application pending. My issued patents are United States Patent No. 6,163,862, entitled "On-Chip Test Circuit For Evaluating An On-Chip Signal Using An External Test Signal", and United States Patent No. 6,252,417, entitled "Fault Identification By Voltage Potential Signature."

11.     For the purposes of this declaration, my opinions are based on my review of the PowerOasis patents, the asserted claims, the file histories of the PowerOasis patents, certain prior art cited during the prosecution of the family of patent applications that led to the PowerOasis patents, dictionary definitions, and my knowledge of the relevant art as defined below.

## III.    THE TECHNOLOGY

### A.    Person of Ordinary Skill in the Art

12.     It is my opinion that a person of ordinary skill in the art relevant to the PowerOasis patents at the time of the claimed invention would be a person with a basic understanding of engineering principles and techniques associated with telecommunications systems and access to telecommunication systems. Such a person would likely have a four-year college degree in engineering (such as electrical engineering or computer science), as well as one or two years of experience working in the telecommunications industry. A technician without a college degree but with

4

sufficient industrial experience (four or five years) working with telecommunications access issues would also have ordinary skill in the art.

13.    To the extent that I propose definitions of claim terms, I make them from the perspective of one of ordinary skill in the relevant art as described above.

### B.    The PowerOasis Patents

14.    The PowerOasis patents are both directed to "power and telecommunications access vending machines."

15.    The PowerOasis patents describe a specialized "vending machine" for vending electrical power and/or telecommunications access to a customer.  The machine described in the PowerOasis patents is essentially a specialized payphone for computers. Just as a payphone begins a transaction when money is inserted and ends when the user hangs up, the telecommunications transaction provided by the vending machine described in the PowerOasis patents begins when it receives payment and ends when a user disconnects from the vending machine.

16.    Figure 2 in the '658 patent illustrates one embodiment of the vending machine described in the PowerOasis patents:

FIG. 2

17.    Figure 2 is a front view of a vending machine operating panel for vending

power and telecommunications channel access.  (Exh. 1, '658 patent, col. 5, ll. 13-14;

Exh. 2, '400 patent, col. 5, ll. 16-17).  The customer sees an operating panel (101) with a

user interface (110).  The operating panel (101) includes a payment processing unit (114)

in the form of a credit card swipe reader, a power connector (108) in the form of a

standard duplex, 115 VAC connector, and a telecommunications channel access

connector (122) in the form of a standard telephone line connector (RJ-11).  (Exh. 1, '658

patent, col. 5, ll. 56-63; Exh. 2, '400 patent, col. 5, l. 61 – col. 6, l. 2).

18.    To operate the vending machine, a customer swipes her credit card

through the payment mechanism (114) and plugs her laptop or other equipment into the

appropriate connectors (108) and/or (122).  The customer interface light (110) indicates

the status of the transaction.  Once the customer completes the transaction, she pulls the

6

power plug (108) and/or disconnects the cable from the socket (122) and the vending

machine detects the disconnection and ends the transaction.  (Exh. 1, '658 patent, col. 8,

l. 64 – col. 9, l. 19; Exh. 2, '400 patent, col. 9, ll. 1-22).

19.     Figure 5 below illustrates another embodiment of the alleged invention

configured in a telephone booth style structure.  (Exh. 1, '658 patent, col. 5, ll. 20-22;

Exh. 2, '400 patent, col. 5, ll. 24-26).



20.     In the embodiment shown above, the operational panel (501) is located on

the side wall (503) of a vending unit (502).  Panel (501) contains electrical receptacles

(508), video display unit (510), telecommunications access connectors (522), and card

swipe (514).  All other components of the described "vending machine" are hidden within

the physical structure.  (Exh. 1, '658 patent, col. 11, ll. 51-61; Exh. 2, '400 patent, col. 11,

ll. 54-64).

7

21.    Figures 6-7 and 10-11 below show similar arrangements, illustrating again that the vending machine is a relatively small, unitary machine.



8

## IV.    CLAIM TERMS IN DISPUTE

22.    I have read PowerOasis' brief in support of its positions on the construction of certain claim terms and disagree with its proposed constructions of the disputed claim terms. I have also read Wayport's brief in support of its positions on claim construction and, as outlined below, agree with those constructions as they reflect how one of ordinary skill in the art would understand the disputed terms.

23.    I understand that the claim terms in dispute are: (1) "vending machine," (2) "payment mechanism," (3) "customer interface for indicating the status of said vending machine," (4) "a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access to the end of the vending transaction," (5) "a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer," (6) "said customer interface comprises a mechanism that interfaces with software supplied by the customer," and (7) "located remote from." I address each of these claim terms in turn below.

### A.    "Vending Machine"

24.    The term "vending machine" appears in all of the asserted claims of the PowerOasis patents.

9

25.     It is my opinion that a person of ordinary skill in the art would understand the term "vending machine" to have its plain meaning of a mechanically, electrically, or electronically operated device or unit for dispensing goods or services to a single customer at a time when the customer provides sufficient payment. My opinion is based on my review of the PowerOasis patents, the file histories of these patents, the prior art cited, and what I consider to be the plain meaning of the term.

26.     In my view, the PowerOasis patents and accompanying figures consistently describe a "vending machine" as a physical combination of components. For example, Fig. 5, 6-7 and 10-11 each show a vending machine that is a unitary, self-contained structure. No figures in the PowerOasis patents show it otherwise. These figures all show a small machine that, instead of selling soda, sells access to a telecommunications channel to one user at a time. Figs. 1, 3 and 4 are block or architectural diagrams of the vending machines that show its internal components. These specific components are described throughout the specification. The PowerOasis patents, however, fail to show or meaningfully describe a vending machine as anything other than a self-contained structure.

27.     The vending machine described in the PowerOasis patents is constructed from a number of small components and embedded software. These components (shown in Figs. 1, 3 and 4) are directly connected to each other within the vending machine. For example, the central control unit (106) is described in the patents as a microprocessor, which is an integrated circuit or chip typically about the size of a postage stamp.

Similarly, the telecommunications channel access connector (122) is a telephone jack connector, which is also a small device.

28.    All of this information leads me to conclude that the term "vending machine" means a vending machine (similar to a Coke® machine) that allows a customer to access a telecommunications channel.

29.    Furthermore, my understanding of the term "vending machine" is consistent with other information I have reviewed.  For example, U.S. Patent No. 5,544,784 to Malaspina (Exh. 4, "Malaspina patent"), is referenced by PowerOasis in the background section of the '658 and '400 patents.  The Malaspina patent describes a vending machine for vending a rechargeable battery pack.  It uses the term "vending machine" in a manner consistent with my understanding of the term.

30.    The file history of the PowerOasis patents is also consistent with my view of the meaning of the term "vending machine."  In particular, in connection with U.S. Patent No. 5,812,643 (which I have been informed is the parent to the '658 and '400 patents), the Patent Examiner stated that "[n]one of the art of record suggests nor teaches the system and method of vending telecommunications channel access and power to a customer having the *physical combination* of elements and steps as set forth in independent claim 1."  (Exh. 5, Notice of Allowability for U.S. Patent No. 5,812,643) (emphasis added).  I have reviewed the patent claim then pending and note that the claim language said "vending machine," but did not say "system" or "method" or "physical

11

combination." In my opinion, a person of ordinary skill in the art reviewing the claim language and the Examiner's statement would conclude that the Examiner was equating a "vending machine" with a "system" having a specific "physical combination" of elements.

31.    I understand that PowerOasis refers to a statement in the '658 and '400 patents that "[a]lmost any combination of functional components of the vending machine could be moved to a location remote from the machine" to support its argument that the term vending machine as used in the patents need not be a self-contained unit.    I do not agree with such an interpretation. To start, the sentence is an isolated statement that finds essentially no other support in the PowerOasis patents. Therefore, any understanding of what this sentence means must be found from the sentence itself. Pursuant to PowerOasis' argument, the sentence is illogical grammatically and confusing technically. For example, it makes no sense grammatically to say components "of" a vending machine could be moved to a location "remote from" the same vending machine. PowerOasis' argument also makes no sense from a technical perspective. For example, the switchable telecommunications channel circuit (120) is the entity that provides or enables access to the telecommunications channel. I do not understand how this component may be moved to a "remote" location and at the same time be, as called for in the claim, the entity to "enable access" to a telecommunications channel.

32.    I also understand that PowerOasis' proposed construction itself refers to the statement made by the Patent Examiner in connection with U.S. Patent No. 5,812,643

that I discussed above. From my review, PowerOasis seems to focus on the first part of the sentence which says "system or method" and completely ignores the latter part which says "physical combination." In my opinion, the Examiner's reference to a "physical combination" supports the view that the claimed "vending machine" is a unitary machine, and not a distributed system consisting of components at remote locations.

33.     Finally, the plain and ordinary meaning of the term as set forth in dictionary definitions that I have reviewed supports my understanding of "vending machine" as set forth above. (*See, e.g.,* Exh. 8, *The American Heritage College Dictionary*, Houghton Mifflin Company at 1496 (3rd ed. 1997)).

### B.     "Payment Mechanism"

34.     The term "payment mechanism" appears in claims 1 and 49 of the '658 and '400 patents.

35.     It is my opinion that a person of ordinary skill in the art would understand the term "mechanism" to mean an arrangement of connected parts. My opinion is based upon my review of the PowerOasis patents, the file histories of these patents, the prior art cited, and what I consider to be the plain meaning of the term.

36.     My understanding is consistent with use of the term "mechanism" in the '658 and '400 patents, where a mechanism is described not as a process but rather as something tangible. For example, the '658 and '400 patents describe the payment mechanism as a card reader. Specifically, it states that "the operating panel 101 includes

a payment processing unit 114 in the form of a credit card swipe reader." (Exh. 1, '658 patent, col. 8, ll. 58-60; Exh. 2, '400 patent, col. 8, ll. 61-63).

37.    Moreover, reading the term in the context of the claims in which it appears supports my understanding of mechanism.  The term "payment mechanism" is recited as a component of the claimed vending machine; therefore it is a physical part of the vending machine.

38.    Finally, the plain and ordinary meaning of "mechanism" as set forth in dictionary definitions that I have reviewed supports my understanding of the term as set forth above.  (*See, e.g.,* Exh. 9, *The New IEEE Standard Dictionary of Electrical and Electronic Terms* at 795 (5th ed. 1993)).

### C.    "Customer Interface For Indicating The Status Of Said Vending Machine"

39.    It is my understanding that Wayport and PowerOasis disagree about the meaning of the phrase "customer interface," which appears in claims 1 and 15 of the '658 and '400 patents.

40.    It is my opinion that a person of ordinary skill in the art would understand the term "customer interface" to mean a part of the vending machine for communicating information about the status of the vending machine to the customer.  My opinion is based upon my review of the PowerOasis patents, the file histories of these patents, the prior art cited, and what I consider to be the plain meaning of the term.

14

41.     The PowerOasis patents use the term consistently with my understanding. (*See, e.g.,* '658 patent, col. 3, ll. 1-3, col. 6, ll. 9-12, col. 8, ll. 10-12 ("the user interface 110 includes a push-button which allows the customer to terminate the transaction"), col. 8, ll. 55-57, and col. 9, ll. 2-23 (a customer interface in the form of lights exists as part of the vending machine); *see also* Exh. 2, '400 patent, col. 3, ll. 1-3; col. 6, ll. 14-17; col. 8, ll. 14-16; col. 8, ll. 56-58 and col. 9, ll. 23-26).

42.     I understand that PowerOasis contends that "customer interface" means "the place where two different systems meet and interact with each other." This definition is contrary to the common technical meaning of the term and does not make sense. A "customer interface" is not a place. In a piece of equipment like a vending machine, a customer interface is typically hardware and software, rather than a location. Adopting literally PowerOasis' definition would lead to the nonsensical result that the vending machine would be the one system and the "customer" would be the other system. This is an improper understanding because a customer is not typically referred to as or considered to be a "system."

43.     I also understand that PowerOasis relies on a statement in the '658 and '400 patents that the user interface could be present in the user's laptop. To put this statement in context, these patents describe the user interface as having a visual display unit ("VDU") and/or display lights and then states that "on the other hand, no VDU or display light is required, and the user interface can be present in the user's laptop." (Exh. 1, '658 patent, col. 9, ll. 28-30; Exh. 2. '400 patent, col. 9, ll. 31-33). In my

15

opinion this statement is irrelevant to the meaning of "customer interface" in the claims. The claims asserted against Wayport are directed to a vending machine that includes a customer interface. The quoted language describes an arrangement where the vending machine does not have a customer interface. Thus, it has no impact on the meaning of the claim term.

44.    Like the term "payment mechanism," the claimed "customer interface" is a part of the vending machine. According to the claim language, the vending machine has the customer interface.

45.    As a result, it is my opinion that one of ordinary skill in the art would understand "customer interface" to mean a part of the vending machine for communicating information about the status of the vending machine to the customer.

**D.    "A Telecommunications Channel Access Circuit Adapted To Be Connected To At Least One External Telecommunications Channel For Enabling Access To The At Least One External Telecommunications Channel At The Beginning Of A Vending Transaction And Disabling Access To The End Of The Vending Transaction"**

46.    It is my understanding that Wayport and PowerOasis dispute the meaning of the terms "access," "beginning of a vending transaction," and "ending of the vending transaction." These phrases appear in claim 1 of the '658 and '400 patents.

47.    It is my opinion that a person of ordinary skill in the art would understand the entire claim phrase to mean a circuit adapted to enable and disable access to the

16

external telecommunications channel. The enabling and disabling of access is in connection with and actually defines "the vending transaction." That is, the term "vending transaction" means what the customer buys is the time from when access to the telecommunications channel is enabled to the time when it is disabled. My opinion is based upon my review of the PowerOasis patents, the file histories of these patents, the prior art cited, and what I consider to be the plain meaning of the words.

48.    My understanding of these terms is consistent with their use in the '658 and '400 patents. For example, for enabling access at the beginning of a vending transaction, both the '658 and '400 patents state that: "When the customer first approaches the vending machine 100, the READY light is on … If the central control unit 106 receives valid card information it… turns on telecommunications channel access …" (Exh. 1, '658 patent, col. 8, l. 64 – col. 9, l. 4; Exh. 2, '400 patent, col. 9, ll. 1-8). As to ending the vending transaction, the patents state that: "When the customer is finished, they merely disconnect from the connectors 108 and 122 and leave. The central control unit 106 automatically senses this event, records the end of the transaction, turns off the AVAILABLE light 110 and returns the READY light 110 to be on continuously." (Exh. 1, '658 patent, col. 9, ll. 15-20; Exh. 2, '400 patent, col. 9, ll. 18-22).

49.    My understanding of the phrase "vending transaction" is also supported by the file history of the PowerOasis patents. In particular, during the prosecution of one of the applications in the chain of application that led to the '658 and '400 patents, PowerOasis made remarks to the Examiner to distinguish its invention, and more

17

particularly to distinguish the recited "vending transaction," from prior art that used a pre-paid approach. In particular, PowerOasis described the prior art as "a prepaid machine so that when a fixed amount of value has been used, the unit stops dispensing power. This type of system is not an open-ended transaction system as that set forth in the present invention." (Exh. 6, December 1, 1999 Amendment at 6). I agree with the argument PowerOasis made to the Patent Office, *i.e.*, that a vending transaction should not include within its meaning pre-paid approaches.

E.    **"A Telecommunications Channel Access Connector Connected To Said Telecommunications Channel Access Circuit For Enabling Connection To An External Telecommunications Device Of The Customer"**

50.    It is my understanding that the construction of this term relates to the meaning of the term "telecommunications channel access connector." The claim phrase at issue here appears in claims 1 and 35 of the '658 and the '400 patents.

51.    It is my opinion that a person of ordinary skill in the art would understand the term "telecommunications channel access connector" to mean a physical device providing a connection, such as an outlet, receptacle, or plug. My opinion is based upon my review of the PowerOasis patents, the file histories of these patents, the prior art cited, and what I consider to be the plain meaning of the words.

52.    My understanding of this term is consistent with its use in both the '658 and '400 patents. For example, both patents' specifications identify the connector as a physical device: "The customer selects which utilities or services they require, typically

18

by just connecting to the appropriate connector (also know [*sic*] as outlet, receptacle, or plug) either through physical means or through wireless connections such as infrared." (Exh. 1, '658 patent, col. 2, ll. 57-61; Exh. 2, '400 patent, col. 2, ll. 61-65).

53.     I understand that PowerOasis contends that "telecommunications channel access connector" means "a device providing a connection such as a plug or a wireless connection." From my review, while PowerOasis relies upon the same sentence from the specifications as that cited in ¶ 52, (Exh. 1, '658 patent, col. 2, ll. 57-61; Exh. 2, '400 patent, col. 2, ll. 61-65), it focuses on the latter half concerning the means of connection, thus confusing the physical device used to make the connection with the means, either physical or through wireless connections, by which the connection is made. No matter what means of connection are used, however, the connection must be made through a physical device, such as an outlet, receptacle, or plug.

54.     As a result, it is my opinion that one of ordinary skill in the art would understand the claim term "telecommunications channel access connector" to mean "a physical device providing a connection, such as an outlet, receptacle, or plug."

**F.     "Said Customer Interface Comprises A Mechanism That Interfaces With Software Supplied By The Customer"**

55.     It is my understanding that the construction of this term relates to the meaning of the term "customer interface," which I discussed above. The claim phrase at issue here appears only in claim 15 of the '658 and '400 patents.

19

56.    It is my opinion that a person of ordinary skill in the art would understand the term "mechanism" to mean an arrangement of connected parts, as explained above. My opinion as to the meaning of the term "customer interface" is also set forth above, *i.e.*, it is a part of the vending machine for communicating information about the status of the vending machine to the customer. The plain meaning of the terms as read in the context of the claim supports my understanding of the terms as something physical that is a part of the vending machine. My opinion is based upon my review of the PowerOasis patents, the file histories of these patents, the prior art cited, and what I consider to be the plain meaning of the term.

57.    I understand that PowerOasis argues that the description in the '658 and '400 patents supports its view that a "user interface" that could be present inside, or uploaded to, the customer's laptop computer. In particular, I understand that PowerOasis cites to the following passage of the specification to support its view: "the user interface can be present inside or uploaded to the user's laptop or other device thereby obviating the need for an interface within the vending machine unit." (Exh. 1, '658 patent, col. 6, ll. 15-18; Exh. 2, '400 patent, col. 6, ll. 20-23).

58.    I have reviewed the statement and disagree with PowerOasis' conclusion. The cited statement from the '658 and '400 patents does not in any way relate to the subject matter of claim 15. Claim 15 is directed to a vending machine having a customer interface, but the statement in the specification, when read in context, describes an

20

alternative embodiment where there is no customer interface at all. It does not describe a customer interface for a vending machine.

59.     Moreover, the plain language of the claim ("software supplied by the customer") clearly shows that the software must by supplied by the customer and not the vending machine. Thus, PowerOasis' argument that the mechanism is interacting with software loaded on the customer's computer is incorrect.

60.     As a result, it is my opinion that one of ordinary skill in the art would understand this claim term to mean that the customer interface (as discussed above) comprises a mechanism (as I previously discussed in connection with "payment mechanism") that interacts with software made available to the vending machine by the customer.

**G.    "Said Control Unit is Located Remote From Said Vending Machine"**

61.     It is my understanding that the phrase in dispute in this claim term is "located remote from." This phrase appears only in claim 38 of the '658 and '400 patents.

62.     The plain meaning of the term "remote from" as understood by one of ordinary skill in the art is "in a separate physical location." Here I understand that the dispute once again focuses on whether the vending machine is self-contained at one fixed location (as Wayport contends) or whether the vending machine is composed of components that may have different physical locations (as PowerOasis contends).

21

63.     It is my opinion that statements in the specification cited above in support of my review of the term "vending machine," and the statement relied upon by PowerOasis in support of its construction, consistently refer to the vending machine as one unit.  My opinion is based upon my review of the PowerOasis patents, the file histories of these patents, the prior art cited, and what I consider to be the plain meaning of the terms.

64.     The '658 and '400 patents make clear that:  "The central control unit 106 is autonomous and controls the operation of the vending machine 100 completely." (Exh. 1, '658 patent, col. 7, ll. 37-38 and col. 10, ll. 5-7; Exh. 2, '400 patent, col. 7, ll. 42-43 and col. 10, ll. 8-10).  Thus, from a technical perspective it does not make sense that the unit that controls all operating functions of the vending machine could be separate from the vending machine in a different physical location.  Such an arrangement simply would not work.

65.     Moreover, the plain meaning of these terms in the context of the dependent claims would mean that by locating components of the vending machine outside of the vending machine, the dependent claim would in effect be to a broader concept than the independent claim.  As explained above, this argument does not make sense from a technical perspective.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this 25th day of January 2006 in Hanover, New Hampshire.

Dr. Edmond S. Cooley