IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| POWEROASIS, INC. and<br>POWEROASIS NETWORKS, LLC<br><br>Plaintiffs,<br><br>v.<br><br>WAYPORT, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 04-12023-RWZ<br>)<br>)<br>)<br>) |

### PLAINTIFFS' REPLY MEMORANDUM ON CLAIM CONSTRUCTION

Wayport's Rebuttal Claim Construction Brief relies on and cites extensively to the Declaration of Dr. Edmond S. Cooley. In this Reply, PowerOasis points out that, in his deposition, Dr. Cooley actually supported the construction proposed by PowerOasis. PowerOasis focuses here on meaning of "vending machine" in the preamble to Claim 1 of the asserted patents and the construction of "vending transaction." Regarding the construction of the remaining elements and the issue as to whether the preamble of Claim 1 constitutes a limitation, PowerOasis rests on its opening brief.

    1.    **"Vending Machine for Vending Telecommunications Channel Access"**

In construing "vending machine for vending telecommunications channel access," Wayport improperly confines the claims to one disclosed embodiment, i.e., a "stand-alone unit" like a Coke® machine.[1] *See*, *Phillips v. AWH Corporation*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). While the

---

[1] Wayport's proposed construction is: "A mechanically, electrically or electronically operated device or unit for dispensing goods or services to a single customer at a time when the customer provides sufficient payment."

- 1 -

specification of both patents in suit does disclose the specific embodiment described by Wayport,[2] it more broadly discloses a <u>system</u> containing <u>functional components</u> in a block diagram:

> Referring now to FIG 4, there is illustrated therein a block diagram of a preferred embodiment of a telecommunications vending machine 300 for vending telecommunications access.

('658, col. 4, ln. 43-46; '400, col. 4, ln. 46-49):



FIG. 4

Each of the elements of Claim 1 corresponds to one of the functional components shown in FIG 4.[3] The "vending machine" of Claim 1 is, thus, nothing more than the apparatus and system combining those functional components that collectively perform the vending of telecommunications access.

---

[2] Wayport's Rebuttal Claim Construction Brief at 4-6.
[3] The central control unit includes the "electronic circuit for determining when the vending transaction is completed." The one-to-one correspondence between the elements of claim 1 and the functional components of Fig. 4 is otherwise clear from the labels in the boxes.

Far from stating that the functional components of FIG 4 (and Claim 1) have to be in a "stand-alone unit," the specification makes clear that <u>the functional components depicted in FIG 4 do not need to be located in a stand-alone unit</u>, as follows:

- "It might be more cost effective to have one **control unit** operating multiple vending machines." '658, col.. 4, ln. 25-7; '400, col. 4, ln. 29-310).

- "It is possible to . . . **require the central control unit to contact a central computer** and obtain payment approval before allowing a transaction to begin." ('658, col.. 7, ln. 40-42; '400, col. 7, ln. 45-47); "In another version, **the central control unit 106 must contact a central computer** for approval before allowing a transaction to begin." ('658, col. 11, ln. 21-23; '400, col. 11, ln. 24-26).

- "Alternatively, the **user interface** can be present inside or uploaded to the user's laptop or other device thereby obviating the need for an interface within the vending machine unit." ('658, col. 6, ln. 15-18; '400, col. 6, ln. 17-22).

- "No **physical payment method** need be included in the vending machine." ('658, col. 3, ln. 19-20; '400, col. 3, ln. 23-24).

- "**Almost any combination of functional components** of the vending machine could be moved to a location remote from the vending machine. This could be accomplished, for example, by **networking a cluster of machines to a server either on site or at a remote location**." ('658, col. 4, ln. 30-34; '400, col. 4, ln. 33-36).

Wayport's response is that it "makes no sense" that components of the vending machine could be remote from the vending machine.[4]  To the contrary, the patentee's usage makes sense if "vending machine for vending telecommunications channel access" is understood figuratively as a system with functional components that can be geographically distributed.  The vending machine is both the component (i.e., the wired or wireless "telecommunications channel access connector") that is located at the place where the customer who obtains telecommunications access is located, and, in a broader sense, the system of components that collectively accomplish the vending of access to the customer.  Nothing in the claims bars the "vending machine" from being a system of components that may be distributed, i.e., placed in more than one location.

Wayport's expert, Dr. Cooley, understands full well that this concept of vending machine makes sense – he admitted as much in his deposition, the transcript of which is attached hereto as **Exhibit A**.[5]  Regarding the term "vending machine," Dr. Cooley testified that, prior to seeing the patents-in-suit, he had not been aware of a "vending machine for vending telecommunications channel access to a customer."  (p. 38).  He agreed that a "vending machine for vending telecommunications channel access" was not a normal vending machine, which he understood to be a Coke or candy vending machine (pp. 39-40).

---

[4] Wayport also cites *Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc*., 242 F..3d 1337 (Fed. Cir. 2001), for the proposition that PowerOasis disclaimed a vending machine that requires pre-approval by the central office by criticizing prior art payphones, and should not be permitted to reclaim that disclaimed subject matter through the claim construction process.  Wayport's citation is inapposite.  In *Scimed*, the specification explicitly and repeatedly defined the invention in a way that limited it to a single embodiment by excluding the only alternate arrangement.  The exact opposite situation is found in the present case, in which the specification expressly includes references to an alternative embodiment by stating, e.g., "[i]t is possible to modify this to require the central control unit to contact a central computer and obtain payment approval before allowing a transaction to begin." ('658, col.. 7, ln. 40-42; '400, col. 7, ln. 45-47).  See also, '658, col. 11, ln. 21-23; '400, col. 11, ln. 24-26.  In addition, this alternative embodiment makes no mention of a "central office to process the transaction," but merely to a "central computer."  PowerOasis did not disclaim the disclosed embodiment in its discussion of the prior pay phone art.

[5] Exhibit A contains highlighted portions from PowerOasis' deposition of Dr. Cooley on November 17, 2005, in the case now being prosecuted by PowerOasis against T-Mobile, concerning a declaration submitted in that case by Dr. Cooley on claim construction issues that in all material respects is literally identical to Dr. Cooley's declaration in

Dr. Cooley agreed that words can be used literally or figuratively, and that a figurative use is one that uses a description to add color to the definition or provide a context (p. 41). He agreed that one could use the term "vending machine" to describe a system for buying and selling goods over the Internet, such as eBay, and that such usage would be a figurative use of the term "vending machine" (pp. 41-48).

Dr. Cooley testified that he was unfamiliar with a *Time Magazine* article entitled "Cyber Vending Machine" published in *Time's* October 7, 1996 edition (Exhibits 5 and 6 to the Cooley Deposition attached hereto as Exhibits B and C, respectively), and was not aware that this document was in the inventor's notebook at the time of the patented invention (p. 51). He agreed that, as described in the *Time Magazine* article, what was described was some type of computer-based vending machine, and that someone of ordinary skill would have understood that as of 1997 (pp. 52-53). Dr. Cooley agreed that the description of the "Internet Vending Machine" in the *Time Magazine* article was a commonly understood concept of "vending machine" being applied to the Internet context (p. 53). He agreed that the words "vending machine" do not necessarily mean a Coke machine in this context. He further agreed that, in this particular context, you have a figurative use of the term vending machine in which various functions performed by components are not all necessarily located in the same "box," and that he would not expect to be located in the same "box" (pp. 54-55).

With reference to claim 1 of the '658 patent-in-suit, Dr. Cooley agreed that there was nothing in the claim indicating that the inventors meant the term "vending machine for vending telecommunications channel access" to be understood literally, as opposed to figuratively. He also agreed that there was nothing in the claim indicating that the inventors intended that all of

---

the present action. Counsel for the parties have stipulated and agreed that such depositions can be used in both actions.

the elements or components stated after the word "comprising" had to be contained in the same box or unit, or co-located (pp. 55-56).

Dr. Cooley agreed that there was no express definition of the term "vending machine for vending telecommunications channel access" in the specification. (p. 58). He agreed on examination by PowerOasis that Figure 4 of the patents-in-suit was a description of the functional components of the disclosed invention, and that he was not aware of any of statement in the patent which says that all of the components performing those functions had to be co-located in the same physical box (pp. 58-59). He further agreed that the patent says that almost any of the functional components could be remote, which means not in the same place. He also agreed that such language told him that the inventor contemplated the functional components of the system being spread out, *i.e.*, not in the same box. He agreed that would be a different embodiment from what he discussed in paragraphs 16 through 21 of his declaration (p. 59). He agreed that the inventors referred to the concept of spreading things out (p. 60).

Dr. Cooley agreed that it makes sense for the cyber vending machine to have the parts spread out and still have that as a concept of a vending machine (p. 61). Regarding the functional components described in Figure 4, Dr. Cooley agreed that you do not have to have those components right next to each other for the system to work from an engineering viewpoint (p. 62). He agreed that the inventors stated that almost any combination of components could be moved to a remote location and that, from an engineering point of view, that is something he understood and could design (p. 63).

Dr. Cooley agreed that, under one embodiment, the central control unit contacts a central computer before it does its vending or permits its vending, and that the central computer is located at a distant location (p. 64). Dr. Cooley agreed that the inventors are, by this language,

disclosing a system where an essential part of the vending process is not contained in what he called the vending machine or box (p. 65). He agreed that the system is what is necessary for the vending to happen and that, as disclosed in the patent specification, all the essential parts and pieces are not all in the same box (p. 66). He reads the patents as saying that the functional components could be geographically dispersed (p. 66). He also agreed that is an embodiment different from the "everything in one box" embodiment (p. 66).

      2.      "Enabling access…at the beginning of a vending transaction and disabling access at the end of the vending transaction"

Wayport's proposed construction of element 1(d) conflicts with the agreed-upon construction of element 1(c), and with the construction of element 1(d) proposed by the same counsel in the T-Mobile action, and contravenes the specification of the patents in suit. In addition, Wayport errs in arguing that its construction finds support in the file history.

PowerOasis and Wayport agree that in element 1(c), the term "when the vending transaction is complete," means "when the customer's connection to the vending machine has been terminated or the customer's payment has been exhausted."[6] This same construction obviously applies to define "the end of the vending transaction" in element 1(d). Nevertheless, in a transparent effort to obtain a construction that takes its accused Internet access service off the hook, Wayport adds to its proposed construction of element 1(d) a definition of "vending transaction":

> "[V]ending transaction" means a single open-ended session delineated by a turning on and off of access to the telecommunications channel ("pay-as-you-go") and does not include multiple sessions ("prepaid subscription").

---

[6] Wayport Brief, Appendix A, Claim Terms No Longer in Dispute

This added language conflicts with the agreed-upon construction of "vending transaction" as to element 1(c). Under the latter, the transaction is complete, *inter alia*, when payment has been exhausted. Under Wayport's construction of element 1(d), entirely new considerations are added regarding "open-ended" versus "multiple sessions." The restrictions of Wayport's construction of element 1(d) are not found in the agreed-upon construction of element 1(c). Payment could be exhausted at the end of a period of time, such as an hour, day or month, whether or not access has been turned off and on in the meantime. Thus, under the agreed-upon construction of element 1(c) a "vending transaction" includes both "open-ended" and "prepaid subscription" access as those terms are used in Wayport's construction of "vending transaction" in claim 1(d).

The same counsel represents T-Mobile in PowerOasis's action against that company as represents Wayport in this action. However, the construction of element 1(d) proposed by said counsel for T-Mobile regarding the identical patents <u>did not</u> include the above-quoted additional language regarding "open-ended" and "multiple" sessions. The simple reason is that Wayport is attempting in this case to characterize all of its services, including the service it publicly advertises as "pay-as-you-go," as a "prepaid subscription," in a transparent attempt to avoid infringement. The construction Wayport requests is narrower than the construction the same lawyers sought in the PowerOasis action against T-Mobile.

Most importantly, the specification of the two patents in suit provides no support for Wayport's restrictive definition of a "vending transaction." To the contrary, the specification states, "[t]he transaction ends when the customer disconnects from all of the connectors **or otherwise indicates that the customer is finished**." ('658 col. 3, ln. 63-65; '400, col. 2, ln. 67-col.3, ln. 2). There is no reference in the specification to any distinction between "open-ended"

- 8 -

and "multiple" sessions, or to "pay as you go" and "prepaid subscriptions," as now proposed by Wayport.

In his deposition testimony, Dr. Cooley agreed with PowerOasis. Regarding paragraph 15 of Dr. Cooley's declaration, where he states, *"[t]he telecommunications transaction provided by the vending machine described in the PowerOasis patents begins when it receives payment and ends when a user disconnects from the vending machine*," Dr. Cooley testified that this statement is accurate for one of the ways that the customer can end the transaction with the vending machine, but that there are other ways disclosed in the specification besides those which he chose to describe in his declaration. (pp. 16-17, 19). In particular, he testified that the element of claim 1 of the patents-in-suit, "an electronic circuit for determining when the vending transaction is completed," means that there is an electronic circuit that is somehow sensing when the user disconnects or otherwise indicates that the transaction is over. (p. 24). Dr. Cooley agreed that this limitation would be met by a system under which there was an electronic clock that turned off access at a particular time (pp. 24-25, 31), for example, by telling the vending machine to stop vending access at the end of a twenty-four hour period (pp. 25, 31-33). Dr. Cooley admitted that the specification of the patents in suit discloses embodiments regarding how a vending transaction could end other than when the customer disconnects as he describes in paragraphs 16 through 21 of his declaration (pp. 35-37).

Finally, Wayport disingenuously misreads the file history when it argues that "PowerOasis distinguished its claimed invention from the prior art" when prosecuting its '487 patent application[7] by arguing that "the term 'vending transaction,' as recited in the claims, is a single open-ended transaction."[8] Wayport refers to an argument made to the Patent Examiner

---

[7] Wayport mistakenly refers to the '487 application as the '169 application.
[8] Wayport Brief at 23.

- 9 -

regarding a different invention for vending electrical power set forth in claim 22 of the '487 patent application (attached to Wayport's brief in Exhibit 6 thereto).  The Examiner had previously rejected claim 22 of PowerOasis' original application over certain prior art.  However, Wayport fails to explain that the arguments asserted by PowerOasis in this subsequent application concerned an <u>amended claim 22</u> in which the additional limitation had been added, "**said control unit including means for detecting when the customer has disconnected from said power connector.**"  That limitation is not found in any claim of the patents in suit.  The arguments made by PowerOasis regarding "open-ended" transactions only concerned amended claim 22, and have no bearing on the construction of the claims of the patents in suit.  Indeed, as recognized by the Examiner of the '487 application, the broad language of the claim (without the limitation added by amendment in that case) covers both "open-ended" and "prepaid" transactions, because both are within the scope of "vending transactions."  This includes transactions that are "complete" when "the customer's payment is exhausted," as stated in the agreed-upon construction of element 1(c).

## CONCLUSION

PowerOasis respectfully requests that this Court construe the claims of the patents-in-suit in the manner set forth in PowerOasis' proposed claim construction.

                                         Respectfully submitted,

                                         POWEROASIS, INC. and
                                         POWER OASIS NETWORKS, LLC
                                         By their attorneys,

                                         /s/ Sibley P. Reppert
                                         Sibley P. Reppert, BBO No. 416900
                                         William A. Scofield, Jr., BBO No. 448940
                                         LAHIVE & COCKFIELD, LLP
                                         28 State Street
                                         Boston, Massachusetts  02109-1784
                                         Tel. (617) 227-7400

Dated:  February 2, 2006

## CERTIFICATE OF SERVICE

I, William A. Scofield, Jr. hereby certify that I caused the foregoing to be served via the Court's electronic filing system on counsel of record this 2d day of February, 2006.

                                         /s/ William A. Scofield, Jr.
                                         William A. Scofield, Jr.