# EXHIBIT A

00001

Volume I
Pages 1 to 87
Exhibits 1-7

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - -x
                               :
POWEROASIS, INC. and           :
POWEROASIS NETWORKS, LLC,      :
     Plaintiffs/               :
     Counterclaim-Defendants,  :
                               :
          vs.                  :  Civil Action No.
                               :  05-CV-42-PB
 T-MOBILE USA, INC.,           :
     Defendant/                :
     Counterclaim-Plaintiff.   :
                               :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF EDMOND S. COOLEY, D.Eng., a
witness called on behalf of the Plaintiffs/
Counterclaim-Defendants, taken pursuant to the
Federal Rules of Civil Procedure, before Anne H.
Bohan, Registered Diplomate Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Lahive & Cockfield LLP, 28 State
Street, Boston, Massachusetts, on Thursday, November
17, 2005, commencing at 9:30 a.m.

PRESENT:

     Lahive & Cockfield LLP
          (by Sibley P. Reppert, Esq. and
          William A. Scofield, Jr., Esq.)
          28 State Street, Boston, MA 02109-1784,
          for the Plaintiffs/Counterclaim-Defendants.

     Wilmer Cutler Pickering Hale and Dorr LLP
          (by Amr O. Aly, Esq.)
          399 Park Avenue, New York, NY 10022,
          for the Defendant/Counterclaim-Plaintiff.


                    * * * * *

00002

1                          I N D E X

2
   WITNESS                    DIRECT    CROSS
3

4  EDMOND S. COOLEY, D.Eng.

5     BY MR. REPPERT              3

6     BY MR. ALY                           78

7

8                          * * * *

9                      E X H I B I T S

10
    NO.              DESCRIPTION              PAGE

11
      1    Declaration of Dr. Edmond S. Cooley     3

12
      2    United States Patent 6,466,658 B2       8

13         issued to Schelberg, Jr., et al.

14    3    United States Patent 6,721,400 B2       9
           issued to Schelberg, Jr., et al.

15
      4    Webster's dictionary definition of     46

16         "device"

17    5    Time magazine October 7, 1996          49
           article entitled "Cyber Vending

18         Machine"

19    6    Time magazine October 7, 1996          50
           article entitled "Cyber Vending

20         Machine" (reprint)

21    7    Webster's dictionary definition of     73
           "interface"

22

23                          * * * *

24

00003

```
 1              P R O C E E D I N G S

 2              EDMOND S. COOLEY, D.Eng.

 3  a witness called for examination by counsel for the

 4  Plaintiffs/Counterclaim Defendants, having been

 5  satisfactorily identified by the production of his

 6  driver's license and being first duly sworn by the

 7  Notary Public, was examined and testified as

 8  follows:

 9                  DIRECT EXAMINATION

10     BY MR. REPPERT:

11     Q.   Please state your name, sir.

12     A.   My name is Edmond, that's E-d-m-o-n-d,

13  middle initial S, the last name is Cooley,

14  C-o-o-l-e-y.

15          MR. REPPERT:  Just wait for a second, I'm

16  trying to find my version of your report.

17          (A pause)

18              (Document marked as Cooley

19              Exhibit 1 for identification)

20     Q.   I'm going to show you a document marked as

21  Exhibit 1.  Can you tell me if you can identify it.

22     A.   This document is my declaration.

23          MR. REPPERT:  Just stop for a second here,

24  I have to find my copy.
```

00004

```
 1              MR. ALY:  You may want to go through the

 2  pages to make sure it's all complete.

 3              MR. REPPERT:  I'll be right back.

 4         (A pause)

 5    BY MR. REPPERT:

 6    Q.   Dr. Cooley, does your report correctly

 7  state your qualifications in Roman numeral II,

 8  Paragraphs 4 through 11 of your report?

 9    A.   Yes, that's accurate.

10    Q.   So you're an assistant professor at

11  Dartmouth; is that correct?

12    A.   Yes.

13    Q.   You hold a degree of Ph.D.?

14    A.   Specifically the degree is Doctor of

15  Engineering.

16    Q.   Doctor of Engineering.

17              Now, you provide in your report in

18  Paragraph 12 the statement as to what your opinion

19  is as to what a person of ordinary skill in the art

20  would be.  Do you see that?

21    A.   I do, yes.

22    Q.   Do you think that's a correct statement?

23    A.   I believe it to be, yes.

24    Q.   Now, would it be fair to say that you are
```

00005

1   not a person of ordinary skill as explained in that

2   paragraph?

3       A.   That is correct, yes.

4       Q.   So you're a person of somewhat more than a

5   higher level of skill in the art than the person you

6   would consider to be a person of ordinary skill in

7   the art?

8       A.   Yes.

9       Q.   What you're attempting to do in this report

10  is to opine as to what someone of ordinary skill in

11  the art would understand.

12      A.   Yes, that's correct.

13      Q.   Can you tell me, how do you know what

14  someone of ordinary skill would understand

15  considering the fact that you're not of ordinary

16  skill?

17      A.   Well, I once was of ordinary skill, I would

18  like to say.  My opinion is based on looking at the

19  technology and checking that from my point of view

20  of being a professor and having worked in this

21  industry, the types of qualifications that I would

22  expect as a minimum level for somebody to work in

23  this area.

24      Q.   Have you done any research to figure out

00006

1    what the terms that you're attempting to construe

2    in your report would have been understood to mean by

3    someone of ordinary skill at the relevant time?

4         A.   I believe so, yes.

5         Q.   What's the research that you've done?

6         A.   Well, when I was --

7         MR. ALY:  Is there a specific term you want

8    him to address --

9         MR. REPPERT:  No.

10        MR. ALY:  -- or is this just in general?

11        MR. REPPERT:  In general.

12        A.   What I did was to think about what the

13   skill set would be that would be necessary in order

14   to work in this particular area.  So in terms of the

15   types of courses a student would need to take or the

16   types of professional experience that that student

17   would need to have, in order to be able to perform

18   these kinds of tasks.

19        Q.   Did you do any research to figure out how

20   the words being defined in your report were actually

21   being used at the time that was relevant from the

22   point of view of the patents?

23        A.   I used my personal experience for that.

24        Q.   So you didn't do any research in terms of

00007

```
 1    literature searches, for example, to figure out how

 2    people in the art were using those terms at the

 3    relevant times?

 4         A.   Well, since I was a person of relevant

 5    skill in the art in 1997, for example, I used my own

 6    experience for that.

 7         Q.   But could you just answer my question.

 8         A.   Did I do a literature search for that?

 9    No.

10         Q.   Tell me, what is the relevant time period?

11         A.   It's my understanding, from looking at the

12    patent materials and other materials, that the

13    relevant period for this would be from approximately

14    1997 on.

15         Q.   To figure out what people of ordinary skill

16    were thinking about the terms in question in 1997,

17    how would you do that?

18         A.   Excuse me --

19         Q.   How would you figure out, in order to be

20    able to opine on the subject, what people of

21    ordinary skill would have understood the words that

22    you're talking about here to mean in 1997?

23         A.   Well, beyond my own personal experience

24    from that time frame, I would also talk with
```

00008

1    colleagues who were active in the area at that time.

2    I think that it would be reasonable to also look at

3    the literature from that time to say what was

4    published in, for example, IEEE journals or what was

5    published in the trade press at the time.

6        Q.   What was published in -- would you include

7    what was published, generally speaking, in the media

8    to figure out how those words are being used?

9        A.   I would --

10            MR. ALY:  Objection.  What media are you

11   referring to?

12       Q.   Any media.

13       A.   Exactly.

14       Q.   Any published sources.

15       A.   To answer that question, I would say no.

16       Q.   Now, have you had an opportunity to read

17   the patents that are involved in this case?

18       A.   Yes.

19       Q.   I'm going to show you the next exhibit,

20   which is Exhibit 2.

21                (Document marked as Cooley

22                 Exhibit 2 for identification)

23       Q.   That's the patent numbered 6,466,658.

24       A.   Thank you.

00009

```
 1        Q.   Do you recognize the document?

 2        A.   It's the patent that you've listed, the

 3   '658 patent.

 4        Q.   Have you read it?

 5        A.   I have.

 6                    (Document marked as Cooley

 7                    Exhibit 3 for identification)

 8        Q.   I'm going to show you Cooley Exhibit 3 and

 9   that is U.S. Patent 6,721,400.

10        A.   Thank you.

11        Q.   Do you recognize the document?

12        A.   Yes.  It is the '400 patent.

13        Q.   These patents refer back to a patent which

14   is No. 5,812,643.  Do you see that?

15        A.   Yes.

16        Q.   Have you read that patent?

17        A.   Yes.

18        Q.   Now, I'm going to direct your attention now

19   to -- does your report in general -- what is it you

20   understand you are trying to do in your report?

21   What's the purpose of your report, as you understand

22   it?

23        A.   It's my understanding that the purpose of

24   this report was to give my opinions on definitions
```

00010

1    of certain terms that appeared in the claims of the

2    patents.

3        Q.   So is it your understanding that what

4    you're trying to do is to provide the meaning or

5    construction of those terms that the Court should

6    apply in this case?

7        A.   It's my understanding that my

8    interpretation of those terms would help the Court

9    make that decision, but I don't know what that

10    process is.

11        Q.   Are you an expert in the field of patent

12    claim construction?

13        A.   I am not.

14        Q.   Do you know what rules the Court is

15    supposed to apply in figuring out what words in

16    patents mean?

17        A.   From a legal point of view --

18        Q.   Yes.

19        A.   -- no.

20        Q.   No, you're not.  Do you know what cases are

21    the leading cases in trying to provide guidelines

22    for the judges in determining what patent terms

23    mean?

24        A.   I do not.

00011

1    Q.   So in your report, you are not attempting
2    to provide a legal construction of the terms; is
3    that right?
4    A.   Yes.
5    Q.   Now, this is not a situation where the
6    technology involved in this case is particularly
7    complicated; isn't that correct?
8    A.   That would be my opinion, yes.
9    Q.   So there really isn't any need to have an
10   expert teach the Court what the technology is all
11   about.  I compare it to like a case involving
12   biotechnology and an explanation of how RNA and DNA
13   works, for example, something like that.
14   A.   And your question again, please.
15   Q.   This is not a case where there is
16   particularly complicated technology?
17        MR. ALY:  Objection.
18   Q.   Correct?
19   A.   And as I answered, yes.
20   Q.   You don't understand your testimony to be
21   being offered for purposes of teaching the
22   technology of the patented inventions to the Court;
23   isn't that right?
24   A.   I honestly don't know.

00012

```
 1      Q.   Do you understand what you're going to be
 2   testifying about?
 3      A.   Yes.
 4      Q.   What you're going to be testifying about is
 5   what you think these various words mean; isn't that
 6   right?
 7      A.   That is correct.
 8      Q.   You're not going to be testifying for
 9   purposes of teaching the technology underlying these
10   patents to the Court; isn't that correct?
11      A.   That is correct.
12      Q.   So what you're doing is you're just reading
13   the specification and you're telling the Judge what
14   you think the words mean?
15           MR. ALY:  Objection.
16      Q.   Correct?
17           MR. ALY:  That mischaracterizes his
18   testimony.  He previously stated it's not what his
19   view is but what one of ordinary skill in the art
20   would view these terms to be, just to be clear.
21           MR. REPPERT:  Fine.  That's a nice
22   objection, but you know you're not supposed to do
23   that on the record.
24           MR. ALY:  Well, you're mischaracterizing
```

00013

1    his testimony, so I'm here to keep you straight.

2        Q.    Let's take a look at Paragraph 15 of your

3    report.

4        A.    I'm there.

5        Q.    First of all, who actually wrote the words

6    contained in your report?

7            MR. ALY:  Objection.  Vague.

8        Q.    Do you know who wrote the words contained

9    in your report?

10       A.    Yes.

11       Q.    Who?

12       A.    I was certainly on the team that wrote

13   that.  The report is mine, and therefore I take

14   responsibility for it.

15       Q.    But the words weren't written all by you,

16   were they?

17       A.    I reviewed every word in this report.

18       Q.    That's not my question.

19       A.    In the end I would say that I approved

20   every word and therefore they're mine now.

21       Q.    That wasn't my question, though.  Could you

22   just answer my question.

23       A.    Would you ask your question again, please.

24       Q.    The words weren't all written by you, were

00014

1    they?

2        A.   100 percent, no.

3        Q.   Now let's take a look at the sentence in

4    Paragraph 15 where it says, "The machine described

5    in the PowerOasis patents is essentially a

6    specialized payphone for computers."  Are those your

7    words or somebody else's words?

8             MR. ALY:  Where are you --

9             MR. REPPERT:  The second paragraph, the

10   second sentence of Paragraph 15 at the top of Page

11   5.

12       Q.   Do you see that?  Is that something you

13   wrote, or are those someone else's words?

14       A.   I wrote that.

15       Q.   What did you mean by "payphone"?

16       A.   What I was thinking of was a technology

17   that is very closely related to this patent, in the

18   sense of, if I'm connecting to a phone line and

19   paying for it, that process sounded to me like a

20   payphone.

21       Q.   What do you mean by "payphone"?  Just tell

22   me what you mean by that.

23       A.   A payphone is a device which you typically

24   put coins or slide a credit card through in order to

00015

1    get access to telecommunication services.

2        Q.    That means voice, doesn't it?  The phone,

3    it means voice, doesn't it?

4        A.    A telephone is voice, but it is also used

5    for data.

6        Q.    So that your payphone, as you described it,

7    is a device that enables you to talk over the

8    telephone line; isn't that right?

9        A.    In the old sense of the "payphone" word,

10   yes.

11       Q.    You're not saying that the PowerOasis

12   inventions are payphones, are you?

13       A.    Per se they're not a payphone.

14       Q.    They don't provide voice access, do they?

15       A.    Well, if one were to connect a phone into

16   the phone jack, they could get phone access.

17       Q.    Is that anywhere disclosed in this patent?

18       A.    No.

19       Q.    Now, you go on to say "the

20   telecommunications transaction provided by the

21   vending machine described in the PowerOasis patents

22   begins when it receives payment and ends when a user

23   disconnects from the vending machine."

24            MR. ALY:  Where are you citing to?

00016

1           MR. REPPERT:  That's in the third sentence

2    of Paragraph 15 of his report.

3       Q.   Now, that's not what's claimed here, is it,

4    relating to this invention?  If you look at Claim 1,

5    it doesn't say that, does it?

6           MR. ALY:  Are you saying Claim 1 is

7    asserted in this case?

8           MR. REPPERT:  I'm just asking a question.

9           MR. ALY:  Okay.

10      A.   Let me take a quick look at Claim 1.

11      Q.   Feel free to look at the patents, because

12   that's what I'm asking about.

13      A.   Thank you.  (Witness reviews document)  In

14   Claim 1 there is the third paragraph, if you will --

15   I'm not sure if it's a paragraph or a sentence --

16   that talks about "an electronic circuit for

17   determining when the vending transaction is

18   completed."

19      Q.   Right.  It doesn't say that it receives

20   payment and ends when a user disconnects, does it?

21      A.   That sentence does not.  It talks about a

22   payment mechanism previously.

23      Q.   It's also correct to say the specification

24   of the patents-in-suit contains descriptions of the

00017

1    way in which the communication or the vending access

2    is terminated that are different from what you got

3    listed there or stated; isn't that correct?

4        MR. ALY:  Objection.  I don't understand

5    the question.

6        Q.   Take a look at Column 2, Line 65 of the

7    '658 patent.

8        A.   I'm there.

9        Q.   Now, it says, "The transaction ends when

10   the customer disconnects from all of the connectors

11   or otherwise indicates that the customer is

12   finished."

13       A.   I'm sorry, Column 2?

14       Q.   Column 2.

15       A.   Line 65?

16       Q.   63 to 65, the '658 patent.

17       A.   Yes, I'm there.

18       *Q.   So would you agree that that's a disclosure

19   in the specification of a kind of ending of the

20   transaction which is not completely accurately

21   described in Paragraph 15 of your report?

22       MR. ALY:  You'll have to give him an

23   opportunity to look throughout the other areas of

24   the specs --

00018

1          MR. REPPERT:  He can take as much time as

2     he wants.

3          MR. ALY:  Perhaps if you direct him to

4     Column 8.

5          MR. REPPERT:  I'm directing him to a

6     particular part.  I'm giving a question.  If you

7     want to be a witness, I'll be glad to put you on the

8     stand.

9          MR. ALY:  I'm not being the witness.

10    You're again mischaracterizing him and you're

11    pointing him to specific areas.  So if you want your

12    question to be valid and you're asking about the

13    specification in general, he's entitled to look at

14    the whole specification.  And I'm saying there are

15    other areas of the specification that disclose this

16    subject that you're talking about.

17         MR. REPPERT:  I just asked a question about

18    a particular part.  He can answer it however he

19    wants.

20         MR. ALY:  Okay.

21    A.   So what's the question again?

22         MR. REPPERT:  Read it back, please.

23         *(Question read)

24    Q.   That's my question.

00019

1      A.   I would say that this is accurate for one

2  of the ways that the vendor or, excuse me, that the

3  customer can end the transaction with the vending

4  machine.

5      Q.   But there are other ways disclosed in the

6  specification besides those which you chose to put

7  in Paragraph 15; isn't that correct?

8      A.   Yes.

9      Q.   Now, an electronic clock includes

10  electronic circuitry, doesn't it?

11      A.   Yes.

12      *Q.   Just to pose a hypothetical here, if you

13  had a clock that was electronically operated, and it

14  was used in an electronically operated device to

15  turn off access at a particular time, would that be

16  an electronic circuit for determining when the

17  vending transaction is completed?

18         MR. ALY:  Objection.  Is that discussed

19  anywhere in his declaration?

20         MR. REPPERT:  That's just my question, Amr.

21         MR. ALY:  Well, I see where you're going

22  with some of the documents that you have on this

23  table, and I'm going to set the record straight

24  right now so we don't have to go through this

00020

1    several times.

2         The sole purpose of Professor Cooley being

3    here is a deposition with respect to his

4    declaration.  If you have a different understanding,

5    let's air that out right now so we're clear whether

6    we need to get the Court involved or otherwise.  If

7    you're going to start asking him hypotheticals, that

8    is not the time for it.  Today he is here for the

9    declaration.  If you intend to go anywhere else,

10   let's clear it out right now, because I don't want

11   to keep going through this throughout the day.

12        MR. REPPERT:  Now I just have a question on

13   the table.  Could you please read it back and let's

14   have it answered.

15        MR. ALY:  And my position is, if it's not

16   related to his declaration, he's not going to answer

17   it.  And I'm going to instruct him not to answer.

18   And if you take opposition with that, let's clear it

19   with the Court right now.

20        *(Question read)

21        MR. ALY:  Again, I'm going to instruct

22   you -- I'm going to ask you to tell me where is that

23   discussed in his declaration.  If it's not discussed

24   in his declaration, he's not going to answer it.  As

00021

```
 1   you've started out with the question, it's a
 2   hypothetical.  He's not here to answer your
 3   hypotheticals.
 4           MR. REPPERT:  I just pointed him to a
 5   paragraph in his report that talks about when the
 6   transaction ends.  It relates to a claim.  The
 7   purpose of his testimony, as he's already said, is
 8   to explain what these words mean as he understands
 9   them.  I'm inquiring about that subject matter.  If
10   you want to shut him down now, you're taking your
11   own risks.  We will seek costs.
12           MR. ALY:  I'm not taking any risks.
13           MR. REPPERT:  Fine.
14           MR. ALY:  I'm telling you, he's here for
15   his declaration.
16           MR. REPPERT:  That's fine.  If you're
17   going to instruct him not to answer, you do so at
18   your own risk.  We're obviously going to see if we
19   can get relief from the Court, if that's necessary.
20           Let's have the question back again.  This
21   is clearly within the scope of --
22           MR. ALY:  Point me to a spot --
23           MR. REPPERT:  This is an affidavit or a
24   declaration that relates to what the claim terms
```

00022

1    mean.  This is a claim term.  It's a claim term of a

2    patent-in-suit, and we're entitled to ask about it.

3         MR. ALY:  Which claim term are you talking

4    about?

5         MR. REPPERT:  Claim 1.  Claim 1, Paragraph

6    3, Limitation 3, which is exactly the subject matter

7    of Paragraph 15 of his report.  Let's not waste any

8    more time.

9         *(Question read)

10        MR. ALY:  Again, I will instruct the

11   witness, unless you indicate to me how that relates

12   to his declaration with respect to the claim terms

13   in dispute, I don't see how you can ask him that

14   question today being that you pose it as a

15   hypothetical.  If you can direct it to his

16   declaration with respect to a specific claim term in

17   dispute, he can answer the question, and you have

18   not done that yet.

19        MR. REPPERT:  I'd like an answer to the

20   question, please.

21        MR. ALY:  You haven't directed him to a

22   specific area of his declaration that deals with the

23   disputed term.

24        MR. REPPERT:  I just asked him about the

00023

1    sentence in Paragraph 15 that says "the

2    telecommunications transaction provided by the

3    vending machine described in the PowerOasis patents

4    begins when it receives payment and ends when a

5    user disconnects from the vending machine."  There

6    it is.

7        MR. ALY:  Right.  How does that question

8    that you just posed relate to the sentence?

9        MR. REPPERT:  It relates to a claim where

10   the issue of disconnecting, that's the element of

11   the claim we're talking about, that's it.  I want to

12   know -- I want the answer to my question, or you can

13   instruct him not to answer if you want to take that

14   risk.

15       MR. ALY:  I'm not taking any risk.  You

16   haven't satisfied me that what you're asking relates

17   to the declaration.

18       MR. REPPERT:  Can we have the question back

19   one more time.  Thank you.

20       *(Question read)

21       MR. ALY:  That does not relate to the

22   declaration.

23   Q.   Please answer.

24       THE WITNESS:  Now, sir?

00024

         1              MR. ALY:  He has not satisfied me that this

         2     hypothetical question that he's posing relates to

         3     anywhere in this Paragraph 15.

         4        Q.   The question is on the table.  You've got

         5     to answer it.

         6              THE WITNESS:  May I or may I not?

         7              MR. ALY:  I'm instructing him not to

         8     answer.

         9              MR. REPPERT:  Very well.  Mark that

        10     section, we will go to the Court.  We will seek

        11     costs.

        12        Q.   Do you have an understanding as to what the

        13     claim term means that I just referred to, which is

        14     the one you read, "an electronic circuit for

        15     determining when the vending transaction is

        16     completed"?

        17        A.   Do I know what that means?

        18        Q.   Yes.

        19        A.   Yes, I do.

        20        Q.   What does that mean?

        21        A.   That means that there is an electronic

        22     circuit that is somehow sensing when somebody

        23     disconnects or otherwise the transaction is over.

        24        Q.   If you had an electronic clock that turned

00025

1    off access at a particular time, is that an

2    electronic circuit for determining when the vending

3    transaction is completed?

4              MR. ALY:  That question you can answer.

5         A.   I would describe that as one embodiment of

6    that, yes.

7         *Q.   Now, if you had an arrangement where the

8    customer indicated that he was going to be finished

9    at the end of a particular day and to turn off at

10   that time, turn off access, and that access was

11   turned off electronically at the end of that day in

12   response to the customer's request to the vending

13   machine, would that be a situation within the scope

14   of Column 2, Lines 63 through 66, where it says,

15   "The transaction ends when the customer disconnects

16   from all of the connectors or otherwise indicates

17   that the customer is finished"?

18             MR. ALY:  Objection.  Vague.  And I'll also

19   instruct you, Mr. Reppert, now you're getting into

20   an area of infringement and noninfringement.  Again,

21   he is not here to opine on those topics.  You know

22   very well that there is a later time in the

23   discovery schedule for these depositions, and for

24   you to attempt to ask questions on this right now, I

00026

1   will be shutting it down.  So, once again, I'm

2   putting you on notice.

3       Q.   If you can't recall, we can ask to have it

4   read back.

5       A.   Please.

6            *(Question read)

7            MR. ALY:  Objection.  The section in Column

8   2, Lines 63 through 65, as you've indicated, is part

9   of the specification.  We're here to look at claim

10  terms that are in dispute.  Can you point me to a

11  claim term in one of the asserted claims where this

12  appears as a claim term?

13           MR. REPPERT:  I don't know, I assume you've

14  been practicing a long time and you know how to

15  defend depositions, but what you're doing is not

16  kosher and you know it.

17           MR. ALY:  No, it is.

18           MR. REPPERT:  You have to say you object.

19  You're not sitting there trying to tell the witness

20  how to answer, you know that's not proper.  And if

21  you're really going to do that today, then we're

22  going to have to bring that to the attention of the

23  Court too.

24           MR. ALY:  We will also bring --

00027

```
 1          MR. REPPERT:  I would suggest if you want
 2     to preserve your rights to have the question
 3     stricken for some reason at trial, you just say
 4     "objection," that's all you have to say.
 5          MR. ALY:  We're not here for the purposes
 6     of the trial; we're here for the purposes of the
 7     Markman hearing.  And you very well know that we're
 8     here for just the purpose of his declaration.  And
 9     you are attempting here, and the record speaks for
10     itself, you are attempting to solicit information
11     and testimony with respect to infringement, and you
12     very well know that that's not the purpose of this
13     deposition.
14          MR. REPPERT:  I guess we have to have the
15     question back once more.
16          MR. ALY:  And my objection stands.
17          *(Question read)
18          MR. ALY:  I object.  This question does not
19     relate to a disputed term; it's more in line with an
20     infringement or noninfringement issue, which, again,
21     we are not here for.  So unless you can point him to
22     a claim term where that term appears in the asserted
23     claim, I don't see how you can ask him that
24     question.
```

00028

```
 1            MR. REPPERT:  The purpose of his

 2    testimony, or rather his report, is to give his

 3    opinion as to what he thinks these words mean, and

 4    we're talking about the words of the patent; namely,

 5    the limitations of the patent.  And this is a

 6    question directed specifically to one of those

 7    limitations.

 8            MR. ALY:  Which limitation?

 9            MR. REPPERT:  As described in the

10    specification.

11            MR. ALY:  Which limitation?  Point me to a

12    claim --

13            MR. REPPERT:  I'm not going to get into a

14    dispute with you anymore.  We are wasting time.

15    You're acting improperly from the point of view of

16    defense counsel, and you know it, and I am well

17    within my rights in requesting this answer.

18            MR. ALY:  I just think you're getting

19    frustrated because I'm not allowing you to do a

20    run-around with the Court's order.  I have the

21    Court's order with me right here, and if we need to

22    go to it, we'll do it.

23            MR. REPPERT:  I would like to have it back

24    one more time and then we're going to get an answer,
```

00029

1    please.

2         MR. ALY:  You think you're going to get an

3    answer.

4              *(Question read)

5         MR. ALY:  It's an infringement question.

6    We're not here for infringement.  Frankly, if we

7    continue with this and you don't turn to the

8    declaration, we're going to seek costs from the

9    Court in preparing him and getting him here.

10    Q.   Please answer the question.

11         MR. ALY:  He's not going to answer the

12    question.  It's an infringement question.  It has

13    nothing to do with his declaration.  It has nothing

14    to do with a disputed claim term.  I have asked you

15    repeatedly now, direct him to an area in the claim

16    where this appears as a disputed claim term.

17         MR. REPPERT:  I just want to get it clear:

18    Are you instructing him not to answer that

19    question?

20         MR. ALY:  I am instructing him not to

21    answer the question.

22         MR. REPPERT:  Please mark that place so we

23    can find it.

24              (Page 25, Line 7)

00030

```
 1       Q.   The question relates to your statement,
 2  sir, that the transaction ends when a user
 3  disconnects.  Do you see that in the paragraph, in
 4  Paragraph 15?
 5       A.   Yes, I see that.
 6       Q.   By "the transaction ending," you mean when
 7  the telecommunications access provided by the
 8  vending machine described in the PowerOasis patents
 9  ends, correct?
10       A.   I'm sorry, I'm not sure I quite understood
11  your question.
12       Q.   In your Paragraph 15 you state "the
13  telecommunications transaction provided by the
14  vending machine described in the PowerOasis patents
15  begins when it receives payment and ends when a user
16  disconnects from the vending machine."
17       A.   That's what I wrote there, yes.
18       Q.   The question I just asked you relates to
19  when a user -- when the transaction ends, does it
20  not?
21       A.   I'm sorry, your question?
22       Q.   The question I just asked you, you were
23  instructed not to answer, you understand that
24  question to relate to when the transaction ends;
```

00031

1    isn't that correct?

2        A.    Yes.

3        Q.    As you understand the meaning of the terms

4    of the patent, correct?

5        A.    Yes.

6            MR. REPPERT:  I want the question reasked,

7    the same question.

8            *(Question read)

9            MR. ALY:  Objection.  Vague.  There are

10    several vague portions of that question.

11       Q.    Please answer.

12           MR. ALY:  You can answer to the extent you

13    understand the question.  It's riddled with

14    vagueness.

15       A.    Okay.  Let me try to take that in pieces,

16    then, as I understand your question.  Your question

17    has asked me about the ending of the transaction.

18    One embodiment of that would be that the user

19    disconnects from the jacks on the vending machine.

20    That's one way of doing that.

21           You've also asked a question about whether

22    that transaction could be timed.  I would say that

23    that is true.  To the extent that one could pay for

24    an hour or two hours, something like that.  To my

00032

1   knowledge, there is no way, in my reading of this

2   patent anyway, for a user to define a time at which

3   they want it to stop.

4       *Q.   If the user indicated that he was finished

5   by telling the vending machine when to stop,

6   wouldn't that be such a situation?

7           MR. ALY:  How would he indicate to the

8   vending machine?

9       Q.   If the user -- just answer my question,

10  please.

11          MR. ALY:  Objection.  Vague.

12          MR. REPPERT:  Can we have it back, please.

13          *(Question read)

14          MR. ALY:  The same objection.  To the

15  extent you understand it, go ahead and answer.

16      A.   Well, I'm not sure I do.  What I do know is

17  that the customer can indicate the end of that

18  transaction by disconnecting.

19      Q.   If he indicates the end of the transaction

20  by telling the machine when to stop, isn't he

21  indicating when he is finished?

22          MR. ALY:  Objection.  Vague.

23      A.   Shall I answer the question?

24      Q.   If you understand it.

00033

1      A.   My understanding is that the user could buy

2    a certain amount of time, but there is no way of

3    indicating that I want it to stop at 5 p.m., for

4    example, as I understand this patent.

5      Q.   So if he buys 24 hours and says, "I want 24

6    hours," then he's telling the machine when to stop

7    essentially, correct?

8      A.   To the extent that the user did not

9    disconnect any time within that 24 hours, yes.

10     Q.   Now, electronic circuit, the word, what is

11   an "electronic circuit"?

12     A.   A circuit literally built of electronic

13   devices.

14          MR. REPPERT:  Let's just take a break for a

15   second.

16          (Recess)

17   BY MR. REPPERT:

18     Q.   Can you take a look at Paragraph 16 of your

19   report on Page 5.

20     A.   I'm there, yes.

21     Q.   In your first line of that you say that

22   "Figure 2 in the '658 patent illustrates one

23   embodiment of the vending machine."  What is an

24   "embodiment," as you understand that word?

00034

1    A.   As I understand it, it's one representation

2  of the way the system might be put together.

3    *Q.   Now, as you understand the process of

4  figuring out what a patent covers, how do

5  embodiments compare to the claim itself?

6        MR. ALY:  Again, I think you've established

7  he's not here as a patent expert, so why are you

8  asking him patent law questions?

9    Q.   Just answer my question, please.

10        MR. ALY:  He's not a patent expert, so I

11  don't know how you can ask him that question.  You

12  established that fact for yourself.

13    Q.   Please answer.

14        MR. ALY:  You can answer to the extent you

15  know the answer.

16    A.   May I have the question again, please.

17        MR. REPPERT:  Please read it back.

18        *(Question read)

19        MR. ALY:  If you know the answer, go ahead.

20        THE WITNESS:  Well, from a legal point of

21  view, I don't.

22    Q.   So, as you understand it, an embodiment is

23  an example; is that correct?  An embodiment is an

24  example of a configuration that would be covered by

00035

1    the claim?  Is that how you would understand that

2    term?

3        A.    I would describe it as one example, yes.

4        Q.    Now, you understand that for purposes of

5    figuring out what the claim terms mean, the claim

6    terms are not necessarily limited in their meaning

7    to the disclosure in any particular embodiment.  Do

8    you understand that?

9            MR. ALY:  If that's your understanding, go

10   ahead.

11       A.    It is, it is my understanding.

12       Q.    Just going back to Paragraph 15 for a

13   minute, when you say in effect the transaction ends

14   when the user disconnects, is it fair to say that's

15   a particular embodiment of how a transaction could

16   end as disclosed in the patent?

17       A.    Yes.

18       Q.    And there are also discussions relating to

19   other potential embodiments in the specification,

20   correct?

21       A.    Yes.

22       Q.    Now, in taking a look from Paragraph 16 --

23   just to go back.  These other embodiments could

24   include some other way in which the customer

00036

```
  1    indicates that the transaction is done, right?

  2        A.   Yes.

  3        Q.   Paragraphs 16 and 17 and 18 and 19, 20, 21,

  4    those are all describing a particular embodiment,

  5    right?

  6             MR. ALY:  Objection.

  7             THE WITNESS:  May I answer the question?

  8             MR. ALY:  To the extent you know it, sure.

  9        A.   May I have the question again, please.

 10        Q.   Paragraphs 16, 17, 18, 19, 20 and 21,

 11    those are all describing a particular embodiment,

 12    correct?

 13             MR. ALY:  It's not correct, because it's

 14    not a particular embodiment, it's several

 15    embodiments.  That's my problem with that question.

 16             MR. REPPERT:  Would you like me to swear

 17    you as a witness?

 18             MR. ALY:  Just ask proper questions and

 19    then I'll have no reason to object.

 20        Q.   Could you answer the question, please.

 21        A.   I would describe those as different

 22    embodiments of the patent or of the patented item.

 23        Q.   Now, you would agree that the patent itself

 24    describes other possible embodiments besides those
```

00037

1    that you describe in Paragraphs 16 through 21; isn't

2    that right?

3        A.    Yes.

4        Q.    Now let's take a look at Paragraph 22.

5        A.    I'm there.

6        Q.    You say that you agree with T-Mobile's

7    brief in support of its position on claim

8    construction.  Now, when you say that, you're not

9    saying that they're legally correct in what they

10   say, correct?

11       A.    I was not asked to give a legal opinion on

12   that.  So the answer to your question is yes.

13       Q.    So what do you mean when you say you agree

14   with those constructions?

15       A.    What I mean is that from looking at them

16   from my technical perspective, and I think more

17   importantly, looking at these from the perspective

18   of one of ordinary skill in the art, that we would

19   agree with their terms.

20       Q.    I'm going to direct your attention to the

21   term "vending machine," but I'm not going to limit

22   it just to "vending machine," I'm going to use the

23   words that appear in the claim, Claim 1 of the '658

24   patent, which are "a vending machine for vending

00038

1    telecommunications channel access to a customer."

2    Okay?

3        A.   I see that, yes.

4        Q.   Now, prior to seeing this patent, did you

5    ever see that description of "vending machine"

6    before, "vending machine for vending

7    telecommunications channel access to a customer"?

8        A.   I don't recall whether I did or not.

9        Q.   You can't recall that you did, correct?

10       A.   That is correct.

11       Q.   So "vending machine for a vending

12   telecommunications channel access" is not your

13   normal vending machine; isn't that right?

14           MR. ALY:  Objection.  Vague.

15           You can answer it to the extent you know

16   the answer.

17       A.   I got as far as the word "vending machine,"

18   and I'm thinking vending machine.

19     *Q.   I'm not talking about a vending machine;

20   I'm talking about vending machine for

21   telecommunications channel access.  That's not what

22   vending machines normally do, is it?

23           MR. ALY:  Objection.  Vague.  What

24   understanding of "vending machine" are you using as

00039

```
 1   your basis?

 2       Q.   Please answer my question.

 3            MR. ALY:  You may answer to the extent you

 4   have your question.

 5       A.   May I have your question again, please.

 6            MR. REPPERT:  Please read it back.

 7            *(Question read)

 8            MR. ALY:  Objection.  Vague as to the word

 9   "normally do."

10            THE WITNESS:  May I answer it?

11            MR. ALY:  To the extent you understand it,

12   sure.

13       A.   If I understand your question, I would

14   answer it by saying that a vending machine vends

15   some kind of service or good, and one that vends

16   telecommunications services would therefore be a

17   vending machine.

18       Q.   But you just said you didn't know of any

19   usage of the term "vending machine for vending

20   telecommunications channel access" before you saw

21   this patent, correct?

22       A.   That's what I said, yes.

23       Q.   So it's fair to say that's not a normal

24   type of vending machine that you would have thought
```

00040

1   of under the term "vending machine" prior to the

2   time you saw this patent, correct?

3           MR. ALY:  Objection.  Vague.

4       A.   Most vending machines I've seen will

5   distribute a Diet Coke or a candy bar or something

6   like that.

7       Q.   So the answer is "no"; isn't that right?

8       A.   I would say that I have not seen a vending

9   machine like the one described here prior to this,

10  no.

11      Q.   If someone had come up to you back before

12  you were retained in this case and said, "Tell me

13  what a vending machine is," what do you think you

14  would have said?

15      A.   I would have described a machine which

16  distributed some good or service.

17      Q.   Like a Coke machine, for example, or a

18  candy machine?

19      A.   For example, yes.

20  *Q.   And you wouldn't have said, "Well, a

21  vending machine is something that vends

22  telecommunication channel access," right?

23      A.   I was not the one who applied for this

24  patent either.

00041

```
 1    Q.    Could you answer my question.

 2    A.    May I have the question again, please.

 3          *(Question read)

 4    A.    It might not have been my first thought,

 5  no, but that's what they're claiming in this patent.

 6    Q.    Now, you would agree that the term "vending

 7  machine for vending telecommunications channel

 8  access" is a figurative use of the term "vending

 9  machine"; isn't that right?

10          MR. ALY:  Objection.  Vague.

11          THE WITNESS:  May I answer it?

12          MR. ALY:  Sure.

13    A.    Having read the patent, I'm actually not

14  convinced that it is.

15    Q.    You agree the words can be used literally

16  or figuratively?

17    A.    From a grammatical point of view, yes.

18    Q.    And what do you understand the figurative

19  use to be?

20    A.    One that uses a description to add color to

21  the definition, if you will.  Provide a context,

22  perhaps.

23    Q.    Now, I'd like to take you back to 1997 when

24  the parent patent was applied for.  Have you done
```

00042

1    any literature search to see how the word "vending

2    machine" was being used at that point?

3        A.   I'm thinking.  I have not.

4        Q.   Do you know of any uses of the word

5    "vending machine" in connection with providing

6    services over the Internet?

7        A.   I'm sorry, would you ask that again.

8        Q.   Do you know of any uses of the term

9    "vending machine" in connection with providing --

10   selling goods or services over the Internet?

11           MR. ALY:  We're talking back in 1997 or

12   today?

13           MR. REPPERT:  1997 or '96.

14       A.   I'm thinking.  I'm not aware of a system

15   like that, I'm not remembering one.

16       Q.   Do you think you could use the term

17   "vending machine" in some sense or other to describe

18   a system for buying and selling goods over the

19   Internet?

20       A.   Are you asking for something like eBay, for

21   example?

22       Q.   Well, possibly.

23       A.   I could think of a vending machine that

24   would be used for certainly buying goods.

00043

1     Q.   Would that be a figurative use of the term

2   "vending machine" if you said a vending machine for

3   buying goods like eBay?

4     A.   I was thinking of the sales process of eBay

5   rather than buying eBay itself, but yes.

6     Q.   Buying goods over eBay.

7     A.   Yes.

8     Q.   And that would be a use of the term

9   "vending machine" that did not -- that was

10  essentially a play on the literal concept of vending

11  machine, to give a description, in a more figurative

12  sense, to a process of a purchase over the Internet,

13  correct?

14    A.   If what you mean is, there was no physical

15  structure which itself provided the good, then yes,

16  I would agree with that.

17    Q.   Well, let's just talk about EBay for a

18  minute.  There is a physical structure involved

19  whenever you have physical goods being bought and

20  sold; isn't that correct?

21    A.   The goods -- please continue.

22    Q.   There has to be some kind of physical

23  structure involved for the goods to show up at your

24  door, correct?

00044

1        A.   Yes.

2        Q.   And that is certainly the case with eBay,

3   isn't it?

4        A.   Most of the time, yes.

5        Q.   Let's just take a look at Paragraph 25 of

6   your report.  You say it is your opinion that "a

7   person of ordinary skill in the art would

8   understand the term 'vending machine' to have its

9   plain meaning of a mechanically, electrically, or

10  electronically operated device or unit for

11  dispensing goods or services to a single customer at

12  a time when the customer provides sufficient

13  payment."

14        Now, first of all, where did you get that

15  definition?  Does that just come out of your head?

16        A.   It may have, actually.

17        Q.   Do you know whether it did or not?

18        A.   Having worked on this report with several

19  others, several of the legal team, I should say, I

20  would say that I certainly approved it, probably

21  wrote it.

22        Q.   Now, let's just take a look at that.  Let's

23  talk about eBay.  First of all, eBay operates

24  electronically in some way or other, doesn't it?

00045

```
 1    Electricity is involved, or electrically, there is
 2    electricity involved in the operation of eBay in
 3    some way or other?
 4        A.   To drive their computers, yes.
 5        Q.   As well as electronically, correct?
 6        A.   Again, yes.
 7        Q.   EBay is a device, is it not?
 8             MR. ALY:  Objection.  You're talking eBay
 9    as a company?  Vague.  I have no idea what you're
10    asking.
11        Q.   What do you mean by "eBay"?
12        A.   I am thinking of the corporation ebay.com.
13        Q.   Let's talk about the service being rendered
14    by eBay under which you buy goods or service or
15    goods primarily over the Internet.
16        A.   Okay.
17        Q.   That's a device for buying goods, isn't it?
18    EBay is a device?
19        A.   It's certainly the mechanism.  It is a
20    physical structure.
21        Q.   It was devised, correct?  It didn't just
22    kind of come out of nowhere, someone devised it?
23        A.   Yes.
24        Q.   So, in that sense, it is a device?  And
```

00046

1    I'll just give you a dictionary definition here,

2    which we'll mark as the next exhibit.

3                        (Document marked as Cooley

4                        Exhibit 4 for identification)

5        Q.   So I've highlighted on your copy of it the

6    definition as contained in this dictionary -- which

7    is Webster's II New Riverside University Dictionary

8    -- of "device."  It says:  "1.  Something

9    constructed or devised for a particular purpose."

10   That would certainly apply to eBay, right, as we've

11   talked about it as a system for providing ways you

12   can buy stuff over the Internet?

13       A.   I don't know that I would have thought of

14   it that way, no.

15       Q.   But within that definition, using that

16   definition, that would apply, correct?  It's a

17   device?

18       A.   I don't normally think of a company as

19   being constructed or devised.

20       Q.   I'm not talking about the company.  I'm

21   talking about their offering, their Internet

22   offering, their Internet service.

23       A.   Okay.

24       Q.   That's a device within the definition of

00047

1    that term, isn't it?

2        A.    I would think of it more as the service.

3        Q.    The service is a device.  Is that what

4    you're saying?

5        A.    Interesting question.  I'll say yes.

6        Q.    EBay is a system and method of providing

7    goods to people who want to buy them over the

8    Internet, right?

9        A.    Yes.

10        Q.    It provides them on a transaction-by-

11    transaction basis to a customer, right, and the

12    customer buys one thing at a time from eBay, right?

13        A.    Typically, yes.

14        Q.    When the customer provides sufficient

15    payment, right?

16        A.    Yes.

17        Q.    So under that approach, eBay is a vending

18    machine under your definition, isn't it?  We've just

19    been through every part of it.

20        A.    I don't agree with that.

21        Q.    It's a vending machine for vending goods

22    over the Internet, correct?

23        A.    I don't think of it that way, no.

24        Q.    But it meets -- each individual part of

00048

1     your definition is met by eBay, isn't it?

2          A.   I'm reading that section.

3          Q.   It's on the bottom of Page 8.

4          A.   Yes, I see that.  Thank you.

5          Q.   Take your time.

6          A.   (Witness reviews document)  It meets

7     several of the criteria, I admit.  I still don't

8     think of eBay as a vending machine.

9          Q.   So that's a figurative use, then, wouldn't

10    it be?  To call it a vending machine, you would call

11    that a figurative use, isn't that right, the way you

12    describe what "figurative" is?

13         A.   Yes.

14         Q.   So, figuratively speaking, it's a vending

15    machine?

16         A.   Yes.

17    *Q.   Now, would you agree that the inventor is

18    normally one of ordinary skill in the art?

19              MR. ALY:  Objection.  He is not an expert

20    in patent law, you've established that for yourself,

21    so why are you asking him these questions?

22              MR. REPPERT:  I'm just asking him a

23    question.

24              MR. ALY:  You keep coming back when you

00049

1    know you should not be asking these questions.

2            THE WITNESS:  May I answer the question?

3            MR. ALY:  To the extent you're a patent

4    expert, go ahead and answer the question.

5    Q.   If you know, you know; if you don't, you

6    don't.  I'm just trying to find out what you know.

7            MR. ALY:  We have told you several times

8    and yet you keep asking and asking and asking.

9    Q.   Would you please answer to the extent you

10   can.

11   A.   And would you please reread the question to

12   me.  Thank you.

13           MR. ALY:  We're not here to rehabilitate

14   your expert; we're here to deal with his

15   declaration.

16           *(Question read)

17   A.   To the extent that not everyone with

18   ordinary skill in the art attains a patent, I would

19   say no.

20   Q.   I'm going to show you an article we'll mark

21   as the next exhibit.

22               (Document marked as Cooley

23               Exhibit 5 for identification)

24   Q.   I'll show you a reprint on it, it's easier

to read on the bottom, which we'll mark as Exhibit No. 6.

(Document marked as Cooley Exhibit 6 for identification)

MR. REPPERT: Just for the record, Exhibit 5 is an article published in Time magazine, October 7, 1996, entitled "Cyber Vending Machine."

Exhibit 6 is a reprint I printed off Google yesterday of the same article. It's just easier to read the bottom part of it where it says "The Internet Vending Machine." It's hard to read in the version of Exhibit 5 because it's been photocopied too many times.

THE WITNESS: I see that, yes.

MR. REPPERT: But it appears to be the same language.

THE WITNESS: I'll have to take your word for it, I can't read the original either.

MR. ALY: For the record, is this cited anywhere in his declaration?

MR. REPPERT: Whose declaration?

MR. ALY: Professor Cooley's.

MR. REPPERT: No.

MR. ALY: So why are we talking about this?

00051

```
 1              MR. REPPERT:  Because it has to do with
 2    what the word "vending machine" means from the point
 3    of view of one of ordinary skill.
 4         Q.   First of all, have you ever seen the
 5    article called "Cyber Vending Machine" in Time
 6    magazine?
 7         A.   I don't recall seeing it, no.
 8         Q.   Why don't you read it.
 9         A.   (Witness reviews document)  Okay.
10         Q.   Now, you never were shown this document by
11    the people who retained you in this case?
12         A.   No.
13         Q.   Are you aware of the fact this document was
14    contained in the inventor's notebook at the time the
15    patent was invented?
16         A.   I was not.
17         Q.   Does that possibly tell you anything about
18    how one of ordinary skill might have used the word
19    "vending machine" in connection with this
20    invention?
21         A.   Considering it's from Time magazine, I
22    would say no.
23         Q.   Now, is this a meaningless article, from
24    your point of view?  Does the word "cyber vending
```

00052

1   machine" have no meaning whatsoever to you?

2      A.   If I can straighten out the negatives

3   there, the term "cyber vending machine" does mean

4   something to me, yes.

5      Q.   It's not unintelligible gibberish of some

6   language you don't understand?

7      A.   That is correct.

8      Q.   What does "cyber vending machine" mean to

9   you, as you understand it, as one of ordinary skill

10  would have understood this as of 1997?

11     A.   Well, I think that one of no skill at all,

12  in other words, the man on the street or the woman

13  on the street, would be able to read this and

14  understand what it means too.  And I think that one

15  of skill would understand that it's some type of a

16  computer-based, computer-operated vending machine.

17     Q.   Would you agree that the description down

18  in the bottom, "The Internet Vending Machine," is a

19  description of some type of computer-based vending

20  machine?

21     A.   This is the bottom of Page 2?

22     Q.   Yes.

23     A.   The second page?

24     Q.   Yes.  Items 1 through 4 there.

00053

1     A.   Yes.  Actually, I have a question about

2   this exhibit.  I see Pages 1 of 3, 2 of 3, but no 3

3   of 3.

4     Q.   That's because Page 3 of 3 was a blank page

5   when I printed it out.

6     A.   Okay.  Just asking.

7     *Q.   There may have been a date or something on

8   the bottom of it, but it is not part of the article

9   if you compare the two.

10          MR. REPPERT:  Could I have my question

11   back, please.

12          *(Question read)

13     A.   Yes.

14     Q.   Someone of ordinary skill would have

15   understood that as of 1997?

16     A.   Yes, they also would have understood it.

17     *Q.   That was a commonly understood concept of

18   "vending machine" being applied to an Internet

19   context, correct?

20          MR. ALY:  Objection.  Vague.

21          THE WITNESS:  May I answer that?

22          MR. ALY:  To the extent you understand it.

23     A.   May I have the question again, please.

24          *(Question read)

00054

```
 1          A.   I believe this is one example of it, yes.

 2          Q.   By "vending machine" here, they don't mean

 3   a Coke machine, do they?

 4          A.   In this particular example, no.

 5          Q.   So the word "vending machine" doesn't

 6   necessarily mean a Coke machine, does it?

 7          A.   In this particular context, no.

 8          Q.   And this particular context you have a

 9   vending machine with various functions being

10   performed that aren't necessarily all in one metal

11   box, correct?

12          A.   I'm sorry, may I have the question again.

13          Q.   I'll do it again.

14               In this particular vending machine, you

15   have various functions performed by components that

16   aren't all necessarily in the same box?

17          A.   That is correct.

18          Q.   In fact, they're not in the same box,

19   correct?

20          A.   I don't know whether they are or not.

21          Q.   Well, you wouldn't normally expect the

22   consumer and the vendor and CyberCash all to be in

23   the same box, would you?

24          A.   I would not expect them to be all
```

00055

1    colocated, no.

2        Q.   The whole point of the Internet is it works

3    when people aren't colocated, correct?

4        A.   It does as well, yes.

5        Q.   Now, looking at the Claim 1 again, there's

6    nothing in the claim there that tells you --

7            MR. ALY:  Which patent are you referring

8    to?

9            MR. REPPERT:  The same one, same claim.

10       Q.   Take '658.  There's nothing in Claim 1 that

11   tells you that the inventor or inventors meant the

12   word "vending machine for vending telecommunications

13   access" literally or figuratively, right?  It

14   doesn't tell you whether it's literal or figurative?

15       A.   From a definition point of view, no, they

16   do not.

17       Q.   There's nothing in the various elements, as

18   they call them, which are the paragraphs below the

19   introductory paragraph after the word "comprising,"

20   that tells you that the inventor intended all of

21   those elements or components to be contained in the

22   same box or unit, or "colocated" is the word they

23   used?

24       A.   From this description, there is no

00056

1     indication that they are all in the same box.   The

2     figures showing the embodiments do show that, but

3     these claims do not.

4          Q.   It's fair to say that one of ordinary skill

5     could have understood this Claim 1 figuratively to

6     cover a system or method where the various

7     components were not all in the same box?

8          A.   I actually would disagree with that, to the

9     extent that the discussion leading up to the claims

10    shows various embodiments with the device all

11    colocated.

12         Q.   Now, take a look at the paragraph right

13    above Claim 1.  It's Line 10, Column 15.

14         A.   I see that, yes.

15         Q.   It says:  "It is to be understood that

16    although the present invention has been described

17    with regard to preferred embodiments thereof,

18    various other embodiments and variants may occur to

19    those skilled in the art, which are within the scope

20    and spirit of the invention, and such other

21    embodiments...are intended to be covered by the

22    following claims."

23              Do you see that?

24         A.   I read that.

00057

1      Q.    Did you take that language into account in

2   your opinion?

3      A.    I did.

4      Q.    What did you give that language when you

5   gave your opinion?

6            MR. ALY:  Objection.  Vague.

7      Q.    How did you take that into account?

8      A.    Well, by reading it ahead of reading the

9   claims.

10     *Q.    Does that tell you that the particular

11  embodiment that you're referring to in Paragraphs 16

12  through 21 of your report is not intended to be the

13  only embodiment or variant of the patented

14  invention?

15     A.    I'm sorry, may I have the whole question

16  again, please.

17            *(Question read)

18     A.    I think I understand your question.  My

19  read of that is that there are other embodiments

20  that are possible here.  However, my reading of this

21  patent covered the embodiments that the authors did

22  think of and did include within the patent.  So

23  although there are others that I'm sure could be

24  conceived, I was not inventing them for them, for

00058

1    example, inventing those embodiments for the

2    inventors.

3       Q.   Now, the term "vending machine for vending

4    telecommunications access" isn't actually defined in

5    the specification, is it?

6       A.   I don't believe so, no.

7       Q.   Now, there's a description of the

8    functional components of the disclosed invention,

9    isn't there?

10       A.   Yes.

11       Q.   There's a box, a block diagram showing the

12    functional components; isn't that right?

13       A.   Three I think in fact, yes.

14       Q.   If you'd look at Figure 4 as an example.

15       A.   I'm there.

16       Q.   Now, there's no statement in the patent

17    that all those components have to be in the same

18    box, correct?

19       A.   As I'm recalling it, there are descriptions

20    of the other figures that describe the remaining

21    components other than the jacks and the card writer

22    being hidden behind the plate or within the unitary

23    structure.

24       Q.   I'm referring to the functional components

00059

1    shown in block form in Figure 4.

2        A.    I see that, yes.

3        Q.    You don't know of any statement in the

4    patent which says that all of the components

5    performing those functions have to be colocated in

6    the same physical box?

7        A.    Specifically, no.

8        Q.    In fact, the patent says that almost any of

9    those functional components could be remote, doesn't

10   it?

11       A.    The patent does say that, yes.

12       Q.    "Remote" means not in the same place,

13   doesn't it?

14       A.    Yes.

15       Q.    Doesn't that tell you that the inventor

16   contemplated the functional components of the system

17   being spread out somehow?

18       A.    Yes.

19       Q.    If they're spread out, then they're not in

20   the same box, right?

21       A.    As we've said, yes.

22       Q.    That would be a different embodiment from

23   what you talk about in Paragraphs 16 to 21, right?

24       A.    Yes.

00060

1      Q.   But it's fair to say the patent does

2   disclose that different embodiment, doesn't it?

3      A.   To the extent it's described in that text,

4   yes.  The authors chose not to show any of those in

5   the embodiments.

6      Q.   But they made reference to the concept of

7   spreading things out?

8      A.   Yes.

9   *Q.   When you provided your opinion as to what

10  you thought these terms meant, particularly "vending

11  machine," you didn't pay attention to that part of

12  the specification where they said they contemplated

13  spreading the parts out so they're not in the same

14  box, did you?

15      MR. ALY:  Do you want to direct him to that

16  isolated statement?

17      MR. REPPERT:  No, I don't.

18      MR. ALY:  You don't?

19      MR. REPPERT:  I want him to answer my

20  question.

21      A.   May I have the question again, please.

22      Q.   Sure.

23      A.   Thank you.

24      MR. REPPERT:  Would you read that back,

00061

1    please.

2         *(Question read)

3    A.   I would answer in the negative, because I

4    did consider that, I did not ignore it.

5    Q.   How did you consider it?

6    A.   I read the statement and thought about

7    whether that made sense for this particular device.

8    Q.   Well, does it make sense for the cyber

9    vending machine, which we already talked about, to

10   have the parts spread out and still have that as a

11   concept of a vending machine?

12   A.   Presumably, yes.

13   Q.   Why doesn't it make sense for the vending

14   machine for vending telecommunications access to

15   have a distributed system where the parts are spread

16   out?

17   A.   What I was doing was reading the

18   descriptions of the embodiments and making comments

19   on that.

20   Q.   That's not my question.

21        MR. REPPERT:  Can you read the question

22   back.

23        *(Question read)

24   A.   My thought on that was that since the

00062

1  device had been described in the text describing the

2  embodiments as being a unitary structure, by

3  removing parts from the device, the device would no

4  longer work.

5      Q.   Why wouldn't they work?

6      A.   Well, if you start taking parts out of the

7  device, it stops working.

8      Q.   Well, what if you put them somewhere else

9  and you connect them up by some way so they're

10  connected the way the parts of the cyber vending

11  machine are connected?  It would work, wouldn't it?

12      A.   Since I don't know exactly how the cyber

13  vending machine was connected, I can't make an

14  educated comparison of the two systems.

15      Q.   But if you took the functional components

16  described in Figure 4, you don't have to have them

17  right next to each other for the system to work, do

18  you, from an engineering point of view?

19      A.   From an engineering point of view, you do

20  not.

21      Q.   And you can have them communicating with

22  each other by a variety of means, correct?

23      A.   One could design a system that would do

24  that, yes.

00063

1    Q.   And for example, you could use wired or

2   wireless connections between them for those that

3   have to communicate, send signals back and forth,

4   right?

5    A.   From an engineering point of view, one

6   could design a system that does that, yes.

7    Q.   So almost any combination of components

8   could be moved to a remote location, right?

9    A.   I read that in the patent, and the author

10  does not tell us how they would do that.

11    Q.   They didn't tell you how, but they said it

12  could be done, didn't they?

13    A.   This is what they stated, yes.

14    Q.   That's from an engineering point of view,

15  that's something you could understand, right?

16    A.   I could design a system that would do that,

17  yes.

18    Q.   Now, there's a -- can you explain what the

19  role of the central computer is in this vending

20  machine that they disclosed?

21        MR. ALY:  Objection.  Vague.  What do you

22  mean by "they"?

23        MR. REPPERT:  The inventors.

24    A.   I believe so, yes.

00064

1    Q.   What's the role of the central computer?

2    A.   It runs a piece of code that the inventors

3    wrote, and it then controls the other components of

4    the vending machine.

5    Q.   So that it has to be there for the thing to

6    work, right?

7    A.   Yes.

8    Q.   And as they disclose it, the central

9    computer doesn't have to be in the same box, does

10   it?

11   A.   As I'm remembering it, the descriptions of

12   the embodiments talk about all the other devices as

13   being hidden behind the panel on the unitary device.

14   Q.   Isn't it correct to say that they say that

15   the -- that under one embodiment, the central

16   control unit has to contact some central computer

17   and get permission before it does its vending or

18   permits its vending, right?

19   A.   Yes.

20   Q.   Your understanding is that central computer

21   is not in the box; that's at some distant location,

22   correct?

23   A.   It certainly could be, yes.

24   Q.   As they disclosed it, correct?

00065

1     A.  As I'm remembering -- excuse me.  As I'm

2    remembering that, yes.

3     Q.  So they're disclosing a system where an

4    essential part of the vending process is not

5    contained in what you call the vending machine or

6    the box, right?

7     A.  That is one possibility, yes.

8     Q.  In fact, if you'd take a look at Column 7

9    at Line 40 of the '658 patent.

10     A.  Column 11?

11     Q.  Column 7.  Thank you.  "It is possible to

12    modify this and require the central control unit 106

13    to contact a central computer and obtain payment

14    approval before allowing a transaction to begin."

15    Do you see that?

16     A.  Yes.

17     Q.  Now, that's the situation where they are

18    actually disclosing in the specification a system

19    where all the essential parts and pieces are not in

20    the same box, right?

21     A.  By that question are you referring to the

22    entire system or the vending machine or what?  I'm

23    sorry, I don't follow you.

24     Q.  The system is what's necessary for the

00066

1    vending to happen?

2        A.   Yes.

3        Q.   Okay.  So they're not all in the same box,

4    right?

5        A.   The approval system is not.  It is separate

6    from the vending machine, yes.

7        Q.   They also say that "almost any combination

8    of functional components could be moved to a

9    location remote from the machine," right?

10           MR. ALY:  Where is that?

11       Q.   One example is Column 11, Line 26, starting

12   at 25, 26.

13       A.   I see that, yes.

14       Q.   Isn't that telling you that they

15   contemplate that the functional components could be

16   geographically dispersed?

17       A.   That's what they write there, yes.

18       Q.   So that's an embodiment different from the

19   "everything in one box" embodiment, correct?

20       A.   I would interpret it as such, yes.

21    *Q.   Now, you make the reference to the file

22   history.  It's fair to say you don't have any

23   special expertise in how you're supposed to

24   interpret the file history to figure out what

00067

1    patents mean; is that right?

2            MR. ALY:  Objection.  Vague.

3    Q.   Answer, please.

4            THE WITNESS:  May I answer?

5            MR. ALY:  You may answer to the extent you

6    understand the question.

7        A.   And that said, may I have the question

8    back, please.

9            *(Question read)

10       A.   I am not an expert in patent law, so to

11   that extent, yes.

12       Q.   Now, in this cyber vending machine, there

13   is a payment mechanism, isn't there?

14       A.   There's a payment process, yes.

15       Q.   And that's a payment mechanism, isn't it,

16   in some sense of the term "mechanism"?

17           MR. ALY:  Objection.  What does it mean,

18   "the term 'mechanism'"?

19           MR. REPPERT:  I'm just asking him a

20   question.

21       A.   Is it a mechanism?  I would agree.

22       Q.   They make it clear that -- sorry.  Taking a

23   look at Claim 1, when it talks about "a payment

24   mechanism for receiving payment from the customer,"

00068

1    that's on Column 15, now, they disclose an

2    embodiment where you use a card swipe, right?

3        A.    Yes.

4        Q.    That is a payment mechanism, plus the

5    process, the way in which the card gets approved by

6    the credit card system, correct?

7        A.    Yes.

8        Q.    But the claim doesn't say anything about a

9    card swiping, does it?

10       A.    I'm sorry, where are you reading this now?

11   The first paragraph?

12       Q.    Yes, "a payment mechanism."

13       A.    Okay.  I see that.

14       Q.    It doesn't make any reference in the claim

15   itself to card swiping?

16       A.    It does not say "card swipe" there, that's

17   correct.

18       Q.    And a payment mechanism isn't limited to

19   just card swiping; there are other possible payment

20   mechanisms in the world besides card swiping,

21   correct?

22       A.    Yes.

23       Q.    There's like paying cash; that's a payment

24   mechanism?

00069

1     A.   For example, yes.

2     Q.   Or paying by cyber cash; that's a payment

3  mechanism, right?

4     A.   Yes.

5     Q.   There's a process; if you follow the

6  process, payment occurs.   That's a payment

7  mechanism, right?

8     A.   Yes.

9     Q.   Now, in this patent they actually make

10 disclosures of other embodiments which don't use

11 card swiping, right?

12        MR. ALY:  Is this a memory test, or do you

13 want to guide him to someplace where he can look at

14 it?

15        MR. REPPERT:  He's the expert.

16     A.   I'm thinking it describes other devices, so

17 it's card swipe for credit cards, phone cards, debit

18 cards, that kind of thing.

19     Q.   They do say that payment -- in one option,

20 payment is not made during the transaction, right?

21     A.   I'm sorry, would you direct me to that.

22     Q.   That's Column 10, Line 57.

23     A.   If I continue reading that, I'm reading

24 from 57, "In still another option, payment is not

00070

1    made during the transaction, the user is identified

2    through some other type of authentication."

3         Q.   Right.

4         A.   "These can include RF ID cards, hotel keys,

5    software or anatomical characteristics such as

6    fingerprint," et cetera.

7         Q.   It says, if you look at Column 3, Line 19,

8    it says "no physical payment method need be included

9    in the vending machine."

10        A.   I'm sorry, Column 3, which line?

11        Q.   Lines 19 and 20.

12        A.   I'm there.

13        Q.   "No physical payment method need be

14   included in the vending machine."  What do you

15   understand that to mean, these words?

16        A.   Let me read the rest of that to understand

17   the context here.  (Witness reviews document)

18             When I read that in context, it's talking

19   about the vending machine itself is not dealing with

20   the payment, but the central computer does.

21        Q.   So you have some kind of like

22   CyberCash-type approach there, is that what they're

23   talking about?  Some type of billing through the

24   Internet?

00071

1     A.   Excuse me, I'm just rereading that.

2     Q.   Software forms of payment.

3     A.   I'm interpreting that to say payment is

4     collected, it's just not at the vending machine

5     itself.

6     Q.   So that's a situation where there isn't a

7     physical card swipe-type mechanism inside the box

8     where the payment happens, correct?

9     A.   As I'm reading that, it's not taking that

10    payment information at the box, but there would need

11    to be some other mechanism for identifying the user.

12    Q.   Now, what do you understand the word

13    "interface" to mean from the point of view of one of

14    ordinary skill?

15    A.   Not to blow my own horn, but I think I'm

16    probably beyond ordinary skill, certainly for the

17    definition of these terms.  What I think of for

18    "interface" is the mechanism, if you will, by which

19    I communicate with some system.

20    Q.   So can you give me an example?

21    A.   Well, one from the patent is the flashing

22    LED that indicates some status to the user, that I

23    would consider part of the interface.

24    Q.   Is an interface a point at which

00072

1    independent systems or diverse groups interact?

2    A.    It can be to the extent that I could have

3    two pieces of software interfacing, for example, in

4    which case I would describe that as two systems

5    interacting.

6    Q.    What is a "GUI interface"?

7    A.    Although it's an awful word, that's

8    referred to as the graphical user interface.

9    Q.    What is that?

10   A.    It is literally the portal, if you will, or

11   the means by which a user will interface with some

12   system, and it's presented in a graphical format.

13   Q.    So just give an example in the computer

14   world, in which you are clearly an expert, what is

15   an example of a GUI interface that we would all

16   understand, like right there?

17   A.    Like right here, for example. One example

18   might be a Web browser, for example, connected to

19   eBay, since we were using that as an example

20   earlier.

21   Q.    So it's what the user of the computer sees

22   on his or her screen and then that provides

23   information about the system they're connecting to;

24   is that a fair description?

00073

1    A.   I would describe it as the browser itself,

2    the nuance being it's separate from the content that

3    the user is actually presented with.

4    Q.   It's capable of presenting a variety of

5    information rather than specific to particular

6    information?

7    A.   Yes.

8    Q.   Now, let's just take a look again at a

9    dictionary definition.

10    MR. REPPERT:  Mark this as the next

11    exhibit.

12    (Document marked as Cooley

13    Exhibit 7 for identification)

14    Q.   There's a definition of "interface" there.

15    Is that something you would understand as what the

16    term means from the point of view of one of ordinary

17    skill?

18    A.   Yes.

19    Q.   So just to read it:  "1.  A surface forming

20    a common boundary between adjacent regions.  2.  A

21    point at which independent systems or diverse groups

22    interact.  b.  The device or system by which

23    interaction at an interface is effected."  Did I

24    read that correctly?

00074

1      A.   Yes.

2      Q.   Now, in a situation where you have a

3  laptop, an interface can be visible on a laptop,

4  right?

5      A.   Yes.

6      Q.   In the particular specification, the

7  specifications for the patents-in-suit, they

8  disclose an embodiment where the interface is

9  present on the laptop, right?

10     A.   If I'm remembering that correctly, it talks

11  about a mechanism for interfacing with software on

12  the user's laptop.

13     Q.   It says on Column 3, Line 1:  "The

14  microprocessor also communicates with the customer

15  via a user interface to provide details on the

16  process of the transaction.  The user interface is

17  not particularly limited."  First of all, what does

18  that mean, "not particularly limited"?  How do you

19  understand that to mean?  What do you understand

20  that to mean?

21     A.   What I understand that to mean is that

22  they're about to tell me another way they think they

23  could do this.

24     Q.   That would mean it's not limited to colored

00075

1     lights, for example, right?

2          A.   It certainly could, yes.

3          Q.   They go on to say "and need not even

4     include a visual display on the vending machine."

5          A.   I read that, yes.

6          Q.   So is it fair to say they are disclosing

7     here an embodiment where the interface is something

8     different from the colored lights that you refer to

9     in your report, right?

10         A.   They are talking about other ways they

11    think they can do that, yes.

12         Q.   It says in Column 6, Line 12:  "The user

13    interface may be a visual display or some other type

14    of progress indicator such as an auditory signal.

15    For example, the vending machine could instruct or

16    inform the user via an audio speaker."

17         A.   I see that, yes.

18         Q.   "Alternatively," reading on, "the user

19    interface can be present inside or uploaded to the

20    user's laptop or other device thereby obviating the

21    need for an interface within the vending machine."

22    Are those examples of different embodiments of

23    interfaces?

24         A.   As the authors present them, yes.

00076

1    Q.   Now, when trying to figure out what the

2    claims mean, what I just read is something you

3    should take into account, isn't it?

4    A.   I did read that when I was making my

5    comments here in the report.

6    Q.   As you understand your job of opining as

7    to what these words mean "from ordinary skill,"

8    that's what they mean from the point of view of

9    someone who would have had this patent available to

10   them to read to try to figure out what was being

11   invented, right?

12   A.   Yes.

13   Q.   Now, if you had an embodiment that had an

14   interface the way we just described it, either

15   auditory or present on the laptop, that would be an

16   interface, wouldn't it?

17   A.   Yes.

18   Q.   That would be an interface used for the

19   process of vending telecommunications access, right?

20   A.   I'd say it would be part of that interface,

21   yes.

22   Q.   Now, taking a look at that language

23   relating to the "interface being present inside or

24   uploaded to the user's laptop," could that be --

00077

```
 1          MR. ALY:  Do you want to direct him to the
 2   specific spot?
 3          MR. REPPERT:  We just read that.  That
 4   would be Column 6, Line 14.
 5      A.   I'm there, yes.
 6      Q.   Would that be a disclosure of an
 7   embodiment where there is an interface that somehow
 8   interfaces with the software that's on the
 9   customer's laptop?
10      A.   I think I have that question.  You're
11   asking whether the system interfaces with software
12   on the user's laptop?
13      Q.   Yes.  As disclosed in this embodiment in
14   Column 6 that we just read.
15      A.   That is what it says:  "Alternatively, the
16   user interface can be present inside or uploaded to
17   the user's laptop."
18          MR. REPPERT:  Let's take a break.
19          (Recess)
20          MR. REPPERT:  No further questions.
21          MR. ALY:  I have a few questions for
22   Professor Cooley.
23
24
```

00078

```
 1                    CROSS EXAMINATION

 2    BY MR. ALY:

 3        Q.   Professor Cooley, can you look at your

 4    declaration, please.  If I can direct you to

 5    Paragraph 29.

 6        A.   I'm there.

 7        Q.   There you make reference to the Malaspina

 8    patent.  Do you see that?

 9        A.   Yes.

10        Q.   Malaspina was cited in the specification of

11    the patents-in-suit, was it not?

12        A.   It was, yes.

13        Q.   So Malaspina is a reference that is from

14    the relevant time period, meaning around 1997; isn't

15    that correct?

16             MR. REPPERT:  Objection.  It's a leading

17    question.

18        Q.   You may answer.

19        A.   It's my understanding that since this was

20    in the material presented when the authors of the

21    patent went to submit their patent that it's of that

22    time or a little earlier.

23        Q.   Malaspina uses the term "vending machine,"

24    does it not?
```

00079

```
 1      A.   Yes.

 2      Q.   Do you recall how the Malaspina patent used

 3 the term "vending machine"?

 4      A.   Well, it used it in the title, as I recall

 5 it, but it used it to describe a mechanism for

 6 distributing rechargeable batteries.

 7      Q.   Unfortunately, it wasn't marked during your

 8 deposition, so we don't have a copy of it right

 9 here.

10           I next want to turn your attention to the

11 '658 patent, which is Cooley Exhibit 2.

12      A.   I have that.

13      Q.   I'm going to direct your attention to

14 Figure 4, which is the block diagram that Mr.

15 Reppert asked you some questions about; isn't that

16 correct?

17      A.   I'm at Figure 4, and yes, I was asked some

18 questions about this.

19      Q.   One of the questions was whether this

20 figure indicates that the distributed systems can

21 exist outside of the block diagram.

22      A.   That's correct.

23      Q.   What is your understanding of a block

24 diagram, when you see components within the block
```

00080

1    diagram?

2        A.   Is this from the engineering point of view

3    or from the context of the patent?

4        Q.   Let's start with the engineering point of

5    view.

6        A.   Okay.  When I see a block diagram, I see

7    blocks of intercommunicating devices.  So, for

8    example, I see a block 300 drawn around these

9    devices, so I think of that as the, as we have

10   discussed earlier, unitary device or system.

11       Q.   So without otherwise, your understanding

12   would be that all the components would be within

13   this block diagram or colocated; isn't that correct?

14            MR. REPPERT:   Objection.

15       A.   May I answer?

16       Q.   Yes.

17       A.   From the point of view of the block

18   diagram, I would think that all those devices or all

19   those systems would be within the block in Figure 4

20   marked 300.

21       Q.   Next I want to turn your attention to the

22   Cyber Vending article, Cooley Exhibit 5.  Do you see

23   that?

24       A.   Yes, I have that.  Thank you.

00081

```
 1      Q.   Does that article discuss the components
 2  that make up the actual machine, or is it
 3  referencing other entities that interact to
 4  construct the vending transaction?
 5           MR. REPPERT:  Objection.
 6      A.   I'm sorry, could you ask that one again.
 7      Q.   Sure.  I'll strike that.  Let me start
 8  again.
 9           Mr. Reppert asked you a question as to
10  whether or not components are distributed.  Do you
11  remember that line of questioning?
12      A.   Yes.
13      Q.   To the extent there are entities that are
14  dispersed, this article is making reference to the
15  consumer, the merchandise, and those are not in the
16  same colocation; isn't that correct?
17           MR. REPPERT:  Objection.
18      A.   I would agree.
19      Q.   But there's no mention in this article as
20  to whether the components that actually make up the
21  unitary machine are collocated or distributed; isn't
22  that correct?
23           MR. REPPERT:  Objection.  There's no
24  reference to a unitary machine in there.
```

00082

1       A.    I'm just checking.  I'm actually checking

2    Exhibit 6 because it's easier to read.

3       Q.    Sure.

4       A.    (Witness reviews document)  There is no

5    mention of a single box in there.

6       Q.    So this article does not stand for a

7    vending machine with distributed components; isn't

8    that correct?

9           MR. REPPERT:  Objection.

10      A.    I would argue from the information in the

11   article, it's not defining whether it's distributed

12   or not.  I would interpret that you've got consumers

13   at one end, vendors at the other end, the system in

14   between that's handling those transactions.

15      Q.    That's really no different than the alleged

16   invention of the patents-in-suit here where you

17   would have a laptop, you would have a vending

18   machine, and then you would have the ISP.  So in

19   that situation, the ISP or the Internet, that's not

20   colocated with the vending machine; isn't that

21   correct?

22          MR. REPPERT:  Objection.

23      A.    Not necessarily, no, I'd say it's not

24   colocated.

00083

1      Q.    To the extent that the article and the

2   alleged invention here, if the focus is on whether

3   the service and the merchandise is distributed from

4   the vending machine, there is no inconsistency

5   there?

6            MR. REPPERT:  Objection.

7      A.    I don't see an inconsistency, no.

8      Q.    Next I want to direct your attention to

9   Claim 15 of the '658 patent.

10     A.    I'm sorry, that was '658?

11     Q.    At Claim 15.

12     A.    I'm there.

13     Q.    The customer interface in Claim 15 --

14   strike that.  Where is the customer interface

15   located in Claim 15?  Is it on the vending machine

16   or on the customer's laptop?

17           MR. REPPERT:  Objection.

18     A.    The way that I read this, and I'm just

19   reading the claim, "A vending machine is claimed in

20   Claim 1, wherein said customer interface comprises a

21   mechanism that interfaces with software supplied by

22   the customer."  The way that I have interpreted that

23   is that there is a mechanism somehow within the

24   vending machine that is interfacing the software on

00084

```
 1    the -- or software supplied by the customer; it's

 2    unspecific as to whether that's a laptop or some

 3    other device.

 4        Q.   Now, if I could turn your attention to

 5    Column 6, Lines 15 through 18.

 6        A.   6.  I'm there.

 7        Q.   That's the alternative embodiment that Mr.

 8    Reppert was asking you questions about; isn't that

 9    correct?

10        A.   Yes.

11        Q.   The statement, the statement there is,

12    "Alternatively, the user interface can be present

13    inside or uploaded to the user's laptop or other

14    device thereby obviating the need for an interface

15    within the vending machine unit."  So that

16    alternative embodiment really is not covered by

17    Claim 15; isn't that correct?

18             MR. REPPERT:  Objection.

19        A.   May I answer that?

20        Q.   Sure.

21        A.   I actually see that as being two different

22    things, because it doesn't talk about the mechanism

23    listed in Claim 15.

24        Q.   In Column 6 is an embodiment where the user
```

00085

1    interface is inside the user's laptop; isn't that

2    correct?

3              MR. REPPERT:  Objection.

4        A.    That's what it says, the interface is

5    inside the laptop or uploaded to it.

6              MR. ALY:  I have no more questions.

7              MR. REPPERT:  I have no questions.  Thank

8    you for your time.

9              (Deposition concluded at 11:46 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

00086

```
 1              C E R T I F I C A T E

 2     I, Edmond S. Cooley, D.Eng., do hereby certify

 3   that I have read the foregoing transcript of my

 4   testimony, and further certify that said transcript

 5   (with/without) suggested corrections is a true and

 6   accurate record of said testimony.

 7      Dated at _____, this _____ day of _____,

 8   2005.

 9

10                          _____

11

12                      * * * * *

13

14

15     On this _____ day of _____, 2005, before

16   me, the undersigned Notary Public, personally

17   appeared _____ and proved to

18   me through satisfactory evidence of identification,

19   which was _____, to be the person

20   whose name is signed above.

21

22   _____

23   Notary Public

24   My commission expires: _____
```

00087

```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                 )

 3      I, Anne H. Bohan, Registered Diplomate Reporter

 4   and Notary Public in and for the Commonwealth of

 5   Massachusetts, do hereby certify that there came

 6   before me on the 17th day of November, 2005, at 9:30

 7   a.m., the person hereinbefore named, who was by me

 8   duly sworn to testify to the truth and nothing but

 9   the truth of his knowledge touching and concerning

10   the matters in controversy in this cause; that he

11   was thereupon examined upon his oath, and his

12   examination reduced to typewriting under my

13   direction; and that the deposition is a true record

14   of the testimony given by the witness.

15      I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 21st day of

21   November, 2005.

22                     _____

23                         Notary Public

24                  My commission expires 12/25/09
```