EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**PowerOasis, Inc. and**
**PowerOasis Networks, LLC**

    **v.**                                      Civil No. 05-cv-42-PB

**T-Mobile USA, Inc.**

MEMORANDUM AND ORDER

PowerOasis[1] claims that T-Mobile USA, Inc. has infringed two patents for a "Power and Telecommunications Access Vending Machine."  In this Memorandum and Order, I construe several patent terms that have been placed in dispute by PowerOasis' infringement claims.

I.  BACKGROUND

A.  General Description of the Patented Invention

The patents-in-suit are U.S. Patents Nos. 6,466,658 ("'658 patent") and 6,721,400 ("'400 patent").  They disclose inventions designed to support "the operation of computers and other

_____

[1]  PowerOasis, Inc. licenses the patents-in-suit from PowerOasis Networks, LLC.  Both companies have sued T-Mobile.  I refer to plaintiffs collectively as "PowerOasis."

electrical and electronic devices while [their owners are] traveling away from home." '400 patent col. 1, ll. 22-24.[2]  The patentees discerned a need for the inventions due to the fact that "individuals are increasingly dependent on a variety of electronic devices to receive and send information."  Id. col. 1, ll. 26-28.

The patentees refer to their inventions as "vending machine[s] for dispensing telecommunications access."  Id., Abstract.  The "vending machine[s]" provide electrical power and/or a telecommunications channel (such as a high-speed Internet connection) to a customer after the customer supplies payment information or user identification.  Id. col. 2, ll. 43-67.  The "vending machine[s']" central features include "a control unit," which receives payment information and controls access to the electrical power or telecommunications channel, "a customer interface," with which customers can monitor the "vending machine," and a "payment mechanism."  Id. col. 16, ll. 5-25.

_____

[2] I cite to the '400 patent where the '400 and '658 patents do not differ in substance.

-2-

**B.**   **The Claims**

The disputed patents are quite similar.  Both consist of a
single independent claim (claim 1) and 48 dependent claims.
PowerOasis bases its infringement claims on dependent claims 15,
18, 31, 35, 38, 40 and 49.  The independent claim and the
disputed dependent claims are reproduced below, with the disputed
terms in boldface.[3]

What is claimed is:
1.  A **vending machine** for vending telecommunications
channel access to a customer, said **vending machine**
comprising:

a **payment mechanism** for obtaining information from the
customer to initiate a vending transaction;

a **customer interface** for indicating the status of said
**vending machine**;

an electronic circuit for determining when the vending
transaction is completed;

a telecommunications channel access circuit adapted to
be connected to at least one external telecommunica-
tions channel **for enabling access to the at least one
external telecommunications channel at the beginning of
a vending transaction and disabling access at the end
of the vending transaction;**

───────────────

[3]   The '658 patent's independent claim differs in immaterial
ways from the corresponding claim in the '400 patent.  The
disputed dependent claims in both patents are identical.

–3–

a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and

a control unit having a device for receiving payment information from the customer and for controlling said electronic circuit and said telecommunications channel access circuit.

. . . .

15.  A **vending machine** as claimed in claim 1, wherein said **customer interface** comprises a **mechanism that interfaces with software supplied by the customer.**

. . . .

18.  A **vending machine** as claimed in claim 1, wherein said telecommunications access channel #1 connector comprises a high bandwidth channel connector.

. . . .

31.  A **vending machine** as claimed in claim 1, wherein said telecommunications channel access circuit is adapted to be connected to a direct internet connection via an Internet service provider selected by the **vending machine.**

. . . .

35.  A **vending machine** as claimed in claim 1, wherein said telecommunications channel access connector comprises a transceiver to connect wirelessly to an external communications device of the customer.

. . . .

–4–

38.  A **vending machine** as claimed in claim 1, wherein said control unit is **located remote from said vending machine.**

. . . .

40.  A **vending machine** as claimed in claim 1, wherein said control unit further comprises circuitry for controlling a plurality of vending machines.

. . . .

49.  A **vending machine** as claimed in claim 1, wherein said **payment mechanism** comprises a mechanism that interfaces with software resident on equipment of the customer.

## C.  Prosecution History

The '658 and '400 patents are links in a chain of continuation and continuation-in-part applications that began with the patentees' first application in 1997.  The following describes this prosecution history.

On February 6, 1997, the patentees filed Application No. 08/796,562 ("1997 Application").  The Patent and Trademark Office (PTO) examiner rejected one claim and allowed the remainder of the claims, which became U.S. Patent No. 5,812,643 ("'643 patent").  '643 patent Notice of Allowability at 1.  As to the allowed claims, the examiner noted that "none of the art of record suggest nor teach the system and method of vending

-5-

telecommunications channel access and power to a customer having the physical combination of elements and steps as set forth [in the application]." Id. at 3.

On September 18, 1998, the patentees filed Application No. 09/156,487 ("1998 Application"), which was a continuation of the 1997 Application. They amended the application on December 1, 1999, see 1999 Amendment, and subsequently abandoned it.

On June 15, 2000, the patentees filed Application No. 09/594,028 ("2000 Application"), which was a continuation-in-part of the 1998 Application. It became U.S. Patent No. 6,314,169 ("'169 patent"). The 2000 Application added substantial new matter to the previous applications. This new matter included Figures 10-12 and new language in the specification. The relevant new language appears in boldface in the passages below:

> This invention provides access to one or more utilities after the customer provides payment in electronic form (e.g. credit card, debit card, smart card, **or other forms of electronic or magnetic currency devices**) or optionally, currency. **Alternatively, no physical payment method is required, and payment is carried out through software that is present in the user's laptop or other device. In still another option, payment is not made during the transaction, and the user is identified through some type of authentication. These can include RF ID cards, hotel keys,**

-6-

**ID cards, software or anatomical characteristics such as fingerprint, voiceprint or retinal pattern identification.** '400 patent col. 2, ll. 50-61; <u>see also</u> <u>id.</u> col. 10, ll. 59-65.

**Alternatively, no payment mechanism is required, and the vending transaction starts when a customer is identified. Once identified, the user can be billed at a later date. Or, the identification is used as additional security for use in conjunction with electronic or magnetic payment cards or software e-money.** <u>Id.</u> col. 6, ll. 9-14; <u>see also</u> <u>id.</u> col. 10, ll. 5-7.

The microprocessor [that controls the vending process] also communicates with the customer via a user interface to provide details on the progress of the transaction. **The user interface is not particularly limited and need not even include a visual display on the vending machine.** <u>Id.</u> col. 3, ll. 5-9.

**The user interface may be a visual display or some other type of progress indicator such as an auditory signal. For example, the vending machine could instruct or inform the user via an audio speaker. Alternatively, the user interface can be present inside or uploaded to the user's laptop or other device thereby obviating the need for an interface within the vending machine unit. Similarly, the use of a card access system which prevents usage by ejecting the user's card would also obviate the need for a visual or aural interface.** <u>Id.</u> col. 6, ll. 17-26; <u>see also</u> <u>id.</u> col. 9, ll. 32-35.

Another object of this invention is portability. Using an internal power source and wireless telecommunications channels, this invention is not limited to a fixed location. In this configuration, the invention could be used at fairs, outdoor concerts and similar sites where permanent installations are not cost effective. **In these cases, it might be more cost effective to have one control unit**

-7-

> **operating multiple vending machines.  These multiple vending
> machines may be arranged in the form of a kiosk to allow
> multiple customers access to the vending machine at the same
> time.  Similarly, almost any combination of functional
> components of the vending machine could be moved to a
> location remote from the machine.  This could be
> accomplished, for example, by networking a cluster of
> machines to a server either on site or at a remote location.**
> Id. col. 4, ll. 23–37; see also id. col. 11, ll. 26–31.

The 2000 Application also altered the language of independent

claim 1 and added 43 new dependent claims.  Notably, the 2000

Application added several dependent claims disclosing a "vending

machine" with its component parts "located remote from said

vending machine."  See '169 patent claim 45; '169 patent claim

46; '169 patent claim 47.

On November 16, 2001, the patentees filed Application No.

09,985,930 ("2001 Application"), which was a continuation of the

2000 Application.  It became the '658 patent.  The 2001

Application did not add substantially to the previous patent's

specification, although it did delete some dependent claims.

Dependent claim 45, which had first appeared in the 2000

Application, was renumbered to become dependent claim 38.

On October 15, 2002, the patentees filed Application No.

10/270,108 ("2002 Application"), which was a continuation of the

-8-

2001 Application.  It became the '400 patent.  The 2001
Application made insubstantial changes to the previous patent.

On April 7, 2004, the patentees filed Application No.
10/819,168 ("2004 Application"), which was a continuation of the
2002 Application.  In the 2004 Application, the patentees
replaced the phrase "a vending machine for vending
telecommunications access" with "a method for vending
telecommunications channel access."  2004 Application at 39, l.
4.  They also changed the phrasing of independent claim 1 by
converting the structural components of the "vending machine"
into "steps" in a method.  Id. l. 5.  The PTO examiner rejected
the 2004 Application under the "doctrine of obviousness-type
double patenting" with reference to the '400, '658, '169, and
'643 patents and because the 2004 Application's claims were
either anticipated by or unpatentable over a patent held by
another inventor.  2004 Application Office Action Summary at 2-5.

## II.  CLAIM CONSTRUCTION

"It is a 'bedrock principle' of patent law that 'the claims
of a patent define the invention to which the patentee is
entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d

-9-

1303, 1312 (Fed. Cir. 2005), <u>cert. denied</u>, 2006 U.S. LEXIS 1154
(Feb. 21, 2006) (quoting <u>Innova/Pure Water, Inc. v. Safari Water
Filtration Sys., Inc.</u>, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).
Claim construction, or the interpretation of claim terms, is a
matter of law.  <u>IMS Tech., Inc. v. Haas Automation, Inc.</u>, 206
F.3d 1422, 1429 (Fed. Cir. 2000).  A claim term must be assigned
"the meaning that the term would have to a person of ordinary
skill in the art in question at the time of the invention, i.e.,
as of the effective filing date of the patent application."
<u>Phillips</u>, 415 F.3d at 1313.

     To discern the meaning of a claim term, courts examine the
same sources as would the hypothetical person of ordinary skill
in the relevant art.  <u>Id.</u>  First, courts examine the so-called
intrinsic evidence - the claim language, the specification, and
the prosecution history.  <u>Id.</u> at 1314.  The claim language is a
useful starting point.  <u>Id.</u>  "[T]he context in which a term is
used in the asserted claim can be highly instructive."  <u>Id.</u>
"Differences among claims can also be a useful guide in
understanding the meaning of particular claim terms."  <u>Id.</u>  In
addition, "claims 'must be read in view of the specification, of
which they are a part.'"  <u>Id.</u> at 1315 (quoting <u>Markman v. Westview</u>

-10-

Instruments, Inc., 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc),
aff'd, 517 U.S. 370 (1996)).  In fact, the specification is
usually "'the single best guide to the meaning of a disputed
term.'"  Id. (quoting Markman, 52 F.3d at 979).  Finally, the
prosecution history should also be consulted to clarify "how the
inventor understood the invention and whether the inventor
limited the invention in the course of prosecution, making the
claim scope narrower than it otherwise would be."  Id. at 1317.

    After examining the intrinsic evidence, courts may also
refer to extrinsic evidence such as dictionaries, treatises, and
expert testimony.  Id. at 1317-18.  These sources must be
"considered in the context of the intrinsic evidence."  Id. at
1319.  "[T]here is no magic formula" that will reveal the correct
construction of a disputed claim term.  Id. at 1324.  Courts may
review a variety of materials so long as they do not ignore
"claim meaning that is unambiguous in light of the intrinsic
evidence."  Id.

### III.  ANALYSIS

    The following patent terms are in dispute:  "vending
machine," "payment mechanism," "customer interface," "enabling

-11-

access to at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction," "a mechanism that interfaces with software supplied by the customer," and "located remote from said vending machine."  I take each in turn.

## A.    **Vending Machine**

The preamble to claim 1 identifies the patented invention as "a vending machine for vending telecommunications access to a customer."  '400 patent col. 16, ll. 2-3.  The parties disagree as to whether the term "vending machine" limits the claims or merely give a name to the disclosed invention.  Because all subsequent citations to "vending machine" in the body of the claims refer back to its use in the preamble, I resolve this dispute by determining whether the preamble operates as a claim limitation.

"Whether to treat a preamble as a limitation is a determination 'resolved only on review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'"  Catalina Marketing Int'l v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting Corning Glass Works v. Sumitomo Elec. U.S.A.,

-12-

Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989)).  Language used in
the preamble to a claim ordinarily will limit the claim if: (1)
the patentee relied on the preamble during prosecution to
distinguish prior art; (2) the preamble serves as an antecedent
basis for other claim language; or (3) the preamble "recites
additional structure or steps" or otherwise is "'necessary to
give life, meaning, and vitality'" to the claims.  Id. at 808
(quoting Pitney Bowes, Inc. v. Hewlett Packard Co., 182 F.3d
1298, 1305 (Fed. Cir. 1999)).  In contrast, a term used in a
preamble will not limit the claim if it "merely gives a
descriptive name to the set of limitations in the body of the
claim that completely set forth the invention."  IMS Tech., 206
F.3d at 1434.

     T-Mobile first argues that "vending machine" limits the
claimed inventions because the patentees used the term in the
preamble as the antecedent basis for subsequent references in the
body of the claims.  I disagree.  While I recognize that all of
the references to "vending machine" in the body of the claims
refer back to the preamble, this drafting choice does not
necessarily make the preamble a distinct claim limitation.
Patentees may give an invention a name in the preamble and repeat

-13-

that name in the body of the claim without thereby imbuing the invention with additional limitations.  The real issue is whether the name used in the preamble gives independent meaning to the claims.  See, e.g., Seachange Int'l, Inc. v. C-Cor Inc., 413 F.3d 1361, 1376 (Fed. Cir. 2005) (applying antecedent basis rule where preamble supplies necessary structure); Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1339 (Fed. Cir. 2003) (same).  This question cannot be answered simply by noting that the body of a claim uses a term in a way that refers back to the preamble.

T-Mobile next argues that "vending machine" is a claim limitation because it supplies structure not disclosed elsewhere in the body of the claims.  Again, I disagree.  T-Mobile proposes that "vending machine" includes the following structural elements: (1) a "device or unit;" (2) that is "mechanically, electrically, or electronically operated;" and (3) that "dispens[es] goods or services to a single customer at a time."[4] I address only the first of these proposed elements because T-Mobile has not explained how the evidence supports the second and

---

[4]  T-Mobile defines "vending machine" as "[a] mechanically, electrically, or electronically operated device or unit for dispensing goods or services to a single customer at a time when the customer provides sufficient payment."  T-Mobile Br. at 8.

-14-

third elements.

I agree with T-Mobile that the patents-in-suit disclose a "device or unit."  I base this conclusion, however, on my reading of the claims as a whole rather than because I attach independent significance to "vending machine."  The patents plainly claim an apparatus with a specific structure rather than a "system and method of vending" as PowerOasis claims."[5]  If there were any doubt as to this point, it is dispelled by the PTO examiner's wholesale rejection of the 2004 Application, in which the patentees attempted to convert the inventions described in the '400 and '658 patents into "[a] method for vending telecommunications channel access" comprised of certain specified "steps."  See 2004 Application Office Action Summary at 1-5.

Because the patents as a whole make clear that the patented inventions disclose a device or unit rather than a system and method of vending, it is unnecessary to treat "vending machine" as a structural limitation in order to give "life, meaning, and

---

[5]  PowerOasis argues that if "vending machine" is not merely a name for the invention it should be construed to be "a system and method of vending telecommunications channel access to a customer."  PowerOasis Br. at 6.

-15-

vitality" to the claims.[6]  Accordingly, I hold that "vending machine" is a name for the disclosed invention rather than an independent claim limitation.

## B.  **Payment Mechanism**

Claim 1(a) discloses "a payment mechanism for obtaining information from the customer to initiate a vending transaction." '400 patent col. 16, ll. 5-6.  The parties' dispute concerns the meaning of the term "mechanism."  T-Mobile argues that a mechanism is "an arrangement of connected parts," T-Mobile Br. at 19, while PowerOasis contends that "'[m]echanism' means machinery or process for achieving a result."  PowerOasis Br. at 13.

T-Mobile offers two unconvincing arguments to support its interpretation.  First, T-Mobile notes that the dictionary definition of "mechanism" is "an arrangement of interconnected

---

[6]  T-Mobile suggests that the patentees' use of "vending machine" also limits the claimed inventions to "a unitary machine, and not a distributed system made up of components located at remote locations . . . "  T-Mobile Brief at 12.  The only evidence that T-Mobile identifies to support its position, however, is the PTO examiner's statement that the patents claim a "physical combination of elements and steps."  '643 patent Notice of Allowability at 3.  This statement simply does not carry the meaning that T-Mobile assigns to it.  Accordingly, I decline to construe "vending machine" as a limitation requiring that the claimed inventions be unitary machines.

-16-

parts." T-Mobile Br. at 19 (citing American Heritage College
Dictionary). In fact, "mechanism" has several dictionary
definitions, including ones that comport with PowerOasis'
proposed construction of "payment mechanism." See Compact Oxford
English Dictionary of Current English (defining "mechanism" as
"the way in which something works or is brought about"). Thus,
dictionaries are unhelpful.

Second, T-Mobile argues that the patentees' earlier patents
used "mechanism" in terms such as "cover mechanism," '643 patent
col. 9, l. 22, "steam supply mechanism," '169 patent col. 18, ll.
25-26, "hydrocarbon supply mechanism," id. col. 18, ll. 28-29,
and "electric supply mechanism," id. col. 18, l. 34, "to describe
items that are made of connected parts." T-Mobile Br. at 19.
These references do not support T-Mobile's argument because they
use "mechanism" in the same way as it is used in the phrase
"payment mechanism" without providing any additional guidance as
to the term's intended meaning.[7]

-------------------------

[7] In contrast to the other "mechanisms," the patentees
explained that a "cover mechanism" is a protective enclosure for
the customer's electronic device. '643 patent col. 9, ll. 17-23.
While I agree with T-Mobile that a "cover mechanism" is a
physical structure, my conclusion derives from the patentees'
explication of how the "cover mechanism" functions as a cover for

-17-

T-Mobile's argument also falters in light of the
specification's statement that "no physical payment method is
required [in which case] payment is carried out through software
that is present in the user's laptop or other device."  '400
patent col. 2, ll. 54-56; see also '400 patent col. 3, ll. 22-23.
I agree with PowerOasis that this language refutes T-Mobile's
contention that a "mechanism" must be "an arrangement of
connected parts."  As this statement demonstrates, the patentees
clearly envisioned an embodiment in which the "payment mechanism"
consists of software on the customer's laptop rather than a coin
acceptor, card reader, or other "arrangement of connected parts."

Although I agree with PowerOasis that "payment mechanism"
includes software loaded on the customer's computer, I decline to
adopt its proposed definition without qualification.  As T-Mobile
has correctly pointed out, the '658 and '400 patents are
apparatus claims rather than method claims.  PowerOasis'
definition of "mechanism" as "a process for achieving a result"
improperly attempts to convert disclosed structure into a method

---

the customer's device rather than their use of the term
"mechanism."  Accordingly, "cover mechanism" sheds no light on
the meaning of "mechanism" in "payment mechanism."

for achieving the result.  In order to clarify that the term
"payment mechanism" does not encompass all possible methods for
obtaining payment from the customer, I construe "payment
mechanism" to mean "a mechanical, electrical, or electronic
(i.e., software) means for achieving payment."

## C.  **Customer Interface**

Claim 1(b) discloses "a customer interface for indicating
the status of said vending machine."  '400 patent col. 16, ll. 7-
8.  Dependent claim 15 discloses a "vending machine" in which the
"customer interface comprises a mechanism that interfaces with
software supplied by the customer."  Id. col. 16, ll. 65-67.  The
parties agree that a "customer interface" is "an interface that
enables information to be passed between a human user and
hardware or software components of a system."  T-Mobile Br. at
20; PowerOasis Br. at 14-15.[8]

As to both claim 1(b) and claim 15, the parties disagree
about the location of the customer interface.  T-Mobile contends
that the "customer interface" is "part of the vending machine."

---

[8]  PowerOasis uses the terms "customer interface" and "user
interface" interchangeably.  T-Mobile has not argued that the
terms have different meanings and I treat them as synonymous.

T-Mobile Br. at 20 (claim 1(b)); id. at 22 (claim 15).
PowerOasis responds that the "customer interface" may occur on
the customer's laptop.  PowerOasis Br. at 15 (claim 1(b)); id. at
19 (claim 15).  I agree with PowerOasis.

The specification is clear that the "customer interface"
component of the "vending machine" can take a variety of forms.
It states that "[t]he [customer] interface is not particularly
limited and need not even include a visual display on the vending
machine."  '400 patent col. 3, ll. 7-8; see also id. col. 6, ll.
17-18 ("The [customer] interface may be a visual display or some
other type of progress indicator such as an auditory signal.").
In fact, the patentees specifically identified an embodiment of
the invention in which the "customer interface" is located on the
customer's laptop, noting that "[a]lternatively, the [customer]
interface can be present inside or uploaded to the user's laptop
or other device thereby obviating the need for an interface
within the vending machine unit."  Id. col. 6, ll. 20-23.

According to T-Mobile, this specification language does not
describe a "vending machine" with a "customer interface" on the
customer's laptop, but rather "illustrates an embodiment where
there is no customer interface."  T-Mobile Br. at 22-23.  This

-20-

reading flatly conflicts with the plain meaning of the sentence as it is used in the specification. In light of the specification's clarity as to this issue, I conclude that the "customer interface" may be located on the customer's laptop computer as well as on the vending machine.

**D.    Enabling and disabling access**

Claim 1(d) discloses "a telecommunications channel access circuit adapted to be connected to at least one external telecommunication channel for enabling access to the at least one external telecommunication channel at the beginning of a vending transaction and disabling access at the end of the vending transaction." '400 patent col. 16, ll. 12-17. T-Mobile argues that "'enabling' and 'disabling' means 'turning on and off' access to the external telecommunications channel so that communications through the vending machine to and from the telecommunications channel can or cannot take place." T-Mobile Br. at 21. PowerOasis responds that "'[f]or enabling access to the at least one external telecommunications channel' means for the purpose of activating the telecommunications channel so telecommunications can take place [and] '[d]isabling access' means deactivating the telecommunications channel." PowerOasis

-21-

Br. at 16-17.

T-Mobile has provided three short paragraphs of argument in support of its position. PowerOasis has provided even less analysis of the issue. Neither party has explained why the other's proposed definition is incorrect – in fact, neither party has precisely identified how the competing definitions differ in substance. In the absence of guidance from the parties, I decline to speculate as to the contours of the dispute and its appropriate resolution.

**E.    Located remote from said vending machine**

Dependent claim 38 claims "a vending machine . . . wherein said control unit is located remote from said vending machine." '400 patent col. 18, ll. 17-19. The parties frame their argument concerning this claim as a dispute over the meaning of "located remote from." Because they agree, however, that "located remote from" means "having a different physical location,"[9]

---

[9]    T-Mobile claims that the phrase means "having a different location <u>than</u>." T-Mobile Br. at 23 (emphasis added). It does not explain why I should construe "from" to mean "than." Thus, I decline to adopt this part of its suggested definition.

-22-

PowerOasis Br. at 23, T-Mobile Br. at 23, I cannot accept their characterization of the interpretive problem.  Instead, I see the issue as whether T-Mobile is correct in arguing that the claim describes an invention in which the control unit has a different physical location from the "vending machine," or whether PowerOasis is correct in arguing that the claim describes an invention in which the control unit has a different physical location from the other components of the "vending machine."

Both parties' positions are problematic.  If T-Mobile is correct, the claim is nonsensical.  Claim 1 describes a "vending machine" that has a control unit as one of its essential components.  '400 patent col. 16, l. 22.  Claim 38 is dependent on claim 1.  Therefore, the "vending machine" that it describes must also consist, in part, of a control unit.  T-Mobile's proposed interpretation thus results in a claim for a "vending machine" that has a different physical location from itself.  Obviously, such an invention is a physical impossibility.[10]

---

[10]   The language from the specification that I have relied on in construing "customer interface" and "payment mechanism" differs from claim 38 in that it does not describe a device that is remote from itself.  See, e.g., '400 patent col. 6, ll. 20-23 ("[T]he [customer] interface can be present inside or uploaded to the user's laptop or other device thereby obviating the need for

-23-

PowerOasis proposes a sensible interpretation of claim 38, but its definition requires that the claim be rewritten. If PowerOasis is correct in claiming that "located remote from" means "having a different location from" and "said vending machine" means the invention claimed in claim 1,[11] I cannot adopt its interpretation without inserting the words "the other components of" between the above-quoted terms. While this may well be what the patentees intended, the Federal Circuit has counseled district judges not to rewrite claims simply to avoid nonsensical results. See Chef Am., Inc. v. Lamb-Weston, Inc., 358 F.3d 1371, 1374 (Fed. Cir. 2004). In the present case, the only reason I have to question T-Mobile's proposed interpretation

_____

an interface within the vending machine unit."); id. col. 2, ll. 54-56 ("[N]o physical payment method is required [in which case] payment is carried out through software that is present in the user's laptop or other device."). Thus, my interpretation of those terms is not inconsistent with my determination that T-Mobile's interpretation of claim 38 is nonsensical.

[11] As I have noted, PowerOasis argues that "vending machine" is merely a name for the invention claimed in claim 1. It does not argue that the term should be assigned one meaning when it is used in claim 38 and a different meaning when it is used elsewhere in the claims.

is that it is nonsensical.[12]  Under Federal Circuit precedent,
this is not sufficient to permit an alternative interpretation
that the claim term will not reasonably bear without judicial
redrafting.  Accordingly, I adopt T-Mobile's proposed
interpretation of claim 38 rather than the interpretation
proposed by PowerOasis.

## IV.  CONCLUSION

     For the reasons set forth in this Memorandum and Order, I:
(1) reject T-Mobile's contention that "vending machine" is a
claim limitation; (2) agree with T-Mobile that the patents claim
a "device or unit" rather than a "system and method" of vending;
(3) conclude that a "payment mechanism" is "a mechanical,
electrical, or electronic (i.e. software) means for achieving
payment;" (4) agree with PowerOasis that the "customer interface"
may be loaded on the customer's laptop computer; (5) decline to

_____

     [12]  PowerOasis also claims that the specification supports
its interpretation because it states that "almost any combination
of functional components of the vending machine could be moved to
a location remote from the machine."  '400 patent col. 4, ll. 33-
35.  This statement, however, is unhelpful because it also
literally describes an invention that is located remote from
itself.

address the parties' dispute as to "enabling and disabling access;" and (6) conclude that "located remote from said vending machine" should be given its plain meaning even though that meaning is nonsensical.

SO ORDERED.

                                       /s/Paul Barbadoro
_____        Paul Barbadoro
                                         United States District Judge

March 22, 2006

cc:  Amr O. Aly, Esq.
     David Bassett, Esq.
     Thomas Donovan, Esq.
     William Lee Esq.
     Robert Lucic, Esq.
     Gregory Noonan, Esq.
     Sibley Reppert, Esq.
     John Rhee, Esq.
     William Scofield, Jr., Esq.
     Benjamin Stern, Esq.