# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| POWEROASIS, INC. and<br>POWEROASIS NETWORKS, LLC,<br><br>    Plaintiffs -<br>        Counterclaim Defendants,<br><br>v.<br><br>WAYPORT, INC.,<br><br>    Defendant -<br>        Counterclaim Plaintiff. | Civil Action No.:  04-12023-RWZ<br><br>Hon. Rya W. Zobel |

# REBUTTAL EXPERT REPORT OF EDMOND S. COOLEY, D.Eng.

## I.    Introduction

1.    I have been retained as a technical expert in this case by defendant Wayport, Inc. ("Wayport"). I expect to testify at trial regarding the matters set forth in this report if asked by the Court or the parties' attorneys.

2.    I understand that plaintiffs PowerOasis, Inc. and PowerOasis Networks, Inc. (collectively "PowerOasis") have asserted United States Patent Nos. 6,466,658 (the "'658 patent") and 6,721,400 (the "'400 patent") (collectively the "PowerOasis patents") against certain Wayport products and services.

3.    This report is filed pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure and the Court's October 21, 2005 Order.

4.    Wayport has asked me for my expert opinion as to whether any of its products infringe the asserted claims of the PowerOasis Patents.

5.    This report is submitted in response to the Expert Report of Richard E. Morley dated November 8, 2005.

6.    I previously submitted a report concerning the invalidity of the PowerOasis Patents, dated November 8, 2005 ("Invalidity Report"). My background, qualifications, compensation, publications authored within the previous 20 years, expert testimony I have given in the past four years, and a summary of my employment and teaching history are set forth in that report, and are incorporated by reference herein.

## II.   Materials Considered in Forming Opinions

7.    In addition to the materials listed in my Invalidity Report, I have considered relevant portions of the documents and deposition transcripts identified in Appendix 1 of this

Report. I have also had discussions with Dr. Keeler of Wayport about the Wayport system, and I have used the Wayport system.

## III.   Legal Standards

8.   I am not an attorney. I have been informed about the legal standards for patent infringement by counsel for Wayport.

9.   I understand that analysis of infringement is a two-step process comprising construction of claim terms, and comparison of the construed terms to the accused product. I understand that claim construction is a question of law for the judge, and that the ultimate determination of infringement is a question of fact.

10.   I understand that claims are generally construed where possible by their ordinary meaning, as understood by one skilled in the art at the time of the patent's issuance. I have been informed and understand that the patent specification and prosecution history (including prosecution history of related patents) can be useful in determining ordinary meaning. I further have been informed and understand that a patentee can act as her own lexicographer, and can expressly limit the meaning of a claim or claim term (for example, through the prosecution history). I have been informed and understand that the prosecution history of other patents stemming from the same parent application, and which share a common specification, are relevant in determining the meaning of common claim terms. I have been informed and understand that the Court has not yet construed the claims of the PowerOasis Patents. The claim constructions on which my opinions are based are set forth in the body of this report and in Appendix 2 to this Report (Appendix 2 is identical to the Appendix I used in my initial report on invalidity). I reserve my right to supplement or amend the opinions set forth herein in the event

that another construction, such as that adopted by the Court, is provided to me, or in light of any relevant rulings by the Court.

11.    I have been informed and understand that to find infringement by an accused product, the patentee must show the presence of every element of a given claim (literal infringement) or its substantial equivalent (infringement under the doctrine of equivalents) in the accused method.

12.    I further have been informed and understand that an accused method literally infringes a patent if all the elements of the claim, as construed by the Court, are present in the accused product. If any element of the claim does not appear in the accused product exactly, that claim is not literally infringed.

13.    I have been informed and understand that an accused infringer may be liable for directly infringing a patent claim, or for contributing to or inducing the infringement of a patent claim. I have been informed and understand that both contributory infringement and inducement to infringement require proof of direct infringement of the patent claims, and that the patentee bears the burden of proving direct infringement.

14.    I have been informed that contributory infringement occurs when a person provides a material part or a component to another for use in a product, machine or process that infringes a patent. There are five required elements for there to be contributory infringement: (1) the contributory infringer must know of the patent; (2) she must sell or provide a component that is a material component of the claimed invention; (3) the contributory infringer must know that the part/component was especially made for use in a manner that infringes the patent claim; (4) the component must not have a substantial non-infringing use; and (5) the component

must be used in a manner infringing the patent. The patentee has the burden of establishing that each of these elements is satisfied.

15.    I have been informed that inducement of patent infringement occurs when a person purposefully causes, urges or encourages another to infringe a patent. There are four required elements to a claim for inducement of patent infringement: (1) the inducer encouraged or instructed another person how to use a product or perform a process in a manner infringing the patent claim; (2) the inducer knew of the patent at issue; (3) the inducer knew or should have known that her encouragement or instructions would likely result in the other person infringing the patent; and (4) the other person infringed the patent. Inducing infringement cannot occur unintentionally. The patentee has the burden of establishing that each of these elements is satisfied.

16.    I have been informed that patent claims may exist in two forms known as independent and dependent claims. An "independent" claim does not refer to any other claim of the patent. Thus it is not necessary to look at any other claim to determine what an independent claim covers. A dependent claim refers to at least one other claim in the patent. A "dependent" claim includes each of the limitations of the other claim or claims to which it refers, as well as the additional limitations recited in the dependent claim itself. Therefore, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and the other claim or claims to which it refers. I have been informed and understand that, as a matter of law, if an accused product or method does not infringe an independent claim, it cannot infringe a claim that depends on that independent claim.

## IV.    Summary of Opinions

17.    Based on my understanding of Wayport's products, of the legal standard as set forth above, and the claim constructions set forth in this Report, it is my opinion that the Wayport products do not infringe any of the asserted claims of any of the patents-in-suit.

18.    Based on these conclusions, I expect to testify at trial that the asserted claims are not infringed.

## V.    The Bases and Reasons for My Opinion

### A.    Background of the Technology

19.    The relevant technology concerns fee-based computer communications.

20.    In an office or school, computers can communicate with one another over a wired or wireless network. In such a setting, it is typical that the computer user does not pay a fee to establish a connection. The cost is indirect and thus borne by the company or school, not by the user.

21.    In some other contexts, users are willing to pay a fee directly to achieve a connection to allow computers to communicate – for instance, business travelers in an airport. Historical examples include Internet kiosks that provided ATM-like machines with which a user could communicate with other Internet-connected computers. In this way, a user could access her email or other Internet-based services. Per-minute-type charges were typical. Another example of such a system is SFNet. SFNet provided coin-operated computer communication to bulletin board services and Internet email, dating back to about 1991. (*See, e.g.*, Gregori Deposition Transcript, p. 6, l. 17 – p.7, l. 15; Gregori Deposition Exhibit 4).

22.    PowerOasis approached this type of problem at some airports by providing what are essentially special-purpose payphones. These "payphones" enabled a laptop to connect to an RJ11 connector. For a fee, the user would be allowed to utilize the RJ11 jack to connect her computer to the special purpose payphone to communicate over the phone lines to another computer. (Power could also be sold.)

23.    The PowerOasis model of communication -- like the kiosks and SFNet model before it -- was transaction-based. That is, users paid for the time during which they actually used the telecommunications channel.

24.    PowerOasis used a payphone-like approach to vend power and data access, and even stated in its patents that its alleged invention could be included in a payphone. (*See* '658 patent, col. 12, ll. 59-61; '400 patent, col. 12, ll. 62-65). In this aspect of the invention, PowerOasis was neither alone nor first. Indeed, AT&T, France Telecom (as illustrated in the Tallec patent), and several others used a payphone approach to provide fee-based computer access to phone lines long before PowerOasis did.

25.    During this time and earlier, others were providing Internet access using a subscription-based model. Under a subscription-based model, a user paid a subscription fee entitling her to use the Internet service during a given period; the user did not pay based on actual use. Examples of such systems include AOL, the "Ricochet" network offered by Metricom, and early Wayport systems, to name a few. Using an Internet Service Provider ("ISP") such as AOL, a user could obtain Internet service from a desktop or laptop computer through what is known as a "dial-up" connection. Alternatively, a user could remotely access

the Internet by employing a wireless modem in her laptop to connect to the Internet, as was done in the early Wayport system, the Ricochet network, or as illustrated in the Carnegie patent.

### B.    The PowerOasis Patents

26.    The specifications of the two asserted PowerOasis patents are very similar (with the notable exception of the additional disclosure appearing at col. 15, ll. 15-60 of the '400 patent). Both patents are directed to "power and telecommunications access vending machines." One purpose of the described invention is to provide power to a portable device via a duplex electrical outlet. In this fashion, for a fee, the laptop may recharge. Another purpose of the described invention is to provide a telephone jack (RJ11) as part of the vending machine. This jack enables a user to connect her laptop to a telecommunications channel and thereby enable computer communication on the channel. In this fashion, again for a fee, a user may download email or the like.

27.    All of the illustrated embodiments in both the '658 and '400 patents are small self-contained units that may be easily mounted on a wall or within a storage locker, and are meant for use by one user at a time. This point is illustrated in the following patent figures, where items 501 and 601 depict the operating panel of the vending machine. Figures 5 and 6 show a phone booth-like setting, while Figure 7 shows a locker. Figures 10 and 11 show vending machines in a kiosk arrangement. I have reproduced these figures below to illustrate these arrangements. I note that the Power Oasis patents contain the passage: "Similarly, almost any combination of functional components of the vending machine could be moved to a location remote from the machine." ('400 patent, col. 4, ll. 33-35; and col. 11, ll. 28-31.) This sentence, in my opinion, refers to the fact that components may be removed from the vending machine.

-8-

For example, Figure 3 shows an embodiment where components for vending telecommunications channel access have been removed from the vending machine (see, e.g., '400 patent, col. 9, ll. 55-58, "telecommunications channel access circuit and telecommunications channel access connector are deleted"), and Figure 4 shows an embodiment where components for vending power have been removed from the vending machine (see, e.g., '400 patent, col. 10, ll. 49-53, "this embodiment eliminates power vending components"). In each of these embodiments, the vending machine is still a unitary structure; it just possesses a subset of the components of some of the other embodiments. In all, I found at least eight separate instances where embodiments were described which had components "removed," "eliminated," or "deleted." (See '400 patent, col. 8, ll. 13-20; col. 9, ll. 55-58; col. 10, ll. 23-26; col. 10, ll. 29-32; col. 10, ll. 49-53; col. 11, ll. 44-48; col. 12, ll. 47-49; and col. 13, ll. 61-63.) In addition, Figure 8 is the flow chart of operation, and its description (see '400 patent, col. 14) has many instances where it says do a certain operation if a certain component is "present." I disagree with the suggestion that the sentence saying, "components of the vending machine can be moved to a location remote from the vending machine" means that a vending machine is a distributed system of connected components. In my opinion, a person of ordinary skill in the art would conclude that these sentences refer to the embodiments shown, described, or taught in the patent specification, and would not refer to speculative systems that are not shown or described or taught in the patent. I found no statement in the patents that appeared to me to be an attempt at a definition indicating that a vending machine is a distributed system. I note that the patents also contain the passage: "This could be accomplished for example, by networking a cluster of machines to a server either on site or at a remote location." ('400 patent, col. 4, ll. 35-38.) This sentence by itself is unclear. There are no figures or other descriptions (in any detail) about a

network or cluster of machines to a server on site or at a remote location. Thus, I do not know to

what it is specifically referring. I also do not consider it to be a meaningful teaching of an

embodiment because it is so vague and lacking in detail. I note that, when read in context, it

seems to refer to the preceding sentences in which it says, "multiple vending machines may be

arranged in the form of a kiosk...." ('400 patent, col. 4, ll. 30-33.) I note that the one sentence

refers to a network or cluster of <u>machines,</u> and this seems to be tying back to the earlier sentence

referring to "multiple vending <u>machines</u>". This suggests that the inventors conceived of a kiosk

as an arrangement of multiple vending machines in some form of cluster or network.



FIG. 5



FIG. 6

FIG. 7



FIG. 10



FIG. 11

28.    The PowerOasis patents describe certain functional components of the vending

machine with reference to Figure 1, which I have reproduced below.  (This embodiment sells

power and telecommunications channel access; as I outlined above, other embodiments remove

components and sell power or telecommunications channel access, but not both.)

-12-



**FIG. 1**

29.    The various components of Figure 1 are described in the patents at col. 5, line 48

through col. 8, line 52 for the '658 patent, and col. 5, line 52 through col. 8, line 57 for the '400

patent. Some of these components, like the payment mechanism 114 and customer interface

110, are exposed via an operating panel such as one depicted in Figure 2 (reproduced below). In

this way, a customer may interact with these components to pay for the transaction.

30.    As expressly described in the '658 and '400 patents, most of the components

illustrated above are "hidden within the physical structure" of the vending machine. (See, e.g.,

'658 patent, col. 11, ll. 59-61, col. 12, ll. 11-13 and 40-41; '400 patent, col. 11, ll. 62-64, col. 12,

ll. 14-16 and 43-44). The vending machine could be either a standalone unit, or could be

incorporated within a telephone or payphone. (See, e.g., '658 patent, col. 12, ll. 59-62; '400

patent, col. 12, ll. 62-65).

31.    Figure 2 (reproduced below) is a front view of a vending machine operating panel

for vending power and telecommunications channel access. ('658 patent, col. 5, ll. 14-15; '400

patent, col. 5, ll. 17-18). As described in the patents, the customer sees an operating panel (101)

with a user interface (110) in the form of a blinking light. The operating panel (101) includes a payment processing unit (114) in the form of a credit card swipe reader; a power connector (108) in the form of a standard duplex, 115 VAC connector; and a telecommunications channel access connector (122) in the form of a standard telephone line connector.



**FIG. 2**

32.     To operate the vending machine, a customer swipes her credit card through the payment mechanism (114) and plugs her laptop computer or other equipment into the appropriate connectors (108) and/or (122). The customer interface light (110) indicates the status of the transaction. Once the customer completes the transaction, she pulls the power plug (108) and/or disconnects the cable from the socket (122), and the vending machine detects the disconnection and ends the transaction. ('658 patent, col. 8, l. 64 - col. 9, l. 20; '400 patent, col. 9, ll. 1-22). This action is akin to putting a payphone handset back on-hook. At this point, the call is disconnected, and the user is "charged" for the amount of service provided, *i.e.*, power or phone, based on the time of use. (See, e.g., '400 patent, col. 2, ll. 47-8, Summary of the Invention, "The fee is based upon the length of the time of access and which utilities or services are accessed.") I saw nothing in the patents stating or describing a pre-paid approach in which payment is made in full before any service is rendered, or a subscription-based approach in

-14-

which the duration of service is defined before any service is rendered. This type of system is typically called a "pay-as-you-go" system, though I note that at times, pay-as-you-go may be used in different ways. The key point is that you pay for the time that you use as you are actually using it. There is no pre-payment for a session, and each session is open-ended without a previously specified end-time.

33.     A traveler or other user would desire access to power and data so she can gain access to business data, email, personal pictures, etc., located on a computer or computers that the user regularly has access to. However, when the traveler or other user currently does not have direct access to those data sources, she must access those remotely.

34.     Remote access to data sources (in the case of dial-up modem technology) is made possible by dialing a telephone number from the user's laptop. A telephone call is thus made between the laptop and a remote computer. Once the connection is established, the user can gain access to her data sources.

35.     The PowerOasis patents discuss that the vending machine may be used to connect to an ISP. For example, the patent states, "[t]he central control unit [of the vending machine] then calls an ISP in the area that services the particular unit." ('400 patent, col. 7, ll. 13-15). This arrangement (and any other arrangements involving an ISP connection) is not illustrated in the figures of the patents. This arrangement is analogous to the one I mention in the paragraph immediately above, but in this case the "remote computer" would now be the ISP, and the ISP would be a system of computers, software, routers, and other equipment. In my opinion, this passage and the relevant text (and the other passages referring to an ISP and their relevant text)

-15-

clearly illustrate that the inventors used the terms "vending machine" and "ISP" as clearly separate entities.

36.    In my opinion, the PowerOasis vending machines described in the PowerOasis patents are essentially special purpose payphones. Just as a conventional payphone permits a user to place a phone call for a fee (*i.e.*, inserting coins or using a calling or credit card), the PowerOasis vending machine permits a computer to establish a connection or "call" over a telecommunications channel with a remote computer, again for a fee. Like a payphone, it does not provide content, information, network services, email, etc. Just as a person might use a conventional pay telephone to conduct a conversation, the PowerOasis special purpose payphone allows a user's computer to conduct a computer conversation via a telecommunications channel provided by the vending machine. Just as a conventional payphone begins a transaction, *i.e.*, permits a user to place a phone call, when a fee is paid (*e.g.*, inserting coins or using a calling or credit card), and ends when the user hangs up, the telecommunications transaction for PowerOasis's special purpose payphones begins when the vending machine receives payment information and ends when a user disconnects from the vending machine. ('658 Patent, col. 2, ll. 39-67; '400 Patent, col. 2, l. 43 – col. 3, l. 4.).

**C.    Wayport Products**

37.    Wayport, Inc. is a wired and wireless high-speed Internet Service Provider ("ISP") for mobile users. Typically, the Wayport ISP provides service in hotels, conference centers, airports, and retail venues. (See, e.g., Keeler Dep. Exh. 3 at WP000150). Wayport provides standards-based Internet connectivity including Ethernet and wireless. Id.

REDACTED

61.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport

ISP satisfies the claimed "vending machine" limitation under the doctrine of equivalents. Thus,

there is nothing to rebut at present, and I reserve my right to provide further rebuttal if needed.

R E D A C T E D

76.      I note that Mr. Morley provided no analysis or opinion on whether the Wayport ISP satisfies "payment mechanism" under the doctrine of equivalents.  Thus, there is nothing to rebut at present.  I reserve my right to provide rebuttal if needed.

R E D A C T E D

87.    I note that Mr. Morley provided no analysis or opinion on whether the Wayport

ISP satisfies "customer interface" under the doctrine of equivalents.  Thus, there is nothing to

rebut at present, and I reserve my right to provide rebuttal if needed.

R E D A C T E D

106.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport ISP satisfies "a telecommunications channel access circuit. . ." under the doctrine of equivalents. Thus, there is nothing to rebut at present, and I reserve my right to provide rebuttal if needed.

REDACTED

111.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport ISP satisfies "a telecommunications channel access connector. . ." under the doctrine of equivalents.  Thus, there is nothing to rebut at present, and I reserve my right to provide rebuttal if needed.

R E D A C T E D

120.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport ISP satisfies "a control unit. . ." under the doctrine of equivalents.  Thus, there is nothing to rebut at present, and I reserve my right to provide rebuttal if needed.

124.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport ISP satisfies "a customer interface compris[ing] a mechanism that interfaces with software supplied by the customer" under the doctrine of equivalents.  Thus, there is nothing to rebut at present, and I reserve my right to provide rebuttal if needed.

R E D A C T E D

129.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport

ISP satisfies claim 31 under the doctrine of equivalents.  Thus, there is nothing to rebut at

present, and I reserve my right to provide rebuttal if needed.

R E D A C T E D

136.   I note that Mr. Morley provides no analysis or opinion on whether the Wayport ISP satisfies claim 38 under the doctrine of equivalents.  Thus, there is nothing to rebut at present, and I reserve my right to provide rebuttal if needed.

R E D A C T E D

140.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport ISP satisfies claim 40 under the doctrine of equivalents.  Thus, there is nothing to rebut at present, and I reserve my right to provide rebuttal if needed.

144.    I note that Mr. Morley provides no analysis or opinion on whether the Wayport ISP satisfies claim 49 under the doctrine of equivalents. Thus, there is nothing to rebut at present, and I reserve my right to provide rebuttal if needed.

## VI.    Trial Exhibits

145.    I would expect to use demonstrative exhibits in support of any trial testimony, including charts, claim charts, patent drawings, excerpts from relevant documents, deposition testimony and exhibits, video, animations, and other aids to be determined.

146.    Other than as referred to herein, I have not yet prepared any exhibits, but I would expect to do so in accordance with any scheduling order from the Court.

## VII.    Supplementation

147.    I reserve the right to revise, supplement or amend my opinions in light of any additional information that I might receive after the date of this report including but not limited to rebuttal reports submitted by PowerOasis. I also reserve the right to adjust or supplement my analysis in light of any critique of my report or alternative opinions advanced by or on behalf of PowerOasis or by any ruling of the Court including claim construction rulings.


Dated:   December 1, 2005

_Edmond S. Cooley_
Edmond S. Cooley

-51-