# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**PowerOasis, Inc. and**
**PowerOasis Networks, LLC**

        **v.**                          Case No. 05-cv-42-PB
                                    Opinion No.  2007 DNH 042
**T-Mobile USA, Inc.**

### MEMORANDUM AND ORDER

PowerOasis[1] has several patents for a "Power and Telecommunications Access Vending Machine."  It has sued T-Mobile USA, Inc. for patent infringement, claiming that T-Mobile's wireless "HotSpot Network" infringes several claims in two of the patents.

T-Mobile has responded with a motion for summary judgment arguing that the claims in suit are invalid.  Because I determine that the claims PowerOasis relies on were anticipated by a wireless data network operated by T-Mobile's predecessor, I grant T-Mobile's motion for summary judgment.

---

[1]  PowerOasis, Inc. licenses the patents in suit from PowerOasis Networks, LLC.  Both companies have sued T-Mobile.  I refer to plaintiffs collectively as "PowerOasis."

## I. BACKGROUND

### A. The Patents In Suit

The patents in suit are U.S. Patents Nos. 6,466,658 (" '658 patent") and 6,721,400 (" '400 patent").  They disclose inventions designed to support "the operation of computers and other electrical and electronic devices while [their owners are] traveling away from home." '400 patent col. 1, ll. 22-24.[2]

PowerOasis refers to its inventions as "vending machine[s] for dispensing telecommunications access."  Id., Abstract.  The "vending machine[s]" provide electrical power and/or a telecommunications channel access (such as a high-speed Internet connection) to a customer after the customer supplies payment information or user identification.  Id. col. 2, ll.43-67.  The "vending machine[s']" central features include "a control unit," which receives payment information and controls access to the electrical power or telecommunications channel, "a customer interface," with which customers can monitor the "vending machine," and a "payment mechanism."  Id. col. 16, ll.5-25.

---

[2]  I cite to the '400 patent where the '400 and '658 patents do not differ in substance.

B.    <u>The Claims</u>

The disputed patents are quite similar.  Both consist of a single independent claim (claim 1) and 48 dependent claims. PowerOasis bases its infringement claims on dependent claims 15, 18, 31, 35, 38, 40 and 49.  The independent claim and the disputed dependent claims are reproduced below.

What is claimed is:

1.  A vending machine for vending telecommunications channel access to a customer, said vending machine comprising:

a payment mechanism for obtaining information from the customer to initiate a vending transaction;

a customer interface for indicating the status of said vending machine;

an electronic circuit for determining when the vending transaction is completed;

a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction;

a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and

a control unit having a device for receiving
payment information from the customer and for
controlling said electronic circuit and said
telecommunications channel access circuit.

. . . .

15.   A vending machine as claimed in claim 1,
wherein said customer interface comprises a
mechanism that interfaces with software
supplied by the customer.

. . . .

18.   A vending machine as claimed in claim 1,
wherein said telecommunications access
channel # 1 connector comprises a high
bandwidth channel connector.

. . . .

31.   A vending machine as claimed in claim 1,
wherein said telecommunications channel
access circuit is adapted to be connected to
a direct internet connection via an Internet
service provider selected by the vending
machine.

. . . .

35.   A vending machine as claimed in claim 1,
wherein said telecommunications channel
access connector comprises a transceiver to
connect wirelessly to an external
communications device of the customer.

. . . .

38.   A vending machine as claimed in claim 1,
wherein said control unit is located remote

-4-

Case 1:05-cv-00042-PB    Document 81    Filed 03/30/2007    Page 5 of 28

from said vending machine.

....

40.  A vending machine as claimed in claim 1, wherein said control unit further comprises circuitry for controlling a plurality of vending machines.

....

49.  A vending machine as claimed in claim 1, wherein said payment mechanism comprises a mechanism that interfaces with software resident on equipment of the customer.

## C.   **Prosecution History**

The '658 and '400 patents are links in a chain of continuation and continuation-in-part ("CIP") applications that began with the patentees' first application in 1997.  The following describes this prosecution history.

On February 6, 1997, the patentees filed Application No. 08/796,562 ("Original Application").  The Patent and Trademark Office (PTO) examiner rejected one claim and allowed the remainder of the claims, which became U.S. Patent No. 5,812,643 (" '643 patent").  '643 patent Notice of Allowability at 1.  As to the allowed claims, the examiner noted that "none of the art of record suggest nor teach the system and method of vending telecommunications channel access and power to a customer having

-5-

Case 1:05-cv-00042-PB    Document 81    Filed 03/30/2007    Page 6 of 28

the physical combination of elements and steps as set forth [in the application]." Id. at 3.

On September 18, 1998, the patentees filed Application No. 09/156,487 ("1998 Application"), which was a continuation of the Original Application. They amended the application on December 1, 1999, see 1999 Amendment, and subsequently abandoned it.

On June 15, 2000, the patentees filed Application No. 09/594,028 ("CIP Application"), which was a continuation-in-part of the 1998 Application. It became U.S. Patent No. 6,314,169 ("'169 patent"). The CIP Application added substantial new matter to the previous applications. This new matter included the substitution of the term "customer interface" for the claim term "display" in claim 1 and the addition of several independent claims disclosing a "vending machine" with component parts "located remote from said vending machine." The CIP Application also made changes to the specification. The relevant new specification language appears in boldface in the passages below:

> This invention provides access to one or more utilities after the customer provides payment in electronic form (e.g. credit card, debit card, smart card, **or other forms of electronic or magnetic currency devices**) or

-6-

optionally, currency. **Alternatively, no physical payment method is required, and payment is carried out through software that is present in the user's laptop or other device. In still another option, payment is not made during the transaction, and the user is identified through some type of authentication. These can include RF ID cards, hotel keys, ID cards, software or anatomical characteristics such as fingerprint, voiceprint or retinal pattern identification.** '400 patent col. 2, ll. 50-61; see also id. col. 10, ll. 59-65.

**Alternatively, no payment mechanism is required, and the vending transaction starts when a customer is identified. Once identified, the user can be billed at a later date. Or, the identification is used as additional security for use in conjunction with electronic or magnetic payment cards or software e-money.** Id. col. 6, ll. 9-14; see also id. col. 10, ll. 5-7.

The microprocessor [that controls the vending process] also communicates with the customer via a user interface to provide details on the progress of the transaction. **The user interface is not particularly limited and need not even include a visual display on the vending machine.** Id. col. 3, ll. 5-9.

Once attached and initiated, the customer can monitor the state of the vending machine and the transaction via the user interface. **The user interface may be a visual display or some other type of progress indicator such as an auditory signal.  For example, the vending machine could instruct or inform the user via**

-7-

an audio speaker.  Alternatively, the user
interface can be present inside or uploaded
to the user's laptop or other device thereby
obviating the need for an interface within
the vending machine unit.  Similarly, the use
of a card access system which prevents usage
by ejecting the user's card would also
obviate the need for a visual or aural
interface.  Id. col. 6, ll. 14-26; see also
id. col. 9, ll. 32-35.

Another object of this invention is
portability.  Using an internal power source
and wireless telecommunications channels,
this invention is not limited to a fixed
location.  In this configuration, the
invention could be used at fairs, outdoor
concerts and similar sites where permanent
installations are not cost effective.  In
these cases, it might be more cost effective
to have one control unit operating multiple
vending machines.  These multiple vending
machines may be arranged in the form of a
kiosk to allow multiple customers access to
the vending machine at the same time.
Similarly, almost any combination of
functional components of the vending machine
could be moved to a location remote from the
machine.  This could be accomplished, for
example, by networking a cluster of machines
to a server either on site or at a remote
location.  Id. col. 4, ll. 23-37; see also
id. col. 11, ll. 26-31.

On November 16, 2001, the patentees filed Application No.

09,985,930 ("2001 Application"), which was a continuation of the

CIP Application.  It became the '658 patent.  The 2001

-8-

Case 1:05-cv-00042-PB    Document 81    Filed 03/30/2007    Page 9 of 28

Application did not add substantially to the previous patent, although it did delete several dependent claims. Dependent claim 45, which had first appeared in the CIP Application, was renumbered to become dependent claim 38.

On October 15, 2002, the patentees filed Application No. 10/270,108 ("2002 Application"), which was a continuation of the 2001 Application.  It became the '400 patent.  The 2002 Application made insubstantial changes to the previous patent.

**D.    T-Mobile's Allegedly Infringing Device**[3]

T-Mobile acts as an Internet service provider through the T-Mobile HotSpot Network.[4]  (Archibald Deposition, Doc. No. 54 Ex. I ("Archibald Dep.") at 13-14).  The HotSpot Network provides

---

[3]  I draw the facts concerning T-Mobile's products—which PowerOasis does not dispute—primarily from the memoranda of law and exhibits supporting T-Mobile's summary judgment motions.  I draw all inferences in favor of PowerOasis.

[4]  Prior to June 15, 1999, T-Mobile's predecessor, MobileStar Networks, Inc., developed, publicly used, and offered for sale a high-speed wireless data network (the "MobileStar Network") that connected laptop users to the Internet and served fifteen to twenty-five public access locations.  T-Mobile submits—and PowerOasis does not dispute—that in all relevant respects, the MobileStar Network is the same as the HotSpot Network.

high-speed wireless broadband Internet access for IEEE 802.11[5]
enabled laptops and personal digital assistants in public
locations such as Starbucks, Kinkos, and Hyatt hotels.  (Doc. No.
55 Ex. 3, p. 7).  The HotSpot Network works as follows:

When a user enters a HotSpot location with an appropriately
equipped device such as a laptop, the user may attempt to connect
to the Internet using a browser program such as Microsoft
Internet Explorer.  (Archibald Declaration, Exhibit to Doc. No.
55 ("Archibald Dec.") at ¶ 6).  If the laptop computer is
equipped with a wireless ("Wi-Fi") modem, it will interact with
T-Mobile's wireless Access Point equipment within its range by
transmitting and receiving radio frequency ("RF")signals.
(Archibald Dec. at ¶ 6).

When the user attempts to connect to the Internet, the T-
Mobile Access Point device converts the wireless RF signals
received from the user's laptop into standard, wired
communication signals for further transmission to a T-Mobile
Point of Presence ("POP").  T-Mobile's POPs are physical

--------

[5]  IEEC 802.11 refers to wireless internet standards
developed by the Institute of Electrical and Electronics
Engineers.

-10-

locations in T-Mobile's network that are dispersed throughout the
United States and consist of computer servers and various
networking equipment such as routers and switches.  Each POP
supports and communicates with several Access Points. (Archibald
Dec. at ¶ 6).  Thus, the user's request to connect to the
Internet is communicated by the Access Point to a remotely
located T-Mobile POP. (Archibald Dec. at ¶ 7).

The POP includes network router equipment that runs a
service referred to as the Subscriber Selection Gateway Service
("SSG").  (Archibald Dec. at ¶ 8).  The SSG receives the user's
request to connect to the Internet and processes it.  (Archibald
Dec. at ¶ 8).  The SSG determines whether the user is trying to
access an Internet site that is among a group of sites known as
the "Open Garden."   (Archibald Dec. at ¶ 8).  The Open Garden is
a group of Internet sites such as the Starbucks home page, to
which a user can connect, free of charge, without providing any
payment information (such as a credit card number) or
authentication information (such as a username and password).
(Archibald Dec. at ¶ 8).

If a user attempts to connect to an Open Garden site, the
POP routes this request, through a data network and a T-Mobile

-11-

data network and a T-Mobile Data Center, to the Internet.
(Archibald Dec. at ¶ 8).  In this manner, the HotSpot network
provides a user with access to a telecommunications channel--the
connection between the user's device and the Access Point, and
ultimately to the Internet sites in the Open Garden--for free and
without the user having to provide any authentication information
to the HotSpot network.  (Archibald Dec. at ¶ 8).

The first time the user attempts to connect to an Internet
site that is not an Open Garden site, however, a process begins
for the user to log onto the HotSpot network.  The POP routes the
user's request through T-Mobile's data network to a T-Mobile Data
Center.  At the Data Center, a computer server running a service
referred to as the Subscriber Edge Service Manager ("SESM")
processes the user's request.  (Archibald Dec. at ¶ 10).  Instead
of sending the requested Internet page back to the user, the SESM
sends the HotSpot network login page.  (Archibald Dec. at ¶ 10).
The login page provides the user with the option of signing up
for a HotSpot account or logging into an existing account by
providing a valid username and password.  (Archibald Dec. at ¶
10).  If the user does not have an existing HotSpot account, the
user must complete a series of forms to create an account and

-12-

must select the type of subscription plan desired.  (Archibald
Dec. at ¶ 11).  If the user already has an account, the user must
enter the appropriate username and password.  (Archibald Dec. at
¶ 11).

After the user enters the appropriate login request, the
Access Point sends the request to the POP, which routes the
request across T-Mobile's data network to the SESM at the Data
Center, and then back across the data network to the remotely
located T-Mobile HotSpot Back Office.  After the Back Office
receives the user's login request, computer servers and databases
in the Back Office authenticate the user and authorize the user
to connect to the Internet--beyond the Open Garden--via the
HotSpot network.  (Archibald Dec. at ¶ 8).

After the user is authenticated, all subsequent requests to
access Internet sites are routed from the Access Point, through
the POP and the data network, to the nearest Data Center and then
to the Internet.  (Archibald Dec. at ¶ 14).  The user's session
continues until the user logs out from the HotSpot network by
either clicking the logout button or turning off the Wi-Fi
device.  (Archibald Dec. at ¶ 14).

Case 1:05-cv-00042-PB    Document 61    Filed 03/30/2007    Page 14 of 28

Notably, as described above, the only HotSpot Network customer interface with which the user interacts appears on the screen of the user's laptop or personal digital assistant.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party moving for summary judgment "bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the burden shifts to the adverse party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d 86, 94 (1st Cir. 1996). The "adverse

party may not rest upon the mere allegations or denials of the
adverse party's pleading, but the adverse party's response . . .
must set forth specific facts showing that there is a genuine
issue for trial." Fed. R. Civ. P. 56(e); see also Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

### III. DISCUSSION

T-Mobile argues that the patent claims at issue in this
litigation are invalid because they were anticipated by the
MobileStar Network, a high speed wireless data network that T-
Mobile's predecessor first placed in service after PowerOasis
filed the Original Application but more than a year before it
filed the CIP Application.  PowerOasis does not challenge T-
Mobile's contention that the MobileStar Network was in use more
than a year before it applied for the patents in suit.  Nor does
it take issue with T-Mobile's assertion that the MobileStar
Network is indistinguishable from the HotSpot Network in all
material respects.  Instead, it argues that T-Mobile's
anticipation defense fails because the claims in suit are
entitled to the priority date of the Original Application.  In
responding to this argument, I first outline relevant Federal

Circuit precedent and then apply it to the facts of the case.

## A.    **Federal Circuit Precedent**

### 1.    Anticipation

A patent is invalid because of anticipation if the invention was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ." 35 U.S.C. § 102(b). Anticipation is a question of fact, and the burden of proof is on the party claiming the defense by clear and convincing evidence. See Mentor H/S, Inc. v. Medical Device Alliance, Inc., 244 F.3d 1365, 1377 (Fed. Cir. 2001).

Because PowerOasis acknowledges both that the MobileStar Network was in public use more than one year before it applied for the '648 and '400 patents and that the network is in all material respects indistinguishable from the HotSpot Network, the claims in suit are invalid because of anticipation unless PowerOasis is entitled to the benefit of the filing date of the Original Application. See e.g., Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc., 246 F.3d 1368, 1378 (Fed. Cir. 2001) ("it is axiomatic that that which would literally infringe if later anticipates if earlier"). Thus, the only factual issues

-16-

that are relevant to the present motion are those that pertain to the issue of priority.

2. Priority

A CIP patent has priority to the application date of the original patent only if the application's written description discloses the patented invention with the specificity required by 35 U.S.C. § 112.  35 U.S.C. § 120.  Powerful public policy considerations underlie § 120's reliance on § 112's written description requirement.  As the Federal Circuit has explained, "[t]he purpose of the written description requirement is to prevent an applicant from *later* asserting that he invented that which he did not; the applicant for a patent is therefore required to recount his invention in such detail that his *future* claims can be determined to be encompassed within his original creation."  Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1319 (Fed. Cir. 2003)(emphasis in original).  Unless this requirement is respected, innovation is undermined because inventors must live in fear that their inventions, which do not infringe when they are placed in use, will later be captured by a CIP application filed only after their ideas have been proven to be of value in the marketplace.

In <u>Augustine Medical, Inc. v. Gaymar Industries, Inc.</u>, 181

F.3d 1291 (Fed. Cir. 1999), the Federal Circuit provided guidance

as to how priority questions are to be resolved when priority is

claimed to the date of a parent application.  Rather than attempt

my own creative rephrasing of this guidance, I reproduce it

below, omitting only internal citations and quotations.

> A CIP application contains subject matter
> from a prior application and may also contain
> additional matter not disclosed in the prior
> application.  Different claims of such an
> application may therefore receive different
> filing dates.  Subject matter that arises for
> the first time in the CIP application does
> not receive the benefit of the filing date of
> the parent application.  Thus, the decision
> on the proper priority date – the parent
> application date or the CIP application date
> – for subject matter claimed in a CIP
> application depends on when that subject
> matter first appeared in the patent
> disclosures.  To decide this question, a
> court must examine whether the disclosure of
> the application relied upon reasonably
> conveys to the artisan that the inventor had
> possession at that time of the later claimed
> subject matter.  This is a question of fact.

<u>Id.</u> at 1302–03.

Other Federal Circuit decisions have recognized that while

the original application need not include a precise description

of an invention that is later claimed in a CIP Application, it

-18-

must include sufficient information to convey with "reasonable
clarity" to a practitioner of the relevant art that the inventor
was "in possession" of the invention when the application was
filed.  See Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555, 1563-64
(Fed. Cir. 1991); Moba, 325 F.3d at 1320-21.  Further,
"[e]ntitlement to a filing date does not extend to subject matter
which is not disclosed, but would be obvious over what is
expressly disclosed."  In Re Charles D. Huston, 308 F.3d 1267,
1277 (Fed. Cir. 2002) (quoting Lockwood v. Am. Airlines, Inc.,
107 F.3d 1565, 1571-72 (Fed. Cir. 1997)).

     The Federal Circuit has not explained how the burden of
proof should be allocated when a priority question arises in the
context of an invalidity dispute.  In a decision addressing the
burden of proof in interference proceedings under the "old"
interference rules, the court held in Utter v. Hiraga, 845 F.2d
993, 998 (Fed. Cir. 1988) that "[a] party who, like Hiraga,
relies on an earlier-filed application under 35 U.S.C. § 119 or §
120 has the burden to show that the foreign or parent application
supports later added claims under 35 U.S.C. § 112, ¶ 1,
regardless of whether that party is the junior or senior party in
the interference."  More recent decisions decided under the "new"

-19-

interference rules make clear that after an interference has been
declared, the party attacking the declaration must overcome the
presumption that the decision is correct by disproving the
priority ruling by a preponderance of the evidence.  See, e.g.,
Bilstad v. Wakalopulos, 386 F.3d 1116, 1120-21 (Fed. Cir. 2004);
Kubota v. Shirbuya, 999 F.2d 517, 521 (Fed. Cir. 1993).  While
these decisions are not directly on point, they suggest that the
burden of proof on issues of priority ordinarily should be
assigned to the party claiming priority to a parent application
except where a prior ruling addressing the issue is entitled to a
presumption of correctness.

When invalidity is argued, it is axiomatic that the
challenged patent is entitled to a presumption of validity.  See,
e.g., Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings, 370
F.3d 1354, 1365 (Fed. Cir. 2004).  However, it is less clear
whether the presumption of validity extends to priority questions
that arise during validity disputes.  One leading commentator
declares the issue debatable where the Patent Office has not
addressed the issue, Chisum on Patents, §13.04[6], and district
court decisions addressing the subject cut both ways.  Compare
Penwalt Corp. v. Akzona, Inc., 570 F. Supp. 1097, 1102 (D. Del.

-20-

1983) (presumption of validity inapplicable to priority claims)
with Ralston Purina Co. v. Far-Mar-Co., 586 F. Supp. 1176, 1211-
12 (D. Kan. 1984) (extending presumption of validity to priority
disputes).

At least in cases such as the present one, where the Patent
Office has not determined that a CIP patent should be entitled to
the priority date of the original patent application, I see no
reason why a presumption to such effect should be recognized.
Accordingly, for the reasons acknowledged by the Federal Circuit
in Hiraga, I conclude that when a dispute arises concerning
whether a CIP patent is entitled to priority to the date of the
original patent application and the Patent Office has not
addressed the issue, the burden of proof ordinarily should rest
with the party claiming priority to the date of the original
application.  See 845 F.2d 993, 998.

I apply these general legal principles in resolving the
present dispute.

**B.   Analysis**

Relying exclusively on changes made to the Original
Application by the CIP Application, I construed the claim term
"customer interface" broadly in a prior order to encompass

-21-

interfaces that are located on a customer's electronic device.
See PowerOasis v. T-Mobile USA, Inc., 2006 D.N.H. 036 at 19-21.
This broad conception of customer interface extends beyond what
was claimed in the Original Application--i.e., a vending machine
with a "display" as one of its component parts.[6]  Thus,
PowerOasis is not entitled to claim priority for this new matter
to the date of the Original Application unless it can prove that
it was "in possession" of the new matter when it filed its
Original Application.

The relevant evidence in this case consists solely of the
Original Application and an affidavit from Richard Morley, an
expert witness who claims that a person reasonably skilled in the
relevant art would understand from the Original Application that
PowerOasis was then in possession of the concept of a vending

---

[6]  Judge Zobel recently construed the same claim term in the
same patents to mean "a part of the vending machine for
communicating information about the status of the vending machine
to the customer."  PowerOasis v. Wayport, Inc., 2006 WL 1752322
*4-5 (D. Ma).  My disagreement with Judge Zobel on this point
stems solely from my inability to reconcile what otherwise
appears to be a correct construction of "customer interface" with
the new references in the CIP Application that give the term a
broader meaning.  If Judge Zobel's construction of "customer
interface" is correct, the HotSpot Network plainly does not
infringe the claims in suit because it does not have a "customer
interface" as she defined the term.

machine with a customer interface located on a customer's
electronic device.  I am unpersuaded by PowerOasis's contention
that its evidence on this point presents a genuine issue for
trial.

The claims in the Original Application describe an invention
with a "display" rather than a "customer interface."  Although
the Original Application's written description refers to the
display as a "user interface," it invariably does so in a context
which suggests only that an interface is achieved through the use
of a component part of the claimed invention.  For example, all
of the Original Application's preferred embodiments and all of
the figures that depict the claimed display referred to in the
claims describe a physical display that is a part of the vending
machine.  See, e.g., '643 patent col. 6, ll 59-67 ("in the
preferred embodiment of Fig. 2, the user interface consists of
two lights which turn on and off in particular patterns to inform
the customer as to how the transaction is processing.  In other
preferred embodiments, these lights may be replaced or augmented
by a video display unit (VDU) which provides more detailed
instruction to the customer on vending machine operation and
detailed information on the progress of the transaction including

-23-

the accumulated changes"). While I recognize that a written description may demonstrate that the inventor is in possession of additional matter beyond what is disclosed in preferred embodiments, I cannot find a single reference in the written description which suggests that PowerOasis understood its invention to include the new matter that it claimed for the first time in the CIP Application.

Although Morley asserts that a person reasonably skilled in the art would understand from the Original Application that PowerOasis was in possession of the concept of a vending machine with a customer interface located on the customer's computer, his affidavit does not give rise to a genuine factual dispute on this issue. With respect to the customer interface issue, Morley states:

> It was well known to those of ordinary skill as of February 6, 1997, that the functionality of providing information to a customer via a user interface can be provided by displaying information on a computer screen, such as on a portable computer of the type referred to in the [Original Application] when that computer is connected to a network of other components and computers. (Morley Decl., Doc. No. 58 Ex. 1 at 6).

-24-

On this basis, he concludes that "[i]t is [his] opinion that the
disclosure in the [Original Application] would have reasonably
conveyed to one of ordinary skill in the art that the inventors
were in possession of the concept of the later-claimed 'customer
interface' as construed by this court, when they filed [the
Original Application]." (Morley Decl. at 6). Additionally,
Morley states:

> One of ordinary skill would have known that a
> laptop computer could be connected to a
> network including other components and
> computers, and that information could be
> transmitted from the network to the laptop
> computer. Such an interface would
> necessarily involve the use of "software
> supplied by the customer" on their laptop.
> The specification of the '643 patent
> specifically discloses examples of "standard
> Internet software such as, but not limited to
> Netscape, Microsoft Explorer, or Mosaic."
> One of ordinary skill would have known that
> such browser software on the customer's
> computer could be used to display information
> to the customer as part of the "customer
> interface." (Morley Decl. at 6 (citing '643
> patent col. 9, ll. 50-53)).

In essence, Morley asserts that PowerOasis was in possession
of the new matter claimed in the CIP Application when it filed
the Original Application because the Original Application refers
to the claimed "display" as a user interface and practitioners of

-25-

the relevant art would understand that the functionality of an
interface could be achieved through the use of the customer's
electronic device rather than by having an interface that is a
component of the invention.  In making this assertion, he does
not cite in a persuasive way any supporting references in the
written description.[7]  Thus, he does not even attempt to
demonstrate how a practitioner of the relevant art would glean
from the Original Application's written description that
PowerOasis was then in possession of a version of the claimed
invention that used the customer's electronic device to achieve
the interface.

More fundamentally, Morley's affidavit is deficient because,
at best, it suggests that a person reasonably skilled in the art
would understand that the *function* of the claimed display could
be achieved by exploiting the customer's electronic device.  This

---

[7]  While the Original Application's specification refers to
standard Internet software such as Microsoft Explorer, it does
not discuss this software in the context of a user interface.
Rather, the language Morley cites merely describes an embodiment
which would allow a customer to connect directly to a high speed
Internet connection on the vending machine without having to go
through the customer's Internet access provider.  See '643 patent
col 9, ll. 42-53.

-26-

amounts to nothing more than an assertion that persons reasonably skilled in the art would find it obvious from what was disclosed in the Original Application that the function served by a "display" could be achieved in this way. As I have explained, an inventor is not deemed to be in possession of later claimed matter simply because the new matter was obvious from what was disclosed. See In re Charles D. Huston, 308 F.3d at 1277; Lockwood, 107 F.3d at 1571-72. Because Morley's affidavit accomplishes nothing more, it does not trigger the need for a trial to resolve the priority issue.[8]

---

[8] PowerOasis asserted in a telephone conference with the court after briefing and oral argument had been completed that the Original Application disclosed a version of the claimed invention with a "customer interface" as that term is used in the CIP because: (1) the "display" claimed in the Original Application is a species of the genus "customer interface;" and (2) Federal Circuit precedent recognizes "the general rule that disclosure of a species provides sufficient written description support for a later filed claim directed to the genus," Bilstad v. Wakalopulos, 386 F.3d 1116, 1125 (Fed. Cir. 2004) (emphasis omitted). I am unpersuaded by this argument because neither the Original Application's written description nor Morley's affidavit support the view that a person reasonably skilled in the art would have understood when the Original Application was filed that a "display" as claimed in the Original Application and a "customer interface" that is achieved through the use of a customer's electronic device are species of the same genus. Accordingly, the general rule that PowerOasis invokes is inapplicable in this case.

### IV.    CONCLUSION

For the reasons set forth herein, I grant T-Mobile's motion for summary judgment of invalidity (Doc. No. 53).  Because I decide this case on the issue of invalidity, I need not address either PowerOasis's motion for summary judgment of infringement (Doc. No. 54) or T-Mobile's motion for summary judgment of non-infringement (Doc. No. 55).  The clerk is instructed to enter judgment accordingly.

SO ORDERED.


                                    /s/Paul Barbadoro
                                    Paul Barbadoro
                                    United States District Judge

March 30, 2007

cc:  Amr O. Aly, Esq.
     David Bassett, Esq.
     Thomas Donovan, Esq.
     William Lee, Esq.
     Robert Lucic, Esq.
     Gregory Noonan, Esq.
     Sibley Reppert, Esq
     John Rhee, Esq.
     William Schofield, Jr., Esq.
     Benjamin Stern, Esq.