UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12023-RWZ

POWEROASIS, INC. and POWEROASIS NETWORKS, LLC

v.

WAYPORT, INC.

MEMORANDUM OF DECISION AND ORDER

May 10, 2007

ZOBEL, D.J.

I.    **Introduction**

Plaintiffs PowerOasis, Inc. and PowerOasis Networks, LLC (collectively

"PowerOasis" or plaintiffs) are vendors of wireless and wired telecommunications

access systems available in airports and other public spaces.  They hold exclusive

rights to U.S. Patents Number 6,466,658 B2 (the "'658 Patent") and 6,721,400 B2 (the

"'400 Patent") (hereinafter, together with the '658 Patent, referred to as the "Patents")

regarding certain telecommunications inventions.  Defendant Wayport, Inc. ("Wayport"

or defendant) competes with plaintiffs to provide wireless and wired Internet access

services to the public and, according to plaintiffs, delivers these services in a manner

that infringes the Patents.  Plaintiffs therefore filed suit for infringement, and the dispute

has narrowed to claims 15, 18, 31, 35, 38, 40 and 49 of the Patents.  The Patents

contain virtually identical claim language, numbering and specification language.[1]  The

---

[1] In the interest of economy and clarity, references to patent language are cited
only to the '400 Patent.  However, the decision applies to both the '400 Patent and the

court held a <u>Markman</u> hearing,[2] and subsequently issued an order regarding claim

construction on June 26, 2006.  (Docket # 77.)  The parties' cross-motions for summary

judgment are now before me.  For the reasons discussed below, Wayport is entitled to

summary judgment of non-infringement on all asserted claims.

## II.    Factual and Procedural Background

### A.    Plaintiffs' Patented Device

The PowerOasis Patents describe a "vending machine for dispensing

telecommunications access."  ('400 Patent, Abstract.)  The specifications of the two

Patents are virtually identical, although the '400 Patent includes an additional

paragraph that describes examples of several of the invention's elements.  (<u>Id.</u> col.15

ll.15-60.)  Each patent contains 49 claims, a single independent claim followed by 48

dependent claims.  The independent claims are almost identical between the two

patents, with minor differences in the limitations on the first and last element

concerning customer payment.  The dependent claims are identical between the

patents.

The Patents describe several embodiments of the invention analogous to a

public pay telephone, but which provide a customer with access to a wired or wireless

data channel for a fee, as well as access to power such as 120 VAC or battery power.

(<u>Id.</u> col.2 l.39 - col.3 l.65.)  The preferred embodiments describe an interface panel

having a power outlet as well as a telecommunications port, such as a standard RJ-11

---

'658 Patent.

[2] <u>See</u> <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (1995).

jack.  A card reader allows the user to swipe a credit card, while lights, a video display or some other user interface device communicates device status to the customer.  (See id. fig 2, col.6 ll.9-18.)  Figures 5 and 6 of the Patents depict this interface panel in a booth-type arrangement, while figures 10 and 11 illustrate kiosks designed to accommodate four or three of plaintiffs' vending machines respectively.  (Id. col.14 l.62 - col.15 l.5.)  The customer begins a vending transaction by connecting his or her equipment to the power and/or telecommunications connectors on the device and making payment in some form: cash, credit card, prepayment cards or electronic transfer.  (Id. col.6 ll.6-14, 58-64.)  Alternately, the customer may identify him or herself for billing at a later date.  (Id.)  The vending machine then enables the transmission of power and/or data to the customer's equipment.  The transaction ends when the customer disconnects from the power/data connectors.  (Id. col.6 ll.27-39.)  The vending machine retains information on the form of payment and the length of the transaction, which it periodically transmits to a central computer.[3]  (Id. col.6 ll.39-52.) The fee charged is a function of "the length of time that a customer uses the machine . . . ."  (Id. col.6 ll.53- 57.)

The Patents identify as related art conventional parking meters, parking meters which vend electricity for engine block heaters or electric cars, pay phones, pay facsimile machines and pay television sets.  (Id. col.1 l.25 - col.2 l.40.)  Plaintiffs contrast their invention with payphones, which, they note, do not accept credit cards or provide AC power and are limited to telecommunications access using the telephone

---

[3] The central computer is not an element of the described invention.

network only.  (Id.)  Even those pay phones that do accept credit cards, they

emphasize, "still require the central office to process the transaction before the phone

can be used."  (Id.)  Plaintiffs note that compared to the prior art, their invention

provides access to high-speed telecommunications lines and "allows the transaction

regardless of the capabilities of the central office."  (Id. col.3 l.60 - col.4 l.1.)

**B.    Defendant's Internet Access System**

Defendant is an Internet Service Provider ("ISP").  (Statement of Undisputed

Material Facts in Supp. of Pls.' Mot. for Summ. J. of Infringement by Wayport, Inc.

(Docket # 86, hereinafter "Pls.' SOF") ¶ 37.)  It provides its customers access to the

Internet through a system of cables, switches, routers, servers and telecommunications

channels.  (Id. ¶¶ 1-5.)  Wayport maintains a series of hub facilities located in major

U.S. cities.  These hubs are connected to each other and to the Internet through a

leased virtual backbone.  (Id. ¶ 24.)  Each hub connects to the customer's equipment to

provide access to Wayport's network and to the Internet.  Wayport's High-Speed

Internet Access ("HSIA") service competes with plaintiffs' business by providing Internet

access through its network in public and semi-public locations such as airports, hotels,

McDonald's restaurants and Hertz car rental locations.  (Decl. of William A. Scofield, Jr.

[Attorney for Pls.] (Docket # 87, hereinafter "Pls. Decl."), Exs. 3-6.)

A customer connects to Wayport's network either through a wired RJ-45 jack or

using a wireless Access Point.  (Pls.' SOF ¶ 4.)  Customer connections are aggregated

in a series of cables and ethernet switches, with all data traffic funneled to a Network

Management Device ("NMD").  (Id. ¶ 23.)  The NMD is a Wayport configured computer

4

that provides routing, DHCP server, DNS server, WINS server, web server, firewall, and print server services to customers' computers.  (Pls.' Decl., Ex. G, 9; <u>see</u> <u>also</u> App. A.)  It is connected through Wayport's network and backbone to the Internet and to remote billing servers at defendant's Austin, Texas, headquarters.  In a hotel installation, the NMD may also be connected to a local hotel billing system known as the Property Management System ("PMS").  (Pls.' SOF ¶¶ 2-3, 24.)

The NMD initially limits a new user's access to a select set of Internet sites known as the "Walled Garden."  (Pls.' Decl., Ex. H, 8-10.)  If the user attempts to view a site which is not within the Walled Garden, the NMD redirects the user's browser to a Wayport subscription page.  (Pls.' SOF ¶¶ 26-27.)  Wayport offers subscriptions based on a set time period.  (<u>Id.</u> ¶¶ 34-36.)  Users pay a fixed fee to purchase an Internet connection for 24 hours in hotels, until midnight in airports, and for two hours at McDonald's restaurants.  (Pls.' Decl., Exs. 3-6.)  Payment is either by credit card or directly to the user's hotel bill.  (Pls.' SOF ¶ 30.)  Frequent users may purchase prepaid connection cards offering 3, 8 or 20 connections or may purchase an annual or month-long membership.  (<u>Id.</u>)  In each case, once a connection is activated, the NMD allows the user full access to the Internet for the time period of that type of connection, whether the user uses the connection or not.  (<u>Id.</u> ¶¶ 33-34.)  For example, a hotel user could connect to the RJ-45 jack in her room in the morning to check her email, disconnect to take her computer to a meeting, then reconnect in the evening to chat with family, all on a single 24-hour hotel connection fee.  (<u>See</u> Pls.' Decl., Ex. J ¶ 27.)

All NMD's connect to central servers at Wayport headquarters for authorization

of credit card payment and verification of prepaid connection cards and membership subscriptions.  (Pls.' SOF ¶¶ 24, 30-33.)  The central servers communicate back to the NMD to authorize full user Internet access.  (Id. ¶ 33.)  In a hotel installation, the PMS records the user's connection charges on the hotel bill and authorizes the NMD to provide full access.  (Id. ¶ 30.)  The NMD would still need to access the central servers to authorize customers using connection cards or with monthly or annual subscriptions. (See Pls.' Decl., Ex. G, 17.)

### C.    Procedural History

#### 1.    Claim of Infringement

On September 9, 2004, plaintiffs filed a complaint against Wayport alleging infringement of the '400 and '658 patents and seeking damages and attorneys' fees as well as both preliminary and permanent injunctions against further infringement. Defendant responded with a counterclaim for declaratory judgment of noninfringement, invalidity and unenforceability of the claims of the Patents.  Plaintiffs sought judgment on the pleadings pursuant to Rule 12(c) against this counterclaim.  Fed. R. Civ. P. 12(c).  After a hearing, the court denied plaintiffs' motions for a preliminary injunction and for judgment on the pleadings.  At that time I noted that, on "a cursory and partial explication of the patent and defendant's system," it did not appear that "defendant's method of providing access to the internet infringes any claims of plaintiffs' patents." (Docket # 41, 2.)

The parties briefed the court on claim construction and argued their respective positions at a Markman hearing held on February 8, 2006.  The court's Order

Regarding Claim Construction (Docket # 77, hereinafter "Order")[4] was followed by the instant cross-motions for summary judgment.  (Docket ## 79, 84.)

Plaintiffs' memorandum in support of summary judgment compared the court's claim construction with defendant's accused service element-by-element and concluded that each claim limitation is literally present in that service.  (Docket # 85, 7-19.)  Plaintiffs also submitted a declaration by their expert, Richard E. Morley ("Morley"), in support of this analysis in which he listed each element of the asserted claims and described those aspects of Wayport's service which literally met that limitation.  (Docket # 88, 15-26.)

In its memorandum supporting summary judgment of non-infringement, defendant pointed out that infringement can be found in one of two ways: either literally or under the doctrine of equivalents.[5]  But since "PowerOasis has not accused Wayport of infringing under the doctrine of equivalents," defendant did not further address the issue.  (Docket # 90, 8 n.5; accord id. at 20.)  Rather, it argued that, under the court's claim construction, its Internet access service does not literally infringe the Patents because it does not meet numerous limitations of the asserted claims.  (Id. at 9.)

Nevertheless, in plaintiffs' opposition to defendant's motion for summary

---

[4] PowerOasis, Inc. v. Wayport, Inc., 2006 U.S. Dist. LEXIS 42505, 2006 WL 1752322 (D. Mass. June 26, 2006) (unpublished).

[5] Under the doctrine of equivalents, an accused device can be found to infringe a patent even though it does not meet every claim limitation, as long as the differences between the accused device and the invention are "insubstantial."  See, e.g., Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1563-64 (Fed. Cir. 1996).

7

judgment, filed one month later, on August 25, 2006, PowerOasis argued for the first time that the court must deny summary judgment "by reason of genuine issues of material fact as to both literal infringement and infringement under the doctrine of equivalents." (Docket # 98(1), 1 (emphasis added).)  Plaintiffs attached to this opposition a second declaration of their expert Morley, in which he opined that "the Wayport high speed Internet access ("HSIA") system is the same as, or at most insubstantially different from, a 'vending machine' . . . as construed by the Court . . . ." (Docket # 98(2), 1-2 (emphasis added).)  In response, defendant moved to preclude Morley's second declaration (Docket # 105), on the ground that it should have been offered prior to the close of fact and expert discovery.

### 2. The Court's Claim Construction[6]

Both patents contain the following independent claim:

1. A vending machine for vending telecommunications channel access to a customer, said vending machine comprising:

a payment mechanism for [obtaining information from the customer to initiate a vending transaction;][7]

a customer interface for indicating the status of said vending machine;

an electronic circuit for determining when the vending transaction is completed;

a telecommunications channel access circuit adapted to be connected to at least one external telecommunications channel for enabling access to the at

---

[6] Terms previously construed in the court's Order, but not necessary to resolve the instant motions, are not discussed here.

[7] The '658 patent replaces the bracketed text with "receiving payment from the customer;"  ('658 Patent col.15 ll.20-21.)

least one external telecommunications channel at the beginning of a vending transaction and disabling access at the end of the vending transaction;

a telecommunications channel access connector connected to said telecommunications channel access circuit for enabling connection to an external telecommunications device of the customer; and

a control unit having [a device for receiving payment information][8] from the customer and for controlling said electronic circuit and said telecommunications channel access circuit.

('400 Patent, claim 1.)

The court held that the term "vending machine" in the preamble of independent claim 1 limited the claim in that it "establishes the framework of a single vending unit, albeit comprised of multiple components, as opposed to an apparatus composed of multiple vending units."  (Order at 3.)  I rejected plaintiffs' contention that "vending machine" should be construed as a system and method for vending services to multiple users and concluded that the term referred to:

A device for vending telecommunications channel access to a single customer at a time when the customer provides sufficient payment.

(Id. at 7.)

Similarly, I rejected plaintiffs' construction of "payment mechanism" to encompass a method or process and construed the term as:

An arrangement of connected parts for paying money in some form and that is part of the vending machine.

(Id. at 8.)

---

[8] The '658 patent replaces the bracketed text with "a storage device for storing payment information received"  ('658 Patent col.15 ll.37-38.)

I also did not find support in the specification for plaintiffs' argument that a "vending transaction" encompasses multiple access sessions. Because all the embodiments in the specification describe a transaction ending either automatically when the customer disconnects from the telecommunications access connector, after a fixed period of inactivity, or manually by pressing a button, I held that a "vending transaction" was:

> A single open-ended session – not multiple sessions – initiated by payment by the customer and delineated by a turning on and off of access to the telecommunications channel.

(Id. at 11.)

Finally, I resolved the parties' dispute over the term "customer interface" by adopting a construction which describes it functionally, while retaining it conceptually as a component of the claimed device:

> A part of the vending machine for communicating information about the status of the vending machine to the customer.

(Id. at 9.)

III.    **Legal Standard**

A.    **Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is as appropriate in a patent case as in any other as long as there is no genuine issue of

material fact.  See, e.g., Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 835 (Fed. Cir. 1984).  "Broad conclusory statements offered by experts are not evidence and are not sufficient to establish a genuine issue of material fact."  Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1329 (Fed. Cir. 2001).  Where the composition of the accused product is undisputed, "literal infringement collapses into claim construction - a matter of law - amenable to summary judgment."  Desper Products, Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1332-33 (Fed. Cir. 1998).

The parties do not dispute the facts regarding the components, topology and functioning of defendant's service; they do disagree about the analysis of those facts with respect to the construed claims.  (See Wayport's Resp. to Pls. PowerOasis, Inc. and PowerOasis Networks, LLC's Statement of Material Undisputed Facts (Docket # 100).)

## B.    Literal Infringement

Infringement analysis requires a two-step process: first, the construction of the asserted claims to determine their meaning and scope; and second, the comparison of the accused product to the asserted claims.  Desper Products, 157 F.3d at 1332.  Each and every limitation of each asserted claim must be present in the accused device to find literal infringement.  Id. at 1338; Telemac, 247 F.3d at 1330.  "One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim."  Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989) (citations omitted).  Because plaintiffs

bear the burden of establishing infringement at trial, Wayport need only establish that a single limitation of the only independent claim, claim 1, is absent from its HSIA service to defeat PowerOasis' assertion of literal infringement under any of the Patents' claims. See Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1325-1326 (Fed. Cir. 2004).

### C.    Infringement under the Doctrine of Equivalents

Even if the accused device does not contain every limitation in an asserted claim, it may still be found to infringe under the "doctrine of equivalents," as long as the differences between the accused device and the claimed invention are "insubstantial." E.g., Desper Products, 157 F.3d at 1338.  The determination of whether these differences are insubstantial is a question of fact.  See Telemac, 247 F.3d at 1323-24.

I do not reach this issue as plaintiffs' reliance on this theory comes too late.  The only evidentiary support for this theory is their experts' second report, produced after the close of all discovery.  Indeed, the doctrine of equivalents surfaced after plaintiffs' briefing in support of their motion for summary judgment and only in opposition to defendant's summary judgment motion.

## IV.    Discussion - Literal Infringement

Wayport's HSIA service does not literally infringe plaintiffs' Patents because it does not meet multiple limitations required by claim 1 of the Patents, as construed by the court:

A.  Wayport's HSIA system is not a vending unit;

B.  Wayport's HSIA system does not contain a payment mechanism;

C.  Wayport's HSIA system does not contain a customer interface;

D.  Wayport's HSIA system lacks an electronic circuit to determine when a vending transaction is completed; and

E.  Wayport's HSIA system does not contain a control unit meeting the claim limitations.

This result is not surprising, given that the Patents describe the prior art as devices similar to parking meters and payphones, while defendant is an Internet Service Provider providing a communications service analogous to that supplied by a local or cellular telephone company.

### A.    Wayport's Service Is Not a "Vending Machine"

Under the court's construction, the term "vending machine" in the preamble of every one of the Patents' claims establishes the framework of "a single vending unit" for "vending telecommunications channel access to a single customer at a time."  (Order at 3.)  Wayport's HSIA system, however, is a distributed system which accommodates multiple customers simultaneously.  In a hotel installation, for example, a single NMD handles not only all network traffic (i.e. telecommunication channel access) from hotel guests, but can also provide simultaneous general Internet access to the hotel's back office staff.  (See Pls.' Decl., Ex. G, 8-9.)  Similarly, in a retail venue installation, multiple users can connect to one Access Point.  (Id. at 10.)  Thus, at its most basic level of functionality, Wayport's service and equipment are not vending Internet access to a single customer at a time, but rather to all customers in a Hotel, a MacDonald's restaurant, or an airport terminal.

13

To sustain their claim of infringement, plaintiffs attempt to deconstruct this system of distributed equipment in multiple locations serving multiple simultaneous users into the paradigm of their single-user payphone/parking meter-like vending machine.  They describe how individual users connected to a Waypport NMD are assigned a separate and unique number known as an Internet Protocol ("IP") address, in order to differentiate packets of information from each user.  (Docket ## 85, 5; 88 ¶¶ 17-28; see also App. A.)  In addition, packets from different users must be transmitted on a given data channel to the NMD sequentially, each identified by its unique IP address so the NMD can identify the source of the data.  Thus, plaintiffs argue, because each customer "gets an IP address that only that particular customer can use to access the internet," Waypport, "in essence," is providing the customer with "his own separate vending machine."  (Docket # 98(1), 5-6.)

Similarly, in a wireless system, plaintiffs explain that multiple users accessing Waypport's service are either assigned separate radio frequencies or must "take turns" sharing a single frequency.  (Docket ## 85, 5; 88 ¶¶ 15-16.)  They conclude that because only one customer can be served by one frequency, the access point operates like a "vending machine (or machines), with multiple doors."  (Id. ¶ 29.)

Under plaintiffs' theory, if multiple customers access the Internet using separate wires or radio frequencies to connect to a single Waypport NMD, that constitutes separate "vending machines," and if the same customers use a single cable or frequency and the data is sent sequential with identifying information, that too

comprises "separate vending machines."  (See Docket # 85, 5-6).[9]  This argument

requires the conclusion that all communication on the Internet operates "one customer

at a time," since all Internet data packets are tagged with the IP address of their source

for identification and on any given data channel data packets must be sent sequentially

to avoid collision.  Extending plaintiffs' analogy, an interstate highway therefore

provides access to a single car at a time because each car is identified by a unique

license plate number and each car cannot occupy the exact same physical piece of

macadam at any given instant.  This argument renders the court's determination that

the term "vending machine" is limited to ". . . access to a single customer at a time"

meaningless, because under plaintiffs' interpretation, all Internet traffic meets this

limitation.

        Therefore, I do not accept plaintiffs' argument that Wayport's use of standard

Internet hardware and protocols transforms their multi-user system into a "vending

machine" providing access to a single customer at a time.  Rather, Wayport's HSIA

---

[9] For plaintiffs to successfully show infringement by Wayport, the Patents' claims
must be construed to encompass a device consisting of any arrangement of the
claimed elements, no matter where in the country the individual elements are located or
how may simultaneous users use the device.  However, as previously explained in the
court's Order, there is no support in the described prior art, the preferred embodiments
or the specification for the Patent to encompass more than a payphone-like collection
of the claimed elements allowing a single user access to a telecommunications
channel.  (See Order at 5-7.)  Indeed, had plaintiffs attempted to claim, during
prosecution, the system they now argue infringes, their claims would likely have been
anticipated by then existing Internet service providers.  Cf. PowerOasis, Inc. and
PowerOasis Networks LLC v. T-Mobile USA, Inc., No. 05-cv-42-PB, Opinion No. 2007
DNH 042 (D. N.H. Mar. 30, 2007) (holding the same asserted claims of the Patents
invalid due to anticipation under that court's broader construction of the Patents'
claims).

system supports multiple customers simultaneously through a collection of distributed components, and thus fails to meet the necessary limitation of a single-user "vending machine" included in all of plaintiffs' asserted claims.

### B.    Wayport's Service Lacks a "Payment Mechanism"

As construed, claim 1, and thus all of plaintiffs' asserted claims, requires "an arrangement of connected parts for paying money in some form and <u>that is part of the vending machine</u>."[10]  (Order at 8 (emphasis added).)  Plaintiffs assert that Wayport's service provides such a mechanism "of connected parts" in the form of the NMD and the remote Wayport payment servers.  (Docket # 85, 7.)  When the customer initially connects to Wayport's service, the NMD directs the user "to a Wayport server that provides the Wayport Welcome Page."  (<u>Id.</u>; <u>accord</u> Pls.' SOF ¶ 26.)  The customer's payment information is then sent to "the Wayport [payment] server, which verifies payment and approves the transaction."  (Docket # 85, 7.)  Wayport's payment servers are located at Wayport's headquarters in Austin, Texas.  (<u>See</u> Pls.' Decl., Ex. G, 5, 8-9.)  Because the court held that the payment mechanism cannot be located external to the vending machine, Wayport's remote servers meet the claim limitation only if they are included in the "arrangement of connected parts . . . that is part of the vending machine."  (<u>See</u> Order at 7-8.)  **However, as discussed <u>supra</u>, Wayport's servers are part of a distributed system serving multiple customers simultaneously, not** part of a

---

[10] Both the '400 Patent and the '658 Patent include a "payment mechanism" as an element of claim 1, although the limitations on its function in each Patent differ slightly.  This difference in claim 1 between the Patents is not relevant to the court's analysis, since the Wayport system does not include any "payment mechanism" as that term is construed by the court.

stand-alone vending machine.  Therefore, the claim limitation requiring a payment

mechanism <u>within</u> the vending machine is not met.

### C.    Wayport's Service Does Not Contain a "Customer Interface"

As discussed in the courts' Order regarding claim construction, the Patents'

specification is at odds with the claim language that requires the claimed vending

machine to include "a customer interface for indicating the status of the vending

machine to the customer."  ('400 Patent, claim 1.)  This conflict arises because the

specification describes an embodiment in which the "user interface can be present

inside or uploaded to the user's laptop or other device thereby obviating the need for

an interface within the vending machine," while claim 1 requires such an interface as an

element of the invention.  (<u>Id.</u> col.6 ll.20-23.)  I resolved this conflict by construing the

"customer interface" to be "<u>part of the vending machine</u> for communicating information

about the <u>status of the vending machine</u> to the customer." (Order at 9 (emphasis

added).)

Plaintiffs assert that the Wayport Welcome Page, served by a remote Wayport

server and displayed in the customer's Internet browser, provides status information to

the customer and thus meets this limitation.  (<u>See</u> Docket # 88 ¶ 52.)  However, the

information displayed by the Wayport Welcome Page does not indicate "the status of

the vending machine," i.e., the status of Wayport's distributed NMDs, switches, network

and servers – the components plaintiffs allege comprise the infringing "vending

machine."[11]  Rather, the Wayport payment servers indicate the status of the

transaction.  (Pls.' Decl., Ex. E, 23:7-10.)  Because Wayport does not provide the

status of its network to users, it does not meet the customer interface limitation of the

Patents.

In addition, as discussed supra, Wayport's remote servers are not "part of the

vending machine" and thus do not meet that limitation either, even if the information

displayed did conform with this element's requirement.

### D.    Wayport's Service Has No "Electronic Circuit for Determining When the Vending Transaction Is Completed"

The Patents describe a vending machine dispensing telecommunications access

that operates similarly to a pay telephone.  Like a payphone, "[a] vending transaction

starts when a customer provides payment" and connects to the power or

telecommunications connector (i.e., provides payment and picks up the handset).  ('400

Patent col.6 ll.1-4.)  "The transaction ends when the customer disconnects from the

[connectors]" (i.e., hangs up the receiver).  (Id. col.6 ll.22-24.)  Like an old-fashioned

long-distance telephone call, "[t]he fee charged for the transaction is a function of . . .

the length of the time the customer uses the machine."  (Id. col.6 ll.47-50.)  Other

embodiments describe a transaction ending when a customer presses a push-button

---

[11] For example, the '400 Patent specification describes several embodiments of the invention that include lights to indicate that the vending machine is "READY" and/or "AVAILABLE."  (See '400 patent, figs. 2, 8; col.8 l.53 - col.9 l.19.)  While it makes sense to indicate to a potential user that a single-user telecommunications access device is available for use, there is no similar need in a multi-user Internet access service to indicate availability, since new users can access the service without waiting for a previous user to complete their session.

(<u>id.</u> col.9 ll.18-21) or when "the customer has stopped using both power and the telecommunications channel for six seconds." (<u>Id.</u> col.14 ll.20-26.) In each case, the specification describes a vending transaction as including a single session in which <u>the customer is charged for the actual amount of time used</u>. Therefore, the court construed a "vending transaction" as "[a] single open-ended session – not multiple sessions – initiated by payment by the customer and delineated by a turning on and off of the telecommunications channel." (Order at 11.) Because the length of the transaction, and thus its cost, is defined by the length of time the customer is actually using telecommunications access, the claimed invention necessarily requires a circuit to detect when the telecommunications session is complete to properly bill for usage. ('400 Patent, claim 1.)

Wayport's HSIA service, unlike the claimed invention, does not charge the customer based on the period of time the vended utility is accessed. Rather, Wayport sells Internet access subscriptions for a fixed unit of time such as two hours, until midnight, twenty-four hours, one month or one year. (Docket # 93, 9.) Once a Wayport user pays for a subscription, he or she has full Internet access for the entire subscription period.[12] Users pay the same fee whether they use the service

---

[12] Plaintiffs' memorandum claims that under Wayport's "pay-as-you-go" connection option, the vending transaction ends when the NMD receives a log off or disconnect signal initiated by the user's actions. (Docket # 85, 11.) However, there is no evidence to support this assertion other than the declaration of plaintiffs' expert in his claim analysis, which itself is in conflict with his factual declaration. (<u>Compare</u> Docket # 88 ¶ 53, <u>with</u> id. ¶ 44.) Indeed, plaintiffs' own statement of undisputed facts states: "Wayport uses the term 'pay-as-you-go' to refer to a 'short-term subscription' that could be from 2 to 24 hours, or as long as 180 days. (Keeler Dep. Tr., pp 23-25; Morley Decl. ¶ 43.)" (Pls.' SOF ¶ 35.) I decline to accept plaintiffs' expert's

continuously over that period or not at all.  (Id.)  Nor is the user limited to a single

session, Wayport customers may connect their equipment to the network as many

times as they choose during the subscription period.  (See Keeler Dep. 117:2-9, 20,

Oct. 20, 2004 (Pls.' Decl., Ex. E); Pls.' Decl., Ex. J ¶ 27.)

       Because Wayport provides access to the full Internet for a set period of time, it

does not need to include electronic circuitry which detects when its users have

disconnected their equipment from the access point or the RJ-45 jack, or that a user

"has stopped using . . . the telecommunications channel for six seconds."  ('400 Patent

col.14 ll.20-26.)  Nor is it necessary for a Wayport user to press a button or otherwise

indicate that he or she is no longer using the telecommunications channel. Plaintiffs

attempt to sidestep this problem by redefining Wayport's subscription period as "a

session," thus asserting that the software in the NMD that restricts a user's access only

to the Walled Garden at the end of a subscription period is "an electronic device" that

terminates a single session.  (Docket # 85, 10.)  This attempt fails because both the

Patents' specification and this court's Order describe a vending session as terminated

_____

contradictory assertion in the face of overwhelming evidence to the contrary.  See
Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001)
(stating that the court need only draw "reasonable inferences from the evidence in favor
of the non-movant") (emphasis added); see also (Keeler Dep. 23:14-25:19, 20:18-
30:12, 59:6-9, 88:9-89:7, Oct. 20, 2004 (Pls.' Decl., Ex. E) (describing the termination
of access for the pay-as-you-go method as dependent solely on the period of time that
the customer has purchased); Duff Aff. ¶¶ 9, 15-16, 27-28, Sep. 10, 2004 (Pls.' Decl.,
Ex. J) (description by Power Oasis, Inc.'s president of the Wayport Pricing Chart and
his personal experience using Wayport's system in a hotel – both of which offered fixed
time subscriptions only); Pls.' Decl., Ex. 6 (Wayport Pricing Chart offering only time
based subscriptions); Joransen Aff. ¶¶ 10, 16, Sep. 10, 2004 (Pls.' Decl., Ex. K)
(description by Chairman of Power Oasis, Inc. of his personal experience purchasing
fixed time subscriptions in airports using Wayport's system)).

by the action of the user in either disconnecting from the device, ceasing use of the telecommunications channel, or pressing a push-button to terminate the session (and thus billing as well).[13]  Wayport's system does not include an "electronic circuit for determining when the vending transaction is completed," because it does need to know if the user is connected or accessing the telecommunications channel in order to determine proper billing.  Therefore, Wayport's system does not infringe this element of claim 1 of the Patents.

### E.    Wayport's Service Does Not Contain a "Control Unit" Meeting the Claim Limitations

Finally, claim 1 requires a "control unit having [a device for receiving payment information][14] from the customer <u>and</u> for controlling said electronic circuit and said telecommunications channel access circuit."  ('400 Patent, claim 1 (emphasis added).)  Plaintiffs argue that this element is satisfied by Wayport's NMD because it alters the firewall rules to allow the customer access beyond the Walled Garden and because it "receives the payment information . . . submitted by the customer via screens in the [sic] displayed in their web browser, and forwards that information to a Wayport server for verification."  (Docket # 85, 12-13.)  This argument, however, improperly allocates payment functions to the NMD that are actually performed elsewhere.  During the period the customer is making payment, the NMD functions as a router to connect the

---

[13] <u>See</u> Order at 11 ("[T]he embodiments clarify the prior specification language that defines the end of a transaction as occurring either when the customer disconnects or 'otherwise indicates' that the customer is finished.).

[14] The '658 patent replaces this bracketed text with "a storage device for storing payment information received"  ('658 Patent col.15 ll.37-38.)

customer's browser to Wayport's remote payment servers.  (See Pls.' SOF ¶ 26 ("The

NMD intercepts this request [to access an Internet site] and redirects it to a Wayport

server.").)  The payment screens displayed in the customer's browser are generated

remotely by these servers, not by the NMD.  (Id. ¶¶ 27, 29-31.)  Thus, the NMD does

not receive payment information from the customer; the information is received by the

remote payment servers which process the transaction.[15]  (Id.)

Once payment has been made and verified, the remote "credit card server

transmits a start signal to the NMD."  (Pls.' SOF ¶ 33.)  The NMD also receives the end

time for the connection so it can terminate access when the subscription period ends.

(Id.)  Thus, unlike the claimed control unit element that stores customer payment

information, the NMD receives an end time from the payment servers telling it when to

restore the limited access rules.  (Cf. '400 Patent, col.6 ll.47-52. ("[T]he control unit . . .

---

[15] To the extent plaintiffs imply that the NMD "receives the payment information"
and thus meets the limitations for the control unit element of claim 1 because it
forwards packets of data to the remote servers, their argument fails because it
unacceptably broadens the term "receives" and is at odds with the description of the
control unit in the specification.  (See '400 Patent, col.10 ll.8-10 ("[T]he central control
unit is autonomous and controls the operation of the vending machine completely."); id.
col.11 ll.24-26 (In another version [of the vending machine], the central control unit
must contact a central computer for approval before allowing the transaction to begin.")
(emphasis added); see also id. col.3 l.67 - col.4. l.1. ("This invention allows the [credit
card] transaction regardless of the capabilities of the central office.").)  Wayport's
payment servers, however, are not some peripheral item that merely provide
"verification" to the NMD "control unit" as plaintiffs suggest.  (See Docket # 85, 12-13.)
They are the method of payment for Wayport's service.  They create and serve the
payment web pages, receive and store user payment information, verify credit card and
coupon data and notify the NMD of the subscription period to allow the user time-
limited Internet access.  Without them the service would not function.  In addition, in a
hotel installation, the customer payment information is received and stored in the PMS,
a system which is not even part of Wayport's network.

call[s] . . . the central computer and then transfers all transaction and payment information in retained memory to the central computer.").)  Because the NMD does not receive payment information from the customer or include a storage device to store the payment information received, it does not meet the limitation for the control unit in claim 1 of either patent.

In addition, the NMD cannot meet the limitation requiring it to "control[] said electronic circuit [for determining when the vending transaction is completed]," because, as discussed supra, Wayport's system does not contain or need such a circuit.

## V.    Conclusion

Based on the court's claim construction, most of the elements of claim 1 of each patent do not read on Wayport's HSIA service.  Because defendant does not literally infringe the independent claims of the '400 and '658 patents, it cannot literally infringe any of the asserted dependent claims, all of which depend on claim 1.

Plaintiffs failed to provide timely disclosure concerning their theory of infringement under the doctrine of equivalents.  Therefore, defendant's motion to preclude the second declaration of Richard E. Morley (Docket # 105) is ALLOWED as to those declarations not previously disclosed alleging that Wayport's HSIA system is insubstantially different from the claimed "vending machine."

Accordingly, defendant's motion for summary judgment of non-infringement on all claims (Docket # 79) is ALLOWED.  Plaintiffs' motion for summary judgment of infringement (Docket # 84) is DENIED.

Judgment may be entered for Wayport on the complaint and on its cross-claim on the ground that it does not infringe any of the claims asserted.


_____May 10, 2007_____          _____/s/Rya W. Zobel_____
            DATE                              RYA W. ZOBEL
                                    UNITED STATES DISTRICT JUDGE

## Appendix A - Background Technical Information

The court relied on the following background technical information in considering the parties' arguments. This information is based on the parties' technical and expert submissions and on relevant Internet standards.

### A.    Computer Networking

A computer network is the connection of two or more computers for the purpose of communicating and sharing resources. For example, several computers could be connected together to share an expensive peripheral such as a color printer. Alternately, several computers could communicate to share and update information in a common database or to exchange electronic mail. The ability of disparate computers to communicate with one another is based on a set of protocols which define a common scheme by which data is to be exchanged. One of these protocols, the ethernet protocol, defines how network information is electrically transmitted over a set of wires. (See Docket # 88, Ex. B.) This protocol is typically used to connect computers in a local area network. (Id.) Other protocols define the format of data sent from one computer to another. For example, if data is to be transmitted sequentially, one bit at a time, the protocol might specify that the most significant bit should be transmitted first. Higher level protocols define the process for transferring specific information between computers. For example, the Simple Mail Transport Protocol ("SMTP") defines how email is sent to a mail server from a email client program or another mail server. See

Network Working Group, RFC2821 Simple Mail Transfer Protocol (J. Klensin ed., 2001) at http://rfc.net/rfc2821.html.

### B.    The Internet

The Internet is a world-wide system of heterogeneous, interconnected computer networks, enabling any computer connected to the Internet potentially to exchange data with any other computer on the Internet.  One of the lower-level protocols necessary to allow the Internet to operate, Internet Protocol ("IP"), defines how a packet of data to be sent from a source computer to an Internet destination is assembled.  The packet contains a destination IP address so routers comprising the public Internet know where to forward the packet.  In addition, the packet contains the IP address of its source so the destination computer knows where to send any response.  See generally Jeff Tyson, How Internet Infrastructure Works, at http://computer.howstuffworks.com/internet-infrastructure.htm (last visited April 3, 2007); see also Defense Advanced Research Projects Agency, RFC0791 - Internet Protocol (J. Postel ed., 1981) at http://rfc.net/rfc0791.html (documenting the official specification of the IP protocol).

### C.    Functions of Wayport's NMD

Wayport's NMD incorporates a number of functions useful to the local network it services.  A DHCP server assigns an IP address to a user's computer that allows it to be uniquely identified on the network segment it is connected to.  A DNS server translates textual Internet names such as "uscourts.gov" to the numeric values

26

necessary to route IP traffic to the correct destination.  A WINS server is a specialized name translator for Microsoft's networking protocol.  A router examines the destination IP address of network traffic and forwards it to its destination or to another router closer to that destination.  A web server provides web pages to be viewed by the user's web browser.  A firewall limits network traffic based on its source, destination and/or protocol (i.e., whether it is a web page, email, etc.) either to restrict the user's Internet access privileges or to protect the local network from malicious users or from unwanted data and programs.  A print server allows a user to print to a shared printer connected to the network, rather than directly to the user's computer.